## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**WALLBUILDER PRESENTATIONS,**
426 Circle Drive
Aledo, TX 76008,

        Plaintiff,

    v.

**RANDY CLARKE, in his official capacity
as General Manager and Chief Executive
Officer of the Washington Metropolitan
Area Transit Authority,**
600 Fifth Street, NW
Washington, DC 20001,

        Defendant.

Case No. _____

## COMPLAINT (FOR DECLARATORY AND INJUNCTIVE RELIEF)

Plaintiff WallBuilder Presentations ("WallBuilders") brings this Complaint against Defendant Randy Clarke, in his official capacity as the General Manager and Chief Executive Officer of Washington Metropolitan Transit Authority ("WMATA"), to declare unlawful and enjoin specific WMATA advertising guidelines (Nos. 9 and 12) and its application of those guidelines to reject certain bus advertisements proposed by WallBuilders. The WMATA advertising guidelines challenged here, both on their face and as applied to WallBuilders' advertisements, violate the First Amendment. In support of its Complaint, WallBuilders alleges as follows:

## INTRODUCTION

1.      Plaintiff WallBuilders sought to advertise on the side of WMATA Metrobuses to promote its religious and educational mission, which is to inform the public about the role that the Founders' religious faith played in the creation of the nation and the drafting of the Constitution. WMATA rejected the ads because they related to issues on which there are varying public opinions.   Though WMATA never identified the specific issue of public controversy that it believed the proposed advertisements addressed, it is apparent that WallBuilders was prohibited from advertising because its proposed ads sought to address issues of public importance from a religious viewpoint.   WallBuilders brings this action to remedy WMATA's violation of its constitutional rights.

2.      In the summer of 2023, WallBuilders sought to launch an advertising campaign in the National Capital region to publicize its organization and its mission and to educate the public on the role of faith in the founding of our nation.   In an effort to reach a broad swath of the metropolitan population, WallBuilders sought access to a widely available advertising platform—the exterior of WMATA's buses—to convey messages in connection with its educational mission. WallBuilders sought to publicize its organization and its mission by inviting viewers to visit its newly updated website, through which viewers may learn more about the role of faith and Christianity in the founding of the United States.

3.      The proposed advertisements took several forms—including 1) a depiction of the well-known Henry Brueckner image of George Washington kneeling in prayer at Valley Forge with the simple question "CHRISTIAN?" superimposed in large font and an invitation (in smaller font) to visit WallBuilders.com "TO FIND OUT ABOUT THE FAITH OF OUR FOUNDERS," 2) an alternate version that merely included the website address (without the question or the

reference to "Faith of Our Founders"); 3) a similar advertisement that depicted a well-known painting of the signing the U.S. Constitution, with an identical tagline, "CHRISTIAN?  TO FIND OUT ABOUT THE FAITH OF OUR FOUNDERS, VISIT WALLBUILDERS.COM," and finally, 4) the identical image of the signing of the Constitution, this time without the question or the reference to "Faith of Our Founders," instead merely directing the viewers to WallBuilders' website.

4.     The advertisements, individually and as a whole, invite viewers to visit WallBuilders' website to access the organization's resources about the critical role that religious faith played in our nation's history.  The first set of advertisements explicitly informed viewers that by visiting WallBuilders' website they could learn whether George Washington and other Founders were Christian.  The second set of advertisements removed the explicit reference to Christianity and simply invited viewers to visit WallBuilders' website without any description of what they might find there.

5.     WMATA rejected each of the proposed advertisements, refusing to allow WallBuilders to purchase advertising space to promote its educational and religious mission. WMATA relied on its "Guidelines Governing Commercial Advertising" ("Advertising Guidelines" or "Guidelines") for its decisions rejecting the religiously themed ads.  Specifically, WMATA cited as the basis for its rejection Guideline 9, which prohibits advertising "intended to influence members of the public regarding an issue on which there are varying opinions."

6.     Even absent WMATA's reliance on Guideline 9, WallBuilders' proposed advertisement would, on information and belief, have run afoul of WMATA Guideline 12, which provides that "[a]dvertisements that promote or oppose any religion, religious practice or belief are prohibited."  WMATA did not expressly invoke Guideline 12 here; it avoided doing so by

3

concluding that Guideline 9 prohibited the advertisements.   Nonetheless, Guideline 12's prohibition of religious advertisements discriminates against WallBuilders' viewpoint regarding the religious foundations of our nation, as well as WallBuilders' religious organizational mission.

7.   This lawsuit challenges WMATA's Guidelines 9 and 12, both on their face and as applied to WallBuilders.

8.   First, Guideline 9's "issue" advertising ban, applied by WMATA to prohibit the advertisements, violates the First Amendment in a number of ways.   It is unconstitutionally vague, announces an unworkable standard that grants unfettered discretion to the decisionmakers, and, consequently, unlawfully discriminates against WallBuilders' religious viewpoint.   While it rejected WallBuilders' advertisements, WMATA permits a wide array of advertising relating to issues involving "varying opinions" on its public buses and other advertising venues subject to its Advertising Guidelines.   WMATA also permits advertisements for other mission-oriented organizations, even advertisements that relate to the faith-based missions of other organizations.

9.   Second, Guideline 12's ban on religious advertising also infringes WallBuilders' right to speak on otherwise permissible topics because of the religious viewpoint WallBuilders seeks to express in its advertisements.   By refusing to accept advertisements that "promote or oppose any religion, religious practice or belief," Guideline 12 necessarily results in discrimination against religious viewpoints on a range of otherwise permissible topics.

10.   The First Amendment prevents the government from restricting speech on the unreasonable, arbitrary, and viewpoint-discriminatory grounds espoused by WMATA.   For these reasons, and those additional reasons explained herein, WMATA's Advertising Guidelines 9 and 12 should be invalidated on their face and as applied to WallBuilders, and the Court should enjoin

WMATA from continuing to reject WallBuilders' advertisements relating to its website and mission on public buses.

## JURISDICTION AND VENUE

11.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this case presents substantial federal questions concerning a deprivation of constitutional rights, (*see* 42 U.S.C. § 1983), as WallBuilders challenges a deprivation of constitutional rights committed under color of state or District of Columbia law.

12.     This Court also has jurisdiction over this action under Section 81 of the Washington Metropolitan Area Transit Regulation Compact, which provides that the U.S. District Courts shall have original jurisdiction over all actions brought by or against WMATA.  D.C. Code § 9-1107.01, ¶ 81.

13.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b), as this is the district in which substantial events giving rise to the complaint occurred and in which WMATA is located and which Defendant's principal place of business exists.

## PARTIES

14.     Plaintiff WallBuilders is a 501(c)(3) non-profit organization in Aledo, Texas, dedicated to presenting America's forgotten history and heroes, with an emphasis on the moral, religious, and constitutional foundation on which America was built.  WallBuilders takes its name from the Old Testament of the Bible, specifically the book of Nehemiah.  Just as the prophet Nehemiah led a movement to rebuild the walls of ancient Jerusalem, restoring its strength and honor, so too WallBuilders is motivated to energize Americans across the country to understand their history and the important role religion played in the founding of our nation.

15.     WallBuilders describes its mission as follows: "WallBuilders' goal is to exert a direct and positive influence in government, education, and the family by (1) educating the nation concerning the Godly foundation of our country; (2) providing information to federal, state, and local officials as they develop public policies which reflect Biblical values; and (3) encouraging Christians to be involved in the civic arena." *See* About Us, WallBuilders.com/about-us.  To that end, WallBuilders engages in a variety of campaigns—including advertising campaigns—to educate the public on the role that the Founders' Christian faith played in the creation of the nation and the drafting of the Constitution.

16.     Defendant Randy Clarke is the General Manager and Chief Executive Officer of WMATA, a government entity created by an interstate compact between Maryland, Virginia, and the District of Columbia.  The General Manager is WMATA's chief administrative officer and, subject to policy direction by the WMATA Board of Directors, is responsible for all WMATA activities.  Clarke has served in the position since July 2022.  With respect to all actions by WMATA alleged in this complaint, Clarke acted in his official capacity and therefore acted under color of law as an officer of WMATA.

17.     WMATA operates one of the nation's largest metropolitan heavy rail and bus transit systems, connecting the District of Columbia with counties in northern Virginia and suburban Maryland.  It has an annual budget of nearly five billion dollars.  The headquarters of WMATA are located in the District of Columbia.  The sale of advertising represents a significant part of WMATA's annual operating revenue.

## FACTUAL ALLEGATIONS

### I.     WMATA'S ADVERTISING GUIDELINES

18.     WMATA leases a variety of advertising spaces, including in and on its buses, in subway cars, and in subway stations.

19.     WMATA's advertising practices are governed by its "Guidelines Governing Commercial Advertising."  *See* Exhibit A.

20.     The leasing of WMATA's advertising space is administered by Outfront Media, Inc. ("Outfront Media"), but implementation and interpretation of WMATA's Advertising Guidelines are the responsibility of WMATA.  Prospective advertisements are submitted to Outfront Media, which forwards the advertisement to and/or consults with WMATA.  WMATA makes the ultimate decision as to whether the advertisement is accepted or denied on the basis of the Guidelines.  Outfront Media then conveys that decision to the applicant.

21.     WMATA will reject a proposed advertisement if it is prohibited by any one of its Guidelines.

22.     Prior to the Spring of 2015, WMATA permitted various types of "issue-oriented advertising."  But in May 2015, WMATA's Board of Directors approved a resolution that purported to temporarily close WMATA's advertising spaces to political, issue advocacy, and religious advertising.

23.     In November 2015, WMATA's Board of Directors approved a resolution extending the ban on issue-oriented advertising indefinitely.  WMATA justified this ban based on concerns that issue-oriented advertising could "provoke community discord," "create concern about discriminatory statements," and lead to "potential threats to safety and security from those who seek to oppose the ad messages."  WMATA Fin. & Admin. Comm., Advertising and Retail Policy Review 6 (Nov. 5, 2015), https://tinyurl.com/3ka2dbre.

24.     The 2015 amendment to WMATA's Guidelines still governs WMATA's advertising practices.  Two of these Guidelines are relevant to this lawsuit.

25.     First, Commercial Advertising Guideline 9 prohibits "[a]dvertisements intended to influence members of the public regarding an issue on which there are varying opinions."

26.     Second, Commercial Advertising Guideline 12 prohibits "[a]dvertisements that promote or oppose any religion, religious practice or belief."

27.     WMATA has not set out any formal regulations to direct the implementation or interpretation of these Guidelines.  Nor is there any further published advertiser guidance about what speech is forbidden under the Guidelines.  When asked by WallBuilders for further guidance with respect to its denial of WallBuilders' ad, WMATA offered no response.

28.     Enforcement of the Guidelines is left entirely to the discretion of WMATA and its General Manager on a case-by-case basis.

## II.   WALLBUILDERS' ADVERTISING CAMPAIGN

29.     WallBuilders is a Christian organization dedicated to restoring the moral, religious, and constitutional foundations upon which America was built.  It has declared its primary mission as "educating the nation concerning the Godly foundation of our country."  To that end, WallBuilders develops "materials to educate the public concerning the periods in our country's history when its laws and policies were firmly rooted in Biblical principles."  *See generally* About Us, WallBuilders.com/about-us.

30.     The founders of WallBuilders created the organization after prayer and study of the Biblical books of Jeremiah and Nehemiah, as a result of what they believe is a calling from God.  WallBuilders' goal is to educate the public "on the moral, religious, and constitutional foundation on which America was built."  WallBuilders' Christian faith animates its mission and is the impetus behind its efforts to teach about both history and God's role in it.  This faith compels WallBuilders to share information about the role that religion and, specifically, Biblical values should play in current politics and public policy.

31.     WallBuilders' website, WallBuilders.com, is the gateway to its religious and educational offerings, providing an online library of resources consistent with its goal, videos discussing America's religious heritage, podcasts offering unique insights from historians and religious leaders, pages of free articles about America's religious history, quotations from historical figures demonstrating their religious commitment, links to request speakers, and even a store to purchase its products.   WallBuilders.com is critical to WallBuilders' religious and educational mission as a place where the organization can share its views about the role of the faith of the Founders, the impact of religion on the founding, and especially the role of Christianity in the drafting of the Constitution.

32.     During the winter of 2022, WallBuilders undertook a rebranding and website relaunch effort, with a launch date of June 1, 2023.

33.     WallBuilders designed advertisements relating to its mission, which it hoped to run beginning in August 2023 to coincide with its rebranding and website relaunch.   WallBuilders targeted these advertisements to key demographics in the Nation's Capital to promote its organization, mission, and new website.   WallBuilders targeted Washington, D.C. because of the District's unique target audience.   Unlike virtually anywhere else in the country, in the Washington, D.C. metro area, WallBuilders could reach people who work in national policy, politics, and law, as well as residents and tourists interested in American history and civic traditions.   WallBuilders believes this target audience would efficiently spread the word about the organization's mission and share the religious and educational resources available through its website.

34.     To launch this campaign, WallBuilders created two advertisements for display on the exterior of public buses and on social media.   Each advertisement features a famous painting

relating to the nation's founding.   The first depicted a famous image of George Washington kneeling in prayer at Valley Forge (from the original painting by Henry Brueckner, a copy of which, as engraved by John C. McRae, is currently housed in the Library of Congress).   The second depicted Howard Chandler Christy's 1940 painting of the signing of the U.S. Constitution, which hangs in the East Stairway of the U.S. Capitol building near the chamber of the U.S. House of Representatives.

35.     Each advertisement also prominently stated, "CHRISTIAN?   TO FIND OUT ABOUT THE FAITH OF OUR FOUNDERS, GO TO WALLBUILDERS.COM."   Each advertisement included WallBuilders' logo in the top left corner and a QR code in the bottom right corner that, when scanned, takes the viewer to a specific page of WallBuilders' newly redesigned website housing the answer to the question posed in the advertisement, supported by dozens of quotations drawn from primary resources.

36.     These initial ads submitted by WallBuilders to WMATA appear as follows:





37.     These advertisements are important to the success of WallBuilders' rebranding and relaunch.  While WallBuilders does have access to other channels for spreading its message, no other medium will be as effective at reaching WallBuilders' target audience as advertising with WMATA, on the outside of public buses throughout the Washington, D.C. metropolitan area or at WMATA rail stations.  Bus advertising is unique in that it is non-stationary and thus provides high visibility along with consistent daily views by drivers, pedestrians, and other passersby.  WMATA's buses travel to many areas of the National Capital region and are able to reach a great number of viewers.  According to WMATA's website, "[e]xterior bus advertising penetrates 90% of the daily population and makes multiple impressions all over the region, throughout business districts, residential areas, and tourist attractions."  *See* WMATA, Advertising Opportunities, https://www.wmata.com/business/advertising/index.cfm.  WMATA rail stations similarly serve thousands of rail customers daily, providing an opportunity for mass exposure to WallBuilders' advertisements.

### III.    WMATA's Rejection of WallBuilders' Advertisements

38.    In the Spring of 2023, WallBuilders asked to purchase space from WMATA to run the advertisements described in Paragraphs 34-36 on the exterior of WMATA buses.  On May 10, 2023, Kristina Smith, the Marketing and Project Coordinator at WallBuilders, sent an email to Aaron Bronson, General Manager of Outfront Media, to inquire about the WMATA advertising space.  Smith explained WallBuilders' mission and that it was seeking to place advertisements on the outside of Metrobuses beginning in August 2023 as part of its website rebranding and relaunching effort.

39.    After receiving no response, Ms. Smith re-sent her May 10 email to Mr. Bronson on May 30, 2023.  Mr. Bronson replied later that afternoon, copying Outfront account executive Audrey Kaiser, and explaining that Ms. Kaiser would follow up with additional information.

40.    On a telephone call on June 1, 2023, Ms. Kaiser told WallBuilders that WMATA quickly reviews advertisements and would respond with acceptance or citing the number of the Guidelines it violated as reason to reject it.  She specifically mentioned that religious advertisements are prohibited but that she was willing to review them.

41.    Following the call, WallBuilders formally submitted the advertisements described in Paragraphs 34-36.

42.    On June 12, 2023, Kaiser emailed Smith, conveying that WMATA had denied the ads.  WMATA's response stated, "The ad review panel has determined that the two attached proposed advertisements are both prohibited by Commercial Advertising Guideline 9," which bars advertisements "intended to influence members of the public regarding an issue on which there are varying opinions."

43.    On June 28, 2023, WallBuilders, through counsel, sent a letter to WMATA requesting clarification regarding its denial of WallBuilders' ads under Guideline 9.  The letter

indicated that Guideline 9 appeared to be vague and had the effect of excluding all religious speech from being advertised on the exterior of WMATA buses.  WallBuilders requested a response by July 19, 2023.

44.     WMATA never responded to WallBuilders' request for clarification regarding Guideline 9.

45.     WallBuilders then went back to the drawing board, without the benefit of further guidance from Outfront Media or WMATA, in an effort to satisfy WMATA's vague Guidelines.  On September 6, 2023, WallBuilders submitted a redesigned advertisement to Outfront Media for display on the exterior of WMATA buses.  The redesigned advertisement featured the same painting of George Washington as one of the prior ads and includes WallBuilders' logo on the top left-hand corner.  But it deleted the text in the original advertisement and instead merely included "VISIT WALLBUILDERS.COM" and a QR code that, when the viewer scans using a smart phone, took the viewer to a page on WallBuilders' website, which includes famous quotations from the Founders on the role of religion and faith in the founding of the United States.  The redesigned advertisement is reproduced below:



46.     On September 8, 2023, WMATA rejected WallBuilders' revised advertisement under Guideline 9.  WMATA provided no further information to explain why the advertisement failed to satisfy Guideline 9.  It did not identify the "issue on which there are varying opinions" that caused it to reject the advertisement.

47.     Still hoping to reach Metro consumers, on September 21, 2023, WallBuilders next submitted a modified version of the advertisement featuring the image of the signing of the U.S. Constitution, which removed the "Christian?" banner and, instead, like the modified George Washington at Valley Forge advertisement, merely included WallBuilders' website address and corresponding QR code.  The proposed advertisement is reproduced here:



48.     In a call with WallBuilders staff shortly after submitting this advertisement, Outfront Media explained that they suspected WMATA would still have a problem with the ad because of the website and suggested that if WallBuilders removed the website and resubmitted, it might pass muster.  WallBuilders nevertheless requested consideration of the ad as submitted.

49.     On September 22, 2023, Outfront Media informed WallBuilders that the revised ad, which merely depicted the signing of the U.S. Constitution and WallBuilders' website address and corresponding QR code, had been rejected as an impermissible advertisement "intended to

influence members of the public regarding an issue on which there are varying opinions" under Guideline 9.   WMATA provided no further explanation of the "issue" that caused the advertisement to be rejected.

## IV.   WMATA's Arbitrary Enforcement and Practices

50.   WMATA, acting through its General Manager, Defendant Clarke, applies its Advertising Guidelines in an arbitrary, inconsistent, and unreasonable manner.   That is not surprising because the Guidelines themselves are incapable of reasoned application.   In light of their vague standards, the Guidelines effectively vest unfettered discretion in WMATA and its General Manager to determine which speech is permissible and which is not, resulting in arbitrary and discriminatory application of WMATA's Guidelines.

51.   Although WMATA Guideline 9 prohibits "[a]dvertisements intended to influence members of the public regarding an issue on which there are varying opinions," WMATA continues to permit advertisements on a variety of controversial issues on which members of the public have varying opinions, including allowing a number of advertisements that criticize or promote religious practices and belief.

52.   Thus, despite prohibiting WallBuilders' religious-themed advertisements, WMATA, in 2017, ran bus-side advertisements for the musical, *The Book of Mormon*, then running at the Kennedy Center, on the exterior of its buses.   *The Book of Mormon* is a well-known Broadway musical, which rather sharply lampoons religious practices and, in particular, the practices of the Church of Jesus Christ of the Latter-Day Saints (LDS).   David Brooks has described the "central theme of 'The Book of Mormon'" as "that many religious stories are silly— the idea that God would plant golden plates in upstate New York.   Many religious doctrines are rigid and out of touch."   *See* David Brooks, "Creed or Chaos," *N.Y. Times* (Apr. 21, 2011), https://www.nytimes.com/2011/04/22/opinion/22brooks.html.   *The Book of Mormon* musical has

been blasted by some critics as blasphemous.  To take one example, it includes a song titled "Hasa Diga Eebowai," a nonsense phrase (meant to parody Disney's *The Lion King*'s "Hakuna Matata"), which according to the lyrics, is supposed to mean "F*** you, God."  The complete lyrics of that song, which express even more explicit and vulgar anti-religious views, are available here: *See* Hasa Diga Ebowai, https://tinyurl.com/mutkkvpb.

53.     WMATA apparently did not review the content of the musical in approving the "Book of Mormon" advertisement.  But it did not need to know of its religious content, as the bus advertisement itself parodied the religious practice of LDS missionaries, substituting a doorbell for one of the "O's" in "Mormon."  The photo in the advertisement is of a Mormon missionary with the Book of Mormon tucked by his side, wearing black pants, a white shirt and plain tie, and a name tag.  An image of the advertisement, posted to social media by the company that produced the bus wrap in 2017, is reproduced below.



54.     WMATA's arbitrary application of its vague Guidelines is further illustrated by its approval of other religious-themed advertisements on its buses.   In 2023, WMATA permitted advertisements for The Catholic University of America, a pontifical university of the Roman Catholic Church, which included the tagline "Every story is a journey of the spirit."   The advertisement included a link to the university's website, catholic.edu.   At that website, viewers can learn about the university's "faith-filled community," daily masses offered on campus, and the university's "first principle" that "[t]he teaching of the University should be faithfully Catholic, conformed in all things to the creed of the Church and the decisions of the Holy See."   The advertisement is reproduced below.



55.     Lest there be any doubt about the religious nature of that message, the Catholic University advertisement also featured, in two places, the university's logo and motto, "Deus Lux Mea Est," a Latin phrase which translates to "God is my light" (reproduced below).



56.     WMATA also has run advertisements on the exterior of its buses for the JxJ DC Jewish Film and Music Festival sponsored by Edlavitch D.C. Jewish Community Center ("DCJCC") and described on its website as "an international exhibition of cinema that celebrates the diversity of Jewish history, culture and experience through the moving image."   The advertisement (reproduced below) included a link to the organization's website, which describes how the festival seeks to promote and celebrate Jewish history and culture.



57.     Similarly, in November 2023, WMATA ran advertising on the back of its buses for the Edlavitch DJCCC's "triptych" of plays entitled "Here I Am," described by the *Washington Post* as performances that "tackle[] notions of faith, family and identify."  T. Floyd, "Theater J's 'Here I Am' tackles notions of faith, family and identity," *Washington Post* (Nov. 8, 2023), https://www.washingtonpost.com/entertainment/theater/2023/11/08/here-i-am-theater-j/);     *see also*                "Here                I                Am"                Playbill, https://issuu.com/washingtondcjcc/docs/fy24_here_i_am_program_issuu  (which  includes  the image used as part of bus advertisement).   One of the three plays advertised as part of the series was *Moses*, by Michelle Lowe, which the playwright describes as a modern retelling of the story of the prophet Moses, a story "about faith, love, and going it alone."    *See* Michelle Lowe, Upcoming Projects, https://www.michelelowe.net/in-development.

58.     WMATA  permits  advertisements  for  other  organizations  that  promote  other controversial issues of public debate.  In 2023, WMATA ran advertisements on the exterior of its

buses for Social Justice School, a middle school seeking "to catalyze an integrated community of middle-school learners to be scholar-activists who are designers of a more just world."   The advertisements prominently describe the school as a place "WHERE *SCHOLAR* MEETS *ACTIVIST*," and include a link to the school's website (thesocialjusticeschool.org), which emphasizes the schools focus on "liberatory design thinking" and "solutions to social justice issues that plague our community."   *See* Social Justice School, *Our* Story, https://www.thescocialjusticeschool.org/about.  An image of the advertisement appears below:



59.     Similarly, in 2023, WMATA buses ran advertisements for the University of Maryland that said, "INCLUSION IS THE SOLUTION," and "WE HAVE THE FORMULA FOR PROGRESS."  The advertisement includes a link that takes viewers to the university's website devoted to its "Fearlessly Forward" campaign, which the University describes there as a "plan [that] is rooted in the principles of values-driven excellence, diversity, equity and inclusion, impact, innovation, collaboration and service to humanity."  *See* Darryl J. Pines, *Fearlessly Forward*, Univ. of Md., https://president.umd.edu/articles/fearlessly-forward.  An image of that advertisement appears below:



60.     The promotion of diversity, equity and inclusion in higher education and elsewhere has proved a highly controversial topic and is the subject of a wide range of opinions in public discourse.  One college administrator recently wrote in the *Wall Street Journal* that "[i]nclusion"

in higher education "now means creating a social environment where identity groups are celebrated while those who disagree are maligned."  Matthew Spalding, "DEI Spells Death for the Idea of a University," *Wall St. J.* (Feb. 10, 2023), https://tinyurl.com/smbh7vcb; *see also* Samuel J. Abrams, "Hardly Inclusive:  Diversity Mandates Have Politicized Campus Life," American Enterprise Institute Op-Ed (October 27, 2023), https://tinyurl.com/yckfpcjb.

61.     WMATA also permits advertisements on the subject of the history of the United States and its fundamental principles, the very subjects that WallBuilders sought to address in its advertisements.  WMATA has recently run advertisements (reproduced below) for the PBS program, "Iconic America:  Our Symbols and Stories with David Rubenstein."  The show "examines the history of America through some of its most iconic symbols, objects and places, diving deep into each symbol's history and how its meaning has changed over time."  Episodes have featured American symbols such as the Gadsden flag and the Monument at Stone Mountain. PBS's website describes Stone Mountain as the "Confederate Mount Rushmore."  *Iconic America: Stone Mountain*, PBS (July 25, 2023), https://www.pbs.org/video/stone-mountain/.  Both symbols are currently the subject of substantial public controversy.  *See, e.g.*, Andrew Kenney, *Governor Polis defends Gadsden flag after student reportedly removed from Colorado Springs class*, CPR News (Aug. 29, 2023), https://tinyurl.com/4fw4dtfx; *see also Georgia lawmakers push to remove Confederate designation on Stone Mountain Park*, Fox 5 Atlanta (Mar. 21, 2023), https://tinyurl.com/e8t5n8mu.



62.    In December 2023, WMATA ran ads for the White House Historical Association's 2023 Christmas Ornament at both its rail stations and on its buses.  The rail ad (reproduced below) featured the ornament and the word "Christmas" in large script, along with a customer testimonial that the White House Historical Association "teaches me new things about the Presidents," and a QR code that links to the Association's website, which explains that "giving these unique ornaments has become a holiday tradition for families across the United States and abroad."  *See* Official   2023   White   House   Christmas   Ornament,   Additional   Information, shop.whitehousehistory.org.  The bus advertisement was nearly identical, but did not include the testimonial panel.



63.     Notwithstanding its stated concerns about inciting community discord, WMATA frequently runs public service ads and even commercial advertisements that touch on controversial issues on which members of the public hold varying opinions.  WMATA also uses the sides of buses to promote its own viewpoint on issues of public controversy.

64.     For example, WMATA has allowed advertisements from DC Health encouraging viewers—i.e., attempting "to influence members of the public"—to get vaccinated with an updated COVID vaccine (reproduced below).  Whatever the merits of the disputes, COVID vaccines have become an issue of substantial public controversy, with "varying opinions" held by the members of the public.



65.    Recently, WMATA ran ads from Montgomery County, Maryland (reproduced below), advertising its Business Recycling Program on the exterior of WMATA buses.  The advertisements instruct viewers to "Make it your BUSINESS to recycle right."  They include a link to Montgomery County's website, where viewers are encouraged to recycle and to learn about Montgomery County's aim to achieve zero waste.



66.     The desirability and efficacy of recycling programs is also the subject of heated public debate. *See, e.g.*, Judith Enck & Jan Dell, "Plastic Recycling Doesn't Work and Will Never Work," *The Atlantic* (May 30, 2022), https://tinyurl.com/55y6ee9y; Bob Tita, "Recycling, Once Embraced by Businesses and Environmentalists, Now Under Siege," *Wall St. J.* (May 13, 2018), https://tinyurl.com/428yw2be; Jo Craven McGinty, "Recycling Isn't as Clear-Cut as You Might Think," *Wall St. Journal* (April 23, 2021), https://tinyurl.com/35cheu3c.

67.     WMATA also allows advertising for consumer products and services that are the subject of substantial public debate, such as alcohol (as depicted below) and online gambling.



68.    WMATA metrobuses have carried ads in recent months for alcoholic beverages, despite the possible harms to viewers who struggle with addiction and possible public health impacts on younger populations and other vulnerable groups.

69.    Sports gambling is also an issue on which members of the public hold varying opinions, *see, e.g.*, Justin Klawans, *Is the legalization of sports betting a good thing?*, Y! News (Feb. 15, 2023), https://tinyurl.com/2zv9t25r, yet gambling-related advertising is allowed on WMATA buses.   For example, WMATA permits advertising for GamBet DC Sportsbook (advertisement reproduced below).   GamBet-DC itself is shrouded in local controversy separate from general discussions on the merits of sports betting.   *See* Philip Connoller, *GambetDC,*

*Controversial Washington DC Sports Bet App, Lost $4 Million Last Year*, Casino.org (Mar. 4, 2022), https://tinyurl.com/yvmu6at5.



70.     WMATA also allows advertisements in other public transit locations, such as inside buses and subway cars and in the D.C. metro stations, which are subject to the same Guidelines. In those similar locations, WMATA has approved advertisements on matters of great public controversy—issues on which there are strongly diverging "varying opinions."   These ads demonstrate the arbitrary nature of the Guidelines and their application by WMATA.

71.     For example, in its subway stations, WMATA has been running an advertisement for the shopping service Instacart, which prominently features a picture of Plan B (described by its proponents as an "emergency contraceptive" pill and by its opponents as an "abortion pill") and encourages viewers to "Buy Plan B without ever stepping foot in a store."   The advertisement (reproduced below) contains a QR code that, when scanned, enables viewers to place Instacart orders for Plan B.  The bottom of the advertisements instructs viewers to "Take Plan B emergency contraception as directed within 72 hours after unprotected sex."



72.     The ready, over-the-counter availability of Plan B emergency contraception is an issue of substantial public controversy.  *See, e.g., The Morning After Pill Controversy*, PBS News Hour (Nov. 2005), https://tinyurl.com/3nk98x98.

73.     In October 2023, WMATA ran an advertisement (reproduced below) inside its Metro Center station for the Brennan Center for Justice urging viewers to "DEMAND SUPREME COURT TERM LIMITS."  The advertisement states prominently, "TOO MUCH TIME.  TOO MUCH POWER," and features a fractured hand holding a gavel.  The bottom of the advertisement includes a link to the Brennan Center's website, which advocates for term limits for Supreme Court

Justices: "Term limits would ensure that the Supreme Court stays in touch with American society and that no justice has too much power for too long."   The Brennan Center's website states that the organization "work[s] to craft and advance a transformative reform agenda."   The Brennan Center describes itself as a "an independent, nonpartisan law and policy organization that works to reform, revitalize, and when necessary, defend our country's systems of democracy and justice." In this role, the Brennan Center acts as, among other things, "an advocacy group, fighting in court and working with elected officials to advance legislation."



74.   Supreme Court term limits are a particularly controversial issue and have been a source of substantial public debate in recent years.   *See, e.g.*, Maggie Jo Buchanan, *Term Limits are Critical to Restoring Public Trust in the Supreme Court*, American Progress, (June 14, 2023),

https://www.americanprogress.org/article/term-limits-are-critical-to-restoring-public-trust-in-the-supreme-court/; J. Harvie Wilkinson III, *Supreme Court Term Limits Wouldn't Solve Anything*, Washington Post, (Oct. 17, 2021), https://www.washingtonpost.com/opinions/2021/10/18/supreme-court-term-limits-wouldnt-solve-anything/.

75.      In September 2023, at its McPherson Square Metro station, WMATA ran a billboard ad (reproduced below) for Power to the Patients, which addressed the issue of transparency in hospital pricing, with the tagline, "WE ~~NEED~~ DEMAND HOSPITAL PRICES," with "NEED" deliberately struck through.   The ad also contained a link to the organization's website, powertothepatients.org, which addresses the need for "real prices and transparency in healthcare" as required by existing federal law.



76. Even this issue is the subject of varying public opinions. Some studies have argued that increased transparency will lead to higher prices because of reduced competition and the potential for collusion. *See* Robert Graboyes & Jessica McBirney, "Price Transparency in Healthcare: Apply with Caution", Mercatus Center, George Mason Univ. (Aug. 19, 2020), https://www.mercatus.org/research/research-papers/price-transparency-healthcare-apply-caution.

77. In or around November 2022, WMATA ran also ran electronic billboard ads at its Metro Center station for an organization called World Beyond War, which describes itself as a "global movement to end all wars." *See* Who We Are, https://worldbeyondwar.org/who. The ads (reproduced below from worldbeyondwar.org's website) contained the message "Peace on Earth," and contained the organization's logo and website address, worldbeyondwar.org. World Beyond War's website explains that it is "a global nonviolent movement to end war and establish a just and sustainable peace." According to the website, the organization "raises funds to— independently and in coalition with others—put up pro-peace and anti-war billboards all over the world." *See* Billboards Project, https://worldbeyondwar.org/billboardsproject/.



78.     In permitting the "Peace on Earth" message, WMATA apparently determined it to be an issue on which there are no "varying opinions" among members of the public.  But both the message of peace and the means to achieve such peace are topics of much public debate and difference of opinion.  One only needs to look at the headlines of the day to see that there are those for whom peace is not the goal.  *See, e.g.,* Ben Hubbard and Maria Abi-Habib, "Behind Hamas's Bloody Gambit to Create a 'Permanent' State of War," *N.Y. Times* (Nov. 8, 2023), https://www.nytimes.com/2023/11/08/world/middleeast/hamas-israel-gaza-war.html.     And of course, the means to achieve that peace often involve substantial issues of public debate, including the existence of the just war, deterrence, and similar weighty and highly debated issues.

79.     Finally, WMATA uses its own buses to promote the views of local residents on topics of public controversy and debate.   In Spring 2023, WMATA buses ran prominent advertisements celebrating Earth Day.  The advertisements were the result of a contest and resulted in displays that featured drawings from local school children.  The purpose of the advertisements,

according to Defendant Randy Clarke, was "to celebrate the role public transportation plays in creating a more sustainable, healthier and cleaner environment."  An example of that campaign is reproduced below:



80.     Yet Earth Day itself is controversial on both the political left and right.  *See, e.g.*, Kimberly Nicholas, "I'm an Environmental Scientist and I Hate Earth Day," *The Daily Beast* (April 22, 2021), https://tinyurl.com/mwstbb6u; Rebecca Leber, "I'm an Environmental Journalist and I Hate Earth Day,"  *Mother Jones* (April 22, 2019), https://tinyurl.com/2speh24f ("For those who devote much of their waking hours to thinking and working on monumental global challenges such as the looming catastrophe of climate change, Earth Day has the dissonance of a trite, too-little-too-late rite marked more by corporate greenwashing than a recognition of the Earth's complexity.").

81.     WMATA's acceptance—and its own display—of the advertisements depicted above on issues on which members of the public have varying opinions has not resulted in any

appreciable community discord, which demonstrates that WMATA's ban on "issue ads" is not reasonably related to its announced justification.

V.     **WALLBUILDERS SUFFERS SUBSTANTIAL INJURY FROM THE EXISTENCE AND APPLICATION OF WMATA'S ADVERTISING GUIDELINES**

82.     WallBuilders has been and continues to be harmed by WMATA's Advertising Guidelines.  But for Guideline 9 and 12, WallBuilders would have purchased and would still purchase WMATA advertising space for this and other, similar campaigns.  WallBuilders has suffered and will suffer irreparable harm to its constitutional rights if it is excluded from WMATA's advertising space simply because of its viewpoint and the content of its advertisements.  WMATA's policy also chills WallBuilders' speech by deterring and preventing it from advertising with WMATA, and it effectively banishes certain messages, especially WallBuilders' religious views about our nation's history, from WMATA buses and other WMATA advertising spaces, which are otherwise broadly open to many types of advertising.  WMATA has caused WallBuilders irreparable harm by preventing WallBuilders from reaching other members of the metropolitan community with its message and its mission.

83.     All of the allegations in Paragraphs 1 through 82 above are incorporated in each of the following claims as if fully restated therein.

## CAUSES OF ACTION

### Count I – 42 U.S.C. § 1983
### First Amendment Freedom of Speech: Guideline 9's Facially Arbitrary Speech Restrictions

84.     The First Amendment's Free Speech Clause is directly applicable to the District of Columbia and is applicable to the states through the Fourteenth Amendment, and is therefore applicable to WMATA as the creature of an interstate compact among Maryland, Virginia and the District of Columbia. It protects against government action burdening Plaintiff's right to be free from vague or unreasonable restrictions on speech.

85.     Guideline 9 violates the First Amendment's Free Speech Clause because it is not "reasonable in light of the purpose served by the forum." *Minn. Voters Alliance v. Mansky*, 138 S. Ct. 1876, 1886 (2018).  The First Amendment requires that "objective, workable standards" guide the enforcement of prohibitions of speech. *Id.* at 1891.  In all forums—even nonpublic forums—restrictions on speech must "articulate some sensible basis for distinguishing what may come in from what must stay out." *Id.* at 1888.

86.     WMATA Guideline 9 fails to meet this constitutional minimum.  Guideline 9's vague standard is incapable of reasoned application and effectively vests WMATA with unfettered discretion to determine what constitutes "an issue on which there are varying opinions." Guidelines 9 does not provide objective standards for distinguishing between permissible and impermissible advertisements in a non-arbitrary, viewpoint-neutral manner.  WMATA has not provided any explanation with regards to what qualifies as "an issue on which there are varying opinions."  This leaves decisions on what advertisements are permissible "to the whim of the administrator[s]," but the "First Amendment prohibits the vesting of such unbridled discretion in a government official." *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 133 (1992).

87.     Guideline 9 also unreasonably requires the reviewer to have an encyclopedic knowledge of the manifold "issues" on which the public may have varying opinions.  WMATA thus allows ads on controversial topics simply because it is not well versed in all of the various topics on which the public may have varying opinions.

88.     WMATA's inconsistent and arbitrary implementation of Guideline 9 shows that WMATA administrators are not cabined by any objective standard.  Rather, WMATA's decisions on what advertisements are "left to the whim of the administrator." *See Forsyth County*, 505 U.S.

at 133.  This pattern of unpredictable and uneven enforcement demonstrates the lack of objective, workable standards and the unreasonableness of Guideline 9.

89.     As a result of Guideline 9's inconsistency with the Free Speech Clause of the First Amendment, WallBuilders has suffered and will continue to suffer irreparable harm, including the loss of its constitutional rights, and it is thus entitled to immediate declaratory and injunctive relief.

**Count II – 42 U.S.C. § 1983**
**First Amendment Freedom of Speech: Guideline 9's Arbitrary Speech Restrictions**
**(As-Applied Challenge)**

90.     The First Amendment's Free Speech Clause is directly applicable to the District of Columbia and is applicable to the states through the Fourteenth Amendment, and is therefore applicable to WMATA as the creature of an interstate compact among Maryland, Virginia and the District of Columbia. It protects against government action burdening Plaintiff's right to be free from vague or unreasonable restrictions on speech.

91.     Guideline 9 violates the First Amendment's Free Speech Clause because it is not "reasonable in light of the purpose served by the forum." *Mansky*, 138 S. Ct. at 1886.  The First Amendment requires that "objective, workable standards" guide the enforcement of prohibitions of speech.  *Id.* at 1891.  In all forums—even nonpublic forums—restrictions on speech must "articulate some sensible basis for distinguishing what may come in from what must stay out." *Id.* at 1888.

92.     Through application of Guideline 9's prohibition against "[a]dvertisements intended to influence members of the public regarding an issue on which there are varying opinions" to the advertisements submitted by WallBuilders, WMATA has arbitrarily denied WallBuilders the ability to engage in protected speech.  WMATA's unreasonable and arbitrary application of Guideline 9 violates the Free Speech Clause of the First Amendment.

37

93.     WMATA unreasonably and arbitrarily denied WallBuilders' original ads on the basis that they were "[a]dvertisements intended to influence members of the public regarding an issue on which there are varying opinions."  In rejecting WallBuilders' advertisements, WMATA did not identify what issue it believed the advertisements were seeking to address.

94.     WMATA rejected WallBuilders' advertisements, despite having accepted, since 2015, a variety of advertisements that address "issue[s] on which there are varying opinions," including even other religious-themed advertisements and advertisements relating to a wide range of public issues on which there are varying opinions.  Such ads accepted by WMATA include advertisements for Supreme Court term limits, an anti-war organization's message of "Peace on Earth," a non-profit organization's ad calling for health care transparency, advertisements for controversial methods of contraception, gambling and alcohol advertisements, COVID vaccination advertisements, and pro-religious (*Moses*) and anti-religious performances (*The Book of Mormon*).

95.     In an effort to receive more guidance on what types of advertisements are permissible under Guideline 9, WallBuilders requested further information on the rejection of its advertisements.  WMATA unreasonably failed to respond.

96.     Despite a lack of further guidance, WallBuilders attempted to revise its advertisements in a way that might be acceptable to WMATA.  Guessing (without guidance) that the word "Christian" on the proposed advertisements (described in Paragraphs 34-36) was the reason for their rejection, WallBuilders removed that word and the related reference to the "Faith of the Founders" from its proposed advertisements and resubmitted them in the revised form described in Paragraphs 45 and 47.  These revised advertisements were also rejected under Guideline 9, with no elaboration as to what failed to satisfy the Guideline.

97.     Apart from the images they portrayed (George Washington in prayer and the signing of the Constitution), WallBuilders' revised advertisements contained no substantive message expressing any viewpoint on any public issue.  The only written "message" on the advertisements was an invitation to visit the linked website.  A viewer of the advertisements could learn of WallBuilders' mission and religious viewpoint only by visiting the website.   WMATA still deemed them to be advertisements that seek to influence the public on "issue[s] on which there are varying opinions."

98.     WMATA frequently allows other advertisements containing links to an advertiser's website, where those websites seek to influence the public on issues on which there is public debate.  Similarly, WMATA also frequently allows advertisements for plays or other performances relating to issues on which there is public debate—including, for example, advertisements for performances of *The Book of Mormon* and *Moses*, which address religious practices and traditions—without regard to the content of those performances.

99.     Defendant's arbitrary and unreasonable enforcement of WMATA's Guideline 9 violates WallBuilders' First Amendment rights because it is impossible for WallBuilders to know whether and how WMATA will apply Guideline 9.

100.    As a result of Defendant's violation of the Free Speech Clause of the First Amendment, WallBuilders has suffered and will continue to suffer irreparable harm, including the loss of its constitutional rights, and it is thus entitled to immediate declaratory and injunctive relief.

### Count III – 42 U.S.C. § 1983
### First Amendment Freedom of Speech: Guideline 9's Facial Viewpoint Discrimination

101.    The First Amendment's Free Speech Clause is directly applicable to the District of Columbia and is applicable to the states through the Fourteenth Amendment, and is therefore applicable to WMATA as the creature of an interstate compact among Maryland, Virginia, and the

District of Columbia. It protects against government action burdening Plaintiffs' rights to be free from viewpoint discrimination.

102.    Guideline 9 is facially unconstitutional under the First Amendment because viewpoint discrimination is inevitable under the Guideline's indeterminate and subjective standard.  Viewpoint discrimination is never permissible, irrespective of the type of forum in which the speech appears.

103.    Guideline 9 requires WMATA to determine whether a particular "issue" is one on which members of the public have differing views—in other words, whether an issue is "controversial."     Prohibiting "controversial" topics is a form of invidious viewpoint discrimination.  *See Matal v. Tam*, 137 S. Ct. 1744 (2017) (plurality opinion) ("Giving offense is a viewpoint."); *Ne. Pa. Freethought Society v. Cnty. of Lackawanna Transit Sys.*, 938 F.3d 424, 439 (3d Cir. 2019) ("The censorship of messages *because* they are controversial is viewpoint discrimination.").  Guideline 9 therefore requires WMATA to engage in viewpoint discrimination.

104.    Separately, WMATA will inevitably identify issues on which public opinion is closely divided as triggering Guideline 9, but will inevitably *fail* to identify issues on which public opinion is mostly *not* divided (but still varied to some degree) as triggering Guideline 9.  This results in discrimination against viewpoints held by small minorities of the public.  For instance, WMATA permitted the Supreme Court term limits ad (*see* Paragraph 73), the "Peace on Earth" ad (*see* Paragraph 77) and an ad encouraging recycling (*see* Paragraph 65) because it erroneously concluded that the viewpoints expressed in those advertisements were not ones on which members of the public have varying opinions.  Yet advertisements expressing contrary views on the same issues would have been rejected, and advertising on more obviously controversial issues is rejected.

105.     As a result of Defendant's violation of the Free Speech Clause of the First Amendment, WallBuilders has suffered and will continue to suffer irreparable harm, including the loss of its constitutional rights, and it is thus entitled to immediate declaratory and injunctive relief.

**Count IV – 42 U.S.C. § 1983**
**First Amendment Freedom of Speech: Guideline 9's Viewpoint Discrimination**
**(As-Applied Challenge)**

106.     The First Amendment's Free Speech Clause is directly applicable to the District of Columbia and is applicable to the states through the Fourteenth Amendment, and is therefore applicable to WMATA as the creature of an interstate compact among Maryland, Virginia, and the District of Columbia.  It protects against government action burdening Plaintiffs' right to be free from viewpoint discrimination.

107.     WMATA's application of Guideline 9's vague and subjective standard to WallBuilders' proposed advertisements results in impermissible viewpoint discrimination. Viewpoint discrimination is never permissible, irrespective of the type of forum in which the speech appears.

108.     As applied here, WMATA's Guideline 9 discriminates against WallBuilders' religious viewpoint on topics that are otherwise permissible on WMATA buses.

109.     WMATA's application of Guideline 9 is particularly problematic in light of the religious viewpoint expressed in WallBuilders' advertisements: "The First Amendment doubly protects religious speech." *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421 (2022).

110.     "Religion may be a vast area of inquiry, but it also provides . . . a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered." *Rosenberger v. Rectors & Visitors of Univ. of Va.*, 515 U.S. 819, 831 (1995).

41

111.    Since the adoption of its current Guidelines in 2015, WMATA has accepted a number of advertisements on behalf of different organizations promoting their secular organizational missions and philosophy, while rejecting WallBuilders' advertisements to promote its religious-based mission and philosophy.

112.    For example, WMATA has allowed advertisements for performances that poke fun at the role of religion in public life, including shows that sharply lampoon religious beliefs and practices.  A prime example is the 2017 advertisements for *The Book of Mormon* musical at the Kennedy Center, a show that harshly parodies religious practices and belief.  WallBuilders' rejected advertisements, by contrast, sought to emphasize the critical role that religious faith plays, emphasizing (according to its website linked in the advertisements) "the moral, religious, and constitutional foundation on which America was built."  WMATA rejected WallBuilders' religious perspective on the important role of religion in American life, while allowing *The Book of Mormon* ad to run.

113.    WMATA has also accepted advertisements for the Social Justice School and University of Maryland, including links to their websites which explain in depth their secular educational mission—even secular educational missions addressing controversial topics such as "social justice" and "inclusion."  WallBuilders is not permitted, however, to promote its own organization and its educational mission to educate the public on the religious basis for the founding of the nation.  The mere mention of its website, which, if the viewer chooses to visit, explains WallBuilders' religious-based educational mission in detail, is apparently enough to result in WMATA's rejection of its advertisements.  But similar website links for other secular educational organizations did not result in rejection of those advertisements.

114.   Similarly, WMATA allows advertisements addressing entertainment and educational programs that discuss controversial aspects of our nation's history from a secular perspective.  It thus ran ads for PBS's "Iconic America: Our Symbols and Stories with David Rubenstein," a television show that "examines the history of America through some of its most iconic symbols, objects and places, diving deep into each symbol's history and how its meaning has changed over time."   At the same time, it rejected WallBuilders' advertisements that address the role of religion, especially Christianity, in our nation's history.

115.   WMATA even allows certain preferred *religious viewpoints* on WMATA buses, including advertisements for Catholic University stating that "[e]very story is a journey of the spirit," and displaying the university's motto, which translates as "God is my light," as well as advertisements for Jewish movie festivals and performances about important biblical prophets (Moses).  These plainly are topics on which there are varying opinions among the public, yet these ads are permitted, while WallBuilders' evangelical Christian perspective on similar religious matters is excluded.

116.   As these varying advertisements illustrate, Guideline 9, as applied to WallBuilders, constitutes unlawful viewpoint discrimination in violation of the First Amendment.

117.   As a result of Defendant's violation of the Free Speech Clause of the First Amendment, WallBuilders has suffered and will continue to suffer irreparable harm, including the loss of its constitutional rights, and it is thus entitled to immediate declaratory and injunctive relief.

### Count V – 42 U.S.C. § 1983
### First Amendment Freedom of Speech: Guideline 12's Facial Viewpoint Discrimination

118.   The First Amendment's Free Speech Clause is directly applicable to the District of Columbia and is applicable to the states through the Fourteenth Amendment, and is therefore applicable to WMATA as the creature of an interstate compact among Maryland, Virginia, and the

District of Columbia.  It protects against government action burdening Plaintiffs' right to be free from viewpoint discrimination.

119.    The prohibition against "[a]dvertisements that promote or oppose any religion, religious practice or belief" in WMATA's Guideline 12 is facially unconstitutional, as it deprives religious advertisers or advertisers who wish to convey a religious message of their right to engage in protected speech in violation of the Free Speech Clause of the First Amendment.  Guideline 12 thus results in impermissible viewpoint discrimination.

120.    Viewpoint discrimination is never permissible, irrespective of the type of forum in which the speech appears.  *See Rosenberger*, 515 U.S. at 829 ("The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction.").

121.    Guideline 12 is particularly problematic in light of the Supreme Court's admonition that "the First Amendment doubly protects religious speech."  *Kennedy*, 142 S. Ct. at 2421.

122.    Guideline 12 does not simply ban religion as a subject matter; it prohibits all religious viewpoints on otherwise permissible subject matters.  "Religion may be a vast area of inquiry, but it also provides . . . a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered."  *Rosenberger*, 515 U.S. at 831.

123.    WMATA's policy, as written, permits secular messages regarding a wide range of topics, but specifically excludes messages on those same topics if they contain religious viewpoints.

124.    Thus, for instance, while Guideline 12 permits WMATA to accept advertisements by an anti-war organization declaring "Peace on Earth," an advertisement from a religious

organization stating "And on earth peace, good will toward men.   Luke 2:14" would be impermissible because it expresses the identical thought from a religious viewpoint.

125.   The Supreme Court long ago rejected the notion that "reliance on [religious] principles taints" speech "in a way that other foundations for thought or viewpoints do not."  *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 111-12 (2001).  By excluding speech "on the ground that the subject is discussed from a religious viewpoint," Guideline 12, on its face, violates the Free Speech Clause of the First Amendment.

126.   While WMATA did not include Guideline 12 in its stated reasons for rejecting WallBuilders' advertisements, on information and belief, WMATA would reject WallBuilders' advertisements under Guideline 12.   Moreover, the very existence of Guideline 12 chills WallBuilders' right to express its religious viewpoint on issues critical to its educational mission, especially as that speech relates to the history of the founding of the United States.

127.   As a result of WMATA's violation of the Free Speech Clause of the First Amendment, WallBuilders has suffered and will continue to suffer irreparable harm, including the loss of its constitutional rights, and it is thus entitled to immediate declaratory and injunctive relief.

**Count VI – 42 U.S.C. § 1983**
**First Amendment Freedom of Speech: Guideline 12's Unreasonable Content Regulation**

128.   The First Amendment's Free Speech Clause is directly applicable to the District of Columbia and is applicable to the states through the Fourteenth Amendment, and is therefore applicable to WMATA as the creature of an interstate compact among Maryland, Virginia, and the District of Columbia.  It protects against government action burdening Plaintiffs' right to be free from vague or unreasonable restrictions on speech.

129.   The prohibition against "[a]dvertisements that promote or oppose any religion, religious practice or belief" in WMATA's Guideline 12 constitutes impermissible content

regulation in violation of the Free Speech Clause because it is not "reasonable in light of the purpose served by the forum." *Mansky*, 138 S. Ct. at 1886.

130.    Guideline 12 is not reasonable because the discretion granted to WMATA in determining whether an advertisement promotes or opposes any religion, religious practice or belief is not guided by any objective, workable standards, thereby leaving WMATA unable to articulate a sensible basis for distinguishing which advertisements are allowed and which are not.

131.    Thus, for example, WMATA accepted advertisements from the Catholic University of America that include its motto "God is My Light," for the Kennedy Center's performance of *The Book of Mormon*, for Edlavitch D.C. Jewish Community Center's performance of *Moses*, and for the White House Historical Association's 2023 Christmas Ornament, but rejected an advent ad from the Archdiocese of Washington, saying "Find the Perfect Gift," *see Archdiocese of Wash. v. WMATA*, 897 F.3d 314 (D.C. Cir. 2018), and also rejected Plaintiffs' proposed advertisements, which expressed its religious viewpoint on the role of Christianity in the founding.

132.    While WMATA did not include Guideline 12 in its stated reasons for rejecting WallBuilders' advertisements, on information and belief, WMATA would reject WallBuilders' advertisements under Guideline 12.   Moreover, the very existence of Guideline 12 chills WallBuilders' right to express its religious viewpoint on issues critical to its educational mission, especially as that speech relates to the founding of the United States.

133.    As a result of WMATA's violation of the Free Speech Clause of the First Amendment, WallBuilders has suffered and will continue to suffer irreparable harm, including the loss of its constitutional rights, and it is thus entitled to immediate declaratory and injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court:

a.      Enter a declaration that the prohibition against "[a]dvertisements intended to influence members of the public regarding an issue on which there are varying opinions" in WMATA's Commercial Advertising Guidelines violates the First Amendment on its face;

b.      Enter a declaration that the prohibition against "[a]dvertisements that promote or oppose any religion, religious practice or belief" violates the First Amendment on its face;

c.      Enter a declaration that WMATA's rejection of WallBuilders' advertisements violates the First Amendment;

d.      Enter an injunction permanently preventing WMATA from enforcing its prohibition against "[a]dvertisements intended to influence members of the public regarding an issue on which there are varying opinions" against WallBuilders, against its advertising campaign to educate the public on the role that the Founders' Christian faith played in the creation of the nation and the drafting of the Constitution, and against the particular proposed advertisements that were submitted by WallBuilders;

e.      Enter an injunction permanently preventing WMATA from enforcing its prohibition against "[a]dvertisements that promote or oppose any religion, religious practice or belief" in WMATA's Guidelines against WallBuilders, against its advertising campaign to educate the public on the role that the Founders' Christian faith played in the creation of the nation and the drafting of the Constitution, and against the particular proposed advertisements that were submitted by WallBuilders;

f.      Award reasonable attorneys' fees and costs to WallBuilders under 42 U.S.C. § 1988;

g.      Award such other relief as the Court may deem just and proper.

Dated: December 12, 2023                                Respectfully Submitted,


/s/ Shannen W. Coffin
Shannen W. Coffin (D.C. Bar # 449197)
Caitlin E. Daday (D.C. Bar # 90002918)
STEPTOE LLP
1330 Connecticut Ave., N.W.
Washington, D.C.  20036
Tel: (202) 429-3000
Fax: (202) 429-3902
scoffin@steptoe.com
cdaday@steptoe.com

David J. Hacker
(*pro hac vice* application forthcoming)
Jeremiah G. Dys (D.C. Bar # 90000678)
(D.D.C. admission pending)
Ryan Gardner
(*pro hac vice* application forthcoming)
FIRST LIBERTY INSTITUTE
2001 West Plano Parkway, Suite 1600
Plano, TX 75075
Tel: (972) 941-4444
dhacker@firstliberty.org
jdys@firstliberty.org
rgardner@firstliberty.org

Camille P. Varone (D.C. Bar # 1617624)
(D.D.C. admission pending)
FIRST LIBERTY INSTITUTE
1331 Pennsylvania Ave. N.W., Suite 1410
Washington, D.C. 20004
Tel: (202) 921-4105
cvarone@firstliberty.org

Arthur B. Spitzer (D.C. Bar # 235960)
Scott Michelman (D.C. Bar # 1006945)
AMERICAN CIVIL LIBERTIES UNION OF THE
  DISTRICT OF COLUMBIA FOUNDATION
529 14th Street NW, Suite 722
Washington, D.C. 20045
Tel: (202) 457-0800
aspitzer@acludc.org

Brian Hauss
(*pro hac vice* application forthcoming)
AMERICAN CIVIL LIBERTIES UNION
 FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2500
bhauss@aclu.org

David Cole
(*pro hac vice* application forthcoming)
AMERICAN CIVIL LIBERTIES UNION
 FOUNDATION
915 15th Street NW
Washington, D.C. 20005
Tel: (212) 549-2611
dcole@aclu.org

*Counsel for Plaintiff*
*WallBuilder Presentations*