**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

**WALLBUILDER PRESENTATIONS,**

Plaintiff,

v.

**RANDY CLARKE, in his official capacity
as General Manager and Chief Executive
Officer of the Washington Metropolitan
Area Transit Authority,**

Defendant.

**Case No. 1:23-cv-03695**

---

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF
WALLBUILDER PRESENTATIONS' MOTION FOR PRELIMINARY INJUNCTION**

David J. Hacker
(*pro hac vice* application forthcoming)
Jeremiah G. Dys (D.C. Bar # 90000678)
(D.D.C. admission pending)
Ryan Gardner
(*pro hac vice* application forthcoming)
FIRST LIBERTY INSTITUTE
2001 West Plano Parkway, Suite 1600
Plano, TX 75075
Tel: (972) 941-4444
dhacker@firstliberty.org
jdys@firstliberty.org
rgardner@firstliberty.org

Shannen W. Coffin (D.C. Bar # 449197)
Caitlin E. Daday (D.C. Bar # 90002918)
STEPTOE LLP
1330 Connecticut Ave., N.W.
Washington, D.C.  20036
Tel: (202) 429-3000
Fax: (202) 429-3902
scoffin@steptoe.com
cdaday@steptoe.com

Camille P. Varone (D.C. Bar # 1617624)
(D.D.C. admission pending)
FIRST LIBERTY INSTITUTE
1331 Pennsylvania Ave. N.W., Suite 1410
Washington, D.C. 20004
Tel: (202) 921-4105
cvarone@firstliberty.org

Arthur B. Spitzer (D.C. Bar # 235960)
Scott Michelman (D.C. Bar # 1006945)
AMERICAN CIVIL LIBERTIES UNION
OF THE DISTRICT OF COLUMBIA
 FOUNDATION
529 14th Street NW, Suite 722
Washington, D.C. 20045
Tel: (202) 457-0800
aspitzer@acludc.org
smichelman@acludc.org

Brian Hauss
(*pro hac vice* application forthcoming)
AMERICAN CIVIL LIBERTIES
 UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2500
bhauss@aclu.org

David Cole
(*pro hac vice* application forthcoming)
AMERICAN CIVIL LIBERTIES
 UNION FOUNDATION
915 15th Street NW
Washington, D.C. 20005
Tel: (212) 549-2611
        dcole@aclu.org

*Counsel for Plaintiff WallBuilder Presentations*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND .............................................................................................. 6

I.  WMATA and Its Advertising Guidelines. ............................................................ 6

II.  WallBuilders Seeks to Advertise on WMATA Buses. ......................................... 8

III.  WMATA's Arbitrary Refusals Have Caused Immediate and Irreparable Harm to
WallBuilders. ...................................................................................................... 13

ARGUMENT ................................................................................................................... 13

I.  WALLBUILDERS' CONSTITUTIONAL CLAIMS ARE LIKELY TO SUCCEED ON
THEIR MERITS ................................................................................................. 15

    A.  WMATA's Guidelines Are Incapable of Reasoned Application and, in Practice,
Are Applied Haphazardly by WMATA ................................................... 15

        1.  Guideline 9 Is Incapable of Reasoned Application .................................. 15

        2.  WMATA Haphazardly Applies Guideline 9, Regularly Displaying Ads
Promoting Issues on Which there is Substantial Public Debate. ............. 22

        3.  Guideline 12 Suffers from the Same Problem of Unworkable Standards  31

    B.  WMATA's Advertising Guidelines Violate the First Amendment's Free Speech
Clause Because They Impermissibly Discriminate Based on Viewpoint. ............. 36

        1.  Guideline 9 Is Viewpoint Discriminatory ................................................. 36

        2.  Guideline 12 Impermissibly Discriminates Against WallBuilders'
Religious Viewpoint on Subjects Allowed to Be Addressed in WMATA
Ads ................................................................................................... 41

II.  WALLBUILDERS' HARMS ARE ONGOING AND IRREPARABLE, REQUIRING
PRELIMINARY RELIEF ................................................................................... 44

III.  PERMITTING WALLBUILDERS' ADVERTISEMENTS ON ITS BUSES WILL NOT
HARM WMATA AND FAVORS THE PUBLIC INTEREST ......................................... 44

CONCLUSION ................................................................................................................. 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU v. WMATA*, No. 1:17-cv-1598-TSC, 2018 WL 7252897
(D.D.C. May 30, 2018) ...........................................................................20, 31

*Amalgamated Transit Union Loc. 1015 v. Spokane Transit Auth.*,
929 F.3d 643 (9th Cir. 2019) ..............................................................3, 18, 21

*American Freedom Def. Initiative v. Suburban Mobility Auth. for Regional Transp.*,
978 F.3d 481 (6th Cir. 2020) ..................................................................... *passim*

*Archdiocese of Wash. v. WMATA*,
140 S. Ct. 1198 (2020).........................................................................41, 42

*Archdiocese of Wash. v. WMATA*,
897 F.3d 314 (D.C. Cir. 2018).................................................................. *passim*

*Archdiocese of Wash. v. WMATA*,
910 F. 3d 1248 (D.C. Cir. 2018).........................................................................42

*Capitol Square Rev. & Advisory Bd. v. Pinette*,
515 U.S. 753 (1995).........................................................................38

*Center for Investigative Reporting v. Se. Pa. Transp. Auth.*,
975 F.3d 300 (3d Cir. 2020)......................................................3, 17, 21, 22

*DeBoer v. Vill. of Oak Park*,
267 F.3d 558 (7th Cir. 2001) .........................................................................38

*Elrod v. Burns*,
427 U.S. 347 (1976).........................................................................44

*Ethical Treatment of Animals, Inc. v. Shore Transit*,
580 F. Supp. 3d 183 (D. Md. 2022) .........................................................................21

*Forsyth County, Ga. v. Nationalist Movement*,
505 U.S. 123 (1992).........................................................................2, 16, 22

*Freedberg v. U.S. Dep't of Justice*,
703 F. Supp. 107 (D.D.C. 1988) .........................................................................45

* *Good News Club v. Milford Cent. Sch.*,
533 U.S. 98 (2001).........................................................................36, 41

*Gordon v. Holder*,
   721 F.3d 638 (D.C. Cir. 2013) ................................................................44

*Iancu v. Brunetti*,
   139 S. Ct. 2294 (2019) ..........................................................................36

*In re Murphy-Brown, LLC*,
   907 F.3d 788 (4th Cir. 2018) ................................................................17

*Kennedy v. Bremerton Sch. Dist.*,
   142 S. Ct. 2407 (2022) .......................................................................6, 38

\*   *Lamb's Chapel v. Center Moriches Union Free School District*,
   508 U.S. 384 (1993) .........................................................................36, 41

*Lamprecht v. FCC*,
   958 F.2d 382 (D.C. Cir. 1992) ..........................................................44-45

*Lofton v. District of Columbia*,
   7 F. Supp. 3d 117 (D.D.C. 2013) ...........................................................45

*Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n*,
   138 S. Ct. 1719 (2018) ...........................................................................38

*Matal v. Tam*,
   582 U.S. 218 (2017) ...........................................................................4, 37

\*   *Minn. Voters Alliance v. Mansky*,
   138 S. Ct. 1876 (2018) ..................................................................*passim*

*Murdock v. Pennsylvania*,
   319 U.S. 105 (1943) ...............................................................................38

*NAACP v. Button*,
   371 U.S. 415 (1963) ...............................................................................16

NAACP v. Claiborne Hardware, Co.,
   458 U.S. 886 (1982) ...............................................................................15

*Ne. Pa. Freethought Society v. County of Lackawanna Transit Sys.*,
   938 F.3d 424 (3d Cir. 2019) .............................................5, 37, 39, 42, 43

*R.I.L-R v. Johnson*,
   80 F. Supp. 3d 164 (D.D.C. 2015) .........................................................44

\*   *Rosenberger v. Rector & Visitors of Univ. of Va.*,
   515 U.S. 819, 831 (1995) ..............................................................*passim*

iii

*Simms v. District of Columbia*,
    872 F. Supp. 2d 90 (D.D.C. 2012) ........................................................................45

*Tyndale House Publishers, Inc. v. Sebelius*,
    904 F. Supp. 2d 106 (D.D.C. 2012). .....................................................................44

*White Coat Waste Project v. Greater Richmond Transit Co.*,
    35 F.4th 179 (4th Cir. 2022) ......................................................3, 17, 18, 21, 22

*Widmar v. Vincent*,
    454 U.S. 263 (1981).............................................................................................41

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ...........................................13

*Women's Health Link, Inc. v. Fort Wayne Public Transp. Corp.*,
    826 F.3d 947 (7th Cir. 2016) ...............................................................................21

*Young Israel of Tampa, Inc. v. Hillsborough Area Regional Transit Auth.*,
    582 F. Supp. 3d 1159 (M.D. Fla. 2022)...............................................................42

\* *Zukerman v. U.S. Postal Serv.*,
    961 F.3d 431 (D.C. Cir. 2020) ..................................................................... *passim*

iv

## INTRODUCTION

WallBuilder Presentations ("WallBuilders"), is a Texas-based, non-profit organization "dedicated to presenting America's forgotten history and heroes, with an emphasis on the moral, religious, and constitutional foundation on which America was built." *See* Declaration of Timothy Barton ¶ 5 ("Barton Decl."); *see also* About Us, https://www.wallbuilders.com/about-us/. WallBuilders seeks preliminary injunctive relief against Washington Metropolitan Area Transit Authority's ("WMATA") General Manager with respect to WMATA's refusal to post WallBuilders' advertisements in advertising space on the exterior of WMATA buses. WMATA justified its decision to refuse WallBuilders' ads under WMATA Advertising Guidelines 9 and 12, which prohibit so-called "issue advertisements" and advertisements promoting or opposing religion, religious practices or belief, respectively. Both on their face and as applied to WallBuilders, WMATA's Advertising Guidelines violate the First Amendment's guarantee of free speech. Preliminary injunctive relief is needed to prevent immediate and irreparable harm to WallBuilders' constitutionally protected freedom of expression caused by WMATA's Guidelines and their application here.

Beginning in the Spring of 2023, WallBuilders sought WMATA advertising space as part of a campaign to publicize its organization, its website, and its mission to educate the public regarding its views on the foundational role of religious faith, particularly Christianity, in the formation of the United States and throughout its history. In a pair of proposed ads—featuring well-known images of General Washington kneeling in prayer at Valley Forge and of the Founders gathered to sign the Constitution at Independence Hall (based on a painting that hangs in the U.S. Capitol), respectively—WallBuilders explicitly invited viewers to learn about the role that Christianity played in the founding of our nation by visiting its website, WallBuilders.com. When

1

WMATA rejected those ads, WallBuilders submitted alternative ads that featured the same images of Washington and the signing of the Constitution, with no additional text other than WallBuilders' website address and a corresponding QR code. WMATA also rejected the revised advertisements.

WMATA rejected WallBuilders' ads under its Advertising Guideline 9, which prohibits advertisements "intended to influence members of the public on an issue on which there are varying opinions." WMATA Guidelines Governing Commercial Advertising, Guideline 9 (amended Nov. 19, 2015) ("Advertising Guidelines" or "Guidelines"). WMATA's Guidelines also explicitly prohibit "[a]dvertisements that promote or oppose any religion, religious practice or belief." WMATA Advertising Guideline 12. WMATA did not explicitly cite Guideline 12, but used Guideline 9 to the same end in rejecting WallBuilders' advertisements because of their perceived pro-Christian viewpoint.

WMATA's Advertising Guidelines, and WMATA's reliance on them to reject WallBuilders' advertisements, violate the First Amendment's guarantee of free speech. First, Guideline 9's "issue ad" ban lacks "objective, workable standards" to guide WMATA's discretion in reviewing proposed advertisements. *See Minn. Voters Alliance v. Mansky,* 138 S. Ct. 1876, 1891 (2018). To be deemed reasonable, government restrictions on speech must "articulate some sensible basis for distinguishing what may come in from what must stay out." *Id.* at 1888. Guideline 9 instead grants unfettered discretion to WMATA's administrators to prohibit advertisements on the basis of their idiosyncratic notions as to whether the public has "varying opinions" on an issue addressed—or that WMATA administrators perceive to be addressed—in an advertisement. But the First Amendment prohibits laws that leave the decision of what is permissible and impermissible speech to the "to the whim of the administrator." *Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 133 (1992).

Applying this *"reasonableness"* standard, several courts of appeals have invalidated similar transit advertising bans on "political issues" or issues of "public debate," holding that they lack sufficiently workable standards to serve the government's interests. *See, e.g.*, *Amalgamated Transit Union Loc. 1015 v. Spokane Transit Auth.*, 929 F.3d 643, 654 (9th Cir. 2019) (holding unreasonable transit agency's ban on "any advertisement touching on any issue having any level of public debate"); *American Freedom Def. Initiative v. Suburban Mobility Auth. for Regional Transp.*, 978 F.3d 481, 496 (6th Cir. 2020) ("*AFDI*") (invalidating ban on "political" ads defined as any advertisement advocating a viewpoint on an issue on which "factions of society have taken up positions . . . that are not in agreement"); *Center for Investigative Reporting v. Se. Pa. Transp. Auth.*, 975 F.3d 300, 316 (3d Cir 2020); *White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179, 201 (4th Cir. 2022). These decisions are consistent with the D.C. Circuit's decision in *Zukerman v. U.S. Postal Serv.*, 961 F.3d 431, 435-36 (D.C. Cir. 2020), which reached the same conclusion in invalidating the Postal Service's exclusion of "political" content in its custom postage program.

Here, simply sampling the advertisements that WMATA *has permitted* on its buses and in its rail stations proves that WMATA's application of Guideline 9 is a hopeless muddle. While it prohibits WallBuilders from advertising its organization and its pro-Christian mission because they relate to "issue[s] on which there are varying opinions," WMATA frequently allows advertisements for organizations touting controversial and divisive issues. Recent ads accepted by WMATA include advertisements urging the public to "DEMAND SUPREME COURT TERM LIMITS," an advertisement demanding hospital price transparency, and advertisements by an anti-war organization promoting the message of "Peace on Earth," as well as commercial advertisements for controversial products, such as "Plan B" contraceptives, gambling websites,

and alcohol.  WMATA similarly allows advertisements addressing heavily debated public issues like COVID vaccination, environmental issues (e.g., Earth Day and recycling), and "inclusion" in education.

Even in the realm of religious beliefs, WMATA has allowed advertisements for *The Book of Mormon* musical, which satirizes both religion in general and the Church of Jesus Christ of Latter-Day Saints in particular, and for plays affirming other religious beliefs and traditions, including a local Jewish theater's recent performance of a modern retelling of the story of Moses. While the religious content of WallBuilders' website was apparently enough for WMATA to reject WallBuilders' advertisements, WMATA frequently runs advertisements that promote controversial performances, such as *The Book of Mormon*, or that link to websites containing other religious content, including The Catholic University of America's website, without any similar searching review of that content.  In short, there is no rhyme nor reason to WMATA's application of Guideline 9.  The Guideline is arbitrary and unreasonable and thus constitutionally impermissible.

Second, not surprisingly, given the unbridled discretion afforded WMATA decisionmakers under Guideline 9's indeterminate standard, Guideline 9 inevitably results in impermissible viewpoint discrimination, governed by little more than WMATA's unguided sense of which ads address "issues" and which do not, and which viewpoints are acceptable and which are not.  *See*, *e.g.*, *Mansky*, 138 S. Ct. at 1885 (requiring viewpoint neutrality even in a nonpublic forum).  By targeting only issues on which it perceives that the public is divided, WMATA selectively seeks to avoid opinions and viewpoints that might offend its riders, and it necessarily applies its own inherently subjective standards in doing so.  *See Matal v. Tam*, 582 U.S. 218, 250 (2017) (Kennedy, J. concurring in part and concurring in judgment) ("[A] speech burden based on audience reactions

is simply government hostility and intervention in a different guise."). Furthermore, prohibiting "controversial" speech is itself a form of invidious viewpoint discrimination. *See id.* at 243 (plurality opinion) ("Giving offense is a viewpoint."); *Ne. Pa. Freethought Society v. County of Lackawanna Transit Sys.*, 938 F.3d 424, 439 (3d Cir. 2019) ("The censorship of messages *because* they are controversial is viewpoint discrimination.").

In declaring WallBuilders' advertisement to touch the third rail of controversial speech, WMATA forbids WallBuilders from expressing its religious viewpoint on topics otherwise permitted on WMATA buses and in rail stations. *See, e.g.*, *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 831 (1995) (religion is "a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered"). While WMATA prohibits WallBuilders from promoting its organizational mission to educate the public on the religious basis for the nation's founding, it permits advertisements for the Social Justice School, including links to its websites which explain its secular educational mission—notwithstanding the robust public debate concerning "social justice." Similarly, WMATA permits advertisements for a television series that addressed our nation's history from a secular perspective, but it rejects WallBuilders' advertisements that similarly address aspects of our nation's history because WallBuilders' viewpoint on that history is religious. And it even permits advertisements featuring stage performances and websites that both parody religious beliefs and practice (the *Book of Mormon*) and present apparently favored pro-religious viewpoints (the Edlavitch Center Theater J's performance of *Moses* or Catholic University's website)—apparently concluding that those advertisements do not seek to influence the public on issues on which the public has varying opinions. But it declares *WallBuilders'* religious viewpoint and mission incompatible with its advertising space.

Although "the First Amendment doubly protects religious speech," *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421 (2022), WMATA singles out WallBuilders' religious speech for special disfavor.  It does so here not only in its application of Guideline 9 but also even more directly through Guideline 12, which bans *all* speech that promotes or opposes religious beliefs or practices, thus preventing any opportunity to express a religious viewpoint on WMATA's buses and trains or in rail stations (except, as the examples above illustrate, where WMATA arbitrarily permits it).  Both Guidelines are unlawful under the First Amendment because they ban WallBuilders' speech simply because, in WMATA's view, some members of the public might disagree with WallBuilders' religious viewpoint.

WMATA's clear constitutional violations are ongoing and cause immediate, irreparable harm to WallBuilders' constitutionally protected rights.  This Court should enter a preliminary injunction prohibiting WMATA from continuing to reject WallBuilders' ads during the pendency of this case.

## FACTUAL BACKGROUND

### I.    WMATA and Its Advertising Guidelines.

WMATA derives significant annual operating revenue, projected to exceed $21 million in 2024, from selling advertisement space on and in buses, on and in subway cars, and in rail stations.  *See* WMATA, FY 2024 Proposed Budget at 12 (July 1, 2023), https://www.wmata.com/about/records/upload/FY2024-Proposed-Budget-1-6-23-FINAL.pdf, Declaration of Caitlin E. Daday ("Daday Decl."), Ex. G.  According to WMATA, this "[a]dvertising is a significant and growing component of Metro's (non-farebox) commercial revenues.…  These funds support operational expenses and help Metro stay within the legally mandated 3 percent annual subsidy growth rate."  *See* WMATA Press Release, "New agreement locks in 25% more revenue to support Metro operations from its advertising network" (Jan. 17,

2020), https://www.wmata.com/about/news/New-agreement-locks-in-more-revenue-to-support-Metro-operations-from-its-advertising-network.cfm, Daday Decl., Ex. H.[1]

A third party, Outfront Media, Inc. ("Outfront Media") administers sales of WMATA's ad spaces (*see Advertising Opportunities,* https://www.wmata.com/business/advertising/index.cfm), but WMATA makes the decisions to accept or deny proposals based on its *Guidelines Governing Commercial Advertising* (as revised in 2015). Regulations Concerning the Use of WMATA Property §§ 5.1-5.3 (2018), https://www.wmata.com/business/real-estate/upload/Property_Use_Regulations.pdf, Declaration of Camille P. Varone ("Varone Decl."), Ex. A.

Under the current regulations, WMATA allows wide varieties of advertising but limits issue-oriented and religious advertising, based on WMATA's concerns about community discord, discrimination, and public safety. *See* WMATA Advertising and Retail Policy Review at 6 (Nov. 5, 2015), https://www.wmata.com/about/board/meetings/board-pdfs/upload/110515_3AAdvertisingandRetailPolicyReview.pdf, Daday Decl., Ex. K.

Two of WMATA's Guidelines are implicated by this case. First, Guideline 9 prohibits "[a]dvertisements intended to influence members of the public regarding an issue on which there are varying opinions." Guideline 12 prohibits "[a]dvertisements that promote or oppose any religion, religious practice or belief." WMATA has not released any regulations to direct the

---

[1] Defendant Randy Clarke is the General Manager and Chief Executive Officer of WMATA, a government entity created by an interstate compact between Maryland, Virginia, and the District of Columbia. The General Manager is WMATA's chief administrative officer and, subject to policy direction by the WMATA Board of Directors, is responsible for the operations, management and administration of WMATA. WMATA Bylaws, Art. IV, § 6. He is sued here only in his official capacity.

application of those Guidelines, leaving enforcement entirely to WMATA's staff on a case-by-case basis.

WMATA will prohibit an advertisement if it fails any single Guideline. WMATA does not necessarily provide notice that a proposed ad fails multiple Guidelines. *See* Declaration of Kristina Smith ¶ 24 ("Smith Decl.").

## II.   WMATA Refuses WallBuilders' Advertisements.

WallBuilders is a 501(c)(3) non-profit organization dedicated to presenting America's forgotten history and founding heroes. Barton Decl. ¶ 4-8. Following the example of the prophet Nehemiah, who led a movement to rebuild the walls of ancient Jerusalem to restore its strength and honor, WallBuilders seeks to rebuild the moral foundations of our nation by highlighting the country's historical legacy. WallBuilders believes that historical education exerts a positive influence on public policy by fostering a Biblical worldview and encouraging Christians to engage in the civic arena. *Id.* ¶¶ 6-10. In WallBuilders' view, an integral part of educating the public about early American history is identifying the important role that faith, especially Christian faith, played in the nation's founding. *Id.* ¶ 7.

To accomplish these goals, WallBuilders has engaged in various public awareness and advertising campaigns. *Id.* ¶ 13. WallBuilders' website is one of its primary tools to educate the public. *Id.* ¶ 14. On the site, WallBuilders provides an online library of resources, including videos, podcasts, free articles, and quotations from American historical figures. *Id.* ¶ 14. At the end of 2022, WallBuilders began efforts to rebrand and relaunch the website, which it planned to roll out alongside an ad campaign beginning in June 2023. *Id.* ¶ 16.

WallBuilders targeted the National Capital Area to launch its campaign because of the region's unique audience—including large numbers of residents who work in politics, policy, and law, as well as residents and visitors interested in learning about American history and civic

traditions.  Smith Decl. at ¶ 7.  And it chose to advertise with WMATA because of the very high visibility of WMATA advertising throughout the metropolitan area, not only to people riding on WMATA buses and trains but also to people viewing exterior ads on passing buses.  *Id.* ¶ 8.

As part of its campaign, WallBuilders designed and proposed two ads to submit to WMATA.  The first ad featured Henry Brueckner's late-1800s painting of George Washington kneeling to pray at Valley Forge.[2]  The second shows Howard Chandler Christy's 1940 painting of the signing of the United States Constitution at Independence Hall, which currently hangs in the U.S. Capitol.[3]  On each ad, WallBuilders added its logo in the top left corner and a QR code in the bottom right corner leading to the relaunched website.  In order to invite viewers to learn about the role of Christianity in the nation's founding, both ads' text read in prominent lettering: "CHRISTIAN?" with a smaller sub-heading reading: "TO FIND OUT ABOUT THE FAITH OF OUR FOUNDERS, GO TO WALLBUILDERS.COM."  *Id.* ¶¶ 9-11.

The originally proposed pair of ads, as submitted to WMATA, are reproduced below:

---

[2] *See* Henry Brueckner, *The Prayer at Valley Forge*, as engraved by John C. McRae (1889), https://www.loc.gov/pictures/item/96521655/.

[3] *See* Howard Chandler Christy, *The Signing of the Constitution* (1940), https://www.aoc.gov/explore-capitol-campus/art/signing-constitution.





In May 2023, WallBuilders contacted WMATA to purchase ad space for the two advertisements. *Id.* ¶ 12. WMATA refused WallBuilders' request to place its paid ad campaign, citing, without further explanation, Guideline 9. *Id.* ¶ 14. WallBuilders requested clarification, noting that WMATA's Guideline 9 was vague and effectively excluded all religious speech. WMATA did not respond to WallBuilders' request. *Id.* ¶¶ 15-16.

WallBuilders went back to the drawing board. Without the benefit of any further guidance from WMATA, WallBuilders sought to redesign its ads to satisfy the vague Guidelines. Guessing that the explicit mention of Christianity was the "issue" of controversy that caused WMATA to

reject its proposed ads, WallBuilders redesigned the ads to keep the two images but cut nearly all of the text. *Id.* ¶¶ 17-19.  The revised ads, as submitted to WMATA in September 2023, contained the original images with only the organizational logo, the QR code linking to WallBuilders' website, and the text "VISIT WALLBUILDERS.COM" in the bottom right corner. *Id.* ¶¶ 19-20. The embedded QR code directs viewers to a page on WallBuilders' website collecting famous quotations from the Founders on the religion in the founding. *Id.* ¶ 19.  The redesigned ads are reproduced below:





WMATA rejected both revised ads. *Id.* ¶ 22. WMATA somehow determined that the mere display of images of George Washington at Valley Forge and the signing of the Constitution, adorned only with a website address and QR link to WallBuilders' website, impermissibly "intended to influence members of the public regarding an issue on which there are varying opinions" under WMATA Advertising Guideline 9. *Id.* ¶¶ 22-24. WMATA did not identify what the "issue" was that caused the rejection of the stripped-down advertisements. Its advertising agent, Outfront Media, suggested in discussions with WallBuilders, however, that WMATA may have had concerns less about the content of the advertisements themselves, and more about the content of and *viewpoints* expressed on the website to which the ads referred. *Id.* ¶¶ 25-26. Outfront Media suggested that by removing the website address and QR code from the ads, WallBuilders' ads might pass muster with WMATA. *Id.* ¶ 26. WallBuilders declined to do so because stripping the ads of all references to WallBuilders but the organization's name and logo would have negated any possible promotional and educational benefit WallBuilders sought by running its ads. *Id.* ¶ 27.

III.    **WMATA's Arbitrary Refusals Have Caused Immediate and Irreparable Harm to WallBuilders.**

WMATA's arbitrary refusals have caused WallBuilders substantial injury by preventing it from purchasing ad space in its preferred venue during its relaunch. WMATA's policies have censored WallBuilders' speech by deterring and preventing it from expressing its religious viewpoint regarding its educational mission in general and the role of religious faith and Christianity in U.S. history in particular. By excluding WallBuilders because of its viewpoint and the contents of its ads, WMATA's policies have prevented WallBuilders from speaking and reaching members of the Washington, D.C., metropolitan community with its message. This ongoing harm cannot be undone without judicial intervention. Barton Decl. at ¶¶ 18-19.

In view of WMATA's proffered rationale for denying WallBuilders' ads, its vague and arbitrarily enforced policies, and the ongoing harm to WallBuilders while WMATA's denial persists, WallBuilders now brings this motion for preliminary injunctive relief to vindicate its Free Speech rights and seek relief pending further legal proceedings.

## ARGUMENT

WallBuilders is entitled to an immediate injunction against WMATA's Advertising Guidelines 9 and 12 and WMATA's application of those Guidelines to refuse to run WallBuilders' proposed advertisements. A party seeking a preliminary injunction must establish the following: 1) it is likely to succeed on the merits; 2) it is likely to suffer irreparable harm in the absence of preliminary relief; 3) the balance of equities tips in its favor; and 4) an injunction serves the public interest. *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008).

WallBuilders readily satisfies this standard. WallBuilders has a strong likelihood of prevailing on the merits.  Even in nonpublic fora,[4] restrictions on protected speech can survive First Amendment scrutiny only if they are: 1) reasonable, and 2) viewpoint neutral.  *See, e.g.*, *Mansky*, 138 S. Ct. at 1885; *Archdiocese of Wash. v. WMATA*, 897 F.3d 314, 318 (D.C. Cir. 2018) (WMATA Advertising Guidelines survives First Amendment scrutiny "as long as the restrictions are reasonable and are not an effort to suppress expression merely because public officials oppose the speaker's view.") (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985)) (cleaned up).  The challenged Guidelines fail both requirements.

First, WMATA's incoherent Advertising Guidelines are incapable of reasoned application. They afford unchecked discretion to WMATA officials to decide which advertisements are acceptable and which are not.  As a result, WMATA applies its policies arbitrarily and selectively, allowing all manner of advertisements that relate to issues on which the public has varying opinions, including even religious practices, while denying WallBuilders the right to express its opinion—or even simply advertise the existence of WallBuilders and its website without expressing any opinion on any public issues.  In short, the Guidelines are unreasonable.

Second, both on their face and as applied, WMATA's relevant Advertising Guidelines discriminate on the basis of viewpoint—in particular, against WallBuilders' religious viewpoint. WMATA has prohibited WallBuilders from advertising *because* of its religious viewpoint, yet it allows all manner of secular advertising on similar issues, like education and American history.  It even allows select religious and anti-religious viewpoints to be expressed in WMATA

---

[4] The level of scrutiny to which a court must subject WMATA's restrictions on speech depends upon the forum in which the speech arises.  But for purposes of this preliminary injunction motion, WallBuilders assumes that WMATA advertising spaces are limited, nonpublic fora.  Even under the standard applicable to nonpublic fora, as discussed here, WMATA's Guidelines fail.

advertisements, provided that the favored viewpoint survives WMATA's arbitrary and indecipherable standards. WMATA's viewpoint discrimination violates the First Amendment.

WallBuilders satisfies the remaining factors for obtaining preliminary injunctive relief. Given the First Amendment injuries caused by WMATA's Advertising Guidelines, WallBuilders' irreparable injury is presumed, and the balance of the equities tips sharply in favor of protecting constitutionally protected rights, as does the public interest in enforcing the First Amendment's protections of free speech. WallBuilders thus urges this court to enter a preliminary injunction prohibiting WMATA from rejecting WallBuilders' advertisements while litigation proceeds.

I.    **WALLBUILDERS' CONSTITUTIONAL CLAIMS ARE LIKELY TO SUCCEED ON THEIR MERITS**

A.    **WMATA's Guidelines Are Incapable of Reasoned Application and, in Practice, Are Applied Haphazardly by WMATA**

WallBuilders' proposed advertisements, which seek to promote its educational and religious mission and its views on the role of religious faith and Christianity in American history, are squarely within the realm of First Amendment protections. The Supreme Court "has recognized that expression on public issues 'has always rested on the highest rung of the hierarchy of First Amendment values.'" *NAACP v. Claiborne Hardware, Co.*, 458 U.S. 886, 913 (1982) (quoting *Carey v. Brown*, 447 U.S. 455 (1980)). Yet, in promulgating and applying the relevant Advertising Guidelines, WMATA has denied WallBuilders those fundamental constitutional protections. The relevant Guidelines (Guidelines 9 and 12) do so, first, by seeking to advance WMATA's objectives through unworkable, and thus unreasonable, standards. *See Mansky*, 138 S. Ct. 1891-92.

1.    **Guideline 9 Is Incapable of Reasoned Application**

WMATA applied Guideline 9 to prohibit all of WallBuilders' ads, concluding that they address an "issue on which there are varying opinions." But Guideline 9 lacks "objective,

workable standards" and is thus not "capable of reasoned application." *Mansky*, 138 S. Ct. at 1891-92; *see also Zukerman*, 961 F.3d at 447. In *Mansky*, the Supreme Court articulated how that standard applies in a nonpublic forum, explaining that, in order to pass the test of constitutional reasonableness, "the government 'must be able to articulate some sensible basis for distinguishing what may come in from what must stay out' under the rule." *Zukerman*, 961 F.3d at 447 (quoting *Mansky*, 138 S. Ct. at 1888); *see also NAACP v. Button,* 371 U.S. 415, 433, 438 (1963) ("Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms.").

Applying that standard, the *Mansky* Court invalidated a Minnesota law that prohibited the wearing of any "political" badges or apparel at voting places, concluding that the regulation failed to draw a reasonable line because of its "unmoored use" of the term "political," a term that the Court held incapable of reasoned application. 138 S. Ct. at 1888. "Because the term 'political' admits of such capacious readings, a blanket prohibition on 'political' apparel has an 'indeterminate scope.'" *Id.* at 1889. The "open-ended" and undefined term permitted decisionmakers to apply their "own politics" in determining what was impermissible "political" apparel. *Id.* at 1891; *see also Forsyth County*, 505 U.S. at 133 ("The First Amendment prohibits the vesting of such unbridled discretion in a government official."). While not necessary to its ruling, the Court also found support for its conclusion from Minnesota's "haphazard interpretations" in seeking to articulate what was covered by the ban in practice. *Mansky*, 138 S. Ct. at 1888; *see Zukerman*, 961 F.3d at 448.

The D.C. Circuit summarized the twin problems with vague speech regulation in *Zukerman*: "If a regulation on speech does not provide government decision-makers with objective, workable standards, the risk of 'unfair or inconsistent enforcement' and even 'abuse' is 'self-evident.'" 961 F.3d at 447 (quoting *Mansky*, 138 S. Ct. at 1891). Moreover, "the risks of

arbitrary or inconsistent enforcement will tend to undermine the very governmental interests that the regulation in question was meant to advance." *Id*. (citation omitted); *see also In re Murphy-Brown, LLC*, 907 F.3d 788, 800 (4th Cir. 2018) (*Mansky*'s "core requirement of clarity avoids twin problems": the "serious risk of chilling protected speech pending the drawing of fine distinctions that, in the end, would themselves be questionable" and "the risk of discriminatory or arbitrary enforcement") (citations omitted).

Guideline 9 suffers from many of the same problems that led the Court to invalidate the voting apparel statute at issue in *Mansky*. *First*, WMATA provides no additional "authoritative" guidance for what it means to be an "issue on which there are varying opinions." *Mansky*, 138 S. Ct. at 1889; *see also AFDI*, 978 F.3d at 495 (finding political advertising ban unreasonable, in part, because of the lack of "other sources defining the word 'political' or telling officials how to apply it"); *Center for Investigative Reporting*, 975 F.3d at 315 (asking whether "terms are 'indeterminate,' such as by being left undefined in the statute or government policy at issue").

*Second,* WMATA administrators are left to their own devices to decide whether an advertisement speaks to an issue on which public opinion is divided. "[F]ar from clarifying the indeterminate scope of the [] provision[s], the [Guidelines] introduce[] confusing line-drawing problems." *Mansky*, 138 S. Ct. at 1889. As in *Mansky,* unanswered questions abound here, such as:

- "What qualifies as an 'issue'?" *Id.* at 1889; *see also White Coat Waste Project*, 35 F.4th at 199 (with respect to statute's ban on "public issues," asking "whatever that might mean").

- What is the threshold for "varying opinions?" Must varying opinions be widely accepted or is it enough that a few people somewhere have different views on the same topic? Does

17

an opinion have to be reasonable to be the basis for a division of opinion?  *See AFDI*, 978

F.3d at 496 ("And whose perspective matters?  The reasonable commuter's?").

- Must the ad address the debated issue, or is it enough that it advertises a website, book, or

  performance that does?  *Id.* at 495 (asking whether a political ban was limited to "the ad's

  four corners" or whether it considered "related content like information on websites").  On

  this question, WMATA sometimes looks beyond the four corners of the advertisements to

  review content, as in the case of WallBuilders' website, and sometimes does not, as in the

  case of Catholic University's or Social Justice School's websites, or the content of the plays

  *The Book of Mormon* and *Moses*, leaving the actual standard impossible to determine.

- Do advertisements that sell products or services address issues of public debate?  What

  reasonable basis is there for the Guidelines excepting commercial ads from the "issue ad"

  ban?  *See Amalgamated Transit Union*, 929 F.3d at 654) ("[f]or most every good or service,

  there is some level of debate"); *White Coat Waste Project*, 35 F.4th at 200 (asking whether

  a McDonald's advertisement is acceptable while an anti-McDonald's ad by an animal

  rights group is not).  For example, does a diamond retailer's advertisement touting "conflict

  free" diamonds address an issue of public debate, given the controversy over so-called

  conflict (or "blood") diamonds?[5]  What about ads for defense contractors' latest offerings,

  as in the ads below for Lockheed Martin and Boeing, displayed at WMATA rail stations?

  *See* Declaration of Elaine Stamp, ¶ 2.

---

[5] *See* A. Baker, "Blood Diamonds," *Time*, https://time.com/blood-diamonds/.

 

*Third,* Guideline 9 requires WMATA administrators to have an encyclopedic knowledge of the countless issues on which American public opinion is divided.  In similar circumstances, *Mansky* faulted the Minnesota statute for requiring officials to "maintain a mental index of the platforms and positions of every candidate and party on the ballot."  138 S. Ct. at 1889.  As the D.C. Circuit similarly reasoned in striking down the U.S. Postal Service's exclusion of "political" custom postage designs, a "'rule whose fair enforcement requires [a government decision-maker] to maintain a mental index' of commercial or social designs that have any possible 'political' resonances is 'not reasonable.'"  *Zukerman*, 961 F.3d at 450 (alterations in original; citation omitted).

WMATA's Guideline 9 goes even further than the bans invalidated in *Mansky* and *Zukerman*.  It requires WMATA administrators to know not only the arguably "political" issues that might be on or affected by a ballot or that might appear on a postage stamp, but also ***every issue*** (political or not) on which "members of the public [have] varying opinions."  Of course, if you talk to two random Americans, you'll find differing opinions on a vast range of issues.  *See AFDI*, 978 F.3d at 497 ("noting that "[t]here are plenty of nonpolitical issues on which members of society disagree").  As the Sixth Circuit reasoned in *AFDI*, such a ban, read literally, raises questions like whether an advertisement taking sides in the Ohio State-Michigan football rivalry would be prohibited.  *Id.* at 497.  Any measure, such as Guideline 9, that "may turn in significant

part on the background knowledge and media consumption of the particular [official] applying it" is inherently unreasonable. *Mansky*, 138 S. Ct. at 1890.

This problem is exacerbated by WMATA's application of its Guidelines not only to issues explicitly addressed on the face of the advertisement, but also to hidden issues that WMATA somehow discovers lurking beyond the four corners of an advertisement, as with the WallBuilders' ads that contained nothing but famous historical paintings displayed with WallBuilders' website address. In a similar vein, WMATA previously rejected the following ACLU ad, which merely invited viewers to attend a conference, without any discussion in the ad of theme or topics to be at the conference:



*See ACLU v. WMATA*, No. 1:17-cv-1598-TSC, 2018 WL 7252897 (D.D.C. May 30, 2018), (discussing rejection of ad by WMATA). In both cases, it was not the content of the advertisement that apparently triggered WMATA, but information outside of the four corners of the advertisement.[6] A Guideline that requires such a vast "mental index" of issues—both expressed in, implied by, or even inferred from an advertisement by responsible officials—on which there is

---

[6] WMATA's approach to materials outside the four corners of an advertisement, such as website content or the content of plays or books referenced in an advertisement, is itself haphazard, as discussed, *infra*, at 29-31.

some level of public debate is inherently unreasonable. *See Mansky*, 138 S. Ct. at 1889; *Zukerman*, 961 F.3d at 450; *see also Women's Health Link, Inc. v. Fort Wayne Public Transp. Corp.*, 826 F.3d 947, 952-53 (7th Cir. 2016) (holding unreasonable transit authority's application of bus advertising policy to prohibit advertising by pro-life group where decision was based on "what may lie behind an innocuous ad—which might be a website containing forbidden matter").

As a result of these many flaws, Guideline 9 fails to articulate a "sensible basis for distinguishing what may come in from what must stay out." *Mansky*, 138 S. Ct. at 1888. Several courts, including at least four federal courts of appeals applying the standards discussed on *Mansky*, have held similar transit system bans on "issue ads" unreasonable. *See, e.g.*, *AFDI*, 978 F.3d at 495-97; *Amalgamated Transit Union Loc. 1015*, 929 F.3d 643; *Center for Investigative Reporting*, 975 F.3d at 316 ("[T]he lack of 'objective, workable standards' [for what constitutes a political advertisement] may allow the [official's] 'own politics to shape his views on what counts as political.'") (citation omitted); *White Coat Waste Project*, 35 F.4th at 201; *People for the Ethical Treatment of Animals, Inc. v. Shore Transit*, 580 F. Supp. 3d 183, 193 (D. Md. 2022).

In *AFDI*, for instance, the Sixth Circuit invalidated the Detroit transit authority's ban on "political" advertisements, where, as here, transit officials were unable to point to any "workable standards" for defining and applying that term. According to the transit authority, an advertisement was impermissibly "political" if "society is fractured on an issue and factions of society have taken up positions on that issue are not in agreement." 978 F.3d at 496. The court held that this standard, which is essentially identical to Guideline 9, was "subject to the same risk of 'haphazard interpretations' that *Mansky* found unacceptable." *Id.* at 496; *see also Amalgamated Transit Union*, 929 F.3d at 654 ("To the extent that [the transit authority's] position suggests the prohibition applies to any advertisement touching on any issue having any level of public debate,

21

such an interpretation is unreasonable"); *Center for Investigative Reporting*, 975 F.3d at 303 (transit system's ban on "advertisements that are political in nature or discuss matters of public debate" is unreasonable).

WMATA's undefined Guideline 9 raises all of these problems.  In these circumstances, "the danger of censorship and of abridgement of our precious First Amendment freedoms is too great where officials have unbridled discretion over a forum's use."  *AFDI*, 978 F.3d at 497 (citation omitted); *see Forsyth County*, 505 U.S. at 131; *Rosenberger*, 515 U.S. at 835 ("danger to liberty lies in granting the State the power to examine [speech like these ads] to determine whether or not they are based on some ultimate idea and, if so, for the State to classify them").

### 2. WMATA Haphazardly Applies Guideline 9, Regularly Displaying Ads Promoting Issues on Which there is Substantial Public Debate.

One need look no further than WMATA's haphazard application of Guideline 9 to see its rudderless nature.  *See, e.g.*, *Archdiocese of Wash.*, 897 F.3d at 330 ("a challenged regulation may be unreasonable, regardless of the reasons for its adoption, if it is inconsistently enforced"); *AFDI*, 978 F.3d at 496 (examining advertising regulation against transit authority's actual application in practice); *Center for Investigative Reporting*, 975 F.3d at 315 (asking whether standards "have been or are susceptible to 'erratic application'"); *White Coat Waste Project*, 35 F.4th at 199 ("Richmond Transit's actions" demonstrate the lack of clarity of its advertising standards).

While Guideline 9 ostensibly prohibits advertisements that seek to influence the public on issues "on which there are varying opinions," WMATA *regularly* sells space for ads intended to influence the public on issues that divide American opinion, often deeply.[7]  In September 2023,

---

[7] Throughout this motion, Plaintiff cites online sources, newspaper columns and other articles not for the truth of the matter asserted therein, but merely to demonstrate that the authors have expressed their opinion on the issue in a widely available publication.  Plaintiffs request that this Court take judicial notice of these exemplars for the limited purpose of demonstrating that there

WMATA ran a billboard ad (reproduced below) for Power to the Patients, which addressed the issue of transparency in hospital pricing, with the tagline, "WE ~~NEED~~ DEMAND HOSPITAL PRICES," with "NEED" deliberately struck through. *See* Declaration of Monica Hopkins at ¶ 2. The ad also contained a link to the organization's website, powertothepatients.org, which advocates for "real prices and transparency in healthcare." The proper degree of hospital price transparency is plainly an issue on which there are varying opinions among members of the public.[8]



---

are varying opinions among members of the public, as evidenced by the views expressed by the authors. *See Washington Post v. Robinson*, 935 F.2d 282, 291 (D.C. Cir. 1991) (a "court may take judicial notice of the existence of newspaper articles in the Washington, D.C., area that publicized" certain facts); *Sandza v. Barclays Bank PLC*, 151 F. Supp. 3d 94, 113 (D.D.C. 2015) (judicial notice of newspaper articles appropriate to demonstrate that the articles contained certain information that would have put defendant on notice).

[8] For example, while PowertothePatients.org argues for increased price transparency, others argue that increased transparency will lead to higher prices because of reduced competition and the potential for collusion. *See* Robert Graboyes & Jessica McBirney, "Price Transparency in Healthcare: Apply with Caution," Mercatus Center (Aug. 19, 2020), https://www.mercatus.org/research/research-papers/price-transparency-healthcare-apply-caution.

WMATA also accepted, and posted in the Metro Center station, the following ad from the Brennan Center for Justice urging viewers to "DEMAND SUPREME COURT TERM LIMITS." Declaration of Kassandra L. Dulin ("Dulin Decl.") at ¶ 5.  The advertisement states prominently, "TOO MUCH TIME.  TOO MUCH POWER," and includes a link to the Brennan Center's website, which advocates for Supreme Court term limits: "Term limits would ensure that the Supreme Court stays in touch with American society and that no justice has too much power for too long."  *See* It's Time for Supreme Court Term Limits, Brennancenter.org/termlimits.



Brennan Center's metro station advertisement is subject to the same Guidelines as WallBuilders' proposed bus advertisements that WMATA rejected.  WMATA allowed the ad

notwithstanding that Supreme Court term limits are a particularly controversial issue and have been a source of substantial public debate in recent years.[9]

Other examples of advertisements addressing issues on which members of the public have varying opinions are plentiful. Earlier in 2023, WMATA buses displayed advertisements for a charter school that seeks to train middle-school students to be "social justice" activists. Declaration of Shannen W. Coffin ¶ 10 ("Coffin Decl."). The Social Justice School seeks to "to catalyze an integrated community of middle-school learners to be scholar-activists who are designers of a more just world." *Id.* The advertisement prominently describes the Social Justice School as a school "WHERE *SCHOLAR* MEETS *ACTIVIST*," and includes a link to the school's website (thesocialjusticeschool.org), which explains the school's focus on "liberatory design thinking" and "social justice." *Id.*

In that same vein, WMATA buses have displayed ads for the University of Maryland proclaiming that "INCLUSION IS THE SOLUTION," and "WE HAVE THE FORMULA FOR PROGRESS." Daday Decl. ¶ 9. The advertisement includes a link that takes viewers to the University's website devoted to its "Fearlessly Forward" campaign, which the University describes as a "plan [that] is rooted in the principles of values-driven excellence, diversity, equity and inclusion, impact, innovation, collaboration and service to humanity." *See* Darryll J. Pines, *Fearlessly Forward* Univ. of Md. (Feb. 9, 2022), https://president.umd.edu/articles/fearlessly-forward. *Id.*

---

[9] *See, e.g.*, Maggie Jo Buchanan, Term Limits are Critical to Restoring Public Trust in the Supreme Court, American Progress, (June 14, 2023), https://www.americanprogress.org/article/term-limits-are-critical-to-restoring-public-trust-in-the-supreme-court/; J. Harvie Wilkinson III, Supreme Court Term Limits Wouldn't Solve Anything, Washington Post, (Oct. 17, 2021), https://www.washingtonpost.com/opinions/2021/10/18/supreme-court-term-limits-wouldnt-solve-anything/

The issues of social justice, inclusion, and diversity in education are hotly debated topics in American discourse.[10]  Similarly, the global non-violence movement is not without its detractors.  Yet, in November 2022, WMATA ran an advertisement in its Metro Center station for an anti-war organization, World Beyond War, which describes itself as a "global movement to end all wars."  *See* https://worldbeyondwar.org.  The ad displayed the message "Peace on Earth," and the organization's logo and website address, worldbeyondwar.org.  World Beyond War's website, referenced in the ad, explains that it is "a global nonviolent movement to end war and establish a just and sustainable peace."  Coffin Decl. ¶ 11.



WMATA apparently determined the ad's anti-war message to be an issue on which there are no differences of opinion among the public, but it is a topic of heated public debate, as

---

[10] *See, e.g.*, Matthew Spalding, "DEI Spells Death for the Idea of a University," Wall St. Journal (Feb. 10, 2023) (contending that the concept "now means creating a social environment where identity groups are celebrated while those who disagree are maligned.), https://tinyurl.com/smbh7vcb; Samuel J. Abrams, "Hardly Inclusive:  Diversity Mandates Have Politicized Campus Life." American Enterprise Institute Op-Ed (October 27, 2023), https://tinyurl.com/yckfpcjb ("[T]he main drivers of overly politicized campus life seem to be the diversity, equity and inclusion (DEI) offices—divisive, omnipresent forces on campuses that thrust students into the intense, chaotic and often vicious political world.").

evidenced by the headlines of recent days showing that there are those who believe that peace is not a desired goal. *See, e.g.*, B. Hubbard and M. Abi-Habib, "Behind Hamas's Bloody Gambit to Create a 'Permanent' State of War," *New York Times* (Nov. 8, 2023), https://www.nytimes.com/2023/11/08/world/middleeast/hamas-israel-gaza-war.html. And of course, the means to achieve peace on earth often involve substantial issues of public debate, including the existence of the just war, deterrence, and similar weighty and highly debated issues. Had WMATA looked behind the advertisement, it would have seen that the sponsor's website shows it to be against "arms manufacturing, weapons stockpiling, and the expansion of military bases," https://worldbeyondwar.org/who/—certainly issues on which there is no public consensus. None of that deterred WMATA from running World Beyond War's advertisement.

WMATA itself has used its bus sides to address controversial topics. With much public ado, WMATA launched a 2023 "Earth Day" campaign displaying images promoting Earth Day and progressive environmental policies. *See* https://dcist.com/story/23/07/03/dc-metro-wrapping-special-trains-pride-cherry-blossoms-more/, Daday Decl., Ex. H. The advertisements were the result of a contest and resulted in displays that featured drawings from local school children. But again, Earth Day itself is the subject of public debate, not only from the right but also from supporters of environmental activism.[11]

In other instances, WMATA ran public service announcements encouraging viewers to get an updated COVID-19 vaccination, Varone Decl. ¶ 6, ads promoting alcohol and sports gambling, *id.* ¶¶ 7-8, and an ad for an online shopping service promoting Plan B, a controversial over-the-

---

[11] *See, e.g.*, Kimberly Nicholas, "I'm an Environmental Scientist and I Hate Earth Day," *Daily Beast* (April 22, 2021), https://tinyurl.com/mwstbb6u; Rebecca Leber, "I'm an Environmental Journalist and I Hate Earth Day," *Mother Jones* (Apr. 22, 2019), https://tinyurl.com/2speh24f.

counter oral contraceptive, inviting viewers to "Buy Plan B without ever stepping foot in a store." Daday Decl. ¶ 11.  These ads all addressed issues of substantial public debate.[12]  While allowing each of these ads addressing issues where public opinion varies, WMATA prohibited WallBuilders' ads, even an ad that did nothing more than depict the signing of the Constitution and WallBuilders' website address.

As these examples demonstrate, WMATA takes a haphazard approach to how content related to, but not depicted in, an advertisement can affect its application of Guideline 9.  WMATA rejected WallBuilders' alternative advertisements, which removed any text apart from its website and the images of George Washington in prayer and the signing of the constitution.  WMATA's third-party administrator, Outfront Media, suggested in consultations with WallBuilders that the content of its website might cause problems for WMATA, and it is apparent that is the case.  Smith Decl. ¶¶ 25-26.  WallBuilders' website explains its pro-Christian mission and viewpoint: "Presenting America's forgotten history and heroes with an emphasis on our moral, religious and constitutional heritage."  *See* WallBuilders.com.

Yet similar links to the websites of the Social Justice School, of the Brennan Center, or of World Beyond War, to name just a few—all of which provide further information on issues of public controversy—were not enough to similarly prohibit those advertisements.  And while a link to WallBuilders' pro-Christian website apparently kept its ad off of WMATA buses, WMATA

---

[12] *See, e.g.*, C.P. Guzman et al., "COVID-19 vaccine controversy: A cross-sectional analysis of factors associated with COVID-19 vaccine acceptance amongst emergency department patients in New York City," J. Am. Coll. Emerg Physicians Open (Nov. 2022), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC9669987/; *see also* Morning After Pill Controversy, PBS News Hour (Nov. 2005) (discussing criticisms of over-the-counter Plan B), https://tinyurl.com/3nk98x98.

inconsistently allows select, unapologetically religious website addresses to be displayed on its buses.  *See, infra*, Section I.A.3 (discussing, inter alia, The Catholic University of America's ads).

WMATA also frequently runs ads for theatrical performances that touch on controversial issues.  For example, in 2017, WMATA ran advertisements for *The Book of Mormon* at the Kennedy Center.  *See* Coffin Decl. ¶¶ 7-9.  *The Book of Mormon*, a well-known Broadway musical from the creators of *South Park*, sharply lampoons religious practices and, in particular, the practices of the Church of Jesus Christ of the Latter-Day Saints (LDS).



*The New York Times'* David Brooks has described the "central theme of 'The Book of Mormon'" as "that many religious stories are silly—the idea that God would plant golden plates in upstate New York.  Many religious doctrines are rigid and out of touch."  *See* David Brooks, "Creed or Chaos," *N.Y. Times* (Apr. 21, 2011).  *The Book of Mormon* musical has been frequently described by critics, even those who otherwise enjoyed the musical, as "blasphemous."  *See, e.g.*, Ben Brantley, "Missionary Men with Confidence in Sunshine," *N.Y. Times* (Mar. 24, 2011) ("Now you should probably know that this collaboration between the creators of television's "South Park" (Trey Parker and Matt Stone) and the composer of "Avenue Q" (Robert Lopez) is also

blasphemous, scurrilous and more foul-mouthed than David Mamet on a blue streak."). The musical features a song entitled "Hasa Diga Eebowai," a parody of Disney's *The Lion King*'s "Hakuna Matata," that describes a fictional Ugandan village's response to its many troubles. "Hasa Diga Eebowai," a village leader explains, translates into English as "F*** you, God." *See Hasa Diga Eebowai*, https://tinyurl.com/mutkkvpb.

Suffice it to say, the musical's viewpoint is highly controversial. Yet WMATA did not decline to run an ad for the musical because of the viewpoint expressed in the musical, even though it excluded WallBuilders' advertisements apparently because of viewpoint expressed on its website and similarly pulled down advertisements for a book by author Milo Yiannopoulos because of the viewpoint expressed by the author not in the ad, but in the book. *See* Defendants' Opposition to Plaintiff Milo Worldwide LLC's Motion for Preliminary Injunction, *ACLU v. WMATA*, No. 1:17-cv-1598 (D.D.C. May 25, 2018), ECF No. 21, at 7 (explaining that a WMATA official "read an excerpt of the book online and concluded that it appeared to be issue-oriented . . . . She immediately submitted the ads to WMATA's review panel, which determined that the ads violated WMATA's Commercial Advertising Guidelines 9 and 14.").

WMATA's inconsistent approach to speech referenced in, but beyond the four corners of, a proposed advertisement reinforces the arbitrary nature of Guideline 9. In *AFDI*, the court faulted the Detroit transit authority for its similar practice of rejecting certain ads based on the contents of the speakers' websites, but "not review[ing] the content of advertised, shows, movies or books" and inconsistently reviewing other advertisers' websites. *See AFDI*, 978 F.3d at 495 (when transit authority "has accepted ads, it is not clear it has reviewed the listed websites").

These advertisements—which are just a small sample collected by WallBuilders in the short window leading up to the filing of its lawsuit—demonstrate the unbounded nature of

Guideline 9.[13]  WMATA's haphazard and arbitrary application of Guideline 9 illustrates the inherent dangers in granting government officials unbridled discretion to enforce vague speech rules.  These decisions show no rhyme or reason to Guideline 9's application—which is entirely the result of its indecipherable standards.  As *Mansky* reasons, the sheer volume of advertisements addressing issues of public debate that Guideline 9 actually allows through its filters severely undermines WMATA's stated interest in preventing community discord, discrimination, and promoting public safety—as any one of those many permitted ads might spark disagreement, even sharp disagreement, among members of the public.  *See Mansky*, 138 S. Ct. at 1891.

When, as here, officials have "difficulties [implementing the State's] restriction[s] [that] go beyond close calls on borderline or fanciful cases," such restrictions are indeterminate and unworkable.  *See Mansky*, 138 S. Ct. at 1891.  Guideline 9's "unmoored" standard, prohibiting display of "issue[s] on which there are varying opinions" is unreasonable on its face and in its application.  *Mansky* and its progeny require that this Court invalidate Guideline 9.

### 3.    Guideline 12 Suffers from the Same Problem of Unworkable Standards

Guideline 12 suffers the same problems of unworkability.  The Guideline presents similar risks of haphazard application, raising serious questions about how WMATA determines whether an advertisement "promote[s] or oppose[s] any religion, religious practice or belief."  Guideline 12.  The D.C. Circuit disagreed in *Archdiocese of Washington*, concluding, on the record before it, that the prohibition was reasonably drawn to WMATA's purpose of "avoid[ing] the inflamed passions surrounding religion."  897 F.3d at 330.  The Court acknowledged that a challenged

---

[13] Other lawsuits now pending in this District provide further examples of Guideline 9's inherent unworkability.  *See ACLU v. WMATA*, No. 1:17-cv-1598-TSC; *White Coat Waste Project v. WMATA*, No. 1:23-cv-1866-JEB.

regulation may be unreasonable "if it is inconsistently enforced," but concluded that the few examples before it did not give rise to such concerns. *Id.*

The many examples of inconsistent application of Guideline 12 in the record here distinguish the holding of *Archdiocese of Washington* on the limited record before the D.C. Circuit in that case. There, the D.C. Circuit found that a small number of examples of advertisements by religious organizations actually reinforced its conclusion that there was no discrimination against religious speakers. *See* 897 F.3d at 330. On the more robust record presented here, by contrast, the advertisements allowed by WMATA demonstrate its inconsistent application of Guideline 12 not simply as to religious speakers, but as to *religious viewpoints*.

Thus, the Kennedy Center is allowed to advertise a performance—*The Book of Mormon*—which skewers religious belief and religious practice, using an ad that itself lampoons the Church of Jesus Christ of Latter -Day Saints' missionary practices. *See* discussion, *supra*, at 29-30.[14] Similarly, the Edlavitch DC Jewish Community Center is permitted to advertise for a Jewish film festival, and even more pointedly, for specific *pro-religious* performances. *See* Coffin Decl. ¶ 14. In November 2023, it ran advertisements for a trio of plays that included *Moses,* a play by Michelle Lowe, described as a modern retelling of the story of the prophet Moses, a story "about faith, love, and going it alone." *See Moses, by Michelle Lowe*, https://theaterj.org/2023-2024-season/moses-2/. Both performances contain content that "promotes or opposes" religious practices and beliefs, yet that speech, unlike the religious viewpoints displayed on WallBuilders' website, did not cause WMATA to reject those ads.

---

[14] Though it predated the decision in *Archdiocese of Washington*, *The Book of Mormon* advertisement was not in the evidentiary record before the D.C. Circuit there. *Amicus curiae* First Liberty cited it in its *amicus* brief, but the D.C. Circuit did not address the advertisement as part of the record before it.

Similarly, a series of advertisements by the Catholic University of America demonstrate the arbitrary, inconsistent approach WMATA takes to Guideline 12.  Of course, as *Archdiocese of Washington* suggests, nothing in Guideline 12 prevents Catholic University from advertising simply because it is a religious university.  But Catholic University's ads go further than simply advertising its educational programs.  Instead, the university advertises itself as a *distinctly Catholic* institution.  A November 2023 advertisement, for instance, touted that: "There are More than 200 Catholic Universities in America.  Only one is The Catholic University of America."  *See* Coffin Decl. ¶ 12.  The point of the ad was emphasizing Catholic University's place as *the* preeminent Roman Catholic university in the country.

Another advertisement as part of the same campaign (reproduced below) included the tagline "Every Story is a Journey of the Spirit," (Daday Decl. ¶ 7), which is, to borrow a phrase from *Archdiocese of Washington,* a "recognizably religious" reference, especially when used by a religious institution.  *See* 897 F.3d at 330.  And any doubt regarding the distinctly religious nature of the Catholic University ads is resolved by the inclusion in each ad of Catholic University's logo and motto, which translates from Latin as "God is my light."  Finally, both ads include Catholic University's website address, which actively promotes the institution's religious mission, including providing information about worship services on campus.  *See, e.g.*, Daday Decl, Ex. A; About Us, Faithfull Catholic, https://www.catholic.edu/about-us/faithfully-catholic/index.html ("'The teaching of the University should be faithfully Catholic, conformed in all things to the creed of the Church and the decisions of the Holy See.'").  Similar religious website content was referenced in the Archdiocese's "Find the Perfect Gift" advertisement *rejected* by WMATA in *Archdiocese of Washington*.  *See* 897 F.3d at 467 (website "contained substantial content promoting the Catholic Church") (cleaned up).



More recently, in December 2023, WMATA ran advertisements for the White House Historical Association's 2023 Christmas Ornament. The advertisement, which ran both in its rail stations and on the sides of buses, had the word "Christmas" in the largest script in the advertisement, making it stand out from the rest of the text.



*See* Daday Decl. ¶ 12.   Unlike the various purely commercial advertisements discussed in *Archdiocese of Washington*, the White House Historical Association ad's explicit reference to a Christian holiday does, in fact, express a view for "how Christmas should be celebrated," *see* 897 F.3d at 329, i.e., by putting up a tree and hanging the White House ornament.  Indeed, the QR code embedded in the advertisement leads to the Association's website site, which explains that "collecting and giving these unique ornaments has become a holiday tradition for families across the United States and abroad."   *See* shop.whitehousehistory.org/products/official-2023-white-house-christmas-ornament.

Taken together, these recent examples demonstrate WMATA's haphazard application of Guideline 12.  Given the compelling examples of WMATA's inconsistent application, this Court

should conclude that Guideline 12 is incapable of reasoned application and is thus unconstitutional under *Mansky*.

**B.** **WMATA's Advertising Guidelines Violate the First Amendment's Free Speech Clause Because They Impermissibly Discriminate Based on Viewpoint.**

**1.** **Guideline 9 Is Viewpoint Discriminatory**

In light of the unbridled discretion that it confers on WMATA administrators, Guideline 9 *inevitably* results in viewpoint discrimination—in this case, discrimination against WallBuilders' religious viewpoint.  Viewpoint discrimination is an "egregious form of content discrimination" that is "presumptively unconstitutional." *Rosenberger*, 515 U.S. at 829–30.  "If a [policy] is viewpoint-based, it is unconstitutional." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2299 (2019). Viewpoint discrimination is impermissible no matter the nature of the forum. *See, e.g.*, *Mansky*, 138 S. Ct. at 1885 (viewpoint neutrality required in nonpublic forum).

Although broadly phrased, Guideline 9's ban on divisive advertisements is nonetheless viewpoint discriminatory.  "Viewpoint discrimination exists even when the government does not target a narrow view on a narrow subject and instead enacts a more general restriction—such as a ban on all 'religious' speech or on all 'offensive' speech." *AFDI*, 978 F.3d at 499 (quoting *Iancu*, 139 S. Ct. at 2300–01; *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 393 (1993)).  While the government may limit content in a nonpublic forum, it "may not go further by prohibiting specific viewpoints on the topics that it allows." *See AFDI*, 978 F.3d at 498; *see also Good News Club v. Milford Cent. Sch.* 533 U.S. 98, 109-112 (2001).

But that is precisely what Guideline 9 does—and precisely what it is intended to do.  By targeting only issues on which the public is divided, WMATA selectively seeks to avoid opinions and viewpoints that might offend.  But prohibiting "controversial" speech is a form of invidious viewpoint discrimination. *See Iancu*, 139 S. Ct. at 2301 (a regulation "disfavoring 'ideas that

offend' discriminates based on viewpoint"); *Matal*, 582 U.S. at 243 (plurality opinion) ("Giving offense is a viewpoint."); *Ne. Pa. Freethought Society*, 938 F.3d at 439 ("The censorship of messages *because* they are controversial is viewpoint discrimination.").

Guideline 9 permits—indeed, invites—WMATA administrators to discriminate against disfavored viewpoints they deem controversial. In determining which speech is too controversial to display, WMATA empowers its decisionmakers to subjectively assess the viewpoints expressed in the advertisements. As in *Mansky*, Guideline 9 invites decisions inevitably shaped by the administrator's "own politics" or other subjective preferences. *Mansky*, 138 S. Ct. at 1891. This results in certain preferred speakers being allowed to address issues of public debate, while WallBuilders is prohibiting from addressing the same topics because of its distinct viewpoint. *See also Matal*, 582 U.S. at 250 (Kennedy, J., concurring in part and concurring in judgment) ("indeed, a speech burden based on audience reactions is simply government hostility and intervention in a different guise. The speech is targeted, after all, based on the government's disapproval of the speaker's choice of message. And it is the government itself that is attempting in this case to decide whether the relevant audience would find the speech offensive.").

The publicly available evidence shows that WMATA takes this arbitrary, viewpoint-based approach in applying Guideline 9. Thus, for example, it permits ads addressing issues such as the public health benefits of vaccination, health care pricing transparency, and judicial term limits (*see* discussion, *supra*, at 23-27, which are plainly issues of public debate, because it arbitrarily determined that the viewpoints expressed in those advertisements were not ones on which members of the public might disagree. Yet it does not strain credulity to conclude that advertisements addressing different viewpoints on the same issues from a more controversial

speaker—such as an advertising expressing skepticism regarding the efficacy of mRNA vaccines—would not be permitted.

Guideline 9 is particularly problematic in light of the religious viewpoints it excludes. "The First Amendment doubly protects religious speech." *Kennedy*, 142 S. Ct. at 2421. "Religious expression holds a place at the core of the type of speech that the First Amendment was designed to protect." *DeBoer v. Vill. of Oak Park*, 267 F.3d 558, 570 (7th Cir. 2001). This protection goes to the heart of the First Amendment. "[I]n Anglo-American history, at least, government suppression of speech has so commonly been directed *precisely* at religious speech that a free-speech clause without religion would be Hamlet without the prince." *Capitol Square Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753, 760 (1995). As a result, the First Amendment promises that individuals of faith "are given proper protection as they seek to teach the principles that are so fulfilling and so central to their lives and faiths." *Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n*, 138 S. Ct. 1719, 1727 (2018) (internal citation omitted). Finally, as relates to the subject matter of this dispute, religious advertising "occupies the same high estate under the First Amendment as do worship in the churches and preaching from the pulpits." *See Murdock v. Pennsylvania,* 319 U.S. 105, 109 (1943).

While religion is a "vast area of inquiry," it "also provides . . . a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered." *Rosenberger*, 515 U.S. at 831. In applying Guideline 9, WMATA "selects for disfavored treatment" WallBuilders' messages "with religious . . . viewpoints" on subject matter otherwise permitted in the forum. *Id.* at 831. Specifically, whereas WMATA forbids WallBuilders from expressing its religious viewpoint on its educational mission and on the role of religious faith and

38

Christianity in American history, ads addressing both topics are generally permitted on WMATA buses when they express a *secular* viewpoint.

First, WMATA allows advertisements from non-religious organizations that promote their *educational missions* from a secular perspective. *See Ne. Pa. Freethought Society*, 938 F.3d at 434 (discrimination occurs where secular associations can advertise "organizational philosophy" but "atheistic and religious associations are banned from saying the same thing because of the character of their speech"). Advertisements for the Social Justice School or the University of Maryland address those organizations' educational missions in the context of controversial educational topics such as "social justice" and "inclusion." Coffin Decl. ¶ 10. By contrast, WallBuilders is not permitted to promote its own organization's educational mission to educate the public on the religious basis for the founding of the nation. The only difference appears to be the religious perspective from which WallBuilders addresses the same subject matter. Indeed, the mere mention of its website, which, if the viewer chooses to visit, explains WallBuilders' religious-based educational mission in detail, is apparently enough to result in WMATA's rejection of its advertisements. But similar citations to the secular educational institutions' websites, which discuss controversial topics from a secular perspective, does not disqualify those advertisements.

Second, WMATA even selectively allows other religious organizations to promote their educational missions, causing discrimination *among* various religious viewpoints. Catholic University's advertisements openly promote its religious mission to educate its students as a Catholic educational institution, displaying openly religious messages, such as Catholic University's motto, the Latin phrase, "Deus Lux Mea Est," which translates as "God is my light." *See* Daday Decl. ¶ 7. Why WMATA would favor Roman Catholic educational messages, but disfavor similar educational messages from an evangelical Christian perspective, is not clear. But

it plainly does.  And that arbitrary discrimination is the inevitable result of WMATA's unmoored Guideline 9.

Third, WMATA permits advertisements addressing aspects of American history, including controversial aspects of that history, from a secular perspective.  WMATA recently displayed ads for a PBS show, "Iconic America: Our Symbols and Stories with David Rubenstein," which "examines the history of America through some of its most iconic symbols, objects and places, diving deep into each symbol's history and how its meaning has changed over time."  Daday Decl. ¶ 6.  Episodes of "Iconic America" have delved into controversial historical symbols like Stone Mountain (which the show describes as the "Confederate Mount Rushmore") and the Gadsden flag, both of which elicit deeply divergent public responses.  *Id.* ¶ 6.  Similarly, the White House Historical Association's Christmas Ornament ad (*see, supra*, at 34-35) explicitly emphasized the Association's role in teaching American history, including a customer testimonial: "Teaches me new things about the Presidents."  By contrast, WMATA rejected WallBuilders' ads addressing the role of Christianity in our nation's history.

Fourth, WMATA has allowed advertisements for performances that poke fun at the role of religion in public life, including shows that sharply lampoon religious beliefs and practices.  As noted, the 2017 bus advertisement for *The Book of Mormon* musical promoted a show that harshly parodies religious practices and belief.  And setting aside WMATA's inconsistent treatment of the underlying content of websites and performances, the *Book of Mormon* advertisement *itself* parodied the religious practices of the Mormon faith and the role of religious faith in American culture.  The photo in the advertisement (*see, supra*, at 29-30) is of a Mormon missionary in a comical pose, with the Book of Mormon tucked by his side, wearing black pants, a white shirt and plain tie and a name tag, with a doorbell substituted for one of the "O's" in "Mormon."

WallBuilders' rejected advertisements, by contrast, sought to emphasize the critical role that religious faith plays, emphasizing (according to its website linked in the advertisements) "the moral, religious, and constitutional foundation on which America was built American life."

Such disparate treatment constitutes viewpoint discrimination. *See Rosenberger*, 515 U.S. at 831 (impermissible to disfavor certain perspectives—"religious editorial viewpoints"—while allowing other content relating to religion as a more general topic). "The First Amendment requires governments to protect religious viewpoints, not single them out for silencing." *Archdiocese of Wash. v. WMATA*, 140 S. Ct. 1198, 1200 (Gorsuch, J., statement respecting denial of certiorari); *see also Rosenberger*, 515 U.S. at 829–30; *Good News Club*, 533 U.S. at 112; *see also Lamb's Chapel*, 508 U.S. at 393-94; *Widmar v. Vincent*, 454 U.S. 263, 267 (1981). In so singling out WallBuilders' religious speech, Guideline 9 violates the First Amendment.

As Justice Gorsuch explained in his statement respecting the denial of certiorari in *Archdiocese of Washington,* "[t]hat's not to say WMATA lacks a choice." 140 S. Ct. at 1200. "The Constitution requires the government to respect religious speech, not to maximize advertising revenues. So if WMATA finds messages like the one here intolerable, it may close its buses to all advertisements. More modestly, it might restrict advertisement space to subjects where religious viewpoints are less likely to arise without running afoul of our free speech precedents. The one thing it cannot do is what it did here—permit a subject sure to inspire religious views . . . and then suppress those views." *Id.*

> **2.    Guideline 12 Impermissibly Discriminates Against WallBuilders' Religious Viewpoint on Subjects Allowed to Be Addressed in WMATA Ads**

WallBuilders' final challenge raises an issue previously addressed by the D.C. Circuit in *Archdiocese of Washington*: Guideline 12 impermissibly discriminates against WallBuilders' religious viewpoint on otherwise permissible topics by prohibiting advertisements that "promote

or oppose any religion, religious practice or belief."  The D.C. Circuit rejected such a viewpoint discrimination challenge, concluding that Guideline 12 permissibly regulates content, not viewpoint.  And this Court is obviously bound by that decision.

Respectfully, however, the D.C. Circuit was wrong, as several judges of that Court suggested in dissenting from denial of *en banc* review and two Supreme Court Justices agreed in a statement respecting denial of certiorari.  *See Archdiocese of Wash. v. WMATA*, 910 F. 3d 1248, 1250-54 (D.C. Cir. 2018) (Griffith, J., dissenting from denial of rehearing en banc); *Archdiocese of Wash. v. WMATA*, 140 S. Ct. at 1199 (statement respecting denial of certiorari, Gorsuch, J., joined by Thomas, J) ("Because the full Court is unable to hear this case, it makes a poor candidate for our review. But for that complication, however, our intervention and a reversal would be warranted for reasons admirably explained by Judge Griffith in his dissent below and by Judge Hardiman in an opinion for the Third Circuit.").

As the Third Circuit and other courts have subsequently held, explicitly rejecting the reasoning of *Archdiocese of Washington*, the trio of Supreme Court cases—*Rosenberger*, *Lambs' Chapel* and *Good News Club*—compel the conclusion that the categorical exclusion of speech with a religious perspective from a forum where the same topics are allowed to be addressed from a secular perspective is viewpoint discrimination.  *See Ne. Pa. Freethought Society*, 938 F.3d at 435 ("We respectfully disagree with our sister court," i.e., the D.C. Circuit in *Archdiocese of Washington*); *see also Young Israel of Tampa, Inc. v. Hillsborough Area Regional Transit Auth.*, 582 F. Supp. 3d 1159, 1170 (M.D. Fla. 2022) (agreeing that *Ne. Pa. Freethought Society*'s "approach better conforms to the prevailing Supreme Court caselaw on the issue of religious viewpoint discrimination").  "What matters for the viewpoint discrimination inquiry isn't how religious a message is, but whether it communicates a religious (or atheistic) viewpoint on a subject

to which the forum is otherwise open)." *Ne. Pa. Freethought Society*, 938 F.3d at 435.  As the Third Circuit properly held, "no prerogative to ban subjects [such as religious speech] can justify viewpoint discrimination." *Id.* at 436.[15]

To take one glaring example from the record here, WMATA allows an advertisement by an anti-war group declaring a message of "Peace on Earth," but Guideline 12 would forbid WallBuilders or the Archdiocese of Washington from running a similar ad that reads "And on earth peace, good will toward men.  Luke 2:14" because it expresses the identical thought from a religious viewpoint.  This is paradigmatic viewpoint discrimination.

We do not expect this Court to correct the error of the D.C. Circuit's decision.  But WallBuilders nevertheless presses the issue here that *Archdiocese of Washington* was wrongly decided, so that it can preserve the issue for review upon appeal.  The error of that decision is now apparent.  For reasons already addressed with respect to Guideline 9, Guideline 12 prevents WallBuilders from addressing topics otherwise allowed on the side of WMATA buses—its educational mission, American history, etc.—from its uniquely religious perspective.  That its speech relates to the forbidden topic of religious beliefs and practices cannot justify discrimination against its religious viewpoint on these otherwise permissible topics.

For all of these reasons, WallBuilders' First Amendment challenge is likely to succeed on the merits.

---

[15] Even if Guideline 12 were only a subject matter ban on religion (as the D.C. Circuit incorrectly held), "it is unreasonable to so broadly single out for exclusion speech entitled to special protection." *Ne. Pa. Freethought Society*, 938 F.3d at 441 (citing *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 100 (1st Cir. 2004) (citation omitted); *Hedges v. Wauconda Cmty. Unit Sch. Dist. No. 118*, 9 F.3d 1295, 1298 (7th Cir. 1993) ("Even when the government may forbid a category of speech outright, it may not discriminate on account of the speaker's viewpoint. Especially not on account of a religious subject matter, which the free exercise clause of the first amendment singles out for protection." (citation omitted)).

## II.    WALLBUILDERS' HARMS ARE ONGOING AND IRREPARABLE, REQUIRING PRELIMINARY RELIEF.

WMATA's decision to prohibit WallBuilders from advertising on its buses has caused irreparable harm.  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality) (citing *N.Y. Times Co. v. United States*, 403 U.S. 713 (1971)).  For First Amendment claims, assuming a likelihood of success on the merits, denial of those rights suffices to demonstrate irreparable harm absent the issuance of a preliminary injunction.  *Tyndale House Publishers, Inc. v. Sebelius*, 904 F. Supp. 2d 106, 129 (D.D.C. 2012).

Additionally, WMATA denied WallBuilders the opportunity to communicate its message to its preferred audience in the Washington metropolitan area during the planned time of its rebrand and relaunch, disrupting WallBuilders' plans and timeline.  Nevertheless, WallBuilders is eager to display its ads now and in the future.  Barton Decl. ¶ 19.  As a result, WallBuilders is suffering ongoing harm from the lost opportunity and constitutional injury that cannot be remedied later.

## III.    PERMITTING WALLBUILDERS' ADVERTISEMENTS ON ITS BUSES WILL NOT HARM WMATA AND FAVORS THE PUBLIC INTEREST.

As this Court has noted, "[t]he Government cannot suffer harm from an injunction that merely ends an unlawful practice."  *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (internal quotation marks omitted). And given the speculative and vague nature of the government's interests, it is not clear what harm the government could possibly suffer.

For similar reasons, providing preliminary injunctive relief to protect WallBuilders' constitutional rights serves the public interest.  As the D.C. Circuit has held, it is "obvious" that "enforcement of an unconstitutional law is always contrary to the public interest."  *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013); *Archdiocese of Wash.*, 897 F.3d at 335 ("[t]he public interest favors the protection of constitutional rights") (citation omitted); *Lamprecht v. FCC*, 958

F.2d 382, 390 (D.C. Cir. 1992) ("[A government] policy that is unconstitutional would inherently

conflict with the public interest."); *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 105 (D.D.C.

2012) ("It is always in the public interest to prevent the violation of a party's constitutional rights.")

(simplified); *Freedberg v. U.S. Dep't of Justice*, 703 F. Supp. 107, 111 (D.D.C. 1988) (same).  And

this court has explained that bringing a government entity into compliance with the law "is not a

harm, but rather is in its best interest, which also weighs in favor of issuing the requested relief."

*Lofton v. District of Columbia*, 7 F. Supp. 3d 117, 124-25 (D.D.C. 2013).

Because the interests of WallBuilders, the public, and WMATA all point in the same

direction, the balance of equities strongly support granting preliminary injunctive relief.

## CONCLUSION

For the foregoing reasons, this court should enter a preliminary injunction to prevent

WMATA from denying WallBuilders' proposed advertisements.

Dated: December 12, 2023                    Respectfully submitted,

                                            By:    /s/ Shannen W. Coffin
                                                   Shannen W. Coffin (D.C. Bar # 449197)
                                                   Caitlin E. Daday (D.C. Bar # 90002918)
                                                   STEPTOE LLP
                                                   1330 Connecticut Ave., N.W.
                                                   Washington, D.C.  20036
                                                   Tel: (202) 429-3000
                                                   Fax: (202) 429-3902
                                                   scoffin@steptoe.com
                                                   cdaday@steptoe.com

                                                   David J. Hacker
                                                   (*pro hac vice* application forthcoming)
                                                   Jeremiah G. Dys (D.C. Bar # 90000678)
                                                   (D.D.C. admission pending)
                                                   Ryan Gardner
                                                   (*pro hac vice* application forthcoming)
                                                   FIRST LIBERTY INSTITUTE

2001 West Plano Parkway, Suite 1600
Plano, TX 75075
Tel: (972) 941-4444
dhacker@firstliberty.org
jdys@firstliberty.org
rgardner@firstliberty.org

Camille P. Varone (D.C. Bar # 1617624)
(D.D.C. admission pending)
FIRST LIBERTY INSTITUTE
1331 Pennsylvania Ave. N.W., Suite 1410
Washington, D.C. 20004
Tel: (202) 921-4105
cvarone@firstliberty.org

Arthur B. Spitzer (D.C. Bar # 235960)
Scott Michelman (D.C. Bar # 1006945)
AMERICAN CIVIL LIBERTIES UNION
  OF THE DISTRICT OF COLUMBIA
  FOUNDATION
529 14th Street NW, Suite 722
Washington, D.C. 20045
Tel: (202) 457-0800
aspitzer@acludc.org
smichelman@acludc.org

Brian Hauss
(*pro hac vice* application forthcoming)
AMERICAN CIVIL LIBERTIES
  UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2500
bhauss@aclu.org

David Cole
(*pro hac vice* application forthcoming)
AMERICAN CIVIL LIBERTIES
  UNION FOUNDATION
915 15th Street NW
Washington, D.C. 20005
Tel: (212) 549-2611
dcole@aclu.org

*Counsel    for    Plaintiff    WallBuilder
Presentations*

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 12th day of December, 2023, he caused a true and correct copy of the MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION to be served by the following means:

By Federal Express Overnight delivery to:

Patricia Y. Lee
Chief Legal Officer and General Counsel
Washington Metropolitan Area Transit Authority
600 5th Street, N.W.
Washington, DC 20001

By Federal Express Overnight delivery and electronic mail to:

Anthony T. Pierce
Caroline L. Wolverton
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street, N.W.
Washington, D.C. 20006
apierce@akingump.com
cwolverton@akingump.com

Rex S. Heinke
COMPLEX APPELLATE LITIGATION GROUP LLP
811 Wilshire Blvd., 17th Floor
Los Angeles, CA 90017
rex.heinke@calapplaw.com

/s/ Shannen W. Coffin
Shannen W. Coffin