# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **WALLBUILDER PRESENTATIONS** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **CIVIL ACTION NO. 1:23-cv-03695-BAH** |
| **v.** | § | |
| | § | |
| **RANDY CLARKE, in his official capacity** | § | |
| **as General Manager and Chief Executive** | § | |
| **Officer of the Washington Metropolitan** | § | |
| **Area Transit Authority** | § | |
| | § | |
| **Defendant.** | § | |

---

## DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iii

PRELIMINARY STATEMENT ..........................................................................................1

FACTUAL BACKGROUND ...............................................................................................4

    I.      WMATA'S ADVERTISING POLICY. ................................................................4

    II.     WMATA EMPLOYS A PANEL TO REVIEW ADS THAT MAY
          VIOLATE THE GUIDELINES. ..........................................................................6

    III.    WMATA REJECTS WALLBUILDERS' ADVERTISEMENTS UNDER
          GUIDELINE 9. .....................................................................................................9

ARGUMENT ........................................................................................................................13

    I.      THE HIGH STANDARDS FOR A MANDATORY PRELIMINARY
          INJUNCTION. .......................................................................................................13

    II.     PLAINTIFF CANNOT ESTABLISH A LIKELIHOOD OF SUCCESS ON
          THE MERITS. ........................................................................................................14

          A.      WMATA's Advertising Space Is a Nonpublic Forum. ...............................14

          B.      Plaintiff Has Not Proven Guideline 9 Is Unconstitutional;
                 Plaintiff's Ads Were Properly Rejected Under Guideline 9 .......................14

               1.      Plaintiff Has Not Established That Guideline 9 Is Incapable
                     of a Reasoned Application. ...........................................................15

                      a.      Guideline 9 is capable of reasoned application
                            because it contains limiting language that provides
                            guidance to WMATA when reviewing ads. ......................15

                      b.      Plaintiff's remaining arguments do not establish that
                            Guideline 9 is incapable of reasoned application. .............21

               2.      WMATA Does Not Apply Guideline 9 Haphazardly. ....................25

               3.      Plaintiff Cannot Establish That Guideline 9 Discriminates
                      on the Basis of Plaintiff's Viewpoint. .............................30

           C.      Plaintiff Cannot Establish a Likelihood of Success in Proving
                 Guideline 12 Is Unconstitutional. ..............................................................33

       1.     Plaintiff Lacks Standing to Challenge Guideline 12 Because Its Ads Were Not Rejected Under That Guideline...........33

       2.     The D.C. Circuit Has Already Found Guideline 12 Reasonable, and Plaintiff Offers No Reason to Depart from That Finding....................................................................................34

       3.     This Court Is Bound by the D.C. Circuit's Finding That Guideline 12 Is Viewpoint Neutral. ................................................36

III.    PLAINTIFF HAS NOT SHOWN IT WILL SUFFER ANY IRREPARABLE HARM IF AN INJUNCTION DOES NOT ISSUE. .................37

IV.    THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST WEIGH AGAINST INJUNCTIVE RELIEF. .......................................................40

CONCLUSION.........................................................................................................................41

## TABLE OF AUTHORITIES

**Page**

**CASES**

\* *ACLU Found. v. WMATA,*
  303 F. Supp. 3d 11 (D.D.C. 2018) ................................................................ 26, 27

*ACLU Found. v. WMATA,*
  No. 17-cv-01598 (TSC),
  2018 WL 7252897 (D.D.C. May 30, 2018) ......................................................... 23

*Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp. (SMART),*
  978 F.3d 481 (6th Cir. 2020) .................................................................. 20, 22

\* *Am. Freedom Def. Initiative v. WMATA,*
  901 F.3d 356 (D.C. Cir. 2018) ...................................................... 4, 5, 7, 14, 15, 37

\* *Archdiocese of Wash. v. WMATA,*
  897 F.3d 314 (D.C. Cir. 2018) ......................... 2, 4, 5, 7, 14, 15, 16, 19, 24, 25, 26, 36

*Babbitt v. United Farm Workers Nat'l Union,*
  442 U.S. 289 (1979) ............................................................................... 34

*Cate v. Oldham,*
  707 F.2d 1176 (11th Cir. 1983) .................................................................... 38

*Cayuga Nation v. Zinke,*
  302 F. Supp. 3d 362 (D.D.C. Mar. 27, 2018) ....................................................... 40

*Chaplaincy of Full Gospel Churches v. England,*
  454 F.3d 290 (D.C. Cir. 2006) .................................................................... 38

*Church v. Biden,*
  573 F. Supp. 3d 118 (D.D.C. 2021) ................................................................ 37

*Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi, Ltd.,*
  15 F. Supp. 2d 1 (D.D.C. 1997) ................................................................... 13

*Comerica Bank v. Lexington Ins. Co.,*
  3 F.3d 939 (6th Cir. 1993) ....................................................................... 17

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,*
  473 U.S. 788 (1985) ......................................................................... 14, 15, 16

*County of Allegheny v. ACLU, Greater Pittsburgh Chapter,*
  492 U.S. 573 (1989) ............................................................................... 36

*Critical Mass Energy Project v. Nuclear Regul. Comm'n*,
   975 F.2d 871 (D.C. Cir. 1992) ................................................................ 37

*Ctr. for Investigative Reporting v. Se. Pa. Transp. Auth.*,
   975 F.3d 300 (3d Cir. 2020) ............................................................ 20, 21

*Dombrowski v. Pfister*,
   380 U.S. 479 (1965) .............................................................................. 38

*Dorfmann v. Boozer*,
   414 F.2d 1168 (D.C. Cir. 1969) ............................................................ 13

*Ebel v. City of Corona*,
   698 F.2d 390 (9th Cir. 1983) ................................................................ 38

*English v. Trump*,
   279 F. Supp. 3d 307 (D.D.C. 2018) ...................................................... 13

*Food & Water Watch, Inc. v. Vilsack*,
   808 F.3d 905 (D.C. Cir. 2015) .............................................................. 33

*Gerson Co. v. United States*,
   898 F.3d 1232 (Fed. Cir. 2018) ............................................................ 17

*Goldie's Bookstore v. Superior Ct.*,
   739 F.2d 466 (9th Cir. 1984 .................................................................. 38

*Green v. U.S. Dep't of Just.*,
   54 F.4th 738 (D.C. Cir. 2022) ......................................................... 33, 34

*Greer v. Spock*,
   424 U.S. 828 (1976) .............................................................................. 18

*Hohe v. Casey*,
   868 F.2d 69 (3d Cir 1989) .................................................................... 38

*Holder v. Humanitarian Law Project*,
   561 U.S. 1 (2010) .................................................................................. 22

*Hosp. Staffing Sols., LLC v. Reyes*,
   736 F. Supp. 2d 192 (D.D.C. 2010) ...................................................... 37

*In re Navy Chaplaincy*,
   516 F. Supp. 2d 119 (D.D.C. 2007) ...................................................... 14

*Initiative & Referendum Inst. v. U.S. Postal Serv.*,
   685 F.3d 1066 (D.C. Cir. 2012) ............................................................ 15

*Int'l Soc'y for Krishna Consciousness v. Lee,*
505 U.S. 572 (1992) ........................................................................................... 16

*Johnson v. District of Columbia,*
71 F. Supp. 3d 155 (D.D.C. 2014) .................................................................... 34

*Kokkonen v. Guardian Life Ins. Co. of Am.,*
511 U.S. 375 (1994) ........................................................................................... 33

*Laird v. Tatum,*
408 U.S. 1 (1972) ............................................................................................... 34

*Lehman v. City of Shaker Heights,*
418 U.S. 298 (1974) ........................................................................................... 18

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992) ........................................................................................... 33

*Lynch v. Donnelly,*
465 U.S. 668 (1984) ........................................................................................... 36

\* *Minn. Voters All. v. Mansky,*
138 S. Ct. 1876 (2018) ........................................... 1, 7, 14, 15, 16, 17, 18, 23, 25, 29

*Navistar, Inc. v. EPA,*
No. 11-cv-449-RLW,
2011 WL 3743732 (D.D.C. Aug. 25, 2011) ..................................................... 13

*Newdow v. Bush,*
355 F. Supp. 2d 265 (D.D.C. 2005) ............................................................ 39, 40

*Perry Ed. Assn. v. Perry Local Educators' Ass'n,*
460 U.S. 37 (1983) ............................................................................................. 14

*Ridley v. Mass. Bay Transp. Auth.,*
390 F.3d 65 (1st Cir. 2004) ............................................................................... 29

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
515 U.S. 819 (1995) ..................................................................................... 24, 25

*Rouse v. Berry,*
848 F. Supp. 2d 4 (D.D.C. 2012) ...................................................................... 37

*Rushia v. Town of Ashburnham,*
701 F.2d 7 (1st Cir. 1983) ................................................................................. 38

*Singh v. Carter,*
185 F. Supp. 3d 11 (D.D.C. 2016) .................................................................... 13

*Tracy Rifle & Pistol LLC v. Harris*,
　　118 F. Supp. 3d 1182 (E.D. Cal. 2015) ............................................................ 38, 39

*Tracy Rifle & Pistol LLC v. Harris*,
　　637 F. App'x 401 (9th Cir. 2016) ...................................................................... 39

*United States v. Neill*,
　　964 F. Supp. 438 (D.D.C. 1997) ...................................................................... 17

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
　　455 U.S. 489 (1982) ........................................................................................ 22

*Werk v. Parker*,
　　249 U.S. 130 (1919) ........................................................................................ 17

*White Coat Waste Project v. Greater Richmond Transit Co.*,
　　35 F.4th 179 (4th Cir 2022) ............................................................................ 20

*White Coat Waste Project v. WMATA*,
　　No. CV 23-1866 (JEB),
　　2024 WL 68256 (D.D.C. Jan. 5, 2024) ....................................................... 19, 20, 22

*Winter v. Nat. Res. Def. Council, Inc.*,
　　555 U.S. 7 (2008) ........................................................................................ 13, 37

\* *Zukerman v. U.S. Postal Serv.*,
　　961 F.3d 431 (D.C. Cir. 2020) .................................................................. 2, 18, 19

**RULES**

Fed. R. Evid. 201(b) ........................................................................................ 17

**OTHER AUTHORITIES**

*Issue*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/issue ................... 17

*Issue*, OED.com, https://www.oed.com/dictionary/issue_n?tab=meaning_and_use#40498811 .. 17

Search Result for "Issue," OED.com,
　　https://www.oed.com/search/dictionary/?scope=Entries&q=issue ............................................ 17

## PRELIMINARY STATEMENT

In its Corrected Memorandum in Support of Plaintiff's Motion for Preliminary Injunction ("Motion" or "Mot.") (ECF No. 20-1), Plaintiff WallBuilder Presentations ("Plaintiff") seeks injunctive relief to require Defendant Randy Clarke, in his official capacity as the General Manager and Chief Executive Officer of the Washington Metropolitan Area Transit Authority ("WMATA"), to display Plaintiff's advertisements in WMATA's subway stations, trains, and buses.  Plaintiff, however, cannot establish any of the requirements necessary for a preliminary injunction.

First, Plaintiff cannot establish a likelihood of success on its claim that WMATA's Guideline 9 is unconstitutional on its face or as applied to Plaintiff.  Plaintiff does not, and cannot, dispute that Guideline 9, if constitutional, would bar Plaintiff's ads, because they are "intended to influence members of the public regarding an issue on which there are varying opinions."  On the webpage linked from the ads, Plaintiff calls on the viewer to "Restore America's Biblical Foundation" and contends that "many 'academics' " distort the "truth" about the country's religious foundation.  WMATA reasonably concluded that Plaintiff's ads sought to influence members of the public to sway their opinion about the meaning of the separation of church and state.

Because Guideline 9 applies to the ad, Plaintiff instead attacks Guideline 9 as unconstitutional, contending: (1) it is not capable of reasoned application under *Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1876 (2018); (2) WMATA applies Guideline 9 haphazardly; and (3) Guideline 9 discriminates on the basis of viewpoint.  None of these arguments has merit.

Guideline 9 is capable of reasoned application because, unlike the blanket ban on "political" apparel in *Mansky*, Guideline 9 contains limiting language that helps WMATA apply it consistently.  Guideline 9 prohibits ads that are "intended to influence" the public on

1

significant matters that are subject to competing views.  The D.C. Circuit has emphasized that such limiting language is a critical distinction between rules and regulations incapable of reasoned application and permissible restrictions on speech.  *Zukerman v. U.S. Postal Serv.*, 961 F.3d 431, 451 (D.C. Cir. 2020) (citing *Archdiocese of Wash. v. WMATA*, 897 F.3d 314, 340 (D.C. Cir. 2018) (Wilkins, J., concurring)).

Plaintiff's remaining arguments that Guideline 9 is incapable of reasoned application are equally unavailing.  Because Plaintiff's ads squarely fall within the scope of Guideline 9, Plaintiff cannot complain that there is no clear threshold for how many varying opinions must exist.  Nor can Plaintiff resort to fanciful hypotheticals about what might or might not fall within Guideline 9, the rejection of other ads, or claim that commercial ads for products should be treated the same as advocacy ads like Plaintiff's.  And contrary to Plaintiff's claim, the panel members who review submitted ads do not have to have an encyclopedic "mental index" of every possible issue on which there are varying opinions to evaluate ads in a consistent and reasoned application.

Plaintiff also cannot establish that WMATA applies Guideline 9 haphazardly.  Plaintiff's attempts to prove inconsistent application rely on highly inapposite ads like ads for theatrical performances, schools and universities, alcohol, and sports gambling.  They are not comparable to Plaintiff's ads.  The decisions made on the remaining few ads Plaintiff cites reflect consistent and reasonable application of Guideline 9.

Plaintiff's final argument about Guideline 9 – that it is not viewpoint neutral – relies on the same type of inapposite comparisons as its other arguments.  Ignoring the content of its ads and website, Plaintiff tries to equate them with ads that are not intended to sway public opinion on important and divisive issues.  That WMATA allows ads from Catholic University, secular

educational institutions, or about American history does not reflect viewpoint discrimination when none of those ads engage in the type of advocacy contained in Plaintiff's ads.

In short, Plaintiff cannot establish a likelihood of success on the merits on its claims that Guideline 9 is unconstitutional.

Plaintiff's challenge to WMATA's Guideline 12, which prohibits ads that "promote or oppose a religion, religious practice or belief" is even more misguided. WMATA did not reject Plaintiff's ads under Guideline 12, so Plaintiff lacks standing to seek injunctive relief.

Moreover, even if Plaintiff could challenge Guideline 12, its arguments suffer from the same defects as its challenges to Guideline 9. Guideline 12 has already been found reasonable and viewpoint neutral by the D.C. Circuit in *Archdiocese*. Plaintiff admits that it is bound by the viewpoint neutrality holding and it cannot prove this Court should depart from *Archdiocese* on the reasonableness of Guideline 12. Plaintiff cannot prove Guideline 12 is incapable of reasoned application by resorting to ads for things like theatrical productions of The Book of Mormon or a play about Moses, a Jewish film festival, and Catholic University, which do not *promote* religion, religious practice, or religious beliefs. That the speaker or subject is connected to a particular religion does not automatically render their advertisements promotions of religions. If WMATA excluded their ads on that basis, when it allows advertisements for other productions, films, and schools, it would actually be engaging in prohibited viewpoint discrimination.

Accordingly, this Court should find that Plaintiff cannot establish a likelihood of success on the merits of its claims. That is fatal to Plaintiff's request for a preliminary injunction.

Plaintiff also cannot establish a basis for irreparable harm, or that the equities favor granting Plaintiff preliminary injunctive relief that will effectively moot its claims. Plaintiff

cannot show harm because the inability to advertise in its "preferred space" does not preclude Plaintiff from running its ads in all sorts of other media.

Moreover, Plaintiff contends it has been irreparably harmed because WMATA's rejection of its ads delayed its planned "relaunch" and "rebrand" set for June 2023.  Although it admits it planned this "relaunch" and "rebrand," Plaintiff waited to submit its ads to WMATA until May 2023, waited to submit revised ads until September 2023, and then waited until December 2023 to seek an injunction.  Those delays were caused by Plaintiff and undermine any argument that it faces irreparable harm requiring injunctive relief.

As for the equities, if WMATA is forced to run Plaintiff's advertisement, it would be forced to run any ad that seeks to sway public opinion on highly divisive issues under the guise of "educating" the public on the issue.  This undermines WMATA's Guidelines and the reasons it closed its advertising space to such ads in the first place.

Accordingly, the preliminary injunction should be denied.

## FACTUAL BACKGROUND

### I.    WMATA'S ADVERTISING POLICY.

WMATA operates one of the nation's largest transit systems, serving customers in Maryland, Virginia, and the District of Columbia.  *Am. Freedom Def. Initiative v. WMATA*, 901 F.3d 356, 359 (D.C. Cir. 2018) ("*AFDI*").  To raise revenue, it sells advertising space in Metrorail stations, in Metrorail cars, and in and on Metrobuses.  *Id*.  WMATA uses an outside media company, Outfront Media ("Outfront"), to manage its sale and placement of ads.  Compl. ¶ 20.

The development of WMATA's advertising guidelines has been detailed in two D.C. Circuit decisions.  *AFDI*, 901 F.3d at 360; *Archdiocese*, 897 F.3d at 319.  As those decisions explain, from the 1970s through 2015, WMATA accepted most issue-oriented advertisements,

including political, religious, and advocacy ads.  *AFDI*, 901 F.3d at 360; *Archdiocese*, 897 F.3d at 319.  Beginning in 2010, due to regular complaints, WMATA reconsidered accepting issue-oriented ads.  *AFDI*, 901 F.3d at 360; *Archdiocese*, 897 F.3d at 319.  Ads generating complaints included ads critical of the Catholic Church's position against use of condoms, ads with graphic images of animal cruelty, and ads opposing discrimination based on sexual orientation.  *AFDI*, 901 F.3d at 360; *Archdiocese*, 897 F.3d at 319.  In 2015, prompted by an anti-Islam ad, WMATA temporarily imposed a ban on issue-oriented advertisements.  *AFDI*, 901 F.3d at 360.  After further consideration of complaints, security, vandalism of WMATA property, and administrative burden associated with reviewing proposed ads and responding to complaints, in November 2015, WMATA's Board of Directors amended the Guidelines to prohibit certain categories of advertising.  *Id.* at 361; *Archdiocese*, 897 F.3d at 319-20.

WMATA ultimately concluded that the economic benefits to it of such issue-oriented ads were outweighed by four considerations: community and employee opposition, security risks, vandalism, and administrative burdens.  Declaration of Lynn M. Bowersox ("Bowersox Decl."), ¶ 9.  First, issue-oriented ads led to community opposition and complaints, adverse publicity for WMATA, and claims from some community leaders that WMATA was perpetuating discrimination.  *Id.*, ¶ 10.  WMATA also received complaints from employees who were exposed to issue-oriented ads over extended periods.  *Id.*

Second, issue-oriented ads sparked concerns about security.  Both the Metro Transit Police Department and the U.S. Department of Homeland Security feared that certain ads, due to external world events, would incite individuals to perpetrate violence on the system and to harm WMATA employees and customers.   Bowersox Decl., ¶ 11.  For example, a proposed ad

featuring a cartoon depiction of the Prophet Mohammad raised concerns in light of violent reactions to such depictions in the past.  *Id.*

Third, the ads led to vandalism.  Bowersox Decl., ¶ 12.  Sometimes, the vandals wrote messages contrary to the messages being advocated in the ads.  *Id.*

Fourth, issue-oriented ads created an administrative burden.   Bowersox Decl., ¶ 13.  WMATA was spending substantial time reviewing proposed ads and responding to the problems noted above.  *Id.*

WMATA's Board made its final decision to close the advertising space to ads that are "issue-oriented," "including political, religious, and advocacy" in nature.  Bowersox Decl., ¶ 7 & Exh. A.  It also enacted Guidelines Governing Commercial Advertising, including the two guidelines relevant here:

> 9.    Advertisements intended to influence members of the public regarding an issue on which there are varying opinions are prohibited.
>
> …
>
> 12.   Advertisements that promote or oppose any religion, religious practice or belief are prohibited.[1]

*Id.*, ¶ 15, Exh. B.

## II.    WMATA EMPLOYS A PANEL TO REVIEW ADS THAT MAY VIOLATE THE GUIDELINES.

Advertisements are submitted to Outfront, which identifies any submissions that appear to violate the Guidelines.  Bowersox Decl., ¶¶ 17-18.  Those advertisements are then forwarded to WMATA for review.  *Id.*, ¶ 18.

---

[1] As detailed below, WMATA did not reject Plaintiff's ad under Guideline 12.  *Infra*, Section II.C.1; Nicol Decl., ¶ 11.

That review is conducted by a three-member panel, consisting of two attorneys appointed by WMATA's General Counsel and WMATA's Marketing Director.[2]  Bowersox Decl., ¶ 19.  The attorneys have reviewed relevant case law regarding advertising restrictions and understand the standards set forth in *Mansky*, 138 S. Ct. 1876, and subsequent decisions, including the D.C. Circuit's decisions in *AFDI*, 901 F.3d 356, and *Archdiocese*, 897 F.3d 314.  Bowersox Decl., ¶ 20.

The panel examines the proposed advertisement, discusses it, and determines if it complies with the Guidelines.  Bowersox Decl., ¶ 21.  If the advertisement contains a website address or a QR code, members of the panel also may review the website, including the linked page, to determine if the advertisement would lead a viewer to material that violates WMATA's Guidelines.  *Id.*, ¶ 22.

Between the implementation of the Guidelines and the end of 2023, the panel has reviewed 2,064 ads.  Bowersox Decl., ¶ 25.  It has rejected 814 of those ads.  *Id.*  The following table reflects the outcome of the panel's review for each year since the Guidelines were adopted in November of 2015:

---

[2] If an attorney member of the panel is unavailable, a WMATA attorney who has previously served on the panel will temporarily take the absent attorney member's place. Bowersox Decl., ¶ 19.

|  | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **2022** | **2023** | **Totals** |
|---|---|---|---|---|---|---|---|---|---|---|
| **TOTAL ADS REVIEWED** | 8 | 164 | 225 | 328 | 355 | 165 | 86 | 166 | 567 | 2,064 |
| **TOTAL ADS APPROVED** | 6 | 109 | 117 | 223 | 226 | 53 | 25 | 47 | 256 | 1,062 |
| **% Approved** | 75% | 66% | 52% | 68% | 64% | 32% | 29% | 28% | 45% | 51% |
| **TOTAL ADS REJECTED** | 2 | 55 | 108 | 105 | 129 | 108 | 61 | 108 | 138 | 814 |
| **% Rejected** | 25% | 34% | 48% | 32% | 36% | 66% | 71% | 65% | 24% | 39%[3] |

*Id.*, ¶ 26.  This table does not reflect the thousands of ads that Outfront accepts that are not forwarded to the panel.  *Id.*, ¶ 28.

When they review ads, panel members will consult prior ads that were either rejected or accepted.  Bowersox Decl., ¶ 23.  Referencing its prior decisions, the panel can compare an ad under review to earlier ads and ensure consistency in how the Guidelines are applied.  *Id.*

Since adopting its advertising policy, WMATA has regularly rejected ads that violate its Guidelines.  Bowersox Decl., ¶ 29, Exh. C.  Rejected ads cover subjects that include: (1) anti-poaching and wildlife trafficking (from WildAid and the U.S. Fish and Wildlife Service); (2) pro-Israel and pro-Egypt (from Birthright Israel and the Egyptian Embassy, respectively); (3) pro-science (from the American Association for the Advancement of Science); (4) refugee support (from Doctors Without Borders); (5) the failure of the June 2015 Turkish coup attempt (from Musiad USA, a Turkish American association); (6) anti-prostitution (from End Demand Illinois);

---

[3] The percentages in the table do not add up to 100% because the panel is unable to perform a review on some of the ads.  Bowersox Decl., ¶ 27.  This usually occurs because a website or QR code on an ad does not lead to a working webpage.  *Id.*  In other instances, the image quality is poor, so the panel could not review, or the submission did not include the ad itself but content from which it was impossible to determine what would be in the actual ad.  *Id.* In such instances, the panel requested the proposed ads be resubmitted, but that did not always occur.  *Id.*  WMATA does not count those ads as rejected or accepted.  *Id.*

(7) the effect of climate change on national parks (from National Parks Conservation Association); (8) criticism of the SEC (from Digital Innovation for America); (9) pro-diversity in Congress (from Joint Center for Political and Economic Studies); and (10) anti-prison labor (from Abolish Slavery National Network).  *Id*.  It also has rejected ads that were pro- and anti-LGBTQ issues.  *Id*., ¶ 30, Exh. D (Human Rights Campaign ad stating "Show Your Pride," and Parents and Friends of Ex-Gays and Gays ad stating "Ex-Gays prove change *is* possible").

### III.    WMATA REJECTS WALLBUILDERS' ADVERTISEMENTS UNDER GUIDELINE 9.

Plaintiff submitted its first two proposed ads to Outfront in May 2023.  Declaration of Katrina Smith ("Smith Decl.") (ECF No. 9-7), ¶ 12.  Outfront forwarded the ads to WMATA for review.  Declaration of Georgetta Nicol ("Nicol Decl."), ¶ 5.

On June 8, 2023, the panel met to discuss the first set of ads.  Nicol Decl., ¶ 6.  Each ad contained the word "Christianity?" and, below that, the statement: "To find out about the faith of our founders, go to WallBuilders.com."  Next to that text, it contained a QR code.

Because the ads contained a website address and a QR code, panel members reviewed the Plaintiff's website, www.wallbuilders.com.  Nicol Decl., ¶ 7.  The website details Plaintiff's mission to educate the public about the religious views of the United States' founding fathers.  *Id*., ¶ 8, Exh. F.  It also contains clear advocacy.  The top of the opening page displays the following image:



*Id.*, Exh. E.

Further down that page, it provides more details about Plaintiff's goal:

# Restore America's Biblical Foundation

Learn the truth about our nation's Godly heritage today!

Nicol Decl., ¶ 7 & Exh. E.  It also contains the following statement:

10

# We care about the future of freedom in America.

Many Americans don't understand the Christian foundation of our nation. Through original source documents, we strive to reveal the historical truths about our Founding Fathers' faith and the religious principles they established. We are driven to equip people to discover this truth with documents and artifacts from the first 400+ years of US history.

*Id.* It also contains additional statements:

- Many "academics" deliberately ignore, change, and revise the facts of history in order to better suit their own agendas. Truth is constantly becoming harder to find. We're here to help. *Id.*

- Do you support Christian ideals of freedom in America? *Id.*

In a video on the page, a representative of Plaintiff describes its mission and states: "Today, so few people recognize what has made this nation, really, the most successful, prosperous nation in the history of the world [is] a biblical foundation." A Word from Our President, at 0:14, https://wallbuilders.com/ (last visited Jan. 30, 2024) (embedded video).

The QR code led to a different page on Plaintiff's website: https://wallbuilders.com/founding-fathers-jesus-christianity-bible. Nicol Decl., ¶ 8. Although

that page no longer exists, Plaintiff submitted a .pdf of the page to WMATA.  Nicol Decl.,

Exh. F.  This page contains the statement:

> One of the common criticisms is that the Founding Fathers were a collective
> group of atheists, agnostics, and or deists who wanted a strict separation of church
> and state, resulting in a secular government and public square.  Some go as far as
> foolishly writing that these allegations are so evident that no actual evidence or
> proof is needed to substantiate their claims.

*Id*.  This criticism, the page said, is "blatantly false."  *Id.*  This language appears on Plaintiff's

current website at: https://wallbuilders.com/resource/the-founding-fathers-on-jesus-christianity-

and-the-bible/.  *Id*., ¶ 9.

Based on their review of the ads and the website, the panel members concluded that the

ads, by leading viewers to the website, were designed to challenge the belief that the separation

of church and state prevents legislation and governance promoting religious views.  Nicol Decl.,

¶ 10.  The ads therefore were "intended to influence members of the public regarding an issue on

which there are varying opinions" in violation of Guideline 9.  *Id*., ¶ 14.

Contrary to Plaintiff's contentions, the panel did not reject the ads under Guideline 12.

Nicol Decl., ¶ 11.  Although the initial ads contained the phrase "Christian?" on them, the panel

concluded that neither the ads nor the website page it reviewed promoted or opposed any

religion, religious practice, or belief.  *Id*., ¶¶ 4, 11.

Through Outfront, WMATA informed Plaintiff of its decision to reject the ads under

Guideline 9.  Mot. at 10.  In response, three months later, Plaintiff submitted new proposed ads.

These ads replaced the text in the initial ads with "Visit WallBuilders.com" and contained the QR

code.  Mot. at 11.

On September 7, 2023, the panel reviewed the revised ads.  Nicol Decl., ¶ 13.  Once

again, it concluded that, based on the ads and the website, the ads violated Guideline 9 because

they sought to influence the public on the issue of the separation of church and state.  *Id.*

**ARGUMENT**

## I.    THE HIGH STANDARDS FOR A MANDATORY PRELIMINARY INJUNCTION.

The standards for a preliminary injunction are well-settled.  The moving party "must establish [1] that [it] is likely to succeed on the merits, [2] that [it] is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in [its] favor, and [4] that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008).  "It is particularly important for the movant to demonstrate a substantial likelihood of success on the merits" because, "absent a substantial indication of likely success on the merits, there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review."  *Navistar, Inc. v. EPA*, No. 11-cv-449-RLW, 2011 WL 3743732, at *3 (D.D.C. Aug. 25, 2011) (internal quotation marks and citation omitted).

Courts also caution that a preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief," *Winter*, 555 U.S. at 22, and "[t]he power to issue a preliminary injunction, especially a mandatory one, should be sparingly exercised," *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969) (internal quotation marks omitted).  Injunctions also "should not work to give a party essentially the full relief [sought] on the merits[.]" *Id.* at 1173 n.13; *accord English v. Trump*, 279 F. Supp. 3d 307, 336 (D.D.C. 2018); *Singh v. Carter*, 185 F. Supp. 3d 11, 17 (D.D.C. 2016).  "[W]here an injunction is mandatory—that is, where its terms would alter, rather than preserve, the status quo by commanding some positive act—the moving party must meet a higher standard than in the ordinary case by showing clearly that he or she is entitled to relief or that extreme or very serious damage will result from the denial of the injunction."  *Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi, Ltd*., 15 F. Supp. 2d 1, 4 (D.D.C. 1997) (internal quotation marks and

13

citations omitted), *aff'd*, 159 F.3d 636 (D.C. Cir. 1998); *see also In re Navy Chaplaincy*, 516 F.

Supp. 2d 119, 123 (D.D.C. 2007).

## II.     PLAINTIFF CANNOT ESTABLISH A LIKELIHOOD OF SUCCESS ON THE MERITS.

### A.     WMATA's Advertising Space Is a Nonpublic Forum.

Plaintiff does not dispute – and it is well-established – that WMATA's advertising space is

a nonpublic forum.  Mot. at 14, n. 4; *Archdiocese*, 897 F.3d at 322-23; *AFDI*, 901 F.3d at 364.

"[T]he government has wide latitude to restrict subject matters . . . in a nonpublic forum as long

as it maintains viewpoint neutrality and acts reasonably."  *Archdiocese*, 897 F.3d at 322 (citing

*Mansky*, 138 S. Ct. at 1885-86); *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc*., 473 U.S.

788, 800 (1985)*.*  Review of restrictions on speech in a nonpublic forum is therefore more

"forgiving" than restrictions on speech in a public forum, because "the government, no less than

a private owner of property, retains the power to preserve the property under its control for the

use to which it is lawfully dedicated."  *Mansky*, 138 S. Ct. at 1885 (internal quotation marks and

citation omitted).  Restrictions on speech in a nonpublic forum are permissible so long as they

are reasonable and do not discriminate based on viewpoint.  *Id.* ("The government may reserve

such a [nonpublic] forum 'for its intended purposes, communicative or otherwise, as long as the

regulation on speech is reasonable and not an effort to suppress expression merely because

public officials oppose the speaker's view.' ") (quoting *Perry Ed. Assn. v. Perry Local Educators'*

*Ass'n*, 460 U.S. 37, 46 (1983)); *accord AFDI*, 901 F.3d at 365; *Archdiocese*, 897 F.3d at 322.

### B.     Plaintiff Has Not Proven Guideline 9 Is Unconstitutional; Plaintiff's Ads Were Properly Rejected Under Guideline 9.

Plaintiff does not dispute that its ads violate Guideline 9, because they are "intended to

influence members of the public regarding an issue on which there are varying opinions."  Its

Motion claims the ads invite the public to "learn about the role that Christianity played in the

founding of our nation" by visiting Plaintiff's website.  Mot. at 1.  That website, in turn, calls on

the viewer to "Restore America's Biblical Foundation."  Nicol Decl., Exh. E.  The website even

states that "[m]any 'academics' deliberately ignore, change, and revise the facts of history in

order to better suit their own agendas."  *Id.*

        1.    <u>Plaintiff Has Not Established That Guideline 9 Is Incapable of a Reasoned Application.</u>

            a.    <u>Guideline 9 is capable of reasoned application because it contains limiting language that provides guidance to WMATA when reviewing ads.</u>

The crux of Plaintiff's argument regarding Guideline 9 is that it is incapable of reasoned

application, the second part of the two-step approach outlined in *Mansky* for determining if a law

or regulation is " 'reasonable in light of the purpose served by the forum.' "  *Mansky*, 138 S. Ct.

at 1886 (quoting *Cornelius,* 473 U.S. at 806); *accord, e.g*., *Archdiocese*, 897 F.3d at 329; *see also*

*AFDI*, 901 F.3d at 370 (" 'A regulation is reasonable if it is consistent with the government's

legitimate interest in maintaining the property for its dedicated use.' ") (quoting *Initiative &*

*Referendum Inst. v. U.S. Postal Serv*., 685 F.3d 1066, 1073 (D.C. Cir. 2012))).  "The

reasonability inquiry is not a demanding one, but rather is a 'forgiving test.' "  *Archdiocese*, 897

F.3d at 329-30 (*quoting Mansky*, 138 S. Ct. at 1888).  "The challenged restriction need not be the

most reasonable or the only reasonable limitation, but the regulation must simply be reasonable

as consistent with the government's legitimate interest in maintaining the property for its

dedicated use[.]"  *Id.* (internal quotation marks and citations omitted); *accord* AFDI, 901 F.3d at

370.

The first step in this reasonableness inquiry is whether the government entity "is pursuing

a permissible objective."  *Mansky*, 138 S. Ct. at 1886.  Plaintiff does not dispute – and the D.C.

Circuit has already recognized – that WMATA's Advertising Guidelines meet that standard.

"WMATA's closure of its forum to certain broad subjects is reasonable in light of its core purpose and experience," namely its purpose "to provide safe and reliable transportation 'attractive to the marketplace' " and its experience of the "divisiveness caused by certain advertisements." *Archdiocese*, 897 F.3d at 330 (quoting *Int'l Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 572, 682 (1992)).

Instead, Plaintiff's challenge is to the second step of the *Mansky* analysis: whether the Guidelines are "capable of reasoned application." *Mansky*, 138 S. Ct. at 1892. A rule satisfies this step of the reasonableness inquiry if it provides "objective, workable standards" to guide the exercise of the government's discretion. *Id*. at 1891. To pass muster, WMATA "must be able to articulate some sensible basis for distinguishing what may come in from what must stay out." *Id*. at 1888 (citing *Cornelius*, 473 U.S. at 808-09); *accord, e.g.*, *Archdiocese*, 897 F.3d at 339.

WMATA does so here, because Guideline 9 contains "some limiting standards" by which impermissible ads can be identified. Those standards distinguish Guideline 9 from *Mansky*.

This is best illustrated in response to Plaintiff's suggestion that Guideline 9 is incapable of reasoned application because it uses the term "issues," a word whose meaning *Mansky* questioned. Mot. at 17 (quoting *Mansky*, 138 S. Ct. at 1889). That, however, misapprehends *Mansky*, which struck down a Minnesota law prohibiting "political badge, political button, or other political insignia" that did not define "political." Recognizing that it should give weight to the state's construction of the statute, it considered the state's argument that the law prohibited "[i]ssue oriented material designed to influence or impact voting." *Mansky*, 138 S. Ct. at 1889. That definition was problematic to the Court:

> What qualifies as an "issue"? The answer, as far as we can tell from the State's briefing and argument, is any subject on which a political candidate or party has taken a stance. [Citation.] For instance, the Election Day Policy specifically notes that the "Please I.D. Me" buttons are prohibited. [Citation.] But a voter

16

identification requirement was not on the ballot in 2010 [Citation], so a Minnesotan would have had no explicit "electoral choice" to make in that respect. The buttons were nonetheless covered, the State tells us, because the Republican candidates for Governor and Secretary of State had staked out positions on whether photo identification should be required.  [Citation].

*Id*.  In other words, the problem was not with the term "issue," but with how the state defined "issue."  Its interpretation was unworkable because it would require the election judge in each precinct to have a "mental index of the platforms and positions of every candidate and party on the ballot[.]"  *Id*.  That could not survive constitutional muster.

Guideline 9's use of "issue" is not like *Mansky*'s.  First, the term "issue" is not impossible to define.  Merriam-Webster's first definition of the word "issue" is "a vital or unsettled matter."[4] *Issue*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/issue (last visited Jan. 30, 2024).  Similarly, the Oxford English Dictionary defines "issue" as "[a] matter which remains to be decided; a significant matter for debate or discussion."  Search Result for "Issue," OED.com, https://www.oed.com/search/dictionary/?scope=Entries&q=issue (last visited Jan. 30, 2024); *see also Issue*, OED.com, https://www.oed.com/dictionary/issue_n?tab=meaning_and_use#40498811

_____

[4] WMATA requests that the Court take judicial notice of these definitions under Federal Rule of Evidence 201(b) (courts may take judicial notice of facts that are "not subject to reasonable dispute" because they are either "generally known within the trial court's territorial jurisdiction" or "can [] accurately and readily [be] determined from sources whose accuracy cannot reasonably be questioned").  It is well settled that dictionary definitions are the proper subject of judicial notice. *Werk v. Parker*, 249 U.S. 130, 132-33 (1919) (holding that the Circuit Court "was justified in taking judicial notice of facts that appeared so abundantly from standard works accessible in every considerable library" including "the British Encyclopedia . . . [and] the Standard Dictionary of 1894"); *Gerson Co. v. United States*, 898 F.3d 1232, 1236 n.4 (Fed. Cir. 2018) (taking judicial notice of "the common dictionary definitions" of " 'machine' " and " 'apparatus' "); *Comerica Bank v. Lexington Ins. Co*., 3 F.3d 939, 944 (6th Cir. 1993) ("district court was within its discretion to take judicial notice of the dictionary definition of the word 'arising' "); *United States v. Neill*, 964 F. Supp. 438, 445 n. 8 (D.D.C. 1997) (citing "dictionaries" among "authoritative sources" from which courts may take judicial notice).

(last visited Jan. 30, 2024). Plaintiff cannot seriously contend that the role of religion in government is not an "issue" under these definitions.

Second, and more importantly, WMATA does not have a blanket ban on "issue" ads; Guideline 9 prohibits ads that are "*intended to influence members of the public* regarding an issue on which there are varying opinions[.]" The requirements that the speech be an "advertisement" and that it be "intended to influence members of the public" provide necessary context and limiting standards that make Guideline 9 sufficiently objective and workable. *Zukerman*, 961 F.3d at 451.

In *Zukerman*, the D.C. Circuit recognized that the Supreme Court has upheld restrictions on political speech. *Id*. at 451. *Mansky*, in fact, acknowledged that "our decisions have long recognized that the government may impose some content-based restrictions on speech in nonpublic forums, including restrictions that exclude political advocates and forms of political advocacy." *Mansky*, 138 S. Ct. at 1885-86 (citing *Lehman v. City of Shaker Heights*, 418 U.S. 298 (1974); *Greer v. Spock*, 424 U.S. 828 (1976)). Yet both *Lehman* and *Greer* would appear on their face to suffer from the same problem as the Minnesota law in *Mansky*. Both cases involve challenges to bans on "political" speech. *Lehman*, 418 U.S. at 299 (city could prohibit "political advertising on behalf of a candidate for public office") (plurality opinion); *Greer*, 424 U.S. at 831 (upholding a ban on "[d]emonstrations, picketing, sit-ins, protest marches, political speeches and similar activities" – and the "rigid[ ] enforce[ment]" of this ban to exclude "political campaign speech[es]" – on a military base).

Analyzing these competing cases, the D.C. Circuit identified what distinguished the permissible restrictions in *Lehman* and *Greer* from the unconstitutional law in *Mansky*. The *Lehman* and *Greer* prohibitions contained "some limiting standards – for instance, the ordinary

meaning of the term 'advertising,' informed by all-important context – to define the scope of the term 'political' and render the prohibition on speech more objective and workable." *Zukerman*, 961 F.3d at 451 (finding Postal Service's ban on "political" content in custom stamp program lacked limiting language and did not pass constitutional muster). *Zukerman* also noted that the *Archdiocese* court had rejected a *Mansky*-based challenge to Guideline 12, with a concurrence "distinguishing a ban on advertisements that promote or oppose any religion, religious practice or belief from a general ban on religious or political speech." *Id.* (citing *Archdiocese*, 897 F.3d at 340 (Wilkins, J., concurring) (internal quotation marks omitted)). In other words, like *Lehman* and *Greer*, WMATA's Guideline 12 contained limiting language that helped it survive a First Amendment challenge.

Guideline 9 contains such limiting language. Like *Lehman*'s prohibition, Guideline 9 applies in the context of advertisements and only to ads "intended to influence members of the public." This differentiates Guideline 9 from a blanket prohibition on "issue" ads. Those criteria are essential factors that the panel considers when it evaluates if an ad falls within the scope of Guideline 9. Bowersox Decl., ¶ 24. The panel, which consists of multiple attorneys familiar with the First Amendment jurisprudence governing advertising restrictions, also considers past advertisements that WMATA has accepted and rejected as baselines for its decisions on ads under review. *Id.*, ¶ 23. This ensures consistent application of Guideline 9's criteria.

The failure to consider the limiting language in Guideline 9, as required by *Archdiocese* and *Zukerman*, is reason to reject the recent decision by Judge Boasberg, who denied WMATA's motion to dismiss in a matter alleging Guideline 9 is unreasonable. *White Coat Waste Project v. WMATA*, No. CV 23-1866 (JEB), 2024 WL 68256, at *9 (D.D.C. Jan. 5, 2024) ("*White Coat I*"). In a two-paragraph analysis focusing only on the term "issue," Judge Boasberg held "it is

difficult to escape the conclusion that [Guideline 9] is unreasonable." *Id*.   That analysis, however, did not consider any of the limiting language.  And, because it was decided on a motion to dismiss, Judge Boasberg did not consider WMATA's consistent application of Guideline 9, despite previously stating that "a key part" of the context in *Lehman* and *Greer* "was a factual record showing a history of consistent enforcement." *Id*.

 The D.C. Circuit's precedent in *Archdiocese* and *Zukerman* also controls over the cases from other circuits that Plaintiff cites.  But even if the Court were to consider them, they either involve advertising restrictions that contain no limiting standards or do not address the limiting standards in the restriction.

In both *American Freedom Defense Initiative v. Suburban Mobility Authority for Regional Transportation (SMART)*, 978 F.3d 481 (6th Cir. 2020) and *White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179, 188 (4th Cir 2022) ("*White Coat II"*), the plaintiffs challenged policies prohibiting "political ads."  Those blanket bans contained no limiting language and, thus, are far more like the unconstitutional restrictions struck down in *Mansky* and *Zukerman* than the more qualified Guideline 9.  In fact, the Fourth Circuit expressly distinguished WMATA's Guideline 12 at issue in *Archdiocese* was " 'narrower and more precise than simply a general ban on "religious" or "political" speech' and was therefore permissible." *White Coat II*, at 203, n.17.

The Third Circuit's decision in *Center for Investigative Reporting v. Southeastern Pennsylvania Transportation Authority*, 975 F.3d 300 (3d Cir. 2020), involved more detailed

prohibitions on political advertisements.[5]  But the court does not appear to have considered if

that additional language limited the restriction.  Instead, the court cited the defendant's failure to

"offer any reason why the lingering references to advertisements that 'contain political messages'

and those that address 'political issues' are any more capable of reasoned application than those

that were struck down."  *Id.* at 316.  The Third Circuit also cited the defendant's counsel's

responses to hypotheticals at oral argument indicating it would apply the policy in an arbitrary

fashion and examples of prior inconsistent applications.  *Id*. at  316-17.  In contrast, the language

applying the restriction only to ads intended to influence the public is limiting language that

allows WMATA to apply Guideline 9 in an objective and workable fashion.

> b.    <u>Plaintiff's remaining arguments do not establish that Guideline 9 is incapable of reasoned application.</u>

Plaintiff offers a series of other arguments about Guideline 9, but they do not show it is

incapable of reasoned application.

First, Plaintiff takes issue with the phrase "varying opinions" because Guideline 9 does

not provide a "threshold" for how much variance must exist.  Mot. at 17-18.  But the Court need

---

[5] The guidelines prohibited:

(a) Advertisements promoting or opposing a political party, or promoting or opposing the election of any candidate or group of candidates for federal, state, judicial or local government offices are prohibited.  In addition, advertisements that are political in nature or contain political messages, including advertisements involving political or judicial figures and/or advertisements involving an issue that is political in nature in that it directly or indirectly implicates the action, inaction, prospective action or policies of a government entity.

(b) Advertisements expressing or advocating an opinion, position or viewpoint on matters of public debate about economic, political, religious, historical or social issues.

*Center for Investigative Reporting*, 975 F.3d at 308-09 (citation omitted).

not indulge in such speculation, because Plaintiff's own website acknowledges that "many 'academics' " present a different view of the separation of church and state.  Nicol Decl., Exh. E.

In the analogous context of claims alleging statutory restriction on speech is too vague, the Supreme Court has held that a plaintiff whose conduct is clearly proscribed by a law or regulation may not challenge it on vagueness grounds on the basis of hypothetical situations. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18-19 (2010) ("We consider whether a statute is vague as applied to the particular facts at issue, for '[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.' " (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc*., 455 U.S. 489, 495 (1982)) (alteration in original).  In *Holder*, the Court held the Ninth Circuit, considering a vagueness challenge to a statute criminalizing providing material support to a terrorist organization, wrongly analyzed "how the statute applied in hypothetical circumstances" by "consider[ing] the statute's application to facts not before it."  *Id*. at 19.  In so doing, the court of appeals "contravened the rule that '[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.' " *Id.* at 20 (quoting *Hoffman Ests.*, 455 U.S. at 495) (alteration in original).

This is another flaw of the recent decision in *White Coat.*  Judge Boasberg opined that the Guideline violates the *Mansky* test based on reasoning that "[v]irtually anything can constitute an 'issue' on which opinions vary — from Yankees versus Red Sox to the correct pronunciation of 'tomato.' " *White Coat I*, 2024 WL 68256, at *9 (citing *Am. Freedom Def. Initiative*, 978 F.3d at 497).  But that does not describe ads intended to influence anyone on those "issues," let alone ads that there is any reason to expect would be submitted to WMATA for running in the Metro

system.  The hypotheticals amount to "fanciful cases" that would not defeat an otherwise reasonably drawn regulation.  *Mansky*, 138 S. Ct. at 1891.

To the extent Plaintiff is asserting a facial challenge to Guideline 9, Plaintiff seeks to rely on the ads of others, such as the ad for an ACLU conference that was the subject of a different action or the ad rejected in *Archdiocese*.[6]  *See, e.g.*, Mot. at 20, 33; *see also id.* at 18 (speculating about a hypothetical anti-McDonald's ad).  This Court should not base its decision on other ads that were rejected or are complete conjecture.

Second, Plaintiff claims WMATA "sometimes looks beyond the four corners of the advertisements to review content, as in the case of [Plaintiff's] website, and sometimes does not, as in the case of Catholic University's or Social Justice School's websites, or the content of the plays *The Book of Mormon* and *Moses*."  Mot. at 18.  That is really not an argument about whether Guideline 9 is capable of reasoned application, but goes more to whether it is applied consistently.  In any event, Plaintiff cites no evidence to support that bald assertion.  In fact, WMATA's third-party vendor, Outfront, did not submit those ads to the panel because they did not appear to violate the Guidelines.[7]  As set forth in the Declaration of Lynn Bowersox (at ¶ 22), if an ad is submitted to the panel for review and it is unclear from the face of the ad if it violates a guideline, the panel will review a website or QR code that is included in the ad.

---

[6] Plaintiff's reliance on the ACLU ad is particularly inapt because it was not just rejected under Guideline 9, but also under Guideline 14.  *ACLU Found. v. WMATA*, No. 17-cv-01598 (TSC), 2018 WL 7252897, at *1 (D.D.C. May 30, 2018).  And Judge Chutkan denied the ACLU's request for a temporary restraining order and preliminary injunction, holding the plaintiff made no showing that WMATA applied its guidelines in an arbitrary and capricious manner.  *Id.* at *3.

[7] As discussed below, even if these ads were submitted to the panel, they would have been approved.

Third, Plaintiff raises hypothetical questions about commercial ads, *e.g.*, "whether a McDonald's advertisement is acceptable while an anti-McDonald's ad by an animal rights group is not" or whether an ad for " 'conflict free' diamonds" or "defense contractors' latest offerings" raise "issues of public debate."  Mot. at 18.  Although this Court should not indulge in hypotheticals not relevant to Plaintiff's ad, the D.C. Circuit has already answered that question. Ads that try to sell products do not express a view or invite debate.  *Archdiocese*, 897 F.3d at 329.

In *Archdiocese*, the D.C. Circuit rejected the plaintiff's attempt to equate its ad – depicting a religious scene and urging the public to "Find the Perfect Gift" by visiting its website, which "contained substantial content promoting the Catholic Church" – with commercial advertisements related to Christmas.  897 F.3d at 320 (citation omitted).  The court recognized that "ads promoting [commercial] Christmastime sales are not expressing a view on Christmas any more than a McDonald's ad expresses a view on the desirability of eating beef that demands the acceptance of a contrary ad from an animal rights group."  *Id*. at 329.  "[I]n terms used by the Supreme Court, the ads imploring the purchase of products do not invite 'debate' about how Christmas should be celebrated."  *Id.* (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 831 (1995)); *see also id*. ("commercial advertisements 'proclaim: Shop Here! Buy This!' while saying nothing about the sellers' viewpoints on how Christmas should be observed" (quoting district court opinion)).

This Circuit further recognized that "[w]ere a court to treat such commercial advertising as expressing a broader view, it would, furthermore, eviscerate the distinction between viewpoint-based and subject-based regulation on which the forum doctrine rests, and the longstanding recognition that the government may limit a non-public forum to commercial

advertising." *Archdiocese*, 897 F.3d at 329; *see also Rosenberger*, 515 U.S. at 829-30 (recognizing distinction between permissible content discrimination and impermissible viewpoint discrimination).

Fourth, this Court should reject Plaintiff's argument that the use of the term "issues" would require panel members to have a " 'mental index' of issues" that might be covered by Guideline 9. As discussed above, the *Mansky* Court rejected the argument that the "political" apparel law could be defined as issues raised by candidates on the ballot in an election. The Court correctly recognized that no election judge could have an encyclopedic knowledge of every position held by every candidate when making an on-the-spot determination if a voter's clothing or accessories violated the statute. *Mansky*, 138 S. Ct. at 1889-90. Those circumstances are not present with respect to WMATA's panel, which can evaluate proposed ads carefully to determine what issues they raise, just as here where the panel determined after reviewing the ads and website that Plaintiff was not promoting a religion, religious practice, or belief in violation of Guideline 12, but was advocating a position regarding the separation of church and state – an issue on which there clearly are varying opinions.

Thus, Plaintiff's speculative questions and conjecture about Guideline 9 do not prove it is incapable of reasoned application.

> 2.    WMATA Does Not Apply Guideline 9 Haphazardly.

Unable to establish that Guideline 9 is unreasonable, Plaintiff next argues that it is applied haphazardly. Plaintiff is wrong.

First, Plaintiff argues that WMATA discriminates on the basis of religious viewpoints. Nothing it cites supports that contention. As detailed further below, Plaintiff's ads do not promote a particular religious message; they promote the political view that religion – Christianity, in particular – should play a greater foundational role in government. That is the

issue – the meaning of the separation of church and state – on which Plaintiff seeks to influence the public through its ads.  Plaintiff offers no evidence that Guideline 9 is haphazardly applied to similar advertisements.

Ads for musicals or plays that have some religious content seek to influence the public on only one thing: buying tickets to a show.  The Kennedy Center is not trying to sway the public's opinion on any "issue" – a "vital," "unsettled," or "significant" matter – in its ads for The Book of Mormon.  Instead, it is encouraging a commercial transaction so, under *Archdiocese*, it is not analogous to Plaintiff's ad.  897 F.3d at 329.

Plaintiff's arguments about The Book of Mormon and other plays likewise would eliminate the distinction between commercial and non-commercial speech if adopted.  Indeed, if WMATA prohibited advertising of The Book of Mormon while otherwise allowing ads for other shows, it would engage in the precise First Amendment violation that Plaintiff alleges here.  It would exclude commercial speech about a play dealing with religion while allowing commercial speech on secular plays and musicals.  WMATA therefore allows advertising of commercial musicals and plays.

In denying a motion for preliminary injunction brought over WMATA's rejection of ads for a book by author Milo Yiannopoulos, Judge Chutkan also rejected arguments like the ones Plaintiff advances here about the alleged inconsistent application of the guidelines.  *ACLU Found. v. WMATA*, 303 F. Supp. 3d 11, 21-26 (D.D.C. 2018).  Like here, the plaintiff in that case argued WMATA inconsistently applied Guidelines 9 and 14 (prohibiting ads "that are intended to influence public policy") by analogizing to, inter alia: (1) a play about a political figure, the life of Justice Antonin Scalia; (2) a law school advertisement that included statements such as "now is the time!," "practice law," "promote justice," and "change lives"; (3) the Boeing ads that

Plaintiff cites on page 19 of the Motion; (4) ads for services like a same-sex dating website and casinos; and (5) ads selling beer. *Id*. The court, however, held these ads were not analogous, because "the intended purpose of Milo Worldwide's advertisements is political advocacy; they are part of a campaign to disseminate and encourage adoption of Yiannopoulos's political positions." *Id*. at 26. By contrast, "[n]one of the comparator advertisements can be so characterized. Indeed, none of them appear to be intended to influence public opinion or policy about any issues at all." *Id.*

This Court also should follow Judge Chutkan's analysis when it comes to Plaintiff's arguments about the Catholic University, Social Justice School, and University of Maryland. Mot. at 18, 23. Those ads advertise the schools. Plaintiff cites nothing in the ads or websites that seek to influence the public's opinion on any issues. Stating that the Social Justice School will teach students to be "scholar-activists" (Mot. at 24) expresses no position on any particular issue. Similarly, stating that the University of Maryland campaign "is rooted in the principles of values-driven excellence, diversity, equity and inclusion, impact, innovation, collaboration and service to humanity" (*id.*) describes the school; it does not seek to influence the public to do anything other than attend the school. That is nothing like Plaintiff's campaign to "Restore America's Biblical Foundation" and convince viewers that "academics" are wrong in claiming religion should play little or no role in government. Nicol Decl., Exh. E.

The same is true for Plaintiff's claim that Guideline 9 is applied haphazardly because WMATA ran ads for alcohol, sports gambling, and an online shopping service promoting an oral contraceptive. Mot. at 26. Those were all ads for goods and services. They did not seek to influence the public on any issue other than to buy those products or use a service. That some people might dislike beer or gambling or contraception does not mean those ads seek to

influence the public on those subjects any more than an ad for McDonald's seeks to influence viewers on the morality of eating meat.

Plaintiff also points to four other ads in its Motion – a public service ad from D.C. Health encouraging people to get COVID-19 vaccinations, an Earth Day bus wrap, one from the organization Power to the Patients, and one from World Beyond War.[8]  (Mot. at 26-28.)  None of these prove Guideline 9 is applied haphazardly.

The COVID-19 public service ad was never submitted by Outfront to WMATA for review.  Nicol Decl., ¶ 16.  It, therefore, does not indicate a haphazard application of Guideline 9.[9]

The Earth Day bus wrap was not submitted through WMATA's advertising program, but was accepted through WMATA's Art in Transit Program from children's artwork submitted to WMATA.  Nicol Decl., ¶ 19.  WMATA reasonably concluded that it was a way to promote children's art, not an advocacy ad seeking to influence the public on an issue on which there are varying opinions and thus prohibited by Guideline 9.  That Plaintiff can find an article from someone who hates Earth Day (Mot. at 26 n.10) does not prove otherwise.

Fundamentally, Plaintiff's argument boils down to the notion that, if it can find some contrarian opinion on a subject of any ad run by WMATA, that renders Guideline 9's application haphazard.  But WMATA can exercise discretion in evaluating the intent and purpose of an ad.

---

[8] In its initial Memorandum, Plaintiff also cited an ad for the Brennan Center regarding the Supreme Court.  As reflected in the Errata (ECF No. 20), the Brennan Center ad was on a billboard owned and operated by a private company, not WMATA.  *See also* Nicol. Decl., ¶ 18.  Plaintiff's Corrected Memorandum omits mention of that ad.

[9] In any event, Outfront reasonably viewed a public service ad for COVID-19 vaccinations more akin to an ad for a commercial transaction than an ad that would violate Guideline 9.

*Mansky* recognizes that "some degree of discretion . . . is necessary" when government officials enforce speech limitations; it only requires that such "discretion must be guided by objective, workable standards." 138 S. Ct. at 1891.

Thus, it was within the panel's discretion to conclude that the Power to the Patients ad calling for price transparency in healthcare services was not an issue subject to significant opposition. The ad and website seek to educate people on their rights under existing law, which WMATA has not viewed as a violation of Guideline 9. Nicol Decl., ¶ 20. Such educational ads do not seek to influence the public on significant issues, unlike ads that seek to encourage them to change laws. *Id.* Indeed, WMATA has rejected ads from Power to the Patients that cross into advocating changes in existing law. *Id.*, ¶ 21.

Even if the Court concludes that the panel's distinction between "know your rights" ads and advocacy prohibited by Guideline 9 was wrong, it does not mean the panel was not operating within objective and workable standards. *See, e.g.*, *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 92 (1st Cir. 2004) (recognizing that defendant could conclude that two of plaintiff's three ads did not violate guideline against ads demeaning religion while the third did; even if the first two ads were accepted in error, it could still reject the third).

As for World Beyond War, the ad merely states "Peace on Earth" and the organization's website. The panel concluded that the message of the ad is hardly controversial or divisive – notwithstanding Plaintiff's citation to a single article supporting war. Plaintiff also cites to no evidence from the organization's website save for references to a secondary page that describes the organization's purpose "is 'a global nonviolent movement to end war and establish a just and sustainable peace' " and that it is opposed to "arms manufacturing, weapons stockpiling, and the expansion of military bases." Mot. at 25-26 (quoting https://worldbeyondwar.org/who/). But

WMATA does not discriminate against organization speakers based on their organizational purpose; it will reject an ad under Guideline 9 only if the ad and the website it links seek to influence the public on important issues. Plaintiff has not shown that, at the time WMATA reviewed the Peace on Earth ad, the website address on the ad contained any advocacy intended to influence the public against war.

Moreover, even if the website did, at most, that would show that WMATA erred in accepting the World Beyond War ad. But that error cannot establish that Guideline 9 is applied haphazardly, particularly in light of the more than 2,000 ads that the panel has reviewed under the Guidelines.

Accordingly, Plaintiff has not established a likelihood of success in proving that WMATA applies Guideline 9 haphazardly.

3. <u>Plaintiff Cannot Establish That Guideline 9 Discriminates on the Basis of Plaintiff's Viewpoint.</u>

Plaintiff maintains that WMATA discriminates against it on the basis of its viewpoint. It makes four arguments, but none have merit.

First, Plaintiff contends that WMATA discriminates against it because it allows non-religious organizations to promote their "*educational missions* from a secular perspective." Mot. at 38. This is disingenuous. Plaintiff's website is not limited to educational material; to the contrary, it promotes advocacy on a particular issue – "[r]estor[ing] America's [b]iblical [f]oundation." Nicol Decl., Exh. E.

By Plaintiff's reasoning, a neo-Nazi group could propose an ad that says "Are Whites Superior?" and link to a website purporting to "educate" the public about the inferiority of people of color and Jews. WMATA cannot be constrained by Plaintiff's self-serving

characterization of the content; WMATA must be entitled to exercise discretion in evaluating the ads.

Moreover, far from discriminating against religious organizations that seek to promote their educational missions, Plaintiff acknowledges that WMATA runs ads from Catholic University. Mot. at 38. Those ads are permissible under Guideline 9 because neither they nor the website to which they link seek to influence the public on any particular issues of significant debate. *See supra*, p. 27; Declaration of Caitlin E. Daday ("Daday Decl.") (ECF No. 9-3), ¶ 7 & Exh. A.

Similarly, WMATA has accepted ads from the Museum of the Bible. Although the organization certainly addresses world and U.S. history from a religious perspective, again, WMATA ran the ads because nothing in them or the linked website sought to influence the public on issues in violation of Guideline 9 or promoted a particular religion, religious practice, or religious belief in violation of Guideline 12. Nicol Decl., ¶ 22 & Exh. I. The ads only encourage people to visit the museum. *Id.*, Exh. I.

That these entities are religious speakers does not automatically render all of their speech religious. *See Archdiocese*, 897 F.3d at 330. Rather, like the Salvation Army and Christian radio station ads identified by the plaintiff in *Archdiocese*, WMATA's running the Catholic University ad, but not the "Find the Perfect Gift" ad, "underscores that WMATA is consistently rejecting ads that have religious content rather than discriminating against ads submitted by religious speakers." *Id.* at 330. For the same reason, WMATA's acceptance of the Catholic University and Museum of the Bible ads demonstrates that it is not discriminating on the basis of the speaker's religious viewpoint, but evaluating the content of the ads to determine if they are seeking to influence the public on important issues on which there are varying opinions.

Second, WMATA does not discriminate against Plaintiff's "educational messages from an evangelical Christian perspective" while favoring the Catholic University's "openly religious messages."  Mot. at 38.  As detailed below, WMATA concluded that Plaintiff's ads and website were not promoting any particular religion, but seeking to influence the public about the separation of church and state.  Catholic University's inclusion of its Latin motto on its ad is not comparable advocacy.

Third, Plaintiff contends that WMATA allows ads about American history from a secular perspective.  Mot. at 39.  But the PBS ad for a program about historical symbols does not "seek to influence" the public on any issues.  Daday Decl., ¶ 6.  That the website for the program lists an episode about Stone Mountain does not change that analysis.  Indeed, the Motion contends that the show describes Stone Mountain "as the 'Confederate Mount Rushmore'" (at 39), but that phrase neither appears in the ad nor on the webpage linked in the Daday Declaration (https://www.pbs.org/weta/iconic-america/about-the-series/).  If the phrase is used in the episode, it has no bearing on WMATA's application of Guideline 9.  WMATA does not have to scour websites and advertised content to root out any possible controversial issue for it to apply Guideline 9 consistently and in a viewpoint-neutral fashion.

Similarly, the ad for the White House Historical Association's 2023 Christmas Ornament promotes the ornament (Mot. at 39); it does not seek to influence the public on any particular issue.  The statement "[t]eaches me new things about the Presidents" likewise conveys no attempt to influence.  And the website linked through the QR code (Daday Decl., Exh. E) only lists products for sale, not advocacy about divisive issues.

Far from establishing any viewpoint discrimination, Plaintiff's arguments actually demonstrate that WMATA consistently applies Guideline 9 to reject ads that seek to influence the

public on matters on which there are varying opinions, while allowing non-advocacy ads from religious, educational, and historical speakers to be displayed.

### C. Plaintiff Cannot Establish a Likelihood of Success in Proving Guideline 12 Is Unconstitutional.

#### 1. Plaintiff Lacks Standing to Challenge Guideline 12 Because Its Ads Were Not Rejected Under That Guideline.

Guideline 12 prohibits ads that "promote or oppose a religion, religious practice or belief." Reviewing Plaintiff's ads, the panel concluded that Guideline 12 did not apply. Nicol Decl., ¶ 11. Although the ads touch on religion in relation to advocating for "restor[ing] America's biblical foundation," they do not clearly promote any religion, religious practice, or belief. Because the ads are not prohibited by Guideline 12, Plaintiff lacks any injury from its application and, thus, has no standing to challenge it.

The federal courts are of "limited jurisdiction," and "[i]t is to be presumed that a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). To satisfy Article III's jurisdictional case-or-controversy requirement, a plaintiff must have standing to press its claim. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The "irreducible constitutional minimum of standing" requires that the plaintiff has suffered (1) an " 'injury in fact' " that is (2) caused by the conduct challenged and (3) likely to be redressed by the relief sought. *Id.* at 560-61. An injury in fact is "concrete and particularized" and " 'actual or imminent, not "conjectural" or "hypothetical." ' " *Id.* at 560. "A party seeking a preliminary injunction 'must show a substantial likelihood of standing.' " *Green v. U.S. Dep't of Just.*, 54 F.4th 738, 744 (D.C. Cir. 2022) (quoting *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015)).

In the First Amendment context, a plaintiff cannot bring a facial or as-applied challenge to a law of regulation unless it faces imminent harm. Even a risk "of a subjective 'chill' are not

an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972) (rejecting challenge to government information-gathering practice when plaintiffs could not show anything detrimental had been done or was contemplated). Where, as here, a restriction on speech has not been applied nor is likely to be applied to the plaintiff, there is no credible harm or imminent threat of harm to establish standing. *Green*, 54 F.4th at 744 (government's concession that plaintiff's conduct did not violate criminal statute "ends any 'credible threat of prosecution' "); *Johnson v. District of Columbia*, 71 F. Supp. 3d 155, 159-61 (D.D.C. 2014) (where plaintiff sought to challenge law that had not previously been enforced and was not threatened with prosecution, plaintiff lacked standing); *see Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) ("When the plaintiff has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he 'should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.' ").

Plaintiff cannot show any injury from the denial of its existing ads when Guideline 12 was not applied to it and has not identified any future or prospective advertisements it intends to submit that would be subject to Guideline 12. Consequently, it lacks the necessary injury or threat of harm to have standing.

2.    The D.C. Circuit Has Already Found Guideline 12 Reasonable, and Plaintiff Offers No Reason to Depart from That Finding.

Plaintiff concedes that the D.C. Circuit has previously rejected a challenge to Guideline 12 on reasonableness grounds, finding that the plaintiff had not shown that WMATA applies the guideline arbitrarily and unreasonably. Mot. at 31-32 (citing *Archdiocese*, 897 F.2d at 330). Plaintiff's challenge here on reasonableness grounds is no different.

34

As with Plaintiff's Guideline 9 argument, comparing Plaintiff's ads to ads for musicals or plays proves nothing.  Mot. at 32.  Plaintiff cites to nothing promoting or opposing religion, religious practice, or religious belief on the face of the ads or any associated website.  That there might be some content in a theatrical work favorable or critical of religion is not enough.  Plaintiff cites no authority that WMATA must scour an entire work to apply its guidelines in an objective and workable fashion.

Similarly, Plaintiff points to nothing in the ads or website for the Jewish film festival that expressly promotes or opposes Judaism (or any other religion, religious practice, or religious belief).  Mot. at 31-32 (citing Declaration of Shannen W. Coffin (ECF No. 9-2), ¶ 14).[10]  Plaintiff also claims the Jewish film festival advertised "specific *pro-religious* performances" (Mot. at 32), but WMATA cannot find anything to that effect in the advertisement and webpage Plaintiff has introduced into evidence (Daday Decl., ¶ 8 & Exh. B).

Plaintiff also cites the Catholic University logo and the phrase "Every Story is a Journey of the Spirit," claiming the latter is a " 'recognizably religious' reference."  Mot. at 32.  As previously stated, the ad promotes the school, not any particular religion, religious practice, or religious belief.  The mere fact that the advertiser is Catholic does not establish that its ad promotes religion.  The incidental use of the Latin logo does not change that analysis.

Moreover, Plaintiff cites nothing to support its contention that the phrase is associated with any religion.  WMATA has found no biblical quotes with that language or even "journey of the spirit."  It has found a fantasy book titled "I, Dragon: A Journey of the Spirit" (https://www.amazon.com/Dragon-Journey-Robert-Joseph-Ahola-dp/1604144882), Shirley

---

[10] The declaration in this citation is incorrect.  The declaration that discusses the film festival is the Daday Declaration (at ¶ 8 & Exh. B).

MacLaine's book, "The Camino: A Journey of the Spirit"

(https://www.goodreads.com/en/book/show/141044), and "Journey of the Spirit," an album of

Native American flute music (https://www.walmart.com/ip/Journey-of-the-Spirit/166604152).

Nothing in the phrase is so overtly religious or linked to a particular religion, religious practice,

or religious belief that it establishes that the Catholic University ad violates Guideline 12.

Finally, Plaintiff cites the ad for the White House Christmas ornament. As *Archdiocese*

holds, merely selling a Christmas-related product does not "express[] a view on Christmas." 897

F.3d at 329; *see infra*, pp. 32, 36. Moreover, the Christmas ornament ad promotes the sale of a

decorative ornament in the shape of a wreath. Daday Decl., ¶ 12. That wreath alone does not

"promote or oppose a religion or religious practice or belief." In fact, the Supreme Court has

described wreaths as "secular" objects. *County of Allegheny v. ACLU, Greater Pittsburgh*

*Chapter*, 492 U.S. 573, 615 n. 62 (1989), *abrogated on other grounds by Town of Greece v.*

*Galloway*, 572 U.S. 565 (2014); *see also Lynch v. Donnelly*, 465 U.S. 668, 711 (1984) (Brennan,

J., dissenting). And the White House website it links to is a shopping site selling White House

memorabilia. Daday Decl., Exh. E. Nothing in the ad or website promotes a religion, religious

practice, or religious belief in violation of Guideline 12.

Accordingly, Plaintiff has failed to establish that Guideline 12 is unreasonable and

incapable of reasoned application.

   3.  <u>This Court Is Bound by the D.C. Circuit's Finding That Guideline 12 Is</u>
      <u>Viewpoint Neutral.</u>

Plaintiff's challenge to Guideline 12 as viewpoint discriminatory is foreclosed by the

D.C. Circuit's rejection of a facial viewpoint discrimination challenge in the nonpublic forum of

the WMATA transit system in *Archdiocese*, 897 F.3d at 325 (finding Guideline 12 to be a

permissible "subject-based prohibition" and not viewpoint discrimination, and explaining

"Guideline 12 does not function to exclude religious viewpoints but rather proscribes advertisements on the entire subject matter of religion"); *see also AFDI*, 901 F.3d at 363 (holding that Guidelines at issue in that case, including Guideline 12, "are viewpoint-neutral"). This Court is bound by that ruling, as Plaintiff acknowledges in its motion for preliminary injunction. Mot. at 40-42 (acknowledging that the D.C. Circuit in *Archdiocese* rejected the claim that Guideline 12 is viewpoint discriminatory "[a]nd this Court is obviously bound by that decision," and stating that "Wallbuilders [] presses the issue here that *Archdiocese of Washington* was wrongly decided, so that it can preserve the issue for review upon appeal"); *see also Rouse v. Berry*, 848 F. Supp. 2d 4, 10 (D.D.C. 2012) ("The decisions of the D.C. Circuit . . . are binding on the lower courts of this circuit 'unless and until overturned by the court en banc or by Higher Authority.' ") (quoting *Critical Mass Energy Project v. Nuclear Regul. Comm'n*, 975 F.2d 871, 876 (D.C. Cir. 1992) (en banc) (citation omitted)). This Court need not address the issue.

## III. PLAINTIFF HAS NOT SHOWN IT WILL SUFFER ANY IRREPARABLE HARM IF AN INJUNCTION DOES NOT ISSUE.

Because Plaintiff cannot establish a likelihood of success on the merits, whether it would suffer irreparable harm ultimately is irrelevant. *Church v. Biden*, 573 F. Supp. 3d 118, 133 (D.D.C. 2021) (plaintiff that fails to establish a likelihood of success on the merits is not entitled to injunctive relief); *Hosp. Staffing Sols., LLC v. Reyes*, 736 F. Supp. 2d 192, 197 (D.D.C. 2010) (if movant fails to establish a likelihood of success on the merits, "inquiry into the remaining factors [for injunctive relief] is unnecessary, for the injunctive relief must be denied on that ground alone"). In any event, Plaintiff has failed to prove it will suffer any irreparable harm. *Winter*, 555 U.S. at 22 ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction."); *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir.

2006) ("movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction" even if other factors merit such relief).

The alleged impairment of Plaintiff's rights is its inability to advertise its website in a particular location. Plaintiff claims it is being denied "its preferred audience" (Mot. at 43), but Plaintiff has many other advertising options in the city, *e.g.*, print ads in newspapers and magazines, billboards and outdoor signs, radio, and television ads. Plaintiff's Complaint and original preliminary injunction motion even erroneously identified an ad location that it thought belonged to WMATA because of its proximity to a WMATA station. Compl., ¶ 73; Memorandum of Points and Authorities (ECF No. 9-1) at 24; Mot. at 27 n.12; Nicol Decl., ¶ 18.

"[T]he assertion of First Amendment rights does not automatically require a finding of irreparable injury, thus entitling a plaintiff to a preliminary injunction if he shows a likelihood of success on the merits." *Hohe v. Casey*, 868 F.2d 69, 72-73 (3d Cir. 1989); *see also Rushia v. Town of Ashburnham*, 701 F.2d 7, 10 (1st Cir. 1983). Rather, the plaintiffs must show " 'a chilling effect on free expression.' " *Hohe*, 868 F.2d at 73 (quoting *Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965)); *accord Chaplaincy of Full Gospel Churches*, 454 F.3d at 301 (quoting *Hohe*). It is "purposeful unconstitutional suppression of speech [that] constitutes irreparable harm for preliminary injunction purposes." *Goldie's Bookstore v. Superior Ct.*, 739 F.2d 466, 472 (9th Cir. 1984) (citing *Ebel v. City of Corona*, 698 F.2d 390 (9th Cir. 1983)). It is the "direct penalization, as opposed to incidental inhibition, of First Amendment rights [that] constitutes irreparable injury." *Cate v. Oldham*, 707 F.2d 1176, 1188 (11th Cir. 1983).

In *Tracy Rifle & Pistol LLC v. Harris*, 118 F. Supp. 3d 1182 (E.D. Cal. 2015), *aff'd*, 637 F. App'x 401 (9th Cir. 2016), which involved similar facts, a court found alleged irreparable harm from a First Amendment violation insufficient to warrant injunctive relief. There, the

plaintiff gun store owners sought to enjoin restrictions on handgun advertising as a restriction on their First Amendment rights. The district court found that the plaintiffs demonstrated likelihood of success and that the infringement of their First Amendment rights constituted irreparable harm. *Id.* at 1191-92. But the court concluded that the harm carried "minimal weight" in the injunctive relief analysis, because the plaintiffs had other available means to advertise that they sold handguns and could do so in other media. *Id.* at 1193. On appeal, the Ninth Circuit confirmed that the district court did not abuse its discretion in finding that "the magnitude of this potential harm [was] minimal due to the commercial nature of the speech and limited scope of the restriction." *Tracy*, 637 F. App'x at 402.

Plaintiff also maintains that it has been harmed because it was denied the opportunity to advertise "during the planned time of its rebrand and relaunch." Mot. at 43. But it concedes that it planned the rebrand beginning at "the end of 2022" which it "planned to roll out alongside an ad campaign beginning in June 2023." Mot. at 8. It nonetheless did not submit its ads until May 10, 2023, and when it received no response, did not follow-up until May 30, 2023.[11] That was only weeks or days before the claimed launch. Moreover, the original ads were rejected on June 12, 2023, and Plaintiff waited months to submit revised ads, which were rejected on September 8, 2023, and September 22, 2023. Smith. Decl., Exh. A. Plaintiff then waited three more months to file this Motion on December 12, 2023.

"An unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm." *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005); *accord Cayuga Nation v. Zinke*, 302 F. Supp. 3d 362, 373

---

[11] Per the email thread submitted by Plaintiff, it appears Outfront did not receive or overlooked the initial email. Smith Decl., Exh. A.

(D.D.C. Mar. 27, 2018).  In *Newdow*, the plaintiff sought to challenge the giving of religious prayers at the 2005 inauguration.  However, he received his ticket to attend the inauguration in mid-November 2004, but waited until December 21, 2004, just a month before the inauguration to file suit.  *Newdow*, 355 F. Supp. 2d. at 292.  "This delay in seeking a preliminary injunction has placed defendants and the federal courts in a difficult position."  *Id*.

The same is true here.  Plaintiff's delay in submitting the ads and then in seeking injunctive relief demonstrates that it has suffered no irreparable harm.

Accordingly, because Plaintiff has not shown it will suffer any irreparable harm without injunctive relief nor that it does not have adequate alternative sites for its ads, it has failed to prove it will suffer irreparable harm absent issuance of a preliminary injunction.

## IV.   THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST WEIGH AGAINST INJUNCTIVE RELIEF.

As discussed above, if Plaintiff can prove any harm from being forced to advertise in other media and locations, such harm would be minimal at best.  For WMATA, if it is forced to run the ads, it will set a precedent that undermines WMATA's ability to control its advertising space.  If Plaintiff's ad runs in WMATA's advertising space, WMATA will lose the ability to foreclose ads that are issue-oriented advocacy and provide for the safety of its riders.  That would greatly undermine the purpose of WMATA's decision to close its advertising space and adopt the Guidelines.

**CONCLUSION**

For the foregoing reasons, Defendant respectfully requests that this Court deny Plaintiff's motion for a preliminary injunction.

Date:  January 31, 2024

Respectfully submitted,

COMPLEX APPELLATE LITIGATION GROUP LLP

 s/ *Rex S. Heinke*
Rex S. Heinke, D.C. Bar No. CA00080
COMPLEX APPELLATE LITIGATION GROUP LLP
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 878-0404
Email: rex.heinke@calg.com

Anthony T. Pierce, D.C. Bar No. 415263
Caroline L. Wolverton, D.C. Bar No. 496433
AKIN GUMP STRAUSS HAUER & FELD LLP
Robert S. Strauss Tower
2001 K Street, N.W.
Washington, D.C. 20006
Telephone: (202) 887-4000
Email: apierce@akingump.com
        cwolverton@akingump.com

Attorneys for Defendant