**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**WALLBUILDER PRESENTATIONS,**

        Plaintiff,

    v.

**RANDY CLARKE, in his official capacity**
**as General Manager and Chief Executive**
**Officer of the Washington Metropolitan**
**Area Transit Authority,**

        Defendant.

**Case No. 1:23-cv-03695-BAH**

---

## PLAINTIFF WALLBUILDER PRESENTATIONS' REPLY IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION

David J. Hacker (admitted *pro hac vice*)
Jeremiah G. Dys (D.C. Bar # 90000678)
Ryan Gardner  (admitted *pro hac vice*)
FIRST LIBERTY INSTITUTE
2001 West Plano Parkway, Suite 1600
Plano, TX 75075
Tel: (972) 941-4444
dhacker@firstliberty.org
jdys@firstliberty.org
rgardner@firstliberty.org

Shannen W. Coffin (D.C. Bar # 449197)
Caitlin E. Daday (D.C. Bar # 90002918)
STEPTOE LLP
1330 Connecticut Ave., N.W.
Washington, D.C.  20036
Tel: (202) 429-3000
Fax: (202) 429-3902
scoffin@steptoe.com
cdaday@steptoe.com

Camille P. Varone (D.C. Bar # 1617624)
FIRST LIBERTY INSTITUTE
1331 Pennsylvania Ave. N.W., Suite 1410
Washington, D.C. 20004
Tel: (202) 921-4105
cvarone@firstliberty.org

Arthur B. Spitzer (D.C. Bar # 235960)
Scott Michelman (D.C. Bar # 1006945)
AMERICAN    CIVIL    LIBERTIES    UNION
FOUNDATION OF THE DISTRICT OF COLUMBIA
529 14th Street NW, Suite 722
Washington, D.C. 20045
Tel: (202) 457-0800
aspitzer@acludc.org
smichelman@acludc.org

*Additional Counsel Listed on Next Page

Brian Hauss
(D.D.C. admission pending)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2500
bhauss@aclu.org

David Cole
(D.D.C. admission pending)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street NW
Washington, D.C. 20005
Tel: (212) 549-2611
dcole@aclu.org

## **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

ARGUMENT .......................................................................................................................2

I.      GUIDELINE 9 IS UNREASONABLE UNDER *MANSKY* ................................2

     A.      WMATA's "Limiting Language" Defense Fails.....................................3

     B.      WMATA's Erratic Approach to Guideline 9 Confirms That It Is Incapable of Reasoned Application ...............................................................8

     C.      WMATA's Commercial/Non-Commercial Distinction Does Not Save Its Inconsistent Application of Guideline 9 ................................................13

II.      GUIDELINE 12 SIMILARLY FAILS *MANSKY'S* REASONABLENESS REVIEW.....16

III.      WMATA DISCRIMINATES AGAINST RELIGIOUS VIEWPOINT ...........................19

     A.      Guideline 9 Effects Viewpoint Discrimination.....................................19

     B.      Guideline 12 Discriminates Against Religious Viewpoints ..................21

IV.      WALLBUILDERS SATISFIES THE REMAINING REQUIREMENTS FOR A PRELIMINARY INJUNCTION .........................................................................23

CONCLUSION....................................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*ACLU Found. v. WMATA*,
  303 F.Supp.3d 11 (D.D.C. 2018) ....................................................................12, 15

*\*Am. Freedom Def. Initiative v. Suburban Mobility Auth.*,
  978 F.3d 481 (6th Cir. 2020) ........................................................................ *passim*

*Am. Freedom Def. Initiative v. WMATA*,
  901 F.3d 356 (D.C. Cir. 2018) .................................................................7, 8, 16

*Amalgamated Transit Union Local 1015 v. Spokane Transit Auth.*,
  929 F.3d 643 (9th Cir. 2019) ...............................................................................5

*Archdiocese of Washington v. WMATA*,
  897 F.3d 314 (D.C. Cir. 2018) ...................................................................... *passim*

*Cayuga Nation v. Zinke*,
  302 F. Supp. 3d 362 (D.D.C. 2018) ....................................................................24

*\*Center for Investigative Reporting v. S.E. Pa. Transp. Auth*,
  975 F.3d 300 (3d Cir. 2020)...............................................................6, 8, 13, 25

*Greer v. Spock*,
  424 U.S. 828 (1976) .............................................................................................6

*Holder v. Humanitarian Law Project*,
  561 U.S. 1 (2010).................................................................................................7

*IOTA XI Chapter of Sigma Chi Fraternity v. George Mason Univ.*,
  993 F. 2d 386 (4th 1993).....................................................................................14

*League of Women Voters v. Newby*,
  838 F.3d 1 (D.C. Cir. 2016).................................................................................23

*Lehman v. City of Shaker Heights*,
  418 U.S. 298 (1974).............................................................................................6

*\*Minn. Voters Alliance v. Mansky*,
  585 U.S. 1 (2018)....................................................................................... *passim*

*\*N.E. Pa. Freethought Society v. County of Lackawanna*,
  938 F.3d 424 (3d Cir. 2019)...............................................................9, 11, 20, 21

*Roman Cath. Archbishop of Wash. v. Bowser*,
  531 F. Supp. 3d 22 (D.D.C. 2021) ......................................................................25

*Rosenberger v. Rector & Visitors of U. Va.,
    515 U.S. 819 (1995).............................................................................. passim

Susan B. Anthony List v. Driehaus,
    573 U.S. 149 (2014).............................................................................16

Turner v. U.S. Agency for Glob. Media,
    502 F. Supp. 3d 333 (D.D.C. 2020) ..............................................16, 24

*White Coat Waste Project v. Greater Richmond Transit Co.,
    35 F.4th 179 (4th Cir. 2022) ..................................................7, 8, 11, 15

*White Coat Waste Project v. WMATA,
    -- F. Supp. 3d --, 2024 WL 68256 (D.D.C. Jan. 5, 2024) ............... passim

*Young Israel of Tampa, Inc. v. Hillsborough Area Regional Trans. Auth.,
    89 F.4th 1337 (11th Cir. 2024) ..........................................2, 11, 17, 18

*Zukerman v. U.S. Postal Serv.,
    961 F.3d 431 (D.C. Cir. 2020) ...............................................5, 7, 14

*Principal authorities are marked with an asterisk.

## INTRODUCTION

Defendant's Opposition ("Opp.") confirms that the Washington Metropolitan Area Transit Authority ("WMATA") has no idea what its Advertising Guidelines 9 and 12 prohibit or allow.[1] ECF No. 22. With respect to Guideline 9, WMATA explains that it has closed its advertising space to "*all issue-oriented advertising* on a permanent basis," Bowersox Decl. ¶ 15 (ECF No. 22-2) (emphasis added), but then, in the same breath, contends that it "does not have a blanket ban on 'issue' ads." Opp. 18. WMATA vacillates between Guideline 12 being a ban on ads "on the entire subject matter of religion," *id.* at 37, and a narrower ban on ads that "promote or oppose" religion, *id.* at 3. Even at this high level of generality, WMATA cannot articulate what "may come in from what must stay out." *Minn. Voters Alliance v. Mansky*, 585 U.S. 1, 16 (2018).

A closer analysis does not help WMATA. In an effort to save Guideline 9, WMATA proposes limiting constructions, which "raise more questions than [they] answer[]." *Id.* at 18. WMATA's limiting constructions differ little from the narrowing constructions rejected in *Manksy. See id.* at 18-19. Moreover, WMATA still cannot answer basic questions, like "what is an 'issue'?" (*see id.*); what makes an issue "significant"? (*see* Opp. 17), or how much disagreement is needed to conclude that opinions "vary"? WMATA suggests that it draws a line between "commercial" and "non-commercial" ads, but that line is found nowhere in the relevant Guidelines, and WMATA does not apply the distinction consistently in its review.

WMATA's Guidelines are so amorphous that even Outfront Media, its exclusive advertising contractor, does not know when to refer an ad that *might* violate the Guidelines to WMATA's review panel. This uncertainty recently led Chief Judge Boasberg to deem Guideline 9 "unreasonable" under the First Amendment. *White Coat Waste Project v. WMATA*, -- F. Supp.

---

[1] For convenience sake, Plaintiff refers to Defendant (sued in his official capacity) as WMATA.

3d --, 2024 WL 68256, *8-9 (D.D.C. Jan. 5, 2024). Similarly, the Eleventh Circuit recently applied *Mansky* to hold unconstitutional a transit ban closely resembling Guideline 12. *See Young Israel of Tampa, Inc. v. Hillsborough Area Regional Trans. Auth.*, 89 F.4th 1337, 1349 (11th Cir. 2024). This Court should do the same here.

Both Guidelines also impermissibly discriminate against religious viewpoints. WMATA applies Guideline 9 to single out WallBuilders' religious viewpoint for unfavorable treatment, while allowing comparable ads discussing American history and education from a secular standpoint. As now interpreted by WMATA, Guideline 12 fares no better. It singles out certain religious viewpoints (*i.e.*, that "promote" or "oppose" religion) for prohibition, while permitting ads that otherwise speak to the topic of religion. *See* Opp. 33. Even under the D.C. Circuit's narrow reading of *Rosenberger v. Rector & Visitors of U. Va.*, 515 U.S. 819, 831 (1995), the government cannot open a forum to discussion of religion as a subject matter, while excluding pro- or anti-religious viewpoints. *See Archdiocese of Washington v. WMATA*, 897 F.3d 314, 326 (D.C. Cir. 2018). WMATA's evolving interpretation of Guideline 12—to permit some but not all religious speech—distinguishes this case from *Archdiocese* and ultimately dooms Guideline 12.

Because WallBuilders satisfies the remaining criteria, its motion for a preliminary injunction should be granted.

## ARGUMENT

## I.    GUIDELINE 9 IS UNREASONABLE UNDER *MANSKY*

Guideline 9 lacks "objective workable standards" to limit WMATA's discretion in what it permits and prohibits. *See Mansky*, 585 U.S. at 21. Considering Guideline 9's "sweeping scope and nebulous boundaries, it is difficult to escape the conclusion that it is unreasonable." *White Coat*, 2024 WL 68256, at *9.

A.      WMATA's "Limiting Language" Defense Fails

Defendant's principal defense of Guideline 9 is that it "contains limiting language that provides guidance to WMATA when reviewing ads," Opp. 15—in particular, the requirements that an advertisement be "intended to influence members of the public" and that the issue be one on "which there are varying opinions."  Opp. 18; Def.'s Mtn. Dismiss 13 (Doc. 23-1) ("MTD"). But, as in *Mansky*, WMATA's purported "limitations" actually "raise[] more questions than [they] answer[]."  585 U.S. at 18.  They do not save Guideline 9 from unconstitutionality.

**"Intended to Influence Members of the Public."**  The phrase "intended to influence members of the public" does not meaningfully limit the discretion of WMATA's review panel. *Every advertisement* seeks to influence members of the public.  Indeed, that is the *raison d'etre* of advertising.  WMATA now contends that Guideline 9 is not a "blanket ban" on "'issue' ads," Opp. 18, but does not explain how an ad that "involves an issue," MTD 13, *would not* seek to influence the public on that issue.

Far from than distinguishing Guideline 9 from *Mansky*, "intended to influence members of the public" drives right into its teeth.  In *Mansky*, Minnesota issued guidance that sought to similarly limit its ban on "political" apparel at polling places to a narrower class of "[i]ssue oriented material designed to influence or impact voting."  585 U.S. at 18.  But "[f]ar from clarifying the indeterminate scope of the political apparel provision," the State's limiting construction "introduces confusing line-drawing problems."  *Id.*  (citation omitted).  The Court singled out, in particular, the undefined and virtually boundless term "issue."  *Id.*

Tellingly, the Court did not hold that the phrase "designed to influence or impact voting"— which served the same function there as "intended to influence members of the public" in WMATA's narrowing construction—saved the State's otherwise "murky" construction of the regulation.  *See id.*  If anything, Minnesota's limiting construction was narrower than WMATA's

proposed limit on "issue ads."  Minnesota required, at the least, a connection between the relevant issues and voting in elections, whereas Guideline 9 prohibits ads on *any* "issue on which there are varying opinions."  WMATA Guideline 9.  As in *Mansky*, WMATA's narrowing construction fails to narrow anything.

WMATA contends that the key problem identified in *Mansky*—"[w]hat qualifies as an 'issue'?"—is not presented here.  585 U.S. at 18.  According to WMATA, "the problem [in *Mansky*] was not with the term 'issue,' but with how the State defined 'issue.'"  Opp. 17.  But what qualifies as an "issue" is *even more* problematic in this case.  *See White Coat*, 2024 WL 68256, at *9 (finding Guideline 9 "equally vague if not more so" than "political" ad bans held unreasonable under *Mansky*).  Guideline 9 offers *no limiting definition* of "issue" at all.  As Chief Judge Boasberg explained, "[v]irtually anything can constitute an 'issue' on which opinions vary," *id.*, including "issues" ranging from the existence of God, to immigration policy, and to "Yankees versus Red Sox."  *Id.*; *see Am. Freedom Def. Initiative v. Suburban Mobility Auth.*, 978 F.3d 481, 497 (6th Cir. 2020) (noting "plenty of nonpolitical issues on which members of society disagree").

After *Mansky,* "courts have rejected efforts by parties to define what is political by reference to contested 'issues' as singularly unhelpful."  *White Coat*, 2024 WL 68256, at *9 (citing cases).  WMATA's citation to dictionary definitions of "issue" do not help, as they merely raise additional questions: What is a "vital or unsettled matter"?  *See* Opp. 17 (quoting Merriam-Webster definition).  What is the threshold of a "significant matter for debate or discussion"?  *Id.* (citing Oxford English Dictionary).  And vital or significant to whom?

**Issue "on Which There are Varying Opinions."**  Just as "intended to influence members of the public" does not narrow the breadth of Guideline 9, ads that involve issues "on which there are varying opinions" includes *all* advertisements.  WMATA makes little effort to

4

address the uncertainty created by the phrase "on which there are varying opinions."  What is the threshold for "varying?"  WMATA suggests that a particular ad (for Power to the Patients) was permitted because it was not "subject to *significant* opposition." Opp. 29 (emphasis added).  But "significant opposition" is found nowhere in the Guideline's text or in any authoritative interpretation.  And it merely raises additional unanswerable questions: what constitutes significant opposition? How widely held must a minority opinion be? Or how strongly held? And "whose perspective matters?  The reasonable commuter's?"—or the views of three attorneys chosen by WMATA to sit on its panel? *See Suburban Mobility Auth.*, 978 F. 3d at 496.

"On which there are varying opinions" does nothing to narrow the field because differences of opinion are as American as apple pie. *See, e.g.*, *Amalgamated Transit Union Local 1015 v. Spokane Transit Auth.*, 929 F.3d 643, 654 (9th Cir. 2019) ("for most every good or service, there is some level of debate").  WMATA's open-ended inquiry requires an encyclopedic knowledge not only of the myriad issues on which there are varying public views but also of the scope and depth of the public disagreement. *See Mansky*, 585 U.S. at 20.

WMATA contends that *Mansky*'s concern that a law should not require decisionmakers to maintain a "mental index" of relevant "issues" applies only to immediate "on the spot" determinations, like those made by Minnesota's election officials at the polls.  Opp. 25.  But the D.C. Circuit has held otherwise.  In *Zukerman,* the D.C. Circuit applied *Mansky's* "mental index" concern well beyond the context of immediate, "on the spot" determinations—to a U.S. Postal Service contractor's evaluation of impermissible "political" subject matter in custom postage: "A rule whose fair enforcement requires [a decisionmaker] to maintain a mental index' of commercial or social designs that have any possible 'political' resonances is not reasonable." *Zukerman v. U.S. Postal Serv.*, 961 F.3d 431, 450 (D.C. Cir. 2020); *see also Ctr. for Investigative Reporting v. S.E.*

*Pa. Transp. Auth*, 975 F.3d 300, 315 (3d Cir. 2020) ("*CIR*") (finding "ultimately unpersuasive" the argument that *Mansky* was inapplicable where review did not involve "quick decisions").

WMATA's fruitless efforts to narrow the expansive and indefinite scope of Guideline 9 bear little resemblance to the sort of limitations that *Mansky* noted would be sufficient to render a "political" ad ban reasonable. *Mansky* cited as examples of "more discernible" limitations a state statutory prohibition on "the visible display . . . of *information that advocates for or against any candidate or measure*," or laws that barred wearing "a badge, insignia, emblem, or other similar communicative device *relating to a candidate, measure, or political party appearing on the ballot, or to the conduct of the election*." 585 U.S. at 22 (emphasis added). Here, by contrast, there is no effort to tie the prohibition on "issue ads" to specific candidates or issues on a ballot or to any other meaningfully narrower set of issues.

For similar reasons, WMATA's reliance on two prior Supreme Court cases—*Lehman v. City of Shaker Heights*, 418 U.S. 298 (1974) (plurality op.) and *Greer v. Spock*, 424 U.S. 828 (1976)—is misplaced. Those decisions largely dealt with the question of whether a particular forum (the interior of a bus or a military base) was open to protected expression and did not focus in any detail on the definition of "political" advertising at issue. *See Lehman*, 418 U.S. at 301-04 ("No First Amendment forum is here to be found"); *Greer*, 424 U.S. at 836-38. Even so, the "political" speech prohibitions there were construed more narrowly—to address particular candidates or issues on the ballot—than the "issue" ad ban here. *See Lehman*, 418 U.S. at 299 (addressing municipality's refusal to "accept paid political advertising on behalf of a candidate for public office" on bus interiors); *Greer*, 424 U.S. at 831 (upholding political speech ban that covered "political campaign speech[es]" on a military base). *Lehman and Greer* upheld rules that, unlike Guideline 9, "excluded 'political advocates and forms of political advocacy' in more

precise, objective and workable terms." *Zukerman*, 961 F. 3d at 451.  Those decisions did not save

the Postal Service's regulation banning custom postage designs containing "[a]ny depiction of

political . . . content" because of the unbounded nature of that prohibition.  *Id.* at 447, 451.  Nor,

for that matter, could they save Guideline 9 in *White Coat*.  *See* 2024 WL 68256, at *8-9.[2]

      WMATA thus shifts to a procedural objection, borrowing from "vagueness" law to argue

that WallBuilders cannot challenge Guideline 9 where its proposed ads fit squarely within it.  Opp.

22.  But *Mansky*'s "reasonableness" inquiry is distinct from (albeit a cousin to) vagueness doctrine.

*See Am. Freedom Def. Initiative v. WMATA*, 901 F.3d 356, 372 (D.C. Cir. 2018) ("*AFDI*").  Unlike

traditional "vagueness" cases, *Mansky* does not require a plaintiff to prove that its own speech is

not "clearly proscribed."  In *Mansky*, certain plaintiffs wore t-shirts containing the language "Tea

Party Patriot," which would have fit squarely within the scope of Minnesota's "political" ban.  585

U.S. at 9.  The Court did not ask whether that t-shirt was "clearly proscribed" by the Minnesota

law.  The Court did not cite vagueness decisions like *Holder v. Humanitarian Law Project*, 561

U.S. 1 (2010), on which WMATA seeks to rely here, *see* Opp. 22, and did not even once refer to

the Minnesota law as "vague."

      Given the wide-ranging nature of its inquiry, the "varying opinions" question invites the

review panel to rely on its "own politics" in making Guideline 9 decisions—the very subjective

determinations against which *Mansky* sought to guard.  *See Mansky*, 585 U.S. at 22; *Zukerman*,

961 F.3d at 449, *White Coat*, 2024 WL 68256, at *8; *CIR*, 975 F.3d at 316-17.  Rather than solve

the *Mansky* problem with Guideline 9, it deepens it.

---

[2] WMATA attempts to brush aside *White Coat*, arguing that that court did not consider any of
Guideline 9's purported limiting language.  Opp. 19-20.  But the opinion discusses extensively
whether Guideline 9 contains "some limiting standards" to cabin WMATA's discretion.  *White
Coat*, 2024 WL 68256, at *8.  The court concluded that it did not.

**B.    WMATA's Erratic Approach to Guideline 9 Confirms That It Is Incapable of Reasoned Application**

Guideline 9's lack of objective, workable standards raises the risk that WMATA reviewers' "background knowledge and media consumption," or even their "own politics," will arbitrarily shape their views on what counts as a covered "issue ad." *Mansky*, 585 U.S. at 21.  Guideline 9's "indeterminate prohibition carries with it 'the opportunity for abuse, especially where it has received a virtually open-ended interpretation.'" *Id. (*cleaned up).  This risk has become reality here.  It is amply illustrated by WMATA's erratic application.

At the outset, WMATA misapprehends the legal significance of its inconsistency, arguing that inconsistent application does not speak to whether "Guideline 9 is capable of reasoned application," Opp. 23, and thus that this Court should not base its decision on other (non-WallBuilders) ads that were accepted or rejected by WMATA.  *Id.*  But this is precisely what *Mansky* requires.  As the D.C. Circuit noted in *AFDI:* "Guideline 9 has been in place for . . . years, and information on how it has been applied would certainly be information as to whether it is capable of reasoned application."  901 F.3d at 373; *see also Archdiocese*, 897 F.3d at 330 ("a challenged regulation may be unreasonable regardless of the reasons for its adoption, if it is inconsistently enforced") (citation omitted); *White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179, 199-200 (4th Cir. 2022) ("Richmond Transit's actions" were relevant to whether regulation was capable of reasoned application).

Guideline 9's scope is so indeterminate that even its advertising contractor, Outfront Media, has no idea when to refer an ad that *might* implicate it.  WMATA brushes off many of the problematic ads cited by WallBuilders—for Catholic University, the Social Justice School, *The Book of Mormon*, a play called *Moses,* and Covid-19 vaccination—on the grounds that its review panel never even saw those ads.  *See* Nicol Decl. ¶¶ 16-17.  But that does not solve its problem; it

merely reveals its breadth. Each ad implicates "issues" on which public opinion varies (Catholic education, the existence of God and the value of organized religion, "Social Justice," and the pros and cons of Covid vaccination), yet WMATA's advertising contractor did not even submit those ads for panel review. *Id.* A stronger indictment of the Guidelines' incoherence and the boundless nature of discretion they confer on decisionmakers would be hard to imagine.

WMATA struggles to explain several ads cited by WallBuilders. It offers no substantive defense of the ad advocating that "An Updated Covid-19 Vaccine Helps Saves Lives," except to speculate (without support), that its contractor may have viewed it as "more akin to an ad for a commercial transaction." Opp. 28 n.9. But the ad doesn't propose any commercial transaction at all. *See* Varone Decl. ¶ 6. It merely advocates that the vaccine saves lives—"a contentious social and political issue." *N.E. Pa. Freethought Society v. County of Lackawanna*, 938 F.3d 424, 440 (3d Cir. 2019). WMATA's contention that its "Earth Day" bus wrap "promot[ed] children's art," Opp. 28, elides the fact that WMATA selected the art to celebrate its role "in creating a more sustainable, healthier and cleaner environment."[3]

WMATA has particular difficulties dealing with a recent pair of blatant issue ads it ran— an ad from Power to the Patients asserting that "WE ~~NEED~~ DEMAND HOSPITAL PRICES" and World Beyond War's "Peace on Earth" ad, both complete with website links. First, WMATA's determination that "transparency in healthcare" was not "an issue subject to significant opposition," Opp. 29, dramatically illustrates the definitional flaws inherent in Guideline 9. It is self-evidently not true—Power to the Patients would not need to spend money to persuade people to join its campaign on this issue if did not face some significant opposition. *See* Pls.' Corrected

---

[3] *See* www.wmata.com/about/news/Metro-Unveils-Earth-Day-Metrobuses-Featuring-Artwork-Created-by-Young-Artists.cfm (quoted in Compl. ¶ 79).

PI Mem. 23 n.8 (ECF No. 20-1) ("Pl.'s Mem") (citing study arguing that increased price transparency leads to higher prices, reduced competition and the potential for collusion). WMATA further claims that this ad is acceptable because it merely "seek[s] to educate people on their rights under existing law," Opp. 29. But a mere glance at the ad and its referenced website belies that characterization. *See* Varone Supp. Decl. ¶ 11 & Ex H ("Together we can *demand change* and bring power back to the patients.") (emphasis added). In any event, "know your rights" ads is not a special category identified anywhere in the Guidelines, and WMATA's reliance on this rationale ignores the fact that "rights under existing law" are often themselves the subject of intense public debate (as with *Roe v. Wade* or Deferred Action for Childhood Arrivals).

Similarly, WMATA defends its acceptance of an anti-war group's "Peace on Earth" ad as a message that is "hardly controversial or divisive." Opp. 29. But WMATA cannot eliminate public controversy about an idea simply by declaring it so. *See* Pl.'s Mem. 25-26. And, as noted, *supra* at 5, its effort to measure the "significance" of the debate merely introduces a further layer of arbitrariness into its determination. Additionally, if WMATA had visited the website on the ad (as it did with WallBuilders' ad), it would have quickly seen that World Beyond War advocates for specific measures whose controversial nature cannot be denied: an end of "arms manufacturing, weapons stockpiling, and the expansion of military bases." Opp. 29. WMATA suggests that it does not discriminate based on an organization's purpose, but the website goes beyond simply stating its organizational purpose to advocating anti-war objectives and even organizing demonstrations at military bases.[4]

---

[4] *See* Varone Supp. Decl. ¶ 9 & Ex. D ("From taking action to block the arms trade to promoting a global nuclear ban, from campaigning in solidarity with communities in active war zones to amplifying calls for decolonization, World BEYOND War's organizing work takes many forms"). WMATA faults WallBuilders for failing to show that "at the time WMATA reviewed its 'Peace on Earth ad,'" World Beyond War's website contained advocacy intended to influence the public

These ads highlight a major inconsistency in how WMATA applies its Guidelines—its erratic approach to looking outside the "four corners" of an ad.  *See Suburban Mobility Auth.*, 978 F.3d at 495 (criticizing transit authority for "inconsistencies" in sometimes reviewing website content, but not the content of "advertised shows, movies, or books"); *Greater Richmond Transit*, 35 F.4th at 200-01 (discussing inconsistent, unwritten standards for website review); *N.E. Pa. Freethought Society*, 938 F.3d at 440 ("It's also unclear whether and when information about an advertiser beyond the face of the ad is relevant.").  *No written standards or guidance* instruct WMATA reviewers when to go outside an ad's four corners or how to conduct such a review.  *See Suburban Mobility Auth.*, 978 F.3d at 495 ("political" ad ban unreasonable where it lacked "any official guidance to create workable standards").

WMATA's actual approach to underlying content is thus also inconsistent.  WMATA apparently does not review (and Outfront Media does not even refer) the content of advertised performances (musicals or plays) addressing issues of varying opinions.  Notwithstanding *The Book of Mormon*'s satirical stab at the Latter Day Saints' faith and organized religion in general, WMATA's review panel did not review the ad.  *See Young Israel*, 89 F.4th at 1349 (asking whether *The Book of Mormon* ad would be prohibited by transit ad ban).  The same is true of *Moses*, a modern-day retelling of the prophet Moses's story featured at the Edlavitch Jewish Community Center's Theater J.  *See* Pl.'s Mem. 32.

But, at least in some circumstances, WMATA *does* review the content of advertised books. It reviewed controversial author Milo Yiannopoulos's book *Dangerous* before determining that an

---

against war.  Opp. 30.  But given the stated purpose of the organization, it begs credulity to suggest that its website was substantially different in late 2022 when the ad was accepted—and internet archives from November 2022 show similar anti-war advocacy.  *See* Varone Supp. Decl. ¶ 9 & Ex. E.

ad for the book violated Guideline 9.  In related litigation over that ad, WMATA argued that "that it would be illogical to require the court to ignore the content of a book when evaluating the message of an advertisement promoting that book."  *ACLU Found. v. WMATA*, 303 F.Supp.3d 11, 19 (D.D.C. 2018).

WMATA's Senior Vice President for Marketing now admits that its practice on whether to "look behind" an ad to any referenced content it promotes is entirely ad hoc.  WMATA's review panel "may" (but not "must") review "the website, including the linked page, to determine if the advertisement would lead a viewer to material that violates WMATA's guidelines."  Bowersox Decl. ¶ 22.  Nothing requires such review or sets its boundaries.  WMATA thus reviewed several pages of WallBuilders' website to determine whether it contained controversial opinions on issues of public debate.  *Id.* ¶ 11.  Yet other websites referenced in WMATA ads—Catholic University's website (which contains a readily accessible "pro-life" page, declaring that "we believe every human life, from the moment of conception until death, is sacred because the human person has been willed for its own sake in the image and likeness of the living and holy God," *see* Varone Supp. Decl. ¶ 10 & Ex. F),  the Social Justice School's website ("empowering and preparing young people to design . . . responses . . . to systems of inequity by creating an inclusive and equitable world"),[5] and the websites of World Beyond War and Power to the Patients—were either not reviewed at all or were not enough for WMATA's review panel to find a violation of Guideline 9.

WMATA contends that is not required to "scour websites and advertised content to root out any possible controversial issue," Opp. 32, but if the concern is that the ad might lead a viewer to content that violates its Guidelines, why not?  Even if WMATA is not required to review every word on a website, at minimum it is required to operate consistently rather than arbitrarily in

---

[5] *See* https://www.thesocialjusticeschool.org/.

deciding when and what to review.  Lacking any governing standards, there is nothing to cabin a reviewer's discretion in deciding when to review and how thoroughly a review must be conducted. Is it only the landing page that must be reviewed?  Does the panel drill down to additional pages on the site?  How many?  There is nothing that stops a reviewer who opposes an organization's mission (or a particular speaker's viewpoint) from continuing to dig until an "issue" is found or that stops a reviewer who supports an organization's mission from foregoing website review entirely.  It is these sorts of "inconsistencies" that have led courts to invalidate similarly unmoored transit advertising regulations.  *See, e.g.*, *Suburban Mobility Auth.*, 978 F.3d at 495.

WMATA's application of the Guidelines need not be perfect.  But this is not a case of mere imperfection.  Instead, the "lack of structure and clear policies governing the decision-making process creates the real risk that it may be arbitrarily applied," *see CIR*, 975 F.3d. at 317, and on numerous occasions identified by WallBuilders, it *has been* arbitrarily applied.

## C.    WMATA's Commercial/Non-Commercial Distinction Does Not Save Its Inconsistent Application of Guideline 9

WMATA seeks to defend its otherwise inexplicable approach to Guideline 9 by drawing a bright line between commercial and non-commercial ads.  Citing *Archdiocese,* WMATA contends that "[a]ds that try to sell products do not express a view or invite debate."  Opp. 24.  But WMATA fundamentally misunderstands *Archdiocese*, which did not grant blanket exemption from the Guidelines to any ad that seeks to sell a product or service.  Instead, *Archdiocese* stands for the proposition that the *mere* advertisement of a product *alone*—"please buy our toothpaste"—does not generally invite debate on broader issues.  According to *Archdiocese*, sometimes an ad for a cheeseburger is just an ad for a cheeseburger.  The D.C. Circuit rejected a comparison between the Archdiocese's "Find the Perfect Gift" Advent advertising campaign and "commercial ads for Christmastime sale of goods."  897 F.3d at 329.  Such generic Christmas sales ads do not, in the

D.C. Circuit's view, "invite debate about how Christmas should be celebrated." *Id.* (cleaned up). But surely the D.C. Circuit did not mean to suggest that the Archdiocese's only mistake was in not selling tickets to Christmas mass.[6]

Though some commercial ads may convey no message other than "buy this product," commercial ads can, and often do, address issues of public debate. *See Mansky*, 585 U.S. at 19-20 ("Ben & Jerry's . . . ha[s] stated positions on matters of public concern"). For instance, *Nike*'s ad featuring Colin Kaepernick with the caption "Believe in something, Even if it means sacrificing everything" at a minimum raises hard questions under an "issue" or "political" ad ban. *See Suburban Mobility Auth.*, 978 F.3d at 496; *see also Zukerman,* 961 F.3d at 450 (asking whether Kaepernick ad would be covered by "political" ban in custom postage program). Similarly, it is hard to believe that WMATA would accept an ad for Hallow.com, the online paid subscription prayer app, that (like its recent Super Bowl ad[7]) thanks God and invites the viewer to "[j]oin us in prayer this Lent on Hallow" simply because seeks to sell a $9.99/month subscription service. As these real-world examples show, urging commercial transactions and promoting positions on issues of public debate are not mutually exclusive in advertising.

WMATA's distinction is especially problematic for theatrical ads, which promote an "inherently expressive" activity. *See IOTA XI Chapter of Sigma Chi Fraternity v. George Mason Univ.*, 993 F. 2d 386, 390-91 (4th Cir. 1993). It is unlikely that WMATA would advertise a pro-Nazi performance because the ad seeks to sell tickets. *See* Opp. 30 (making clear that WMATA would not accept an ad from "a neo-Nazi group"). Similarly, would WMATA have run ads for My Body No Choice," a local 2022 performance in which "female playwrights share what

---

[6] WallBuilders accepts *Archdiocese* as binding on this Court, but it reserves its right to challenge that decision's holding and its reasoning later in this litigation.

[7] *See* https://www.youtube.com/watch?v=0-U1TyEr4IE.

[reproductive] choice means to them," simply because Arena Stage sought to profit from sales?[8] If so, WMATA's standards would undermine its stated purposes of avoiding rider discomfort. If not, why should a musical skewering the LDS religious faith be treated any differently?

WMATA thus cannot avoid difficult questions by relying on the commercial nature of certain approved ads. Its advertising guidelines do not explicitly draw such a line. *See Greater Richmond Transit*, 35 F.4th at 200. More importantly, WMATA *does not consistently apply* a strict commercial/non-commercial distinction in practice. It has, for instance, concluded that "an ad promoting a manifestly political book is itself political advocacy." *ACLU Found.*, 303 F. Supp. 3d at 19. Similarly, here, WallBuilders' website seeks to sell books and other products. Yet that did not prevent WMATA from concluding that the purpose of the proposed ads' invitation to visit WallBuilders' website was not to sell products, but to influence the public on issues. If the WallBuilders ads had included an additional QR code that linked directly to its "Store" that offered books and baseball caps for sale, *see* Varone Supp. Decl. ¶ 8 & Ex. C, it is doubtful that would have changed WMATA's decision. As these examples illustrate, even to WMATA, sometimes ads seeking to sell products *do* express a view on debated issues. But WMATA makes little effort to define the line or apply it consistently.

Similarly, that some ads promote schools does not mean that they do not also address issues of public debate. The very name, "Social Justice School," suggests that it exists as much to inculcate certain political views as it does to teach. Its website confirms that: "We believe in love, learning, and liberation."[9] Catholic University's website unapologetically promotes the Catholic

---

[8] *See* https://www.arenastage.org/tickets/2022-23-season/my-body-no-choice/.

[9] *See* https://www.thesocialjusticeschool.org/.

faith, and, as noted, advocates a clearly pro-life position on the divisive issue of abortion.[10]  The University of Maryland's ad promotes "diversity, equity and inclusion," major issues in our political debate.  Daday Decl. ¶ 9; *see* Pl.'s Mem 24-25 n.9.  WMATA takes a cramped view of these ads, but on their face and their linked websites, they both advertise educational missions and promote their views on hot button "issues."  Despite WMATA's efforts to distinguish them, these ads illustrate WMATA's inconsistent application of Guideline 9, which, when combined with the "unmoored" language of the Guideline, shows that it is "incapable of reasoned application."  *See Mansky*, 585 U.S. at 16-17; *AFDI*, 901 F.3d at 373.

## II.    GUIDELINE 12 SIMILARLY FAILS *MANSKY'S* REASONABLENESS REVIEW

Despite WMATA's arguments, *Archdiocese* does not foreclose reasonableness review of Guideline 12.[11]  The D.C. Circuit merely determined that, *on the record before it*, the "Archdiocese has not shown that 'WMATA appl[ies] [its] policy in arbitrary and unreasonable ways.'"  897 F.3d at 330.  The record contained only a few examples of wholly non-religious ads by religious organizations (such as the Salvation Army) and a yoga studio's ad using the word "mantra," which the Court concluded was "not recognizably religious" in that context.  *Id.*

---

[10] *See* Varone Supp. Decl. ¶ 10 & Exs. F and G.

[11] WMATA's standing challenge is baseless.  *See* Pl.'s MTD Opp. 39-43.  WMATA relies here on additional facts not in the Complaint—i.e., that its review panel found that WallBuilders' ads did not violate Guideline 12—but those facts do not defeat WallBuilders' standing to bring its this challenge.  WallBuilders has standing if it demonstrates its intention to run ads that were "arguably" proscribed by Guideline 12, "and that there exists a credible threat" of "adverse government action."  *See Woodhull Freedom Found. v. United States,* 948 F.3d 363, 371 (D.C. Cir. 2020) (applying *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)); *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 359 (D.D.C. 2020). WallBuilders readily satisfies this standard.  Even assuming the ads that it submitted were not prohibited by Guideline 12 (which it contests), WallBuilders created a dozen other ads for submission to WMATA in early 2023, which plainly "promoted" its religious beliefs (through quotes from the founders regarding faith) and would have violated Guideline 12.  Those ads are described in the Supplemental Declaration of Timothy Barton, ¶¶ 20-31.  WallBuilders is ready to run the ads, but is prevented from doing so by Guideline 12.  *Id.* ¶ 34-36.

The record here tells a different story. As noted, WMATA allows ads for plays and musicals—*The Book of Mormon*, *Moses* (the "specific pro-religious performance" referenced in WallBuilders' motion, Pl.'s Mem. 31-32) and, more recently, *Jesus Christ Superstar, see* Varone Supp. Decl. ¶ 3—that touch on religious themes and religious figures. Those performances directly address religious beliefs and practices. For instance, *Jesus Christ Superstar* depicts the last days of Jesus, a portrayal viewed as highly controversial among some religious critics.[12] And for reasons already discussed, the commercial nature of these ads does not justify WMATA's running them, but merely highlights the inconsistency of WMATA's decision-making.

The ads highlighted by WallBuilders illustrate Guideline 12's lack of guidance in numerous respects. As in *Young Israel*, it is not clear what standards WMATA applies to determine whether an ad "promotes or opposes" religious faith or practice. *See id.* at 1348 (asking whether "'primarily promotes' . . . equate[s] to proselytization? If it can be something less, how much less?"). Why wouldn't ads depicting core religious figures or practices—prophets such as Moses (in a modern incarnation in *Moses*), Jesus as a rock star of ambiguous Godly identity (in *Jesus Christ Superstar*), or the door-to-door evangelization of the LDS Church (in *The Book of Mormon*)—at the very least, set off red flags meriting further review regarding whether they "promote or oppose" any religion, religious practice or religious belief? *See* Opp. 23 (admitting that WMATA's contractor did not submit these ads to WMATA for further review).

WMATA bafflingly cites approved ads for the Museum of the Bible as examples of ads that do not "promote or oppose" any particular religion or religious practice. But the Museum's

---

[12] The *New York Times* summarized the controversy: "[Tim] Rice and [Andrew] Lloyd Webber were accused of denying the divinity of Christ and making a hero of Judas, who is the unambiguous villain in the New Testament." *See* Varone Supp. Decl. ¶ 4 (quoting S Bahr, *'Jesus Christ Superstar' at 50: What Was the Buzz?*, N.Y. Times (Oct. 12, 2021)).

ads clearly invite viewers to engage with the Bible—the central text of Christianity. *See* Nicol Decl., Ex. I. The Museum's website home page (which WMATA reviewed), invites "all people to engage with the transformative power of the Bible." Varone Supp. Decl. ¶ 7 & Ex. A. WMATA cannot plausibly explain how urging the public to earnestly read a religion's main text does not "promote" that religion. Rather than serve as an example of non-religious advertising, the Museum of the Bible ad illustrates WMATA's inconsistency in deciding what messages "promote or oppose" religious faith.

WMATA's inconsistent application also illustrates the inherent difficulties in determining whether a particular practice or belief is "religious." *See Young Israel*, 89 F.4th at 1348 (noting the "inherent ambiguity of the word 'religious'"). As the Supreme Court noted in *Rosenberger*, "[r]eligion may be a vast area of inquiry, but it also provides, as it did here, a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered." 515 U.S. at 831. It thus begs credulity to suggest, as WMATA does, that The Catholic University of America's reference to a "Journey of the Spirit," was not a "recognizably religious" reference. WMATA absurdly contends that, because "no biblical quotes" contain that exact phrase and because the phrase appears in a fantasy book and an autobiography of Shirley MacLaine, the phrase does not promote religious faith. Opp. 35-36. But it also appears frequently in Christian publications, *see, e.g.*, C. Wright, *Charles de Foucald: Journey of the Spirit* (2005) (biography of a Christian martyr), proving that (as even WMATA recognizes, *see* Opp. 20) the message of a *particular* advertisement depends upon "all-important context"—a context that WMATA wholly disregards when inconvenient to its arguments. In the context of an ad for Catholic education, a reasonable viewer would understand "the Spirit" to refer to Roman Catholic religious beliefs. And despite its attempt to brush off Catholic University's motto, which translates to "God is My Light,"

the Catholic University's motto is not "incidental" to its message of the value of the Catholic education offered by the university, it is at the core of that message.

Similarly, WMATA's determination that WallBuilders' ads do not violate Guideline 12 illustrates the arbitrariness of its application. The initial ads explicitly asked whether the founders were *Christian* and invited viewers to learn more about the "faith of the founders." *See* Pl.'s Mem. 10. Two ads depict George Washington *in prayer*. *Id.* at 10-11. WallBuilders' website asks on its home page "Do you support Christian ideals of freedom in America?" The QR code links to quotes from John Adams, Charles Carroll, and George Washington, among others, on their Christian faith. *Id.* at 11. The website, like the organization, does more than simply "touch on religion." *See* Opp. 33. It seeks to "restore America's biblical foundation," not out of historical curiosity but to promote a "Biblical worldview." Barton Decl. ¶ 8. Indeed, WMATA itself concedes that WallBuilders' ads express the "view that religion—Christianity, in particular— should play a greater foundational role in government." Opp. 25. That WMATA now chooses, for the purpose of this litigation, to label this a "political view" demonstrates how haphazard its application of Guideline 12 really is.

## III.   WMATA DISCRIMINATES AGAINST RELIGIOUS VIEWPOINT

### A.   Guideline 9 Effects Viewpoint Discrimination

Guideline 9 also runs afoul of the requirement that, even in a nonpublic forum, a regulation must be viewpoint neutral. *See Mansky*, 585 U.S. at 11-12; Pls.' Mem 35-40. WMATA's efforts to justify the Guideline fail.

First, WMATA deems "disingenuous" the argument that it discriminates between WallBuilders' educational message and those of secular educational institutions like Social Justice School. Opp. 30. WMATA contends that "Plaintiff's website is not limited to educational material," but also "promotes advocacy on a particular issue." *Id.* But the same could be said of

the Social Justice School.  Both use education as a tool for spreading a larger message.
WallBuilders strives "through original source documents . . . to reveal the historical truths about
our Founding Fathers' faith and the religious principles they established"[13] while Social Justice
School seeks to "empower[] and prepar[e] young people to design . . . responses . . . to systems of
inequity by creating an inclusive and equitable world."[14]  Yet, while prohibiting WallBuilders from
inviting the public to learn about its religious-based educational mission, WMATA permits Social
Justice School's ads addressing its secular educational mission.  This is classic viewpoint
discrimination.  *See N.E. Pa. Freethought Society*, 938 F. 3d at 434 (viewpoint discrimination
where ad policy did not "prohibit secular associations from advertising their organizational
philosophy, but banned atheistic and religious associations "from saying the same thing").

Second, WMATA permits ads addressing American history, such as an ad for a PBS
historical show ("Iconic America") and for the White House Historical Association's study of the
Presidents.  Pls.' Mem. 40.  WMATA's defense is that those ads do not seek to "influence" the
public on anything.  But "Iconic America" certainly conveyed a viewpoint on why Stone
Mountain, Georgia and the Gadsden Flag (both controversial in modern politics) are "Iconic."  *See
id.*  Similarly, while WallBuilders' ads, on their face, do nothing more than invite the viewer to
visit its website, WMATA looks to the website to find an impermissible attempt to "influence the
public" on the role of Christianity in the nation's founding.  In that regard, WMATA impermissibly
discriminates against WallBuilders' religious viewpoint on American history expressed on its
website, as compared to secular views on history expressed on PBS's program.

Finally, WMATA seeks to justify its discrimination against WallBuilders' message by

---

[13] *See* www.wallbuilders.org.

[14] *See* https://www.thesocialjusticeschool.org/.

contending that advertisements for Catholic University and the Museum of the Bible show that it does not discriminate based on religious identity of *speakers*.  Opp. 31.  But those ads and the incorporated websites involve much more than a secular message by a religious speaker.  They *promote* particular religious beliefs and address highly debated issues, like abortion and faith.  *See* discussion, *supra*, at 15-16, 18 (discussing Catholic University's ads and website); *id.* at 17-18 (discussing Museum of the Bible's website).  That, for instance, a Catholic religious message is acceptable and WallBuilders' evangelical Christian viewpoint is not, at best, demonstrates the fatally inconsistent application of the Guidelines and, at worst, is proof of impermissible viewpoint discrimination among different religious viewpoints.  "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant."  *Rosenberger*, 515 U.S. at 829.

### B.    Guideline 12 Discriminates Against Religious Viewpoints

*Archdiocese* addressed, in part, WallBuilders' argument that Guideline 12 impermissibly discriminates against religious viewpoint under cases like *Rosenberger*.  Pl.'s Mem. 40-41.  Adopting WMATA's construction in that case, *Archdiocese* held that Guideline 12 permissibly bans *all speech* regarding religion*, i.e.*, "religion as a subject matter."  *See* 897 F.3d at 327.  WallBuilders contends that this holding is inconsistent with *Rosenberger* and its progeny and reserves the right to challenge it in a higher court.  *See Rosenberger,* 515 U.S. at 831-32; *see also N.E. Pa. Freethought Society*, 938 F. 3d at 435-36 (disagreeing with *Archdiocese*).

But that is not the end of the inquiry.  WMATA no longer contends that Guideline 12 prohibits *all* discussion of religion, instead arguing that the fact "[t]hat the speaker *or subject* is connected to a particular religion does not automatically render their advertisements promotions of religions."  Opp. 3 (emphasis added).  WMATA now contends that Guideline 12 is violated only by those ads that "clearly promote" or "oppose" religion, religious belief or practice.  *Id.* at

33.  But ads "promoting" or "opposing" religion do not cover the entire universe of ads *about* religion.  *Rosenberger* flatly rejected the "insupportable assumption that all debate is bipolar and that antireligious speech is the only response to religious speech."  515 U.S. at 831.

WMATA's evolving construction, permitting some but not all speech about religion, is borne out in its practices, which have permitted some discussion on the subject of religion. WMATA reads Guideline 12 to permit WallBuilders' ads addressing Christianity's role in the nation's founding, even though they "touch on religion."  Opp. 33, *see* Nicol Decl. ¶ 11.  WMATA also permits ads for performances that discuss religion and for religious education like Catholic University.  WMATA even tolerates Catholic University's plainly religious motto ("Deus Lux Mea Est") because it deems it "incidental" to the ad's overall purpose.  Opp. 35.  Finally, WMATA accepted ads for Museum of the Bible despite reviewing its website, which invites viewers to "engage with the transformative power of the Bible."  *See* Nicol Decl. ¶22 (WMATA reviewed the website); Varone Supp. Decl. Ex. A (attaching website homepage).

WMATA's interpretive shift dooms Guideline 12 even under *Archdiocese*'s more restrictive reading of *Rosenberger*.  The D.C. Circuit based its holding on WMATA's position that Guideline 12 closed WMATA's ad space to religion *as a subject matter*.  *Archdiocese*, 897 F.3d at 325 ("Guideline 12 does not function to exclude religious viewpoints but rather proscribes advertisements on the entire subject matter of religion").  It reasoned that the Court found the student newspaper funding restriction in *Rosenberger* impermissibly discriminatory *only* because it "*does not exclude religion as a subject matter* but selects for disfavored treatment" student publications "with religious editorial viewpoints."  *Id.* (citing *Rosenberger*, 515 U.S. at 831).

Under WMATA's interpretation, Guideline 12 *does exclude* certain viewpoints *about religion* while permitting others.  Even accepting WMATA's strained characterization of

WallBuilders' ads, the ads clearly express *a viewpoint* about religion: *i.e.*, that religion played a critical role in the nation's founding.  And even if *The Book of Mormon* does not "oppose" religion, it nonetheless at least expresses a discernable viewpoint about religion: that some tenets of religious belief are laughable.  In light of *Rosenberger*'s emphatic rejection of the position that "pro" and "anti" are the only two "viewpoints" that exist about religion, 515 U.S. at 831.  WMATA's selective exclusion of particular viewpoints is no less viewpoint discriminatory for its efforts at evenhandedness.  WMATA's position "that debate is not skewed so long as multiple voices are silenced is simply wrong; the debate is skewed in multiple ways."  *Id.* at 831-32.

## IV.    WALLBUILDERS SATISFIES THE REMAINING REQUIREMENTS FOR A PRELIMINARY INJUNCTION

Because WallBuilders has shown a likelihood of success on the merits, it should also "prevail on the final three factors because 'the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Archdiocese*, 897 F.3d at 334 (quoting *Mills v. District of Columbia,* 571 F.3d 1304, 1312 (D.C. Cir. 2009)).  Despite WMATA's call for heightened scrutiny, Opp. 13-14, the D.C. Circuit "has rejected any distinction between a mandatory and prohibitory injunction." *League of Women Voters v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016).  Properly viewed, WallBuilders faces irreparable injury from WMATA's Guidelines, and the balance of the equities and the public interest favor relief here.

**Irreparable Harm.** "An organization is harmed if" the defendant's actions "perceptibly impaired [its] programs" in a way that "directly conflict[s] with [its] mission." *League of Women Voters*, 838 F.3d at 8.  Because of Guidelines 9 and 12, WallBuilders has lost its ability to advertise its faith-filled message and mission on WMATA buses.  WMATA chides WallBuilders for not advertising in alternative venues, Opp. 38, but no comparable choices exist.  Billboards and outdoor signs offer static platforms in a single location, while WMATA buses travel to where the

viewers are. WallBuilders chose WMATA's ad space because it offers direct, moveable and widespread access to a range of viewers in the nation's Capital. *See* Smith Decl. ¶¶ 7-8. Being forced to turn to less desirable alternatives impairs WallBuilders' outreach goals.

The Guidelines chill WallBuilders' speech, which WMATA concedes is sufficient to establish injury. Opp. 38. If it submits more ads to WMATA, which it plans to do, WMATA will reject them under its interpretation of the Guidelines. *See* Barton Supp. Decl. ¶¶ 32-36. WallBuilders has created numerous additional ads quoting prominent historical figures about the value of Christianity in American government. *Id*. ¶¶ 17-31. It plans to use some or all of them in a future campaign, but Guideline 12 stands in its way, *id.* ¶ 36, by prohibiting WallBuilders from openly "promot[ing] its Christian faith" in WMATA advertising space, *id*. ¶¶ 32-35.

As this Court has explained, a free speech injury "is deemed 'sufficiently imminent' upon 'a credible statement by the plaintiff of intent to commit violative acts and a conventional background expectation that the government will enforce the law [or its policies].'" *Turner v. U.S. Agency for Glob. Media*, 502 F. Supp. 3d 333, 359, 385 (D.D.C. 2020) (citation omitted). That standard is easily met here. WallBuilders continues to be injured by its inability to advertise its Christian viewpoint, which also hampers its educational mission and its ability to seek donations and sell products from its website.

WMATA argues that WallBuilders must not be irreparably harmed because of the time it took bring this lawsuit. Opp. 39-40. But this factor "is not dispositive," *Cayuga Nation v. Zinke*, 302 F. Supp. 3d 362, 373 (D.D.C. 2018), and WMATA's reliance elides its own role in bringing about that delay. WallBuilders first submitted its ads on May 10, 2023, and waited patiently for a response, which did not come. Smith Decl. ¶ 10 & Ex. A. WMATA now claims that it either did not receive or (more likely) "overlooked" that first submission. Opp. 39 n.11. After resubmitting

24

and finally receiving WMATA's rejection, WallBuilders sought clarification from WMATA as to how to comply, but WMATA ignored its request.  Smith Decl. ¶¶ 15-16.  Lacking guidance, WallBuilders redesigned its ads and, in September 2023, submitted the redesigned ads in the hope that they would be accepted.  *Id.* ¶¶ 17-21.  When WMATA rejected those ads in mid-September 2023, WallBuilders had decisions to make—whether to redesign and resubmit again or sue.  It decided not to redesign the ads again because compliance with WMATA's apparent objections would have negated the benefits WallBuilders sought to achieve though its ad campaign.  *Id.* ¶¶ 26-27.  The passage of a few weeks between WMATA's rejection of the second set of ads and the filing of this motion (in December 2023) does not negate the rule that the suppression of the present and ongoing desire to speak entitles a plaintiff to preliminary relief.

**Balance of Equities and Public Interest**.  WallBuilders' loss of First Amendment rights outweighs WMATA's stated interest in this case.  *See Archdiocese*, 897 F.3d at 335.  Those interests are, in any event, undermined by WMATA's arbitrary application of its Guidelines.  *See Mansky*, 585 U.S. at 21-22.  Whatever the asserted public interest, "[t]here is also a vital public interest in safeguarding [First Amendment] freedoms protected by the Constitution." *Roman Cath. Archbishop of Wash. v. Bowser*, 531 F. Supp. 3d 22, 47 (D.D.C. 2021). "The public interest does not suffer by enforcing the First Amendment's protection against restrictions on speech that are incapable of reasoned application."  *CIR*, 975 F.3d at 317.

<u>**CONCLUSION**</u>

For the foregoing reasons, this Court should grant WallBuilders' motion for a preliminary injunction.

25

February 28, 2024

Respectfully submitted,

/s/ Shannen W. Coffin

David J. Hacker (admitted *pro hac vice*)
Jeremiah G. Dys (D.C. Bar # 90000678)
Ryan Gardner  (admitted *pro hac vice*)
FIRST LIBERTY INSTITUTE
2001 West Plano Parkway, Suite 1600
Plano, TX 75075
Tel: (972) 941-4444
dhacker@firstliberty.org
jdys@firstliberty.org
rgardner@firstliberty.org

Shannen W. Coffin (D.C. Bar # 449197)
Caitlin E. Daday (D.C. Bar # 90002918)
STEPTOE LLP
1330 Connecticut Ave., N.W.
Washington, D.C.  20036
Tel: (202) 429-3000
Fax: (202) 429-3902
scoffin@steptoe.com
cdaday@steptoe.com

Camille P. Varone (D.C. Bar # 1617624)
FIRST LIBERTY INSTITUTE
1331 Pennsylvania Ave. N.W., Suite 1410
Washington, D.C. 20004
Tel: (202) 921-4105
cvarone@firstliberty.org

Arthur B. Spitzer (D.C. Bar # 235960)
Scott Michelman (D.C. Bar # 1006945)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE DISTRICT OF COLUMBIA
529 14th Street NW, Suite 722
Washington, D.C. 20045
Tel: (202) 457-0800
aspitzer@acludc.org
smichelman@acludc.org

Brian Hauss
(D.D.C. admission pending)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2500
bhauss@aclu.org

David Cole
(D.D.C. admission pending)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th Street NW
Washington, D.C. 20005
Tel: (212) 549-2611
dcole@aclu.org

*Counsel for WallBuilder Presentations*