# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WALLBUILDER PRESENTATIONS,<br><br>              Plaintiff,<br><br>       v.<br><br>RANDY CLARKE, in his official capacity as<br>General Manager and Chief Executive Officer<br>of the Washington Metropolitan Area Transit<br>Authority,<br><br>              Defendant. | Civil Action No. 23-3695 (BAH)<br><br>Judge Beryl A. Howell |

## <u>MEMORANDUM OPINION</u>

The Washington Metropolitan Area Transit Authority ("WMATA") operates the

Metrorail and Metrobus services in the District of Columbia, Maryland, and Virginia, and

permits advertising throughout its Metro system—specifically, on the exterior of Metrobuses and

"dioramas" inside Metrorail stations.  *Am. Freedom Def. Initiative v. Wash. Metro. Area Transit*

("*AFDI*"), 901 F.3d 356, 359 (D.C. Cir. 2018) (citing D.C. Code § 9-1107.01).  WMATA's

advertising practices are governed by its "Guidelines Concerning Commercial Advertising" (the

"Guidelines"), which were adopted over fifty years ago and last amended nearly a decade ago.

*See* Compl. ¶ 19, ECF No. 1; Compl., Ex. A at 2, ECF No. 1-1.

Relevant to this litigation, Guideline 9 prohibits "[a]dvertisements intended to influence

members of the public regarding an issue on which there are varying opinions," and Guideline 12

prohibits "[a]dvertisements that promote or oppose any religion, religious practice or belief."

Compl., Ex. A at 3.  WMATA provides no definitions for the terms used in these two challenged

Guidelines and has neither "set out any formal regulations to direct the implementation or

interpretation of these Guidelines," nor "published advertiser guidance about what speech is forbidden under the Guidelines."  Compl. ¶ 27.

Plaintiff WallBuilder Presentations ("WallBuilders") is a Texas-based non-profit organization with a "primary mission" of "educating the nation concerning the Godly foundation of our country."  *Id.* ¶¶ 14, 29.  To further this mission, WallBuilders, *inter alia*, "engages in a variety of campaigns—including advertising campaigns—to educate the public on the role that the Founders' Christian faith played in the creation of the nation and the drafting of the Constitution."  *Id.* ¶ 15.  As part of a campaign to publicize its organization, website, and mission, WallBuilders sought advertising space from WMATA and submitted, in May 2023, a pair of proposed ads that stated, in prominent lettering, "Christian?" and, in smaller lettering, "To find out about the faith of our founders, go to wallbuilders.com."  Decl. of Kristina Smith, WallBuilders' Marketing and Project Coordinator ("Smith Decl.") ¶ 11, ECF No. 9-7.  WMATA rejected the ads pursuant to Guideline 9, with no accompanying explanation.  *Id.* ¶ 14.  Still wanting to place its ads with WMATA and suspecting that the ads' reference to Christianity was the "issue" of controversy that triggered Guideline 9, WallBuilders redesigned the two ads by removing all the text except "visit wallbuilders.com," and resubmitted them to WMATA in September 2023.  *See id.* ¶¶ 17–21.  The two ads were again rejected by WMATA, pursuant to Guideline 9, with no accompanying explanation.  *See id.* ¶¶ 22–24.

WallBuilders then commenced this action, in mid-December 2023, against Randy Clarke, in his official capacity as the General Manager and Chief Executive Officer of WMATA, claiming, in six counts, pursuant to 42 U.S.C. § 1983, that both Guidelines 9 and 12 violate the First Amendment in various ways.

Pending before this Court are four motions.  WallBuilders has moved, pursuant to Federal Rule of Civil Procedure 65(a) and Local Rule 65.1(c), for a preliminary injunction to enjoin Clarke, "his officers, agents, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the Order, from implementing or enforcing WMATA's Commercial Advertising Guidelines 9 and 12 to continue to reject WallBuilders' proposed advertisements."  Pl.'s Mot. for Prelim. Inj. at 1 ("Pl.'s PI Mot."), ECF No. 9; *see also* Pl.'s Corrected Mem. Supp. Mot. for Prelim. Inj. ("Pl.'s PI Mem."), ECF No. 20-1; Def.'s Opp'n Pl.'s Mot. for Prelim. Inj. ("Def.'s PI Opp'n"), ECF No. 22; Pl.'s Reply Supp. Mot. for Prelim. Inj. ("Pl.'s PI Reply"), ECF No. 29.  In support of this motion, WallBuilders has twice moved for leave to file supplemental exhibits, *see* Pl.'s Mot. for Leave to File Supp. Decls., ECF No. 28; Pl.'s Mot. for Leave to File Supp. Dulin Decl., ECF No. 34, which motions WMATA opposes, *see* Def.'s Opp'n Mot. for Leave to File Supp. Decls., ECF No. 31; Def.'s Opp'n Mot. for Leave to File Supp. Dulin Decl., ECF No. 35.  WMATA, in turn, has moved to dismiss the complaint for lack of standing, pursuant to Federal Rule of Civil Procedure 12(b)(1), and for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  *See* Def.'s Mot. to Dismiss, ECF No. 23; *see also* Def.'s Mem. Supp. Mot. to Dismiss ("Def.'s MTD Mem."), ECF No. 23-1; Pl.'s Opp'n Mot. to Dismiss ("Pl.'s MTD Opp'n"), ECF No. 27; Def.'s Reply Supp. Mot. to Dismiss ("Def.'s MTD Reply"), ECF No. 33.[1]

For the reasons below, WallBuilders' motion for preliminary injunction is GRANTED IN PART AND DENIED IN PART AS MOOT, Wallbuilders' motions for leave to file

---

[1]    The parties' briefing in connection with plaintiff's motion for a preliminary injunction and WMATA's motion to dismiss are similar.  *Compare* Pl.'s PI Mem., *with* Pl.'s MTD Opp'n; *compare* Def.'s PI Opp'n, *with* Def.'s MTD Mem.  All briefs have been reviewed, but for citation simplicity, the papers corresponding to both motions are cited only where the arguments differ.  Similarly, each declaration and the associated exhibits supporting the parties' positions have been reviewed, but only those declarations and exhibits necessary for resolution of the instant motions are cited.

supplemental exhibits are GRANTED, and WMATA's motion to dismiss is GRANTED IN PART and DENIED IN PART.

## I.    BACKGROUND

The factual background and procedural history of the instant matter are described below.

### A.    Factual Background

#### 1.    *WMATA's Advertising Guidelines*

WMATA "operates the Metrorail and Metrobus services that provide Washington-area residents with the majority of their public transit options," and derives a significant portion of its annual operating revenue from advertising displayed on the exterior of Metrobuses and inside Metrorail stations. *AFDI*, 901 F.3d at 359 (citing D.C. Code § 9-1107.01).

WMATA's advertising practices are governed by its "Guidelines Governing Commercial Advertising," which were adopted on August 3, 1972, and amended twice, on November 20, 2003, and November 19, 2015. *See* Compl. ¶ 19; Compl., Ex. A at 2. Until 2015, the Guidelines permitted "issue-orienting advertising," which, due to D.C.'s "unique" situs as "the seat of the federal government," comprised a significant portion of its revenue—approximately $2 to 5 million of its $20 million in revenue in 2015. Decl. of Caitlin E. Daday, WallBuilders' Att'y ("Daday Decl."), Ex. K at 7, ECF No. 9-3. "Beginning in 2010," however, "WMATA began to reconsider its approach as a result of near-monthly complaints from its employees, riders, elected officials, and community and business leaders about its advertisements." *Archdiocese of Wash. v. Wash. Metro. Area Transit*, 897 F.3d 314, 319 (D.C. Cir. 2018) (cataloguing examples of complaints); *see also AFDI*, 901 F.3d at 360 (collecting examples of WMATA's "controversies surrounding issue-oriented advertisements"); Decl. of Lynn M. Bowersox, WMATA's Senior Vice President for Rail Transformation ("Bowersox Decl.") ¶¶ 5–6, ECF No. 22-2.

In May 2015, WMATA's Board of Directors temporarily prohibited all issue-oriented advertising, "including but not limited to, political, religious and advocacy advertising until the end of the calendar year." Bowersox Decl., Ex. A, ECF No. 22-3; *see also* Compl. ¶ 22; *AFDI*, 901 F.3d at 360 (describing the ads that allegedly prompted the temporary moratorium on issue-oriented ads). In November 2015, after further review and public comment, the Board of Directors amended the Guidelines to make the ban on issue-oriented advertising permanent, *see* Bowersox Decl., Ex. B, ECF No. 22-4, reasoning that any economic benefit of issue-oriented ads was outweighed by community and employee opposition, the associated security and violence risks, the possibility of vandalism, and the administrative burdens associated with reviewing ads and responding to complaints about ads, *see* Bowersox Decl. ¶¶ 9–13; *see also AFDI*, 901 F.3d at 371.

The issue-oriented advertising ban was embodied in Guideline 9, which, as already noted, prohibits "[a]dvertisements intended to influence members of the public regarding an issue on which there are varying opinions," and further bolstered by Guideline 12, which prohibits "[a]dvertisements that promote or oppose any religion, religious practice or belief." Compl., Ex. A at 3. WMATA has neither "set out any formal regulations to direct the implementation or interpretation of these Guidelines," nor "published advertiser guidance about what speech is forbidden under the Guidelines." Compl. ¶ 27. In fact, when WallBuilders sought further guidance on how the Guidelines were applied, WMATA did not respond. *Id.*

### 2. *Administration of the Advertising Guidelines*

The leasing of WMATA's advertising space is administered by Outfront Media, Inc. ("Outfront"), a third-party contractor that "handles day-to-day advertising and is paid for each ad that runs in WMATA advertising space." Bowersox Decl. ¶ 17. Specifically, proposed ads are

submitted to Outfront, which has the authority unilaterally to accept ads that comply with the Guidelines. *Id.* ¶¶ 17–18. Indeed, Outfront accepts "thousands of ads" without forwarding them to WMATA. *Id.* ¶ 28. Outfront is, however, "supposed to submit potential ads that may violate the Guidelines to WMATA for review." *Id.* ¶ 18.

A three-member panel (the "Panel"), comprised of WMATA's Marketing Director and two attorneys appointed by WMATA's General Counsel, reviews any submissions flagged by Outfront to determine whether they comply with the Guidelines. *Id.* ¶¶ 19, 21. To make this determination, the Panel reviews the ad in the context of relevant case law regarding advertising restrictions and prior ads that the Panel has rejected or accepted. *Id.* ¶¶ 20, 23. In addition to reviewing the ad itself, the Panel "may" also review any website or QR code referred to in the ad "to determine if the advertisement would lead a viewer to material that violates WMATA's Guidelines." *Id.* ¶ 22.

Between November 2015 and December 2023, the Panel reviewed 2,064 ads and rejected 814. *Id.* ¶ 25; *see also id.* ¶¶ 29–30 (listing examples of ads rejected by the Panel); Bowersox Decl., Ex. C, ECF No. 22-5 (photos of examples of ads rejected by the Panel); Bowersox Decl., Ex. D, ECF No. 22-6 (same).

### 3. *WallBuilders' Advertising Campaign*

One of the primary tools WallBuilders uses "to educate the public" about its "primary mission" of "educating the nation concerning the Godly foundation of our country," Compl. ¶ 29, is its website, which provides an online library of resources, including videos, podcasts, articles, and quotations from American historical figures, Decl. of Timothy Barton, WallBuilders' President ("Barton Decl.") ¶ 14, ECF No. 9-4; Smith Decl. ¶ 4; *see also* Homepage, WallBuilders, https://wallbuilders.com.

At the end of 2022, WallBuilders began to rebrand its website, with hopes of relaunching in June 2023.  *See* Barton Decl. ¶ 15.  To publicize this relaunch, it developed an ad campaign, with particular focus on "target[ing] Washington, D.C., and the National Capital Area" due to "the region's unique audience—including large numbers of residents who work in politics, policy, and law, as well as residents and visitors interested in learning about American history and civic traditions"—and sought to advertise, in particular, with WMATA due to "the high visibility for WMATA advertising."  Smith Decl. ¶¶ 7–8.

As part of this ad campaign, WallBuilders designed and submitted, in May 2023, two proposed ads to Outfront.  *See id.* ¶¶ 9, 12.  The first featured Henry Brueckner's late-1800s painting of George Washington kneeling to pray at Valley Forge, and the second showed Howard Chandler Christy's 1940 painting of the signing of the United States Constitution at Independence Hall.  *Id.* ¶ 10.  Both ads, which are depicted below, stated, in prominent lettering, "Christian?" and, in smaller lettering, next to a QR code, "to find out about the faith of our founders, go to wallbuilders.com."  *Id.* ¶ 11 (capitalization omitted).





"Concerned the content of the ads might violate WMATA's Guidelines," Outfront forwarded them to the Panel, which met on June 8, 2023, to discuss the ads.  Decl. of Georgetta Nicol, WMATA's Senior Digital Marketing Manager, Acting Director of Marketing, and Panel Member ("Nicol Decl.") ¶¶ 5–6, ECF No. 22-7.  Upon review of WallBuilders' website, the Panel concluded the website "contain[ed] clear advocacy," based on, *inter alia*, the following statements on the homepage: (1) "Helping Americans Remember and Preserve the True History of Our Great Nation[.]  Find all the education, training, and resources you need if you're an educator, church leader, legislator, or anyone who just wants to discover more.";  (2) "Restore America's Biblical Foundation[.]  Learn the truth about our nation's Godly heritage today!"; (3) "Many Americans don't understand the Christian foundation of our nation.  Through original source documents, we strive to reveal the historical truths about our Founding Fathers' faith and the religious principles they established.  We are driven to equip people to discover this truth with documents and artifacts from the first 400+ years of US history."; (4) "Many 'academics' deliberately ignore, change, and revise the facts of history in order to suit their own agendas.  Truth is constantly becoming harder to find.  We're here to help."; (5) "Do you support Christian ideals of freedom in America?"; and (6) in a video statement by the WallBuilders' President available on the homepage, "Today, so few people recognize what has made this

nation, really, the most successful, prosperous nation in the history of the world [is] a biblical foundation."  Def.'s PI Opp'n at 9–11; *see also* Nicol Decl. ¶ 7; Nicol Decl., Ex. E, ECF No. 22-8.

The Panel also reviewed the specific page of WallBuilders' website to which the QR code linked, different from the homepage, and concluded that the page contained advocacy by criticizing as "blatantly false" the following position: "One of the common criticisms is that the Founding Fathers were a collective group of atheists, agnostics, and or deists who wanted a strict separation of church and state, resulting in a secular government and public square.  Some go as far as foolishly writing that these allegations are so evident that no actual evidence or proof is needed to substantiate their claims."  Def.'s PI Opp'n at 11–12; *see also* Nicol Decl. ¶ 8; Nicol Decl., Ex. F, ECF No. 22-9.

The Panel thus concluded that the ads, by directing viewers to these pages on WallBuilders' website, "sought to promote the view that religion should play a significant role in government and politics," amounting to "advocacy on the issue of the separation of church and state," Nicol Decl. ¶ 10, and "intended to influence members of the public regarding an issue on which there are varying opinions."  Accordingly, WMATA, through Outfront, rejected the ads pursuant to Guideline 9, stating, with no further explanation, that "[t]he ad review panel has determined that the two attached proposed advertisements are both prohibited by Commercial Advertising Guideline 9."  Smith Decl., Ex. A at 14.

Hoping to redesign its ads to comport with the Guidelines, WallBuilders sought from WMATA clarification about why its ads were rejected, but WMATA never responded.  Smith Decl. ¶¶ 15–16.  Still wanting to place its ads with WMATA but "without the benefit of any further guidance from WMATA," WallBuilders "suspect[ed]" that the original ads' reference to

Christianity was the "issue" of controversy that triggered Guideline 9.  *Id.* ¶¶ 17–18.

Accordingly, it "redesigned the ads to keep the two images" and QR codes "but cut nearly all

text," except the phrase "visit wallbuilders.com."  *Id.* ¶¶ 18–19.  In September 2023,

WallBuilders resubmitted the revised ads, depicted below, to WMATA.  *Id.* ¶¶ 20–21.





The Panel reviewed the revised ads on September 7, 2023, and concluded, again, that the

ads violated Guideline 9 "because they sought to influence the public on the issue of the

separation of church and state."  Nicol Decl. ¶ 13.  WMATA thus rejected the revised ads, again,

with no accompanying explanation.  *See* Smith Decl. ¶¶ 22–24.  When WallBuilders asked

Outfront about the reason for rejection, Outfront suggested that "WMATA may have concerns

less about the content of the advertisement itself, and more about the content of viewpoints

expressed on the WallBuilders website, which [the] proposed advertisements linked to."  *Id.*

¶ 25.  Outfront "suggested that WMATA might approve WallBuilders' advertisements if [it]

removed WallBuilders' website address and QR code from the ads," which WallBuilders

declined to do "because stripping the ads of all references to WallBuilders but the organizational

name and logo would have negated the possible promotional and educational benefits that

WallBuilders sought to achieve by running these ads."  *Id.* ¶¶ 26–27.

### B.     Procedural Background

On December 12, 2023, WallBuilders filed the instant action against Randy Clarke, in his

official capacity, alleging, in six counts pursuant to 42 U.S.C. § 1983, that Guidelines 9 and 12

violate the First Amendment.  Specifically, WallBuilders alleges that Guideline 9 is unreasonable

both facially, *see* Compl. ¶¶ 84–89 (Count I), and as applied to WallBuilders, *see id.* ¶¶ 90–100

(Count II), and discriminates based on viewpoint both facially, *see id.* ¶¶ 101–05 (Count III), and

as applied to WallBuilders, *see id.* ¶¶ 106–17 (Count IV).  It further contends that Guideline 12

discriminates based on viewpoint, *see id.* ¶¶ 118–27 (Count V), and is unreasonable, *see id.*

¶¶ 128–33 (Count VI), and seeks a variety of declaratory and injunctive relief, *id.* (Prayer for

Relief).[2]

Contemporaneously, WallBuilders moved, pursuant to Federal Rule of Civil Procedure

65(a) and Local Rule 65.1(c), for a preliminary injunction to enjoin Clarke, "his officers, agents,

employees, attorneys, and all persons in active concert or participation with them who receive

---

[2]        WallBuilders is not the first plaintiff to challenge the constitutionality of Guidelines 9 and 12, since similar
claims have been asserted in other cases, *see, e.g.*, *Am. Freedom Def. Initiative v. Wash. Metro Area Transit Auth.*,
No. 17-7059 (D.C. Cir.); *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, No. 17-7171 (D.C. Cir.); *White
Coat Waste Proj. v. Wash. Metro. Area Transit Auth.*, No. 23-cv-1866 (JEB) (D.D.C.), including on behalf of other
plaintiffs by WallBuilders' counsel in this case, *see, e.g.*, *Am. C.L. Union Found. v. Wash. Metro. Area Transit
Auth.*, No. 17-cv-1598 (TSC) (D.D.C.).

actual notice of the Order, from implementing or enforcing WMATA's Commercial Advertising Guidelines 9 and 12 to continue to reject WallBuilders' proposed advertisements."  Pl.'s PI Mot. at 1.  WMATA, in turn, has moved to dismiss the complaint for lack of standing, pursuant to Federal Rule of Civil Procedure 12(b)(1), and for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6).  *See* Def.'s MTD Mem. at 2.  Principal briefing on the preliminary injunction motion was completed on February 28, 2024, with litigation over WallBuilders' requested supplementation continuing until May 10, 2024, while briefing on the motion to dismiss was completed on March 22, 2024.  Both motions are now ripe for consideration.

## II.   LEGAL STANDARD

### A.   Motion to Dismiss for Lack of Subject-Matter Jurisdiction

"'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.'"  *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)).  "[F]orbidden . . . from acting beyond [their] authority," *NetworkIP, LLC v. Fed. Commc'n Comm'n*, 548 F.3d 116, 120 (D.C. Cir. 2008), federal courts thus "have an affirmative obligation to consider whether the constitutional and statutory authority exist for us to hear each dispute," *James Madison Ltd. v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996) (citation omitted).  Absent subject-matter jurisdiction, a case must be dismissed.  *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006); *see also* Fed. R. Civ. P. 12(h)(3).

Article III, Section 2 of the United States Constitution authorizes federal courts to adjudicate "Cases" or "Controversies."  U.S. Const. art. III, § 2; *see also Dep't of Educ. v. Brown*, 600 U.S. 551, 561 (2023) (explaining that the authority of federal courts "under the

Constitution is limited to resolving 'Cases' or 'Controversies'" (quoting U.S. Const. art. III, § 2)); *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014) ("Article III of the Constitution limits the jurisdiction of federal courts to 'actual cases or controversies between proper litigants.'" (quoting *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 661 (D.C. Cir. 1996) (en banc))).  A plaintiff's standing to pursue a claim is "an essential and unchanging" element of the bedrock case-or-controversy requirement.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  As a result, if a plaintiff does not have standing, the court lacks subject-matter jurisdiction over a claim, and the claim must be dismissed.

In resolving a challenge to a plaintiff's standing, the court "must assume that [the plaintiff] states a valid legal claim," *Info. Handling Servs., Inc. v. Def. Automated Printing Servs.*, 338 F.3d 1024, 1029 (D.C. Cir. 2003), and "accept the well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor," *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "Each element of standing must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation."  *Arpaio*, 797 F.3d at 19 (alterations in original accepted) (quoting *Lujan*, 504 U.S. at 561).  In addition, to assure itself of its jurisdiction over a claim, "the district court may consider materials outside the pleadings."  *Jerome Stevens Pharms., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

### B.    Motion to Dismiss for Failure to State a Claim

To survive a Rule 12(b)(6) motion to dismiss, "the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Wood v. Moss*, 572 U.S. 744, 757–58 (2014) (citation omitted).  A claim is facially plausible when the

plaintiff pleads factual content that is more than "'merely consistent with' a defendant's liability" and "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)); *see also Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) ("Plausibility requires more than a sheer possibility that a defendant has acted unlawfully." (citation omitted)).

In deciding a motion under Rule 12(b)(6), the plaintiff bears the burden of showing that the complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," *Zukerman v. U.S. Postal Serv.*, 961 F.3d 431, 441 (D.C. Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678), and the court is required to construe all reasonable inferences in the plaintiff's favor, *Twombly*, 550 U.S. at 555; *see also Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 210 (D.C. Cir. 2022). A court, however, does not "accept inferences drawn by a plaintiff if such inferences are unsupported by the facts set out in the complaint." *Nurriddin v. Bolden*, 818 F.3d 751, 756 (D.C. Cir. 2016) (alterations in original accepted and citation omitted); *see also Iqbal*, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). In determining whether a complaint fails to state a claim, a court may consider only the facts alleged in the complaint and "any documents either attached to or incorporated in the complaint and matters of which the court may take judicial notice." *N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1249 (D.C. Cir. 2020) (alterations in original accepted and citation omitted).

## C.     Motion for Preliminary Injunction

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted," *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted), unless the movant

14

"make[s] a clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest," *League of Women Voters v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (citation omitted). The first factor is "[a] foundational requirement for obtaining preliminary injunctive relief." *Guedes v. Bur. of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 10 (D.C. Cir. 2019); *see also Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (highlighting the first factor as the "most important factor").

## III.    DISCUSSION

Analysis of the constitutionality of a restriction on speech on government property begins with the nature of the forum. The Supreme Court has recognized three types of government-controlled spaces: (1) a traditional public forum, where "the government may impose reasonable time, place, and manner restrictions on private speech," but where "restrictions based on content must satisfy strict scrutiny, and those based on viewpoint are prohibited"; (2) a designated public forum, where "[t]he same standards apply"; and (3) a nonpublic forum, where "the government has much more flexibility to craft rules limiting speech" and may thus "reserve such a forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Minn. Voters All. v. Mansky*, 585 U.S. 1, 11–12 (2018) (citations omitted).

The question as to the proper forum categorization of WMATA's buses, trains, and Metro stations has been answered by the D.C. Circuit: they are a non-public forum. *See Archdiocese*, 897 F.3d at 323 ("Having plainly evinced its intent in 2015 to close WMATA's advertising space to certain subjects, the Board of Directors converted that space into a non-public forum."); *AFDI*, 901 F.3d at 364 ("We need not resolve th[e] disagreement [about how

15

WMATA's advertising space fits into the forum doctrine] . . . because another panel of this circuit recently held the space is a nonpublic forum . . . , and we are bound to follow that decision." (citing *Archdiocese*, 897 F.3d at 314)); *see also Lehman v. City of Shaker Heights*, 418 U.S. 298, 303–04 (1974) (concluding that advertising areas on city buses were not public fora because the city intended to limit access to advertising space).  This is not disputed by WallBuilders.  *See* Pl.'s PI Mem. at 14 n.4 (assuming, for purposes of the preliminary injunction motion, that "WMATA advertising spaces are limited, nonpublic fora").  Thus, the only questions that remain are whether, in this most flexible type of forum for government regulation of speech, Guidelines 9 and 12 are (1) viewpoint neutral and (2) reasonable.  These Guidelines will be addressed *seriatim*.

### A.    Guideline 9

The text of Guideline 9 is short and simple: "Advertisements intended to influence members of the public regarding an issue on which there are varying opinions are prohibited." Compl., Ex. A at 3.  WallBuilders challenges Guideline 9's constitutionally, arguing that it discriminates based on viewpoint, both facially, *see* Compl. ¶¶ 101–05 (Count III), and as applied to WallBuilders, *see id.* ¶¶ 106–17 (Count IV); and is unreasonable, both facially, *see* Compl. ¶¶ 84–89 (Count I), and as applied to WallBuilders, *see id.* ¶¶ 90–100 (Count II).

WMATA moves to dismiss all four counts for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the reasons that follow, WMATA's motion is granted to dismiss Counts III and IV because Guideline 9 is viewpoint neutral both facially and as applied to WallBuilders.  WMATA's motion is denied, however, as to Counts I and II because Guideline 9 is not a reasonable restriction on speech.  Since WMATA's motion to dismiss is denied in part,

a discussion of WallBuilders' motion for a preliminary injunction follows, which motion is granted in part to enjoin preliminarily application of Guideline 9 to WallBuilders.

### 1.    *Viewpoint Neutrality*

The First Amendment prohibits the government from "regulat[ing] speech in ways that favor some viewpoints or ideas at the expense of others." *Matal v. Tam*, 582 U.S. 218, 234 (2017) (quoting *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993)). "To permit one side to have a monopoly in expressing its views is the antithesis of constitutional guarantees." *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1131 (D.C. Cir. 2023) (alterations in original omitted and citation omitted); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995) ("Viewpoint discrimination is . . . an egregious form of content discrimination."). "At its most basic, the test for viewpoint discrimination is whether—within the relevant subcategory—the government has singled out a subset of messages for disfavor based on the views expressed." *Matal*, 582 U.S. at 248 (Kennedy, J., concurring); *see also Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985) (explaining that a distinction is viewpoint based if "it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject").

The distinction between facial and as-applied challenges goes only "to the breadth of the remedy employed by the Court," which line "is not so well defined," *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010), and not to "[t]he substantive rule of law," which "is the same for both challenges," *Edwards v. District of Columbia*, 755 F.3d 996, 1001 (D.C. Cir. 2014). To prevail on a facial challenge, WallBuilders must show that "no set of circumstances exists under which [Guideline 9] would be valid or that [it] lacks any plainly legitimate sweep," which showing does not require that WallBuilders show injury to itself. *Edwards*, 755 F.3d at

1001 (quoting *United States v. Stevens*, 559 U.S. 460, 472 (2010)).[3]  To prevail on an as-applied

challenge, WallBuilders "must show that the regulations are unconstitutional as applied to their

particular speech activity."  *Id.*  A statute that is unconstitutional on its face is generally

unconstitutional as applied.  *See White Coat Waste Proj. v. Greater Richmond Transit Co.*, 35

F.4th 179, 203–05 (4th Cir. 2022).  The converse, however, is not always true; that is, a statute

that is constitutional on its face may be unconstitutional when applied.  *See Ridley v. Mass. Bay

Transp. Auth.*, 390 F.3d 65, 85 (1st Cir. 2004).

### a)    Facial Challenge

In *AFDI*, the D.C. Circuit held, in reviewing Guideline 9, that "WMATA's restrictions

are [facially] viewpoint-neutral."  901 F.3d at 363.  As WallBuilders concedes, this conclusion is

binding on this Court.  *See* Pl.'s MTD Opp'n at 34 ("[T]he D.C. Circuit's viewpoint

discrimination holding in *AFDI* was limited to a facial challenge to the Guideline . . . ; it did not

consider an as-applied challenge."); *id.* at 34 n.22 ("WMATA reserves its right to challenge

*AFDI*'s facial discrimination holding . . . in a higher court.").  Accordingly, WMATA's motion

to dismiss Count III is granted.

### b)    As Applied

As to WallBuilders' as-applied challenge, the operative "question is how to identify the

Government's intent."  *AFDI*, 901 F.3d at 366.  Three types of evidence are particular relevant:

(1) direct evidence, which "would be highly be probative" but is rare because "the government

rarely flatly admits it is engaging in viewpoint discrimination"; (2) retrospective evidence,

*i.e.*, "evidence from before the decision was [made to reject WallBuilders' ads] insofar as it may

---

[3]      A plaintiff can also mount a facial challenge by demonstrating that a statute is overbroad because "a
substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate
sweep," *Edwards*, 755 F.3d at 1001 (citation omitted), but WallBuilders does not argue that Guidelines 9 or 12 are
overbroad.

show whether the Government acted in order to suppress a disfavored view"; and (3) prospective evidence, *i.e.*, evidence of "a lack of evenhandedness in the Government's actions after the forum is closed." *Id.* at 365–66.  WallBuilders presents no direct or retrospective evidence and relies exclusively on prospective evidence, arguing that WMATA "'selects for disfavored treatment' WallBuilders' messages 'with religious . . . viewpoints' on matters otherwise permitted in the forum."  Pl.'s PI Mem. at 37 (quoting *Rosenberger*, 515 U.S. at 831).

"[W]here the government states that it rejects something because of a certain characteristic, but other things possessing the same characteristic are accepted, this sort of underinclusive raises a suspicion that the stated neutral ground for action is meant to shield an impermissible motive." *Ridley*, 390 F.3d at 87 (citing *Cornelius*, 473 U.S. at 812).  WallBuilders cites numerous examples of ads purportedly "possessing the same characteristic" as WallBuilders' proposed ads, but examination of these proffered examples demonstrates that none are directly comparable to WallBuilders' ads.

WallBuilders' proffered examples fall into three categories.  First, WallBuilders points to ads from both nonreligious and other religious organizations that "promote their educational missions."  Pl.'s PI Mem. at 38.  As examples, WallBuilders cites ads for the Social Justice School, the University of Maryland, and Catholic University.  *Id.*  None of these examples are comparable because they promote the educational opportunities that would accompany enrollment in these schools.  To the extent they reference "controversial educational topics such as 'social justice' and 'inclusion'" or "religious messages," such as Catholic University's Latin motto, *id.*, they do so only as reason for enrollment in the school.[4]  WallBuilders' proposed ads,

---

[4] Indeed, the Catholic University example undermines WallBuilders' argument that WMATA "selects for disfavored treatment WallBuilders' messages with religious viewpoints."  Pl.'s PI Mem. at 37 (alteration in original accepted and citation omitted); *see also* Def.'s PI Opp'n at 31 (noting that WMATA has accepted ads from the

in contrast, promote WallBuilders' "religious-based educational mission," *id.*—"to educate the public on the role that the Founders' Christian faith played in the creation of the nation and the drafting of the Constitution," Compl. ¶ 15—in and of itself, and not in service of another end.

Second, WallBuilders points to ads that "address[] aspects of American history . . . from a secular perspective." Pl.'s PI Mem. at 39. Recall, "the government violates the First Amendment when it denies access to a speaker solely to suppress *the point of view he espouses* on an otherwise includible subject." *Cornelius*, 473 U.S. at 806 (emphasis added). Merely "addressing aspects of American history" does not constitute espousing a point of view. The two examples cited by WallBuilders illuminate this distinction rather than aid its constitutional challenge. The PBS ad includes no information except the title of the show, "Iconic America": "Our Symbols and Stories with David Rubenstein," and that the show may be "watch[ed] live" on Wednesdays at 10PM or "stream[ed] anytime." Daday Decl. ¶ 6 (capitalization omitted). It includes, on its face, no information that could reasonably be construed to advocate for a viewpoint and no links to websites or any external sources. WallBuilders contends that some episodes of the show "delve[] into controversial historical symbols." Pl.'s PI Mem. at 39; *see also* Daday Decl. ¶ 6. Even if mere "delv[ing]" could constitute espousing a viewpoint, the fact that some episodes of Iconic America might "delve[] into controversial historical symbols" can be gleaned from neither the face of the ad nor any website cited therein. Similarly, the White House Historical Association's ad, which encourages viewers to "scan to shop" for the official White House Christmas ornament, Daday Decl. ¶ 12, merely "emphasize[s] the Association's role in teaching American history" and plainly, even as described by WallBuilders, does not express a viewpoint, Pl.'s PI Mem. at 39; *see also Archdiocese*, 897 F.3d at 329 ("[A]ds

_____

Museum of the Bible, which "addresses world and U.S. history from a religious perspective" (citing Nicol Decl. ¶ 22)).

promoting Christmastime sales are not expressing a view on Christmas any more than a McDonald's ad expresses a view on the desirability of eating beef that demands the acceptance of a contrary ad from an animal rights group.").  In short, these ads do not include any information that would lead WMATA reasonably to conclude that they expressed viewpoints, much less that they "intended to influence" on an "issue on which there are varying opinions," and thus are not useful examples of comparable but nonreligious viewpoints WMATA permits in the forum.

Third and finally, WallBuilders cites an ad for the Book of Mormon musical, as an example of an ad that "poke[s] fun at the role of religion in public life."  Pl.'s PI Mem. at 39.  As another Judge on this Court has already persuasively explained, however, albeit in the context of Guideline 12, "the fact that there will be satire presented onstage does not transform a poster publicizing the existence of the performance or the availability of tickets into a communication that *itself* promotes or opposes a religion."  *Archdiocese of Wash. v. Wash. Metro. Area Transit*, 281 F. Supp. 3d 88, 108 n.15 (D.D.C. 2017), *aff'd*, 897 F.3d 314.  Consequently, like the PBS and White House Historical Association ads, the Book of Mormon ad is distinguishable because rather than advocate for a viewpoint, this ad is designed to generate ticket sales for the production.  Acceptance of the Book of Mormon ad, therefore, does not indicate that WMATA rejected WallBuilders' ads because the latter's religious viewpoints were disfavored.

In sum, the Complaint fails adequately to allege factual support to show WMATA "singled out" or "disfavor[ed]" WallBuilders on account of its religious viewpoints.  *Matal*, 582 U.S. at 284 (Kennedy, J., concurring).  Accordingly, WMATA's motion to dismiss Count IV is granted.

2.      *Reasonableness*

Even in a nonpublic forum, a viewpoint-neutral government restriction on speech must be "reasonable."  *AFDI*, 901 F.3d at 370 (quoting *Cornelius*, 473 U.S. at 808).  This requirement "is not a demanding one," but a "forgiving test."  *Archdiocese*, 897 F.3d at 329–30 (quoting *Mansky*, 585 U.S. at 17).  "The challenged 'restriction need not be the most reasonable or the only reasonable limitation,'" *id.* (quoting *Hodge v. Talkin*, 799 F.3d 1145, 1165 (D.C. Cir. 2015)), and need only be "consistent with the government's legitimate interest in maintaining the property for its dedicated use," *AFDI*, 901 F.3d at 370 (citation omitted), and "provide[] 'objective, workable standards' to guide a government official's exercise of discretion," *Zukerman*, 961 F.3d at 447 (quoting *Mansky*, 581 U.S. at 21).

As with the question of Guideline 9's viewpoint neutrality, the question of Guideline 9's reasonableness does not proceed on untrodden ground.  In *AFDI*, the D.C. Circuit held that Guideline 9 is consistent with the forum's purpose of "public transportation" and WMATA's interest in "avoid[ing] controversies engendered by advertising on Metrobuses and at Metro stations."  901 F.3d at 370–71; *see also Cmty. for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1393 (D.C. Cir. 1990) (acknowledging "that WMATA is charged with providing safe and efficient transportation for almost 500,000 passengers daily and must be able to ensure that these passengers are able to reach its stations with as little risk as possible").  The Circuit remanded to the district court only the question whether Guideline 9 provided objective, workable standards that made it capable of reasoned application.  *See AFDI*, 901 F.3d at 373.[5]  As a practical matter, however, the question resolved and the question remanded in *AFDI* are closely intertwined.

_____

[5]      On remand, the parties in *AFDI* stipulated to dismissal of the action with prejudice before the question whether Guideline 9 was capable of reasoned application was decided.  *See* Stipulation of Dismissal, Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth., No. 15-cv-1038 (D.D.C. Dec. 12, 2020), ECF No. 61.

Indeed, whether Guideline 9 is consistent with the forum's purpose may be measured against whether the guidance provides objective, workable standards to facilitate that purpose because "the risks of arbitrary or inconsistent enforcement will tend to undermine the very governmental interests that the regulation in question was meant to advance." *Zukerman*, 961 F.3d at 447 (citing *Mansky*, 585 U.S. at 21).  Put differently, concluding that Guideline 9 does not provide objective, workable standards—as the Court does here, for the reasons explained below—may necessarily mean that Guideline 9 is inconsistent with the forum's purpose.[6]  Nonetheless, despite certain troubling facts in the instant record, *see supra* n.6, the *AFDI* holding, based on the record before the Circuit panel, that Guideline 9 is consistent with the forum's purpose, resolves the question affirmatively here.

      The requirement that a restriction on speech be "capable of reasoned application" derives from the Supreme Court's decision in *Minnesota Voters Alliance v. Mansky*, concluding that a Minnesota statute prohibiting the wearing of a "political badge, political button, or other political

---

[6]      WallBuilders does not meaningfully argue that Guideline 9 is inconsistent with the forum's purpose and thus the question whether the facts here constitute reason to disturb the conclusion to the contrary reached in *AFDI* is not considered.  Yet, while left unanswered, two facts bring this question to the fore.  First, WallBuilders had to revise its memorandum supporting its motion for a preliminary injunction because its original memorandum included, as an example of an issue ad published in WMATA's metro stations, a Brennan Center ad demanding term limits for Supreme Court Justices, which ad WMATA informed WallBuilders was "displayed on a private billboard owned by Douglas Development and operated by Branded Cities at the Metro Center station."  Pl.'s PI Mem. at 27 n.12; *see also* Nicol Decl. ¶ 18 (explaining that "although th[e] [Brennan Center] ad is in close proximity to WMATA property, it is not on WMATA property and is owned by a private company" and WMATA "has no control over the ads run in that space"); Decl. of Kassandra L. Dulin, WallBuilders' Att'y ¶ 5, ECF No. 9-6 (photo of Brennan Center ad).  The Court finds persuasive WallBuilders' observation that "[n]o reasonable Metro consumer could know that . . . this display was not owned or operated by WMATA" and "[t]he fact that advertisements addressing controversial issues are displayed on privately owned billboards—alongside advertisements run on Metro-owned billboards—within a Metrorail station creates consumer confusion and strongly undermines WMATA's position that its Guidelines are needed to prevent community discord and promote public safety in the Metro system."  Pl.'s PI Mem. at 27 n.12.  Second, although WMATA refused to place WallBuilders' ads on Metrobuses, these same ads were "approved" for placement on "wallscapes" and "Bike Share," without offering any reason why the purposes of "wallscapes" and "Bike Share" differs from the purpose of Metrobus exteriors and Metrorail stations.  *See* Smith Decl., Ex. A at 14–15.  Nonetheless, the conclusion in *AFDI* that Guideline 9 is consistent with WMATA's interest in maintaining its property for public transportation, though perhaps distinguishable on the record in this case, is not disturbed and is left to the D.C. Circuit for reconsideration in an appropriate case.

insignia" failed to provide "objective, workable standards" to guide a government official's exercise of discretion. 585 U.S. at 11, 16–21. The Court explained that "[a]lthough there is no requirement of narrow tailoring in a nonpublic forum, the State must be able to articulate some sensible basis for distinguishing what may come in from what may stay out." *Id.* at 16. Minnesota's statute was found to have failed to do so for several reasons.

First, the Court took issue with the term "political," which was undefined and "can be expansive." *Id.* at 17. Next, the Court explained that the term's indeterminacy was further augmented by Minnesota's representations to the Court and its official guidance interpreting the statute, which had they "clarif[ied] the indeterminate scope of the political apparel provision" might have "saved" the law. *Id.* at 18 (citation omitted). According to the state, the statute prohibited "only words and symbols that an objectively reasonable observer would perceive as conveying a message about the electoral choices at issue in the polling place," which, in the Court's view, was "far from clarifying" and, in fact, "introduces confusing line-drawing problems." *Id.* at 17–18 (citation omitted). Finally, the state's "authoritative guidance regarding implementation of the statute" stated that any "[i]ssue oriented material designed to influence or impact voting" is banned under the challenged statute, which the Court found also to "raise[] more questions that it answer[ed]." *Id.* at 18 (citation omitted). In sum, "the unmoored use of the term 'political' in the Minnesota law, combined with haphazard interpretations the State has provided in official guidance and representations to this Court, cause[d] Minnesota's restriction to fail even this forgiving [reasonability] test," and the statute was struck down under the First Amendment. *Id.* at 16–17.

Following *Mansky*'s lead, several courts have since struck down state regulations banning "political" content in various nonpublic fora. *See, e.g.*, *Zukerman*, 961 F.3d at 449 (striking

down Postal Service policy banning "political" content on custom postage stamps); *Ctr. for Investigative Reporting v. Se. Pa. Transp. Auth.*, 975 F.3d 300, 308, 316 (3d Cir. 2020) (same as to prohibition on public transit bus that are "political in nature or contain political messages"); *Am. Freedom Def. Initiative v. Suburban Mobility Auth.*, 978 F.3d 481, 486 (6th Cir. 2020) (same as to prohibition on "[p]olitical" ads on city buses); *Greater Richmond Transit Co.*, 35 F.4th at 201 (same as to prohibition "political" ads on public transit buses).  In assessing the reasonableness of the challenged Guideline, this Court follows *Mansky*'s lead, starting with the text and, if terms are ambiguous, looking to the government's clarifying explanations, either informal or formalized in supplementary regulations, and the manner of implementation.

a)      *Guideline 9's Text*

Guideline 9, which prohibits "[a]dvertisements intended to influence members of the public regarding an issue on which there are varying opinions," is as vague, if not more so, than the ban on "political" apparel in *Mansky* given that "an issue on which there are varying opinions" certainly includes political issues.  Nothing in the text of Guideline 9, which offers no definitions for any of its "unmoored" terms, provides any, much less objective and workable, standards.  *Mansky*, 585 U.S. at 16.

The word "issue," for example, has a range of meanings with expansive reach—so much so that even dictionary definitions, rather than aid, only raise more questions than they answer. Merriam-Webster and the Oxford English Dictionary define "issue" as "a vital or unsettled matter" and "[a] matter which remains to be decided; a significant matter for debate or discussion," respectively.  Issue, Merriam-Webster, https://www.merriam-webster.com/dictionary/issue; Issue, Oxford Eng. Dictionary, https://www.oed.com/dictionary/issue_n.  Although the definitions appear largely consistent,

they are silent on what makes a matter "vital" or "significant," and to whom.  By contrast, Black's Law Dictionary defines "issue" as "[a] point in dispute between two or more parties," Issue, Black's Law Dictionary (11th ed. 2019), which definition appears inconsistent with the requirement that a matter be "vital" or "significant" to be an "issue."

This ambiguity is further augmented by Guideline 9's use of the ill-defined phrase "varying opinions."  The dictionary definition of "vary" is to "deviate," "depart," "differ," or "diverge[]."  *See* Vary, Merriam-Webster, https://www.merriam-webster.com/dictionary/vary; Vary, Oxford English Dictionary, https://www.oed.com/dictionary/vary_v.  This definition, and Guideline 9 itself, fail to address basic parameters, such as how many people must have differing opinions and how significant must the differences be to qualify as "varying opinions"?[7]  Do the different opinions have to be reasonable to be the basis for a divergence of opinions, or can conspiracy theories and fringe opinions be the foundation of "varying opinions"?  As another Judge on this Court has noted, "[v]irtually anything can constitute an 'issue' on which opinions vary—from Yankees versus Red Sox to the correct pronunciation of 'tomato.'"  *White Coat Waste Proj. v. Wash. Metro. Area Transit*, No. 23-cv-1866 (JEB), 2024 WL 68256, at *9 (D.D.C. Jan. 5, 2024); *Suburban Mobility Auth.*, 978 F.3d at 497 ("There are plenty of nonpolitical issues on which members of society disagree.").  Indeed, commercial ads intended

---

[7]     Borrowing from vagueness doctrine, WMATA argues that "the Court need not indulge in such speculation, because Plaintiff's own website acknowledges that 'many academics' present a different view of the separation of church and state."  Def.'s PI Opp'n at 21–22 (citation omitted).  Using this as a springboard, WMATA reasons that WallBuilders' admissions about differing views from its own should foreclose the instant challenge to Guideline 9 because its proposed ads are squarely prohibited by it.  Setting aside the fact that "[i]t is not entirely clear that the vagueness doctrine applies to the Guidelines, which do not, of course, impose criminal penalties on those whose advertisements are denied," *AFDI*, 901 F.3d at 372, *Mansky* itself did not require plaintiff to prove that its own speech was not prohibited by Minnesota's statute.  Indeed, the t-shirts worn by several of the *Mansky* plaintiffs, stating "Tea Party Patriots," almost certainly fell within the scope of Minnesota's ban on "political" apparel. *Mansky*, 585 U.S. at 9; *cf. Members of City Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 798–99 (1984) ("The Court has repeatedly held that [an overbroad] statute may be challenged on its face even though a more narrowly drawn statute would be valid as applied to the party in the case before it.").

to influence consumers to purchase a particular good or service may provoke "varying opinions" among viewers on the issue of whether to do so, and may, either expressly or implicitly, invoke issues of public debate.  *See, e.g.*, *Suburban Mobility Auth.*, 978 F.3d at 496 (asking whether Nike's ad featuring a kneeling Colin Kaepernick with the caption "Believe in something.  Even if it means sacrificing everything" would be covered by a "political" ban); *Zukerman*, 961 F.3d at 450 (same as to "a Fox News campaign featuring Tucker Carlson Tonight," which has "recognizable political views" (citation omitted)).  *Compare Suburban Mobility Auth.*, 978 F.3d at 496 (counsel to Michigan's Suburban Mobility Authority for Regional Transportation explaining that a public agency ad promoting free birth control does "not advocate for a position on an issue on which members of society disagree" because the ad "was only informing people from a commercial standpoint of their availability," but conceding that Planned Parenthood could not "place a similar ad informing people from a commercial standpoint that it offers abortion services" because it would be "impermissibly political" (citation omitted)), *with* Def.'s Opp'n Mot. for Leave to File Supp. Dulin Decl. at 2 (explaining that WMATA permitted a Planned Parenthood Primary Care ad promoting health care services, including "gender-affirming care" and "sexual reproductive care," because the ad's purpose was "to promote those health care services, not engage in debate about their merits").  While Guideline 9 is apparently not intended to prohibit such commercial ads, *see* Def.'s PI Opp'n at 26, defendant offers no textual hook for this commercial/non-commercial distinction, and even if such distinction existed, the text simply leaves unclear and undefined when an "issue" would cross the line to fall under the prohibition.

WMATA responds that the phrase "an issue on which there are varying opinions" is cabined by the requirement that "advertisements" must be "intended to influence members of the

public." Def.'s PI Opp'n at 18 (emphasis omitted).  In so arguing, WMATA relies on *Zukerman v. United States Postal Service*, in which the D.C. Circuit reconciled the Supreme Court's continued approval of *Lehman v. City of Shaker Heights*, 418 U.S. 298 (1978), which upheld a policy prohibiting "political advertising," and *Greer v. Spock*, 424 U.S. 828 (1976), which upheld a regulation prohibiting "[d]emonstrations, picketing, sit-ins, protest marches, political speeches and similar activities," with the holding in *Mansky* that Minnesota's blanket bank on "political" apparel was unworkably broad.  *See* Def.'s PI Opp'n at 18–19.  The D.C. Circuit explained that in *Lehman* and *Greer*, in contrast to *Mansky*, "the government could point to at least some limiting standards—for instance, the ordinary meaning of the term 'advertising,' informed by all-important context—to define the scope of the term 'political' and render that prohibition on speech more objective and workable." *Zukerman*, 961 F.3d at 451.

Contrary to WMATA's suggestion, the requirement that "advertisements" must be "intended to influence members of the public" is an insufficient limiting standard.  As WallBuilders points out, "[e]very advertisement seeks to influence members of the public"; "that is the *raison d'etre* of advertising."  Pl.'s PI Reply at 3 (emphasis omitted).  Indeed, in *Mansky*, the Supreme Court rejected the state's attempt to limit Minnesota's political apparel provision to ban "[i]ssue oriented material designed to influence or impact voting."  585 U.S. at 18 (citation omitted).  Despite limiting "issue" to those related to "voting" and "material" to that "designed to influence," the construction was found to "introduce[] confusing line-drawing problems" and thus to be inadequate.  *Id.*  The phrase offered by WMATA here as the "limiting standard"— "advertisements intended to influence members of the public"—is even less narrow than that offered in *Mansky*, given that Guideline 9 applies to any "issue on which there are varying opinions," not only issues related to "voting."  Accordingly, WMATA's argument that

"advertisements intended to influence members of the public" is sufficient to limit "an issue on which there are varying opinions" is unpersuasive.  *See id.* at 22 (suggesting that "more discernible" limitations might include prohibitions on the display of "information that advocates for or against any candidate or measure" or "relating to a candidate, measure, or political party appearing on the ballot, or to the conduct of the election"); *Greater Richmond Transit Co.*, 35 F.4th at 200 (rejecting defendant's definition of a "political" ad as one that "is not viewpoint neutral" and thus "express[es] a viewpoint" because what "it mean[s] for an advertisement to express a viewpoint" is convoluted).

In sum, nothing in Guideline 9's text answers basic questions about its reach, and the "indeterminate scope" of Guideline 9 is not "clarif[ied]" or "saved" by any official guidance. *Mansky*, 585 U.S. at 18.  In fact, WMATA offers no definitions and no guidance on how to define an "[a]dvertisement intended to influence members of the public regarding an issue on which there are varying opinions," and no instruction on how to apply the Guideline, including whether related content, such as information on websites referenced in the ad, should be considered.[8]  Enforcement of Guideline 9 is thus left to individual reviewers to determine, on a

---

[8]         To the extent WallBuilders argues that speech referenced in, but beyond the four corners of, a proposed ad cannot be considered, such argument fails.  The only case WallBuilders appears to cite for this proposition, *Women's Health Link, Inc. v. Fort Wayne Pub. Transp. Corp.*, 826 F.3d 947 (7th Cir. 2016), is plainly distinguishable, *see* Pl.'s PI Mem. at 21, because the policy governing ads in that case, by its text, did "not extend to websites," 826 F.3d at 952.  The problem here is not that WMATA looked at WallBuilders' website when reviewing its ads.  Indeed, if WMATA had a policy of always looking at websites referenced in ads, its process would be considerably more consistent.  Here, the record is unclear whether Outfront, the only entity to review every ad submitted to WMATA, ever looks at websites or QR codes embedded in ads, and while WMATA purportedly "may" review any website or QR code referenced in a proposed ad, Bowersox Decl. ¶ 22, such a review is neither consistently performed by the Panel nor triggered by a well-articulated process, let alone a process transparent to the public.  Instead, by WMATA's own description, "the [P]anel will review a website or QR code that is included in the ad" only if "it is unclear from the face of the ad if it violates a guideline," which begs the question of how the Panel evaluates whether it is "[]clear from the face of the ad [that] it violates a guideline."  Def.'s PI Opp'n at 23. Had WallBuilders submitted its revised ads stating only "visit wallbuilders.com," without first having submitted its original ads, would Outfront have referred the ads to the Panel?  Would the Panel have reviewed the accompanying website or QR code given that the revised ads are likely not "[]clear from [their] face" to violate a guideline"? WMATA provides little explanation or guidance to answer these questions.  *See Suburban Mobility Auth.*, 978 F.3d at 495 (flagging as "inconsisten[t]" defendant's choice to "not review the content of advertised shows, movies, or books" but to review "the content of websites listed on ads," and noting that even when defendant "has accepted ads,

---

case-by-case basis, what constitutes an "[a]dvertisement intended to influence" and what constitutes "an issue on which there are varying opinions."  Such determinations "require[] a government decision-maker to maintain a mental index" of all the issues on which varying opinions exist—which, in turn, requires the decisionmaker to know not only the issues on which opinions differ, but also the precise degree to which opinions differ—an enterprise that the D.C. Circuit has said is "not reasonable."  *Zukerman*, 961 F.3d at 450 (quoting *Mansky*, 585 U.S. at 19).

This Court thus joins the many courts that have rejected similar phrases as constitutionally suspect.  *See, e.g.*, *Mansky*, 585 U.S. at 18 (explaining that the state's ban on "[i]ssue oriented material designed to influence or impact voting" "raises more questions than it answers," in part because it does not define "[w]hat qualifies as an 'issue'" (citation omitted)); *Ctr. for Investigative Reporting*, 975 F.3d at 316 (striking down guideline prohibiting "[a]dvertisements expressing or advocating an opinion, position or viewpoint on matters of public debate about economic, political, religious, historical or social issues"); *Greater Richmond Transit Co.*, 35 F.4th at 199 (commenting "whatever that might mean" about Richmond Transit's ban on "public issues"); *Suburban Mobility Auth.*, 978 F.3d at 495–96 (rejecting definition of "politicized issue" as an issue on which "society is fractured" and "factions of society have taken up positions on it that are not in agreement" for being "subject to the same risk of 'haphazard interpretations' that *Mansky* found unacceptable" (quoting *Mansky*, 585 U.S. at 16)); *Amalgamated Transit Union Loc. 1015 v. Spokane Transit Auth.*, 929 F.3d 643, 648 (9th Cir. 2019) (rejecting ban on "public issue" advertising, where "public issue" was

---

it is not clear it has reviewed listed websites"); *N.E. Pa. Freethought Soc'y v. Cnty. of Lackawanna Transit Sys.*, 938 F.3d 424, 440 (3d Cir. 2019) ("It's also unclear whether and when information about an advertiser beyond the face of the ad is relevant."); *Greater Richmond Transit*, 35 F.4th at 200–01 (similar).

defined as "advertising 'expressing or advocating an opinion, position, or viewpoint on matters of public debate about economic, political, religious or social issues," and suggesting that a policy excluding "any issue having any level of public debate" would be "unreasonable" because "for most every good or service, there is some level of debate" (alteration in original accepted and citation omitted)).

### b)   *Consistency in Enforcement*

Without objective, workable standards in Guideline 9's text or accompanying official guidance, reviewers' "own politics may shape [their] views on what counts" as "an issue on which there are varying opinions," and the risk of "unfair or inconsistent enforcement," and even "abuse" is "self-evident." *Mansky*, 585 U.S. at 21–22.  WMATA appears to argue that consistency in application is irrelevant, *see* Def.'s PI Opp'n at 23, but the D.C. Circuit has advised that "information on how [an advertising policy] has been applied would certainly be information as to whether it is capable of reasoned application," *AFDI*, 901 F.3d at 373; *see also Archdiocese*, 897 F.3d at 330 ("[A] challenged regulation may be unreasonable, regardless of the reasons for its adoption, if it is inconsistently enforced."); *White Coat Waste Proj.*, 2024 WL 68256, at *9 (explaining that *Mansky* reconciled its holding with *Lehman* and *Greer* because "[i]n both *Lehman* and *Greer*, a key part of that context, no doubt, was a factual record showing a history of consistent enforcement").[9]  Here, WMATA's application of Guideline 9 has been far from consistent, with a history of regularly publishing ads that could fairly be described as

---

[9]      For this reason, WallBuilders' Motion for Leave to File Supplemental Dulin Declaration, ECF No. 34, is GRANTED, over WMATA's objection; and WallBuilders' Motion for Leave to File Supplemental Declarations, ECF No. 28, is GRANTED, over WMATA's objection, to include, in the record, the Supplemental Declaration of Camille P. Varone, WallBuilders' Att'y, ECF No. 28-1, and accompanying exhibits.  *See People for Ethical Treatment of Animals, Inc. v. Shore Transit*, 580 F. Supp. 3d 183, 193–94 (D. Md. 2022) (emphasizing the need for a "robust factual record" to evaluate reasonableness); *see also Romero v. RBS Constr. Corp.*, No. 18-cv-179, 2022 WL 522989, at *7 (D.D.C. Feb. 22, 2022) ("Where a party has an opportunity to respond to evidence that may otherwise be objectionable, or does in fact respond, there is no prejudice to that party and striking such evidence is not proper.").

advocating for an "issue on which there are varying opinions."  WallBuilders cites a plethora of examples, and although each example has been reviewed, three are sufficient for illustration.

First, WMATA has published an Instacart ad promoting Plan B, an over-the-counter oral contraceptive, which ad invites viewers to "[b]uy Plan B without ever stepping foot in a store" and instructs viewers to "[s]can [a corresponding QR code] to order now."  Daday Decl. ¶ 11.  As recent Supreme Court litigation has made clear, some members of society do not approve of the use of contraception, *see, e.g.*, *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657 (2020), much less the ready availability of contraception over the counter and delivered to consumers the "same[]day," Daday Decl. ¶ 11.

WMATA argues that the Instacart ad is distinguishable because it seeks to convince the public "to buy th[is] product[] or use [this] service," and not to influence on the issue of the appropriateness of readily available contraceptives.  Def.'s PI Opp'n at 27–28.  To be sure, some commercial ads are straightforward ads communicating only the availability for purchase of a product or service, *see Archdiocese*, 897 F.3d at 329 (citing a McDonald's ad for a cheeseburger as an example of a commercial ad that merely "proclaim[s]: Shop Here! Buy This!" without saying anything "about the sellers' viewpoints"), but WMATA's suggestion that all ads that seek to sell a product or service cannot trigger Guideline 9 is not obvious from, or even implied by, the text of Guideline 9, *see* Def.'s PI Opp'n at 26.  In fact, WMATA previously rejected an ad for a book by Milo Yiannopoulos and when challenged, this rejection was upheld by another Judge on this Court, because "an ad promoting a manifestly political book is itself political advocacy." *Am. C.L. Union Found. v. Wash. Metro. Area Transit Auth.*, 303 F. Supp. 3d 11, 19 (D.D.C. 2018) (citation omitted).  WMATA's position in that case makes clear that not all commercial ads fall outside Guideline 9.  This then begets the question: At what point does a

commercial ad become prohibited under Guideline 9?  WallBuilders itself, for example, sells goods, and its website includes an online store.  If the QR code had linked to WallBuilders' store, rather than to its homepage, would the ad have satisfied Guideline 9?  Nothing in Guideline 9 offers an answer.

Second, WMATA has published a public service ad from D.C. Health encouraging people to get COVID-19 vaccinations, which ad has no discernable commercial purpose.  The D.C. Health ad states that "an updated COVID-19 vaccine helps save lives" and informs readers that "[v]accinated people who receive an updated COVID-19 vaccine were" "14x less likely to die compared with those who received no vaccine" and "3x less likely to die compared with those who received only the original COVID-19 vaccine(s)."  Decl. of Camille P. Varone, WallBuilders' Att'y ¶ 6, ECF No. 9-5 (capitalization omitted).  Whether to get the COVID-19 vaccine has become politicized and is certainly "an issue on which there are varying opinions," *see, e.g.*, *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 595 U.S. 109 (2022), but, nevertheless, WMATA permitted publication of the D.C. Health ad.

Rather than defend the COVID-19 vaccine ads on their substance, WMATA merely argues that the situation is distinguishable because these ads were "never submitted by Outfront to WMATA."  Def.'s PI Opp'n at 28; *see also* Nicol Decl. ¶ 16.  This argument is unresponsive to the concern that Guideline 9 is incapable of reasoned application.  According to WMATA, Outfront has the authority unilaterally to accept ads that this third-party contractor determines, with no guidance, comply with the Guidelines.  Bowersox Decl. ¶ 18.  That Outfront determined that the COVID-19 vaccine ad did not "intend[] to influence . . . regarding an issue on which there are varying opinions," does not make it so.[10]

---

[10]     Given Outfront's threshold role in scrutinizing proposed ads for compliance with the Guidelines, the record is surprisingly spare as to how this contractor carries out this function.  WMATA highlights the composition of the

Third and finally, WMATA has published, in a Metro station, a Power to the Patients ad advocating for lower and more transparent hospital pricing.  *See* Decl. of Monica Hopkins, D.C. Resident ¶ 2, ECF No. 9-8.  The ad reads: "We ~~need~~ demand hospital prices," and "[w]hen we can't see or compare prices, hospitals and insurance companies charge us whatever they want. They're robbing us!"  *Id.* (capitalization omitted).  It also includes a QR code linking to Power to the Patients' website, which website advocates for "real prices and transparency in healthcare." Pl.'s PI Mem. at 23.  The proper degree of hospital price transparency and the appropriate regulatory solution are plainly issues on which members of the public have varying opinions.

WMATA responds that "price transparency in healthcare services [is] not an issue subject to *significant* opposition," Def.'s PI Opp'n at 29 (emphasis added), but nothing in Guideline 9 requires that the "varying opinions" must be "significant."  *Compare, e.g.*, *id.* at 29 (defending, also, its acceptance of an anti-war group's "Peace on Earth" ad based on its "hardly controversial or divisive" message), *with, e.g.*, Pl.'s PI Mem. at 25–26 (noting that the anti-war group's website advocates against "arms manufacturing, weapons stockpiling, and the expansion of military bases" (citation omitted)).  Indeed, as WallBuilders points out, "Power to the Patients would not need to spend money to persuade people to join its campaign on this issue if [it] did not face some significant opposition."  Pl.'s Reply at 9.[11]  WMATA then argues that the Power

---

Panel, which "consists of multiple attorneys familiar with the First Amendment jurisprudence governing advertising restrictions," and its internal process, involving consideration of "past advertisements that WMATA has accepted and rejected as baselines for its decisions on ads under review" to "ensure[] consistent application of Guideline 9's criteria," Def.'s PI Opp'n at 19 (citing Bowersox Decl. ¶ 23), but the fact remains that Outfront forwards to WMATA only the submissions suspected of possibly violating the Guidelines, which is only a small fraction of the ads submitted to Outfront, especially as compared to the thousands of ads accepted at the outset for publication by Outfront, without referral to the Panel, *see* Bowersox Decl. ¶¶ 26–28 (explaining that Outfront reviews and accepts "thousands of ads," whereas the Panel reviews only several hundred every year).

[11]     WallBuilders also makes the legitimate point that the requirement that a viewpoint must "face some significant opposition" to be "an issue on which there are varying opinions" triggering the Guideline 9 bar, veers dangerously into viewpoint discrimination by accepting ads expressing the significant majority-held position, as to which the opposition may be discounted as merely fringe, which potentially "discriminates against minority views on issues on which there is less debate because only a small part of the public holds them."  Pl.'s MTD Opp'n at 34.

to the Patients ad sought "to educate people on their rights under existing law" and did "not seek to influence the public on significant issues, unlike ads that seek to encourage them to change laws," Def.'s PI Opp'n at 29; *see also* Nicol Decl. ¶ 20, but again nothing in Guideline 9 requires that ads must "encourage [viewers] to change laws" to be prohibited.  Moreover, WMATA's characterization of the Power to the Patients ad as merely seeking to "educate," rather than "to influence the public on significant issues," is difficult—if not impossible—to reconcile with the ad's text, which "demand[s]" change.  By comparison, WallBuilders' original ads, which encourage viewers to "find out about the faith of our finders," or its revised ads, directing viewers to their website purporting to offer educational resources about "the Christian foundation of our nation," appear to intend to be similarly educational.

To be clear, WMATA is permitted to retain considerable discretion in evaluating the intent and purpose of an ad, *see Mansky*, 585 U.S. at 21 ("[S]ome degree of discretion . . . is necessary."), but this discretion must be coupled with objective, workable standards.  Although "[p]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity," here, WMATA's "difficulties with its restriction go beyond close calls on borderline or fanciful cases."  *Id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)).  Put simply, the utterly undefined use of the phrase "[a]dvertisements intended to influence . . . regarding an issue on which there are varying opinions," coupled with the lack of any definitions or official guidance and WMATA's inconsistent application of Guideline 9, makes clear that Guideline 9 is not a reasonable restriction on speech.

Accordingly, WMATA's motion to dismiss Counts I and II is denied.

3.       *Injunctive Relief*

To obtain preliminary injunctive relief, the moving party "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  For the reasons explained above, WallBuilders has shown a likelihood of success on the merits on Counts I and II, namely its challenge to Guideline 9 as unreasonable for failing to provide objective, workable standards and thus in violation of the First Amendment.  It follows, therefore, that WallBuilders has satisfied the other three factors because the well-settled law in this Circuit is that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Singh v. Berger*, 56 F.4th 88, 109 (D.C. Cir. 2022) (quoting *Roman Catholic Diocese of Brooklyn v. Cuomo*, 595 U.S. 14, 19 (2020)); *see also Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (same, with respect to "the loss of constitutional freedoms" generally (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976))); *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016) (explaining that "[i]n First Amendment cases, the likelihood of success 'will often be the determinative factor' in the preliminary injunction analysis'" (quoting *Joelner v. Vill. of Wash. Park, Ill.*, 378 F.3d 613, 620 (7th Cir. 2004))); *Nat'l Fed'n of Fed. Emps.-IAM v. Vilsack*, 681 F.3d 483, 499 (D.C. Cir. 2012) (reversing district court's denial of request for preliminary injunction, which was "based solely on likelihood of . . . success on the merits," where the Circuit disagreed with the district court on the merits and "the loss of constitutional protections constitutes irreparable injury").

Indeed, in *Archdiocese*, the D.C. Circuit commented that had plaintiff "show[n] a likelihood of success on the merits" on its constitutional challenge to Guideline 12, "it would

prevail on the final three factors."  897 F.3d at 334.  Specifically, "the deprivation of

constitutional rights constitutes irreparable injury" when the "deprivation is shown to be likely";

the suffering of a constitutional violation by WallBuilders outweighs the costs WMATA has

identified associated with losing the ability to prohibit issue-oriented advocacy and provide for

the safety of its riders; and "[t]he public interest favors the protection of constitutional rights."

*Id.* at 334–35; *see also* Def.'s PI Opp'n at 40.[12]

The question of the breadth of the preliminary injunction remains.  On the one hand, the

Court recognizes that "[h]aving already concluded that the policy is not 'capable of reasoned

application,' it is logically unavoidable that the law lacks any legitimate sweep."  *Greater

Richmond Transit Co.*, 35 F.4th at 204.  On the other hand, "[t]he purpose of a preliminary

injunction is merely to preserve the relative positions of the parties until a trial on the merits can

be held."  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)

(quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)); *see also Singh*, 56 F.4th at 95

("Preliminary injunctions are generally a stopgap measure meant only to preserve the relative

positions of the parties until trial." (citation omitted)).  Given this limited purpose, "[t]he need

for narrow tailoring . . . is particularly important in the context of a preliminary injunction . . . ,

where the court has yet finally to resolve the merits of the dispute."  *U.S. Ass'n of Reptile

Keepers, Inc. v. Jewell*, 106 F. Supp. 3d 125, 126 (D.D.C. 2015).  Moreover, "a grant of

preliminary relief could prove to be mistaken once the merits are finally decided."  *Singh*, 56

F.4th at 95 (citation omitted).  "Ordinarily," therefore, preliminary injunctions "may go no

further than necessary to provide interim relief to the parties."  *Labrador v. Poe by and through*

---

[12]    In arguing that "[t]he assertion of First Amendment rights does not automatically require a finding of irreparable injury, thus entitling a plaintiff to a preliminary injunction if he shows a likelihood of success on the merits," WMATA relies exclusively on out-of-Circuit cases.  Def.'s PI Opp'n at 38.  This Court is bound by D.C. Circuit decisions, including *Archdiocese*, which WMATA fails to address.

*Poe*, 144 S. Ct. 921, 921 (2024) (Gorsuch, J., concurring) (concurring with decision not to stay district court's preliminary injunction as to parties but to stay preliminary injunction "to the extent it applies to nonparties, which is to say to the extent it provides 'universal' relief"); s*ee also Neb. Dep't of Health & Hum. Servs. v. Dep't of Health & Hum. Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2016) (collecting cases emphasizing the need for narrow tailoring of preliminary relief).  Set against these concerns, WallBuilders appropriately seeks preliminary to enjoin the enforcement of Guideline 9 only to itself.  *See* Pl.'s Proposed Order Granting Mot. Prelim. Inj., ECF No. 9-10.

Accordingly, WallBuilders' motion for a preliminary injunction is granted insofar as it seeks preliminary to enjoin the enforcement of Guideline 9 on WallBuilders.

### B.      Guideline 12

Guideline 12 prohibits "[a]dvertisements that promote or oppose any religion, religious practice or belief," Compl., Ex. A at 3, and WallBuilders challenges its constitutionality on two bases, arguing that it is facially viewpoint discriminatory, *see* Compl. ¶¶ 118–27 (Count V), and unreasonable, *see id.* ¶¶ 128–33 (Count VI).  WMATA, in turn, argues that Counts V and VI should be dismissed because WallBuilders lacks standing to bring these claims, and, in any case, the claims are squarely foreclosed by *Archdiocese of Washington v. Washington Metropolitan Area Transit*.  For the reasons explained below, WallBuilders has standing to challenge Guideline 12 as unconstitutional, but *Archdiocese* binds this Court and squarely forecloses Counts V and VI.  Accordingly, WMATA's motion to dismiss Counts V and VII is granted, and Wallbuilders' motion for a preliminary injunction as to Guideline 12 is denied as moot.

1.      *Standing*

"[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) (citation omitted); *see also Members of City Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 796 (1984) ("[T]he seminal cases in which the Court held state legislation unconstitutional 'on its face' did not involve any departure from the general rule that a litigant only has standing to vindicate his own constitutional rights."). "The doctrine of standing gives meaning to these constitutional limits by 'identifying those disputes which are appropriately resolved through the judicial process.'" *Susan B. Anthony List v. Driehaus* ("*SBA*"), 573 U.S. 149, 157 (2014) (alteration in original accepted and citation omitted). Constitutional standing has three elements: (1) injury-in-fact, *i.e.*, "an invasion of a legally protected interest which is (a) concrete and particularized," and "(b) actual or imminent, not conjectural or hypothetical"; (2) causation, *i.e.*, "a causal connection between the injury and the conduct complained of"; and (3) redressability, *i.e.*, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560–61 (citations omitted). The party invoking federal jurisdiction—here, WallBuilders—bears the burden of establishing all three elements. *Id.* at 561.

Each element of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Id.* (alteration in original accepted and citation omitted). To assure itself of

its jurisdiction over a claim, however, "the district court may consider materials outside the pleadings." *Jerome Stevens Pharms., Inc.*, 402 F.3d at 1253.[13]

      The parties primarily dispute the presence of an injury in fact because the Panel cited Guideline 9, not Guideline 12, when rejecting WallBuilders' proposed ad.  WMATA argues that the Panel, by expressly citing only Guideline 9, did not reject WallBuilders' ads pursuant to Guideline 12.  *See* Def.'s MTD Mem. at 17; Def.'s PI Opp'n at 33–34.[14]  WallBuilders, in turn, responds that the Guideline 12 "arguably" prohibited its ads and that WallBuilders "'would have purchased and would still purchase WMATA advertising space for this and other similar campaigns' that advertise its 'religious views about our nation's history,' if not for Guideline 12."  Pl.'s MTD Opp'n at 42 (emphasis omitted) (quoting Compl. ¶ 82); *see also* Pl.'s PI Reply at 16 n.11.  WallBuilders has the better argument.

      "Pre-enforcement review is permitted where the threatened enforcement of a law is 'sufficiently imminent.'"  *Woodhull Freedom Found. v. United States*, 948 F.3d 363, 370 (D.C. Cir. 2020) (quoting *SBA*, 573 U.S. at 159).  Plaintiff establishes a sufficiently imminent threat upon alleging (1) "an intention to engage in a course of conduct arguably affected with a

---

[13]    For this reason, WallBuilders' Motion for Leave to File Supplemental Declarations, ECF No. 28, is GRANTED, over WMATA's objection, and the Supplemental Declaration of Timothy Barton, WallBuilders' President ("Suppl. Barton Decl."), ECF No. 28-10, may be considered.

[14]    WallBuilders' complaint alleges that the Panel did not inform WallBuilders of any decision regarding Guideline 12 and rejected its proposed ads pursuant to only Guideline 9.  *See* Compl. ¶ 42; *see also id.* ¶¶ 126, 132 ("[O]n information and belief, WMATA would reject WallBuilders' advertisements under Guideline 12.").  Recognizing that on a motion to dismiss pursuant to Rule 12(b)(1), "the well-pleaded factual allegations" in WallBuilders' complaint must be accepted "as true," Def.'s MTD Mem. at 5, WMATA argues that by expressly citing Guideline 9, the Panel did not reject WallBuilders ads pursuant to Guideline 12, *id.* at 17.  In contrast, in opposing WallBuilders' motion for preliminary injunction, WMATA asserts that "the [P]anel concluded that Guideline 12 did not apply," a fact not alleged in the complaint.  Def.'s PI Opp'n at 40; *see also* Nicol Decl. ¶ 11 ("The [P]anel . . . determined that the website did not violate Guideline 12.").  Regardless of whether WallBuilders' standing is "evaluated under the motion to dismiss standard," pursuant to Rule 12(b)(6), because "the litigation ha[s] not proceeded past the pleadings stage," or "under the heightened standard for evaluating a motion for summary judgment," because WallBuilders have moved for a preliminary injunction, *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 912–13 (D.C. Cir. 2015); *see also Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 379 n.7 (D.C. Cir. 2017), WallBuilders has standing to challenge Guideline 12 for the reasons explained in the text.

constitutional interest"; (2) "the intended future conduct [is] arguably proscribed by the statute

they wished to challenge"; and (3) "the threat of future enforcement of the challenged statute [is]

substantial." *Id.* at 370–71 (alterations in original accepted) (quoting *SBA*, 573 U.S. at 161–62,

164).  A "courts' willingness to permit pre-enforcement review is at its peak when claims are

rooted in the First Amendment," but "a plaintiff must still demonstrate more than a subjective

chill to establish an injury-in-fact."  *Id.* at 371; *see also Act Now to Stop War & End Racism

Coal. v. District of Columbia*, 589 F.3d 433, 435 (D.C. Cir. 2009) ("While subjective chill alone

will not suffice to confer standing on a litigant bringing a pre-enforcement facial challenge to a

statute alleging infringing on the freedom of speech, imminent threats commonly suffice."

(citation omitted)).

      Applying these principles, WallBuilders has established an injury-in-fact.  *See Am. C.L.

Union Found. v. Wash. Metro. Transit Auth.*, No. 17-cv-1598, 2023 WL 4846714, at *4 (D.D.C.

July 28, 2023) (concluding that plaintiffs had standing to challenge Guideline 13, even though

plaintiffs' ads were formally rejected under Guideline 9, because, like here, the complaint

alleged that "the advertisement would also have violated Guideline 13," which allegation the

court concluded was "enough to support [their] standing to challenge Guideline 13").  First,

WallBuilders has alleged "an intention to engage in a course of conduct arguably affected with a

constitutional interest."  *Woodhull*, 948 F.3d at 370–71 (citation omitted).  WallBuilders began to

rebrand its website at the end of 2022, with hopes of relaunching the website in June 2023, and

as part of a campaign to publicize its website, WallBuilders designed and submitted two

proposed ads to Outfront for publication by WMATA, which conduct is indisputably affected

with a First Amendment interest.  *See* Compl. ¶¶ 32–34; Barton Decl. ¶¶ 15–16.  When its initial

designs were rejected, WallBuilders, rather than giving up on its ad campaign, redesigned and

resubmitted the ads, in hopes of comporting with the Guidelines.  Compl. ¶ 45; Smith Decl.

¶¶ 17–19.  WallBuilders then brought this action, seeking to enjoin WMATA from, *inter alia*,

enforcing Guideline 12 to preclude these two ads, reaffirming its intention to attempt to run these

ads "to [its] preferred audience in [its] preferred venue" in the future.  Barton Decl. ¶¶ 18–19.

Second, this "future conduct [is] arguably proscribed by" Guideline 12, *Woodhull*, 948

F.3d at 371 (alteration in original accepted and citation omitted), which prohibits

"[a]dvertisements that promote or oppose any religion, religious practice or belief," Compl., Ex.

A at 3; *see also* Compl. ¶¶ 6 ("Even absent WMATA's reliance on Guideline 9, WallBuilders'

proposed advertisement would, on information and belief, have run afoul of WMATA Guideline

12."), 126 (similar).  The original proposed ads explicitly reference Christianity and invite

viewers "to find out about the faith of our founders," *id.* ¶ 36 (capitalization omitted), and both

the original and revised proposed ads provide a QR code navigating to and the address of

WallBuilders' website, *id.* ¶¶ 36, 45. 47.  As described by the Panel, WallBuilders' website

offers "education, training and resources" for any "educator, church leader, legislator, or anyone

who just wants to learn more" about, *inter alia*, "America's Biblical Foundation," "our nation's

Godly heritage," and "our Founding Fathers' faith and the religious principles they established."

Nicol Decl., Ex. E; *see also* Def.'s PI Opp'n at 11 (explaining that WallBuilders' website asks

readers, "Do you support Christian ideals of freedom in America?"); Compl. ¶¶ 1 (explaining

that WallBuilders' mission is "to inform the public about the role that the Founders' religious

faith played in the creation of the nation and the drafting of the Constitution"), 14 (similar, and

explaining that "WallBuilders takes its name from the Old Testament of the Bible, specifically

the book of Nehemiah), 15 (explaining that WallBuilders "provid[es] information to federal,

state, and local officials as they develop public policies [that] reflect Biblical values" and

42

"encourag[es] Christians to be involved in the civic arena").  WMATA asserts that "promoting [a] view of the role of Christianity in American history in support of its belief that Christian faith should have a role in government" is "quite different from promotion of a religion, religious practice or belief," Def.'s MTD Reply at 13, but this "differen[ce]" is not immediately obvious, particularly without further explanation by WMATA.  Put bluntly, WallBuilders expressly advocates that "Christian faith should have a role in government," based on "the role of Christianity in American history," and this advocacy appears squarely to promote Christianity. In this way, WallBuilders' ads, which can fairly be read to promote the "religious principles" allegedly adopted by the Founders and thus foundational to the nation, are "arguably" prohibited by Guideline 12.  The record bears this out: when WallBuilders first submitted its ads, an Outfront representative "highlighted that WMATA forbids religious advertisements pursuant to its Commercial Advertising Guidelines."  Smith Decl. ¶ 13.  Although the Outfront representative was ultimately "willing to submit WallBuilders' advertisements for consideration," she informed WallBuilders that she did so "notwithstanding their religious viewpoint."  *Id.*

Third and finally, on this record, "the threat of future enforcement of the challenged statute [is] substantial."  *Woodhull*, 948 F.3d at 371 (citation omitted).  While arguing that Guideline 12 was not the basis for rejecting WallBuilders' ads, WMATA has not disavowed future rejection of WallBuilders' ads pursuant to Guideline 12, especially if Guideline 9 is unavailable due to being found unconstitutional.  *See id.* at 373 (concluding that "the threat of future enforcement against [defendant] is substantial" where "[t]he Department of Justice 'has not disavowed any intention of invoking the criminal penalty provision" at issue in the matter against defendant or similarly situated individuals (quoting *Babbitt v. United Farm Workers*

*Nat'l Union*, 442 U.S. 289, 302 (1979))).  In addition, although WMATA's position so far in this

action is that WallBuilders' ads are not proscribed by Guideline 12, *see, e.g.*, Def.'s MTD Mem.

at 17, "there is nothing that prevents [defendant] from changing its mind," *Woodhull*, 948 F.3d at

373 (quoting *Vt. Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 383 (2d Cir. 2000)).

Accordingly, WallBuilders has standing to challenge Guideline 12 in Counts V and VI.[15]

**2.    *Merits***

On the merits, however, Counts V and VI are foreclosed by *Archdiocese of Washington*

*v. Washington Metropolitan Area Transit Authority*, in which the D.C. Circuit squarely held that

Guideline 12, by "prohibit[ing] religious and anti-religious ads in clear, broad categories," is

viewpoint neutral, 897 F.3d at 325, and is reasonable in light of WMATA's previous "security

concerns arising from [] controversial ad[s]" and its "compelling interest in ensuring the safety

and reliability of its transportation services and operating in a manner that maintains the

attractiveness of its service to a multi-cultural, multi-ethnic, and religiously diverse ridership,"

*id.* at 330–31.

WallBuilders concedes that the conclusion, in *Archdiocese*, that Guideline 12 is

viewpoint neutral forecloses Count V, which alleges that Guideline 12 discriminates based on

viewpoint, in violation of the First Amendment.  *See* Pl.'s PI Mem. at 40–42 (acknowledging

---

[15]    Even if WallBuilders lacked standing based on allegations of injury associated with rejection of the original and revised ads submitted to WMATA, it would have standing based on ads that but for Guideline 12, it "would have purchased and would still purchase WMATA advertising space for," in connection with the campaign to promote its website "and other, similar campaigns" to advertise its "religious views about our nation's history." Compl. ¶ 82.  Barton's Supplemental Declaration buttresses WallBuilders' standing.  The declaration avers that WallBuilders prepared twelve additional ads as part of its campaign to promote its website, which ads are arguably proscribed by Guideline 12 and are reproduced in the declaration, but did not submit these ads to WMATA in light of Guideline 12.  *See* Suppl. Barton Decl. ¶¶ 15–32.  This declaration further states that "[i]f not for Guideline 12, WallBuilders would have submitted some or all of these advertisements to Outfront . . . for placement on WMATA buses," and that it "is ready to run" and "still plans to run some or all of those ads if WMATA's Guideline 12 is invalidated." *Id.* ¶¶ 33–35; *see also id.* at 36 ("Because of Guideline 12, WallBuilders has held these advertisements in reserve pending the outcome of this litigation.  If it prevails, WallBuilders plans to use some or all of these advertisements in a future campaign.").

that Count V "raises an issue previously addressed by the D.C. Circuit in *Archdiocese*," which "rejected such a viewpoint discrimination challenge" and "conclud[ed] that Guideline 12 permissibly regulates content, not viewpoint"; conceding that "this Court is obviously bound by that decision"; and noting that WallBuilders "do[es] not expect this Court to correct the [perceived] error of the D.C. Circuit's decision" and makes the argument only to "preserve the issue for review upon appeal"); *see also Critical Mass Energy Proj. v. Nuclear Regul. Comm'n*, 975 F.2d 871, 876 (D.C. Cir. 1992) (en banc) (explaining that a D.C. Circuit decision is binding on this Court "unless and until overturned by the [D.C. Circuit] en banc or by Higher Authority" (citation omitted)).[16]  Accordingly, Count V is dismissed.

WallBuilders argues, however, that the conclusion, in *Archdiocese*, that Guideline 12 is reasonable does not foreclose Count VI, which alleges that Guideline 12 is unreasonable.  As support for this argument, WallBuilders points to "[t]he many examples of inconsistent application of Guideline 12 in the record here [that] distinguish the holding of *Archdiocese* . . . on the limited record before the D.C. Circuit in that case."  Pl.'s PI Mem. at 31.

---

[16]      In reply supporting its motion for preliminary injunction and opposition to WMATA's motion to dismiss, WallBuilders attempts to walk-back its concession that *Archdiocese* binds this Court, arguing that *Archdiocese* does not "end . . . the inquiry" because "WMATA no longer contends that Guideline 12 prohibits *all* discussion of religion" only "ads that 'clearly promote' or 'oppose' religion."  Pl.'s PI Reply at 21 (citation omitted); *see also* Pl.'s MTD Opp'n at 38 (arguing that "WMATA's policy and practice under Guideline 12 have shifted since" *Archdiocese* because "WMATA now interprets Guideline 12 to allow some views on religion, while prohibiting others," specifically, "those ads that 'clearly promote' or 'oppose' religion, religious belief or practice" (emphasis and citation omitted)).  WallBuilders' argument that WMATA has changed its approach to applying Guideline 12—thereby providing an excuse to revisit the holding in *Archdiocese*—arises from a strained overreading of WMATA's description of how Guideline 12 is applied.  The language of Guideline 12, prohibiting "[a]dvertisements that *promote or oppose* any religion, religious practice or belief," has not changed, Compl., Ex. A at 3 (emphasis added); some of the examples of ads permitted by WMATA cited by the parties have not changed, *compare* Pl.'s MTD Opp'n at 39 (noting that "WMATA permits ads for *performances* that discuss religion," such as the Book of Mormon), *with* Appellant's Br. at 30, Archdiocese of Wash. v. Wash. Metro. Area Transit, No. 17-7171 (D.C. Cir. Jan. 12, 2018) (noting that WMATA permits "commercial advertising for shopping and plays," "even one as potentially divisive as the Book of Mormon"); and the distinction drawn by WMATA between ads that "discuss" religion and ads that "promote" or "oppose" religion has not changed, Def.'s MTD Reply at 14; *see Archdiocese*, 897 F.3d at 329 (distinguishing ads referencing Christmas with those "expressing a view" about Christmas or "invit[ing] debate about how Christmas should be celebrated" (citation omitted)).  In sum, this Court remains bound by the D.C. Circuit's decision in *Archdiocese*.

The Court disagrees with WallBuilders' characterization that the record here, though significantly more fulsome, is sufficient to change the analysis in *Archdiocese*. *Cf. supra* Part III.A.2.b (discussing many of the examples cited by WallBuilders). Accordingly, Count VI is dismissed.

Since Counts V and VI challenging the constitutionality of Guideline 12 are dismissed, WallBuilders' motion for a preliminary injunction is denied as moot, insofar as it seeks to enjoin the application of Guideline 12.

## IV.    CONCLUSION

To summarize, WallBuilders alleges, in six counts pursuant to 42 U.S.C. § 1983, that Guidelines 9 and 12 violate the First Amendment. Specifically, WallBuilders contends that Guideline 9 is unreasonable both facially (Count I) and as applied to WallBuilders (Count II), and viewpoint discriminatory both facially (Count III) and as applied to WallBuilders (Count IV); and that Guideline 12 is facially viewpoint discriminatory (Count V) and unreasonable (Count VI).

With respect to Guideline 9, WMATA's motion to dismiss Count III is granted as foreclosed by *AFDI*, and its motion to dismiss Count IV is granted because WallBuilders has failed sufficiently to allege that WMATA singled out or disfavored WallBuilders due to the organization's religious viewpoints. WMATA's motion to dismiss Counts I and II is denied, however, because Guideline 9 is incapable of reasoned application. For this reason, WallBuilders has shown a likelihood of success on the merits on Counts I and II, and, under the law of this Circuit, it necessarily follows that WallBuilders has satisfied the other three preliminary injunction factors. Accordingly, WallBuilders' motion for a preliminary injunction

is granted insofar as it seeks preliminarily to enjoin the enforcement of Guideline 9 on WallBuilders.

With respect to Guideline 12, while WallBuilders has standing to assert its constitutional claims as to this Guideline, WMATA's motion to dismiss Counts V and VI is granted as foreclosed by *Archdiocese*.  Accordingly, WallBuilders' motion for a preliminary injunction is denied as moot insofar as it seeks preliminarily to enjoin enforcement of Guideline 12 on WallBuilders.

In sum, for the foregoing reasons, WMATA's Motion to Dismiss, ECF No. 23, is **GRANTED IN PART AND DENIED IN PART**; WallBuilders' Motion for Preliminary Injunction, ECF No. 9, is **GRANTED IN PART AND DENIED IN PART AS MOOT**; and WallBuilders' Motion for Leave to File Supplemental Declarations, ECF No. 28, and Motion for Leave to File Supplemental Dulin Declaration, ECF No. 34, are **GRANTED**.

An Order consistent with this Memorandum Opinion will be filed contemporaneously.

Date:  May 21, 2024

_____
**BERYL A. HOWELL**
United States District Judge