# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **WALLBUILDER PRESENTATIONS,** | |
| Plaintiff, | |
| v. | No. 1:23-cv-03695 (BAH) |
| **RANDY CLARKE, in his official capacity as General Manager and Chief Executive Officer of the Washington Metropolitan Area Transit Authority,** | |
| Defendant. | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S RENEWED MOTION FOR SUMMARY JUDGMENT

David J. Hacker (admitted *pro hac vice*)
Jeremiah G. Dys (D.C. Bar # 90000678)
Ryan Gardner (admitted *pro hac vice*)
FIRST LIBERTY INSTITUTE
2001 West Plano Parkway, Suite 1600
Plano, TX 75075
Tel: (972) 941-4444
dhacker@firstliberty.org
jdys@firstliberty.org
rgardner@firstliberty.org

Shannen W. Coffin (D.C. Bar # 449197)
Andrew Sloniewksy (D.C. Bar #440474)
Caitlin E. Ames (D.C. Bar # 90002918)
STEPTOE LLP
1330 Connecticut Ave., N.W.
Washington, D.C.  20036
Tel: (202) 429-3000
Fax: (202) 429-3902
scoffin@steptoe.com
asloniewsky@steptoe.com
cames@steptoe.com

Brian Hauss (D.D.C. Bar # NY0581)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Tel: (212) 549-2500
bhauss@aclu.org

Arthur B. Spitzer (D.C. Bar # 235960)
Scott Michelman (D.C. Bar # 1006945)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE DISTRICT OF COLUMBIA
529 14th Street NW, Suite 722
Washington, D.C. 20045
Tel: (202) 457-0800
aspitzer@acludc.org
smichelman@acludc.org

David Cole (D.C. Bar # 438355)
600 New Jersey Avenue, N.W.
Washington, D.C. 20001
Tel: (202) 662-9078
cole@law.georgetown.edu

*Counsel for WallBuilder Presentations*

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................................................................... 1

I.     WMATA's Advertising Guidelines ................................................................. 4

II.    WMATA Refuses WallBuilders' Advertisements.......................................... 5

III.   This Court Grants a Preliminary Injunction as to Guideline 9 .................... 8

IV.    WMATA Runs WallBuilders' Original Ads in Obedience to the Preliminary Injunction, But Rejects Additional WallBuilder Ads as Violative of Guideline 12 .......................... 10

V.     WallBuilders' Initial Motion for Summary Judgment.................................. 11

VI.    WMATA's Internal Procedures and Interpretive Aids................................ 12

ARGUMENT ............................................................................................................... 15

I.     The Court Should Reaffirm Its Preliminary Ruling That Guideline 9 is Constitutionally Unreasonable.................................................................... 15

       A.    The Court Should Convert Its Preliminary Injunction Ruling into Summary Judgment and Permanent Injunction for WallBuilders......................... 15

       B.    As This Court Previously Held, WMATA Guideline 9 Fails to Articulate a Sensible Basis for Determining What is Covered by Its Prohibition.................. 15

       C.    The Interpretive Aids Exacerbate Guideline 9's Flaws ......................... 18

             1.    The Interpretive Aids Are Not Authoritative Constructions.................... 18

             2.    The Interpretive Aids Introduce Further Confusion by Leaving Critical Terms Undefined ................................................... 19

             3.    The Interpretive Aids' Illustrative Examples and Exemptions Only Raise More Unanswered Questions....................... 24

       D.    WMATA's Haphazard Implementation of Guideline 9 Confirms that the Guideline Is Not Capable of Reasoned Application ............................ 33

             1.    WMATA's Interpretation and Application of Guideline 9 Has Been Consistently Inconsistent ............................................... 33

             2.    WMATA'S Record Under the Interpretive Aids Is No Better than Before Their Adoption................................................... 40

       E.    Guideline 9 Is Inconsistent with WMATA's Purpose Of Avoiding Community Discord And Protecting Public Safety ................................... 46

II.    Guideline 12 is Also Incapable of Reasoned Application ........................... 49

III.   The Court Should Permanently Enjoin Enforcement ................................. 54

CONCLUSION............................................................................................................. 55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU v. WMATA,*
    303 F. Supp. 3d 11 (D.D.C. 2018) ..........................................................................39

*\*Am. Freedom Def. Initiative v. Suburban Mobility Auth.,*
    978 F.3d 481 (6th Cir. 2020) ........................................................................ *passim*

*\*Am. Freedom Def. Initiative v. WMATA,*
    901 F.3d 356 (D.C. Cir. 2018) ....................................................................22, 33

*Amalgamated Transit Union Loc. 1015 v. Spokane Transit Auth.,*
    929 F.3d 643 (9th Cir. 2019) .................................................................18, 20, 25

*Amoco Prod. Co v. Village of Gambell,*
    480 U.S. 531 (1987) ............................................................................................54

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ............................................................................................15

*\*Archdiocese of Washington v. WMATA,*
    897 F.3d 314 (D.C. Cir. 2018) ..................................................................... *passim*

*\*Ctr. for Investigative Reporting v. Se. Pa. Transp. Auth.,*
    975 F.3d 300 (3d Cir. 2020) ...........................................................................17, 55

*Dobbs v. Jackson Women's Health Org.,*
    597 U.S. 215 (2022) ............................................................................................38

*eBay Inc. v. MercExchange, L.L.C.,*
    547 U.S. 388 (2006) ............................................................................................54

*InterVarsity Christian Fellowship/USA v. Bd. of Govs. of Wayne St. Univ.,*
    534 F. Supp. 3d 785 (E.D. Mich. 2021) .............................................................33

*Kennedy v. Bremerton Sch. Dist.,*
    597 U.S. 507 (2022) ............................................................................................46

*Malcolm v. Reno,*
    129 F. Supp. 2d 13 (D.D.C. 2000) .....................................................................15

*\*Minn. Voters All. v. Mansky,*
    585 U.S. 1 (2018) ...................................................................................... *passim*

*Nat'l Institute of Family & Life Advocates v. Bacerra,*
    585 U.S. 755 (2018).................................................................................38

*\*Northeastern Pa. Freethought Society v. County of Lackawanna Trans. Sys.,*
    938 F.3d 424 (3d Cir. 2019)..............................................................46, 54

*Oviedo v. WMATA,*
    948 F.3d 386 (D.C. Cir. 2020) ...............................................................15

*PDK Labs v. Ashcroft,*
    338 F. Supp. 2d 1 (D.D.C. 2004) ............................................................15

*PETA v. Tabak,*
    109 F.4th 627 (D.C. Cir. 2024) ..................................................... *passim*

*Robinson-Reeder v. Amer. Council on Educ.,*
    571 F.3d 1333 (D.C. Cir. 2009) ..............................................................50

*\*Rosenberger v. Rectors & Visitors of Univ. of Virginia,*
    515 U.S. 819 (1995)................................................................................54

*Va. Bd. of Pharm v. Va. Citizens Consumer Council,*
    425 U.S. 748 (1976)..........................................................................25, 39

*\*White Coat Waste Proj. v. Greater Richmond Transit Co.,*
    35 F. 4th 179 (4th Cir. 2022) ......................................................... *passim*

*\*Young Israel of Tampa, Inc. v. Hillsborough Area Reg'l Trans. Auth.,*
    89 F.4th 1337 (11th Cir. 2024) ...................................................18, 49, 52

*\*Zukerman v. U.S. Postal Serv.,*
    961 F. 3d 431 (D.C. Cir. 2020) ...................................................... *passim*

**Federal Rules**

Fed. R. Civ. P. 54(b) ....................................................................................3, 49

Fed. R. Civ. P. 56(a) .........................................................................................15

**Other Authorities**

B. Snyder, "Phil Knight on the Controversial Kaepernick Ad and Nike's Never-
    Give-Up Attitude," Stanford Business (Feb. 14, 2019) .........................27

S. Cohen, "'For Once, Don't Do It': The Powerful Idea Behind Nike's New Anti-
    Racism Ad," Forbes.com (May 30, 2020) .............................................25

*Principal Authorities Marked With an Asterisk

## INTRODUCTION

The Washington Metropolitan Area Transit Authority's ("WMATA") issue advertising ban, Commercial Advertising Guideline 9 ("Guideline 9"), violates the First Amendment.[1]  This Court preliminarily enjoined WMATA from applying Guideline 9 to Plaintiff WallBuilder Presentations ("WallBuilders"), holding that Guideline 9 "is incapable of reasoned application under *Minn. Voters Alliance v. Mansky*, 585 U.S. 1 (2018)."  ECF 38 at 46 ("PI Op.").  The Court reasoned that Guideline 9's ban on ads "intended to influence members of the public regarding an issue on which there are varying opinions" does not provide "objective and workable standards" for determining which ads are allowed and which are prohibited.  *Id*. at 25.

Nothing that WMATA has done since that order saves Guideline 9 from invalidity.  Quite the contrary.  In response to this Court's preliminary injunction, WMATA published, for the first time, "Interpretive Aids" ostensibly meant to address flaws in Guideline 9 and to guide WMATA's review of proposed advertisements.  But, far from clarifying Guideline 9, WMATA's Interpretive Aids "raise[] more questions than [they] answer[]" and introduce further "line-drawing problems" that even WMATA cannot solve.  *Mansky*, 585 U.S. at 3, 4.  This lack of clarity is compounded by WMATA's continuing, haphazard application of Guideline 9, which demonstrates that WMATA itself cannot consistently say what its own issue ad ban covers.

The Interpretive Aids define the "issues" targeted by Guideline 9 as any "point, matter, or dispute, the decision of which is of special or public importance," including ads that "promote a message" about "substantive ethically, socially, or politically controversial or divisive topics."  The Interpretive Aids do not define any of these "murky" terms, *see id.* at 18, are riddled with

---

[1] Defendant Randy Clarke, the General Manager and CEO of WMATA, is sued here in his official capacity only; thus, WallBuilders refers herein to Defendant as "WMATA."

exceptions that swallow Guideline 9's general prohibition, and rely on terminology (e.g.,

"politically") that *Mansky* found impermissibly indeterminate. *Id.* at 16. WMATA is unable to

explain or apply its definitional provisions with even modest clarity.

Barely a week goes by without WMATA running some new ad that is facially

inconsistent with Guideline 9's prohibition. Since publishing its November 2024 Interpretive

Aids, WMATA has run ads for a book publisher's "Read Queer All Year" campaign (Statement

of Undisputed Facts ("SUF") ¶134); a social action campaign ("Stop the Shuffle") meant to

expose insurance fraud in the drug treatment industry (*Id.* ¶142); an energy company's campaign

adopting a Trump White House slogan ("American Energy Dominance") for U.S. energy policy

(*Id.* ¶129); an abortion provider's ad incorporating its website, which contains blatant abortion

advocacy (*Id.* ¶¶148-151); a defense contractor's ads promoting changes in U.S. defense policy

(e.g., "Rebuild the Arsenal") (*Id.* ¶¶136, 138); ads for *Dianetics*, the foundational text of the

Church of Scientology, which detail that religious organization's practices (*Id.* ¶139); an ad for

PowertothePatients.org, similar to one discussed in this Court's opinion, demanding hospital

accountability under healthcare transparency laws (*Id.* ¶97); and U.S. Customs and Border

Protection's "Be An Agent of Action" ad campaign (*Id.* ¶¶130-132)—just to name a few. These

recent examples add to an already substantial record of Guideline 9's "indeterminate

prohibition," demonstrating that neither Guideline 9 nor its Interpretive Aids "articulate some

sensible basis for distinguishing what may come in from what must stay out." *Mansky*, 585 U.S.

at 4, 16.

Time and again, when given an opportunity to explain whether and why a particular ad

was consistent with Guideline 9, WMATA's marketing manager, a longstanding member of its

advertising review panel, could not say whether they violate Guideline 9 and its Interpretive

Aids. *See* SUF ¶80. Guideline 9's "unmoored" prohibition leaves Guideline 9's meaning and application to the subjective judgments of the review panel—and in many cases, the unguided judgments of its advertising contractor, OUTFRONT Media, Inc. ("Outfront"), alone—on an "ad-by-ad" basis. *See, e.g.*, SUF ¶69. This highly subjective "case-by-case" approach prompted this Court to issue its preliminary injunction in the first place. PI Op. at 29-30. An advertising guideline that relies so heavily on the subjective judgments and "the background knowledge and media consumption" of decisionmakers is unreasonable. *See Mansky*, 585 U.S. at 20-21.

Guideline 9 fails *Mansky's* "reasonableness" standard for additional reasons. WMATA's wildly inconsistent application of Guideline 9 "tend[s] to undermine the very governmental interests that [the Guideline] was meant to advance." *Zukerman v. U.S. Postal Serv.*, 961 F.3d 431, 447 (D.C. Cir. 2020); *see* PI Op. at 23. Equally important, WMATA's use of its ad space to display *its own* controversial messages and those of partner governmental agencies fatally undercuts its justification for limiting similar private speech. WMATA wraps its trains with messages celebrating Pride Month (SUF ¶133), partners with private organizations to exhort the public to wear masks to fight COVID (*Id.* ¶128), and extols the virtues of "Car Free Days" to fight climate change (*Id.* ¶93), using the same space on which it prohibits private speech on the same issues. But WMATA's own messages give rise to the same concerns that prompted Guideline 9's ban and reinforce the conclusion that its issue ban is not reasonably related to WMATA's stated purposes.

WallBuilders also asks this Court to declare unconstitutional WMATA's religious ad ban, Guideline 12 (Complaint, Count VI). This Court previously dismissed that claim, but the Court may reconsider that non-final decision at any time before final judgment. Fed. R. Civ. P. 54(b). It should do so here because Guideline 12 is also incapable of reasoned application. WMATA

cannot reasonably explain how Guideline 12, which prohibits ads promoting or opposing religious beliefs and practices, allowed WMATA to run Catholic University's ad declaring "God is Our Light" (SUF ¶117) or a *Dianetics* ad inviting riders to order a Church of Scientology "how-to kit" (*Id.* ¶139). It is also not "immediately obvious" how WMATA could okay *WallBuilders*' "Christian?" ads under Guideline 12, as it did, PI Op. at 43, yet reject similar WallBuilders' ads containing quotes from the nation's founders as too religious. WMATA's new Interpretive Aids, issued after this Court's earlier decision, compound the problem, explicitly exempting many categories of religious speech from its ban and raising questions about Guideline 12's uncertain prohibition that the Court did not previously consider.

This Court should grant WallBuilders summary judgment as to Guidelines 9 and 12, declare that the Guidelines violate the First Amendment, and enjoin their enforcement.

## BACKGROUND

### I.    WMATA's Advertising Guidelines

WMATA derives substantial operating revenue, budgeted to exceed $17 million in 2025, from selling advertising space on and in buses and subway cars and in rail stations. *See* SUF ¶1. According to WMATA, this "[a]dvertising is a significant and growing component of Metro's (non-farebox) commercial revenues . . . These funds support operational expenses and help Metro stay within the legally mandated 3 percent annual subsidy growth rate." *See id.*

WMATA allows a wide variety of advertising, but it prohibits certain advertisements based on its concerns about community discord, discrimination, and public safety. *Id.* ¶10. Its decisions about whether to approve particular advertisements are governed by its Guidelines Governing Commercial Advertising, as revised in 2015 ("Guidelines"). *Id.* ¶¶2-3. Two such Guidelines are challenged here. First, WMATA's Guideline 9 prohibits any advertisement

"intended to influence members of the public regarding an issue on which there are varying opinions." *Id.* ¶13.  Second, Guideline 12 prohibits "[a]dvertisements that promote or oppose any religion, religious practice or belief." *Id.* ¶14.  WMATA's Guidelines are interpreted and applied by a three-member "advertisement review panel" made up of "one person from the Marketing department and two attorneys from the Legal Department." *Id.* ¶7; Metro Internal Procedures and Interpretive Aids for Reviewing Proposed Commercial Advertising (Nov. 1, 2024) ("Interpretive Aids"), Nicol Ex. 4 at 1 (preamble); ECF 49-1, Ex. 1.

A third-party contractor, Outfront, administers WMATA's ad sales.  SUF ¶3.  Outfront has the authority to accept an ad without input from WMATA.  *Id.* ¶¶4-5.  It is supposed to refer ads that it believes may violate the Guidelines to WMATA's review panel.  *Id*. ¶4.  But Outfront does not, in many cases, submit ads to WMATA's review panel where those ads potentially implicate the Guidelines.  *Id.* ¶6.

## II.    WMATA Refuses WallBuilders' Advertisements

Plaintiff WallBuilders is a 501(c)(3) non-profit organization dedicated to presenting the forgotten spiritual history of America's founding heroes.  *Id.* ¶17.  Following the example of the prophet Nehemiah, WallBuilders seeks to rebuild the moral foundations of our nation by highlighting the country's historical legacy.  *Id.* ¶18.  WallBuilders believes that historical education exerts a positive influence on public policy by fostering a Biblical worldview and encouraging Christians to engage in the civic arena.  *Id.* ¶¶17-19.  In WallBuilders' view, an integral part of educating the public about early American history is identifying the vital role that faith, especially Christian faith, played in the nation's founding.  *Id.*

To accomplish its goals, WallBuilders has engaged in various public awareness and advertising campaigns.  *See id.* ¶18.  WallBuilders' website is one of its primary tools to educate

the public. *Id.* ¶19. On the site, WallBuilders provides an online library of resources, including videos, podcasts, free articles, and quotations from American historical figures. *Id.*

At the end of 2022, WallBuilders began efforts to rebrand and relaunch its website. It planned to roll it out alongside an ad campaign beginning in June 2023. *Id.* ¶20. WallBuilders targeted the Washington, D.C. metropolitan area to launch its campaign because of the region's unique audience. *Id.* ¶37. It chose to advertise with WMATA because of the high visibility of WMATA advertising throughout the metro area—to its riders and others. *Id.*

WallBuilders designed more than a dozen ads meant to showcase the views of our nation's founders and historical leaders on the role of faith in American culture and government. *Id.* ¶¶21-22. A number of ads featured faith-based quotes from American founders and other historical figures, such as an ad featuring a quote from Benjamin Rush, a signer of the Declaration of Independence, stating that "The Bible Contains More Knowledge Necessary to Man In His Present State than Any Other Book in the World." *Id.* ¶27.

WallBuilders designed comparable ads featuring quotes from John Adams, Sam Adams, William Penn, George Washington, and later Presidents Teddy Roosevelt, Franklin D. Roosevelt and Dwight D. Eisenhower. *See id.* ¶¶28-35. Each ad invited viewers to learn more about WallBuilders and "how Christianity [or the Bible] influenced our nation's Founders [or Leaders]" by visiting its website, WallBuilders.com. *See id.* The ads also contained an embedded QR code for WallBuilders' website containing similar quotes from historical figures. *See id.* WallBuilders did not include these ads in its initial tranche submitted to WMATA because of concerns with Guideline 12's prohibition (*id.* ¶36) but "still plans to run some or all of those ads if WMATA's Guideline 12 is invalidated." *Id.* ¶26; *see also* ECF 38 at 44 n.15.

To launch its WMATA campaign, WallBuilders submitted a pair of ads featuring famous scenes from the nation's early history.  SUF ¶23.  The first ad featured Henry Brueckner's late-1800s painting of George Washington kneeling to pray at Valley Forge.[2]  Id. ¶¶23, 25.  The second shows Howard Chandler Christy's 1940 painting of the signing of the United States Constitution at Independence Hall, which currently hangs in the U.S. Capitol.[3]  Id.  On each ad,



WallBuilders added its logo in the top left corner and a QR code leading to its relaunched website in a bottom corner.  Id. ¶¶24-25.  Both ads superimposed the text: "CHRISTIAN?  TO FIND OUT ABOUT THE FAITH OF OUR FOUNDERS, GO TO WALLBUILDERS.COM."  Id.

In May 2023, WallBuilders contacted Outfront to purchase ad space for these two ads. Id. ¶38.  Outfront forwarded the ads to WMATA's review panel, which rejected the ads under Guideline 9, WMATA's issue ad ban.  Id. ¶¶42, 44-45.  Despite their overt religious content, WMATA's review panel found that the submitted ads did not violate Guideline 12 (id. ¶¶44-45), though it did not communicate that decision to WallBuilders at the time.  Id. ¶45.  In a June 2023 letter to WMATA, WallBuilders requested clarification of the ads' rejection, noting that

---

[2] See Henry Brueckner, *The Prayer at Valley Forge*, as engraved by John C. McRae (1889), https://www.loc.gov/pictures/item/96521655/.

[3] See Howard Chandler Christy, *The Signing of the Constitution* (1940), https://www.aoc.gov/explore-capitol-campus/art/signing-constitution.

WMATA's Guideline 9 was vague and effectively excluded all religious speech. *Id.* ¶46. WMATA did not respond. *Id.* ¶47.

WallBuilders went back to the drawing board. *Id.* ¶48. Without the benefit of further WMATA guidance, WallBuilders sought to redesign its ads to satisfy WMATA's Guideline 9. *Id.* Guessing that the word "CHRISTIAN?" was the controversial "issue" that caused the rejection, WallBuilders redesigned the ads to keep the two images but cut nearly all of the text. *Id.* ¶49, 52. The revised ads, as submitted to WMATA in September 2023, contained the original images with only WallBuilders' logo, the QR code linking to its website, and the text "VISIT WALLBUILDERS.COM" in the bottom right corner. *Id.* WMATA again rejected both revised ads under Guideline 9. *Id.* ¶¶50-51, 54.

WMATA did not identify either the "issue" that caused rejection of the stripped-down advertisements or whether WMATA rejected the ads on the basis of the ad itself, the cited website, or both. *See id.* ¶55. Outfront suggested that the ads might pass muster with the website address and QR code removed. *Id.* ¶53. WallBuilders declined to remove them, however, because doing so would have negated any possible promotional and educational benefit WallBuilders sought by running its ads. *Id.*

## III.    This Court Grants a Preliminary Injunction as to Guideline 9

WallBuilders filed its Complaint on December 12, 2023, seeking declaratory and injunctive relief against enforcement of Guidelines 9 and 12. WallBuilders challenged both Guidelines under the First Amendment because a) they were unreasonable in that they failed to clearly delineate what was prohibited and what was allowed by their bans and b) they were not viewpoint neutral. WallBuilders challenged Guideline 9's issue ad ban as unconstitutional both on its face and as applied. WallBuilders brought a facial challenge to Guideline 12, alleging that "the very existence of Guideline 12 chills WallBuilders' right to express its religious viewpoint

on issues critical to its educational mission, especially as that speech relates to the history of the founding of the United States." ECF 1 ¶126. WallBuilders moved for a preliminary injunction against enforcement of Guidelines 9 and 12. WMATA opposed WallBuilders' motion and moved to dismiss.

In an order dated May 21, 2024, this Court granted WallBuilders' request for a preliminary injunction against enforcement of Guideline 9's "issue ad" ban, concluding that Guideline 9 "does not provide objective, workable standards" and is not "capable of reasoned" application under *Mansky*. PI Op. at 22-35. "[N]othing in Guideline 9's text answers basic questions about its reach, and the 'indeterminate scope' of Guideline 9 is not 'clarif[ied]' or 'saved' by any official guidance." *Id*. at 29 (quoting *Mansky*, 585 U.S. at 18). The Court concluded the facial flaws in Guideline 9's text are borne out by "a plethora of examples" in the record demonstrating WMATA's inconsistent application. *Id.* at 32. Though reviewing each of WallBuilders' many examples, the Court highlighted three of the ads as "sufficient" to illustrate the problems with Guideline 9. *Id.* at 32-35 (Plan B, D.C. Health Covid Vaccine, and Power to the Patients). While WMATA has "considerable discretion in evaluating the intent and purpose of an ad," this discretion "must be coupled with objective, workable standards." *Id.* at 35.

Turning to Guideline 12, the Court rejected WMATA's standing challenge, concluding that WallBuilders had adequately demonstrated an imminent threat of injury through both its submitted ads and ads that it had designed but withheld based on concerns about Guideline 12. *Id.* at 42-43; *id.* at 44 n.15. In so holding, the Court cast doubt on WMATA's assertion "that 'promoting [a] view of the role of Christianity in American history in support of its belief that Christian faith should have a role in government' is 'quite different from promotion of a religion,

religious practice or belief,'" reasoning that "this 'differen[ce]' is not immediately obvious, particularly without further explanation by WMATA." *Id.* at 43.

However, the Court held that WallBuilders' challenges to Guideline 12 "are foreclosed" by *Archdiocese of Washington v. WMATA*, 897 F.3d 314 (D.C. Cir. 2018). *Id.* at 44. The court declined WallBuilders' invitation to revisit the reasonableness of Guideline 12 but acknowledged that the record before it was "significantly more fulsome" than in *Archdiocese of Washington*. *Id.* at 45-46. The Court dismissed the counts of the Complaint challenging Guideline 12 (Counts V and VI) and denied the request for a preliminary injunction as to those counts as moot in light of the dismissal. *Id.*

## IV.    WMATA Runs WallBuilders' Original Ads in Obedience to the Preliminary Injunction, But Rejects Additional WallBuilder Ads as Violative of Guideline 12

After this Court's preliminary injunction, WallBuilders paid the appropriate fees and WMATA ran the original two "Christian?" ads on WMATA buses in the summer of 2024. *See* SUF ¶57. They continued to appear on WMATA buses for months after the contract period ended in July 2024. *Id.*

On July 2, 2024, in light of WMATA's determination that WallBuilders' "Christian?" ads did not violate Guideline 12, WallBuilders submitted to WMATA four of the ads containing quotes from historical leaders that it had previously withheld. *See id.* ¶58. One such ad contained a quote from William Penn, stating, "Those people who are not governed by God will be ruled by tyrants," and states at the bottom



of the ad, "For more information on how Christianity influenced our nation's Founders, go to

WALLBUILDERS.COM or find us on social media." *See id.* ¶¶31, 58.  The other ads had

similar content and purpose:  to educate the public on the views of the founders on the

importance of faith and on the role of faith in our country's founding and history.  *Id.* ¶58.  At

the time, WMATA was enjoined from relying on Guideline 9; it nevertheless rejected all four

ads based on Guideline 12.  *Id.* ¶59.  WMATA has never explained why these ads violated

Guideline 12 when the original ads did not, especially given its position in this litigation "that

'promoting [a] view of the role of Christianity in American history in support of its belief that

Christian faith should have a role in government' is 'quite different from promotion of a religion,

religious practice or belief.'"  PI Op. at 43.

## V.    WallBuilders' Initial Motion for Summary Judgment

WallBuilders moved for summary judgment in June 2024, seeking permanent declaratory

and injunctive relief against enforcement of Guideline 9 and Guideline 12.  In opposing that

motion, WMATA published, for the first time, Internal Procedures and Interpretive Aids,

purportedly to aid the review panel and Outfront in applying the Guidelines.  *See* SUF ¶60.  In

response, WallBuilders moved for discovery regarding WMATA's application of its Guidelines

and Interpretive Aids.  The Court granted the discovery motion and denied the pending motion

for summary judgment as moot, subject to refiling.  Dec. 17, 2024 Minute Order.  The parties

then conducted written and deposition discovery, including both an individual deposition of

Georgetta Nicol, WMATA's marketing manager and a longstanding member of WMATA's

advertising review panel (*see* SUF ¶16), and a 30(b)(6) deposition in which Ms. Nicol testified on behalf of WMATA.[4]

## VI.    WMATA's Internal Procedures and Interpretive Aids

Prior to this lawsuit, WMATA provided no guidance regarding the interpretation of its Guidelines, leaving that interpretation and application entirely to WMATA's review panel and Outfront on a case-by-case basis.  SUF ¶60.  In November 2024, in response to WallBuilders' initial motion for summary judgment, WMATA published its Internal Procedures and Interpretive Aids in an effort to "help WMATA's advertisement review panel . . . apply the Guidelines to all advertisements submitted for review by its third-party advertising vendor."  *Id.* Those Interpretive Aids were drafted entirely by counsel for WMATA, with an eye to pending litigation challenging the Guidelines, including this case.  *Id.* ¶61.  They were not reviewed by WMATA's Board and are subject to change without notice at any time.  *Id.*

The Interpretive Aids require WMATA's review panel to "review past advertisements that have been considered by the Panel to familiarize themselves with how the Guidelines have been applied in the past."  *Id.* ¶63.  Ms. Nicol confirmed that the Interpretive Aids did not change existing advertising practices.  *Id.* ¶62.

The Interpretive Aids require the panel members to review any website linked to a proposed advertisement.  *Id.* ¶64.  The panel is instructed to review the page linked to the ad, the website's homepage, any page directly accessible from either of those pages, and any page linked from one of the foregoing pages.  *Id.*

---

[4] For the sake of completeness of the record and to provide the full context of her testimony, WallBuilders submits herein the entirety of Ms. Nicol's deposition transcripts.  *See* Attachments 3 (Nicol Deposition Tr.) and 4 (Nicol 30(b)(6) Deposition Tr.).

With respect to Guideline 9, the Interpretive Aids define an "issue on which there are varying opinions" as "a point, matter, or dispute, the decision of which is of special or public importance." *Id.* ¶65.  Ads that include such issues "generally promote a message to the public about substantive ethically, socially, or politically controversial or divisive topics." *Id.*  The Interpretive Aids do not define any of those critical terms.  *See id.* ¶¶66, 69.  Instead, WMATA's review panel determines and applies their own meaning "on an ad-by-ad basis." *Id.* ¶¶67-69.

The Interpretive Aids then list categories of ads meant to be "illustrat[ive]" of prohibited issue ads. *Id.* ¶74.  These include ads supporting, opposing, or promoting a political party, an officeholder or candidate for office, a ballot measure or proposed measure, a law, ordinance, regulation or policy (or proposal for any of them), a constitutional amendment or proposed amendment, a governmental investigation or proposed investigation, or any other governmental action or inaction, "other than offering goods and/or services to the government."  Interpretive Aids §§ IV.G.3.a-g.  But they go well beyond those election-related and government-oriented ads to prohibit, among other things, ads "[s]upporting, opposing or promoting a policy or policies of a business or nonprofit entity other than encouraging or promoting the purchase or use of goods or services of the advertiser," *id.* § IV.G.3.j; ads "[d]escribing or promoting a view of the role that any particular group (including groups characterized by their race, religion, ethnicity, nation origin, sexual orientation, disability status, marital status, age, or ideology) has played or should play in any government, society, or country," *id.* § IV.G.3.l; and ads "[s]upporting, opposing, or promoting a rally, protest, march, demonstration, or other similar event that includes any content that would otherwise be prohibited by the Guidelines," *id.* § IV.G.3.n.

Without providing any explanation or grounding in the Guideline, the Interpretive Aids declare that Guideline 9 *does not* prohibit certain categories of advertisements that otherwise address "issues." *See* Interpretive Aids § IV.G. WMATA does not prohibit:

- ads "for a newspaper, magazine, other publication, TV program, film, theatrical performance, concert, podcast, or other media solely because the medium's content addresses political issues or contains political messages, so long as the advertisement does not otherwise violate the Guidelines," *id.* § IV.G.4,

- ads for employment, "solely because the employer's missions, policies, practices or tactics are the subject of 'varying opinions,'" *id.* § IV.G.5,

- ads "that encourage or promote the purchase or use of goods or services because others may be opposed to their purchase or use, so long as the advertisement does not otherwise violate the Guidelines," *id.* § IV.G.6, or even

- ads "that promote medical services that may be the subject of public debate and controversy (for example, but not limited to, abortion, pregnancy care, gender-affirming medical treatment, in-vitro fertilization, vaccines, etc.) if the advertisement is limited to describing the services available, so long as the advertisement does not otherwise violate the Guidelines." *Id.* § IV.G.7.

The Interpretive Aids also address Guideline 12. SUF ¶78. Again without grounding its position in any actual language of the Guideline, WMATA explains that Guideline 12 does not prohibit (a) ads "for a newspaper, magazine, other publication, TV program, film, theatrical performance, concert, podcast, product, or other media solely because the medium's content addresses religion, religious practices, or religious beliefs or contains religious messages," and (b) ads "for an institution solely because of its affiliation with a religion or because it displays a religious, institutional logo, slogan, phrase, symbol, or any other word(s) or image(s)." *Id.* Similarly, an ad for an educational institution is not prohibited solely because it refers to its mission or describes itself using general terms that do not refer to a specific issue, including that it is "guided by religious tenets." *Id.*

14

**ARGUMENT**

**I.    The Court Should Reaffirm Its Preliminary Ruling That Guideline 9 is Constitutionally Unreasonable**

**A.    The Court Should Convert Its Preliminary Injunction Ruling into Summary Judgment and Permanent Injunction for WallBuilders**

This Court has already made a legal determination that Guideline 9 violates the First Amendment. Though reached in the context of a preliminary injunction, that decision is not couched in tentative terms: "Guideline 9 is incapable of reasoned application." ECF 38 at 46. The evidence adduced in discovery only strengthens and reinforces that decision.

Summary judgment should be granted where the evidence before the Court shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Oviedo v. WMATA*, 948 F.3d 386, 392 (D.C. Cir. 2020). Summary judgment is "especially appropriate" where, as here, the nonmoving party "fails to adduce new evidence suggesting that the court should revisit its grant of a preliminary injunction." *PDK Labs v. Ashcroft*, 338 F. Supp. 2d 1, 6 (D.D.C. 2004); *see also Malcolm v. Reno*, 129 F. Supp. 2d 13, 13 (D.D.C. 2000) (granting summary judgment where defendant cannot "effectively challenge[] the findings supporting the . . . preliminary injunction or the reasons for it").

**B.    As This Court Previously Held, WMATA Guideline 9 Fails to Articulate a Sensible Basis for Determining What is Covered by Its Prohibition**

This Court's preliminary injunction opinion held that Guideline 9 lacks "objective, workable standards" and is "incapable of reasoned application" for the same reasons that the Supreme Court invalidated Minnesota's political apparel ban in *Mansky*, 585 U.S. at 21-23. PI Op. at 25, 46. To satisfy *Mansky*'s "reasonableness" standard, WMATA "must be able to

15

articulate some sensible basis for distinguishing what may come in from what must stay out"
under Guideline 9. *Mansky*, 585 U.S. at 16; *see also Zukerman*, 961 F.3d at 447.

     *Mansky* invalidated a Minnesota law prohibiting the wearing of any "political" badges or
apparel at voting places. 585 U.S. at 16. The Court concluded that the regulation failed to draw
a reasonable line because its "unmoored use" of the term "political" was not capable of reasoned
application. *Id*. Because the term "admits of such capacious readings, a blanket prohibition on
'political' apparel has an 'indeterminate scope.'" *Zukerman*, 961 F.3d at 448 (invalidating the
U.S. Postal Service's ban on "political" custom stamps). This "open-ended" and undefined term
permitted decisionmakers to apply their "own politics" in determining what was impermissible
"political" apparel. *Mansky*, 585 U.S. at 21-22. *Mansky* found support for that conclusion in
Minnesota's "haphazard interpretations" in applying the ban. *Id.* at 16-17.

     As this Court held, Guideline 9 is "as vague, if not more so, than the ban on 'political'
apparel in *Mansky*." ECF 38 at 25. "Nothing in the text of Guideline 9, which offers no
definitions for any of its 'unmoored' terms, provides any, much less objective and workable,
standards." *Id.* This Court reached that conclusion for several reasons. First, Guideline 9's
principal term—"issue"—has "a range of meanings with expansive reach—so much so that even
dictionary definitions, rather than aid, only raise more questions than they answer." *Id.*; *see also
Mansky*, 585 U.S. at 18 ("What qualifies as an 'issue'?"); ECF 20-1("Pl.'s Corrected PI Br.") at
17, 19-20; ECF 29 ("Pl.'s PI Reply Br.") at 3-4. Second, these problems of imprecision are
"further augmented by Guideline 9's use of the ill-defined phrase 'varying opinions.'" PI Op. at
26; *see* Pl.'s Corrected PI Br. at 17-18; Pl.'s PI Reply Br. at 4-5. Dictionary definitions of the
term "and Guideline 9 itself, fail to address basic parameters, such as how many people must
have differing opinions and how significant must the differences be to qualify as 'varying

opinions'?"  PI Op. at 25-27; *see* Pl.'s Corrected PI Br. at 17-18; Pl.'s PI Reply Br. at 4-5.  Third, the Court noted that "[v]irtually anything can constitute an 'issue' on which opinions vary—from Yankees versus Red Sox to the correct pronunciation of 'tomato.'"  PI Op. at 26 (quoting *White Coat Waste Proj. v. Wash. Metro. Area Transit Auth.*, 710 F. Supp. 3d 15, 32 (D.D.C. 2024)); *see also Am. Freedom Def. Initiative v. Suburban Mobility Auth.*, 978 F.3d 481, 497 (6th Cir. 2020) ("There are plenty of nonpolitical issues on which members of society disagree.")).

In short, "nothing in Guideline 9's text answers basic questions about its reach, and the 'indeterminate scope' of Guideline 9 is not 'clarif[ied]' or 'saved' by any official guidance."  PI Op. at 29.  The result is that "[e]nforcement of Guideline 9 is thus left to individual reviewers to determine, on a case-by-case basis, what constitutes an '[a]dvertisement intended to influence' and what constitutes 'an issue on which there are varying opinions.'"  *Id.* at 29-30.  This, too, runs afoul of *Mansky*, as such determinations "'require[] a government decision-maker to maintain a mental index' of all the issues on which varying opinions exist—which, in turn, requires the decisionmaker to know not only the issues on which opinions differ, but also the precise degree to which opinions differ—an enterprise that the D.C. Circuit has said is 'not reasonable.'"  *Id.* at 30 (citing *Zukerman*, 961 F.3d at 450).

The Court "join[ed] the many courts that have rejected similar phrases as constitutionally suspect."  *Id.* at 30-31.  Indeed, *every court of appeals* to consider similar transit advertising bans after *Mansky* has invalidated them.  *See Ctr. for Investigative Reporting v. Se. Pa. Transp. Auth.*, 975 F.3d 300, 316 (3d Cir. 2020) (invalidating ban on ads that contain "political messages" or address "political issues"); *White Coat Waste Proj. v. Greater Richmond Transit Co.*, 35 F. 4th 179, 199-200 (4th Cir. 2022) (invalidating ban on "political ads" in order to prevent "discussion of public issues"); *Suburban Mobility Auth.*, 978 F.3d at 495-96 (invalidating ban on "political"

ads); *see also Amalgamated Transit Union Loc. 1015 v. Spokane Transit Auth.*, 929 F.3d 643, 648 (9th Cir. 2019) (invalidating ban on "public issue" advertising); *cf. Young Israel of Tampa, Inc. v. Hillsborough Area Reg'l Trans. Auth.*, 89 F.4th 1337, 1348-49 (11th Cir. 2024) (invalidating ban on ads "that primarily promote a religious faith or religious organization").

As discussed below, this Court's preliminary injunction decision is reinforced by an even more robust summary judgment record. WallBuilders is entitled to permanent relief for the same reason the Court previously determined—Guideline 9 fails constitutional scrutiny under *Manksy*.

## C.    The Interpretive Aids Exacerbate Guideline 9's Flaws

In response to this Court's observation that "Guideline 9 is not 'clarif[ied]' or 'saved' by any official guidance," ECF 38 at 29, WMATA published its Interpretive Aids in the hopes of rescuing Guideline 9 from constitutional demise. But the Interpretive Aids fail that mission for two reasons. First, the Interpretive Aids are not an "authoritative construction" of the Guideline that a court should consider under *Mansky*. *See* 585 U.S. at 17-18 (quoting *Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 131 (1992)). Second, even if they were, they only exacerbate the constitutional shortcomings of Guideline 9.

### 1.    The Interpretive Aids Are Not Authoritative Constructions

The Interpretive Aids are not sufficiently authoritative to be considered under *Mansky*. *See id.* They were not adopted pursuant to any formal WMATA process. SUF ¶61. They were not reviewed by WMATA's Board of Governors, which "is responsible for establishing policies of the Washington Metropolitan Area Transit Authority." *Id.* They were not promulgated pursuant to any legal authority that would make them binding on WMATA or Outfront. *Id.* ¶62. They were not meant to change WMATA's past practices (*id.*) and are subject to change at any time "without notice." *Id.* ¶61. They are, in short, just "an internal work product; like, internal

work document," meant to informally guide the panel's deliberations.  *See id.* ¶62.  They were

wholly the creation of WMATA's legal counsel in response to this and other litigation.  *Id.* ¶61

(WMATA's counsel "took into consideration the litigation challenging certain of WMATA's

Guidelines," including this case, in drafting Interpretive Aids).  But WMATA's effort to

memorialize its as-yet unsuccessful litigation position in something more official sounding than a

legal brief does not amount to "authoritative" guidance.

### 2.    The Interpretive Aids Introduce Further Confusion by Leaving Critical Terms Undefined

But even considering the Interpretive Aids for whatever they're worth, they only confirm

that Guideline 9 lacks "objective, workable standards."  PI Op. at 35.  Responding to this Court's

(and Chief Judge Boasberg's) observation that Guideline 9's "issue" ban is so broad that it could

encompass advertisements addressing the Red Sox-Yankees rivalry,[5] the Interpretive Aids state

that "[a]n 'issue on which there are varying opinions' does not mean any topic on which people

might disagree."  Interpretive Aids § IV.G.2.  In what seems to be an effort to take the sting out

of Chief Judge Boasberg's example, the Interpretive Aids announce, without any textual basis or

explanation, that an ad "for a sports team does not involve an 'issue on which there are varying

opinions' merely because some people support other teams."  *Id.*  The Interpretive Aids thus seek

to draw a line somewhere short of the entire universe of disputed issues.  But exactly (or even

approximately) where that line lies is anyone's guess.  *See PETA v. Tabak*, 109 F.4th 627, 636

(D.C. Cir. 2024) (government must "draw a reasonable line," . . . informed by 'objective,

workable standards'") (citations omitted).

---

[5] *See* ECF 38 at 26 (citing *White Coat Waste Proj. v. Wash. Metro. Area Transit*, 710 F. Supp. 3d 15, 32 (D.D.C. 2024)).

1.     The main problem stems from WMATA's new attempt to define a covered "issue," which is not much different from its prior litigation efforts to do so. *See* ECF 23-1 at 20 (offering various dictionary definitions). WMATA borrows one of Dictionary.com's open-ended definitions in an effort to draw a line somewhere short of the vast universe of possible, publicly disputed issues. "Issue" is thus defined as a "point, matter, or dispute, the decision of which is of *special* or *public* importance." SUF ¶65 (emphasis added).[6] Like the other dictionary definitions previously relied upon by WMATA, this new definition does nothing to limit Guideline 9's capacious reach. As this Court reasoned with respect to available dictionary definitions, these vague terms "rather than aid, only raise more questions than they answer." PI Op. at 25.

For instance, what makes a matter of "special . . . importance," and to whom must it be of special importance? *Id.* at 25-26. To more than a few Red Sox fans, the century-old rivalry with the Bronx Bombers easily fits that definition, yet WMATA declares by fiat that this passionate dispute falls outside of Guideline 9's prohibition. *See Suburban Mobility Auth*., 978 F.3d at 497 ("During fall in the Midwest, there is perhaps no bigger point of contention in Ohio and Michigan than the Ohio State-Michigan football game."). Similarly, the proffered definition does not explain what it means to be an issue of "public importance." *See Spokane Transit Auth.*, 929 F.3d at 654 (expressing skepticism that a "'public issue' [advertising ban] would survive a facial challenge"). How public must an issue be to be of "public" importance? Must it have reached the pages of *The New York Times*, or would the pages of *The Bi-College News* do?

Ms. Nicol, WMATA's marketing director and a longtime member of its review panel, offered her view that "special or public importance" required there to be a "polarizing discussion

---

[6] Dictionary.com alternatively defines "Issue" broadly as "a point in question or a matter that is in dispute, as between contending parties in an action at law." Dictionary.com, "Issue," Def. 5.

or discourse around [an issue] on—online or, you know, something that you could easily find when searching." SUF ¶68. She suggested that the panel looked for "lack of a better word – [at] the volatility or how substantive [the discourse around an issue] is." *Id.* Testifying as a corporate representative, Ms. Nicol later explained that the phrase "special or public importance" "means that if something . . . has, generally speaking, some sort of importance to the public, then that is an issue that we would consider." *Id.* If an ad's message is "controversial or divisive" in the view of the WMATA review panel, it satisfies this threshold. *Id.*

WMATA has not offered any additional guidance to answer the many questions that its "issue" definition raises. *See id.* ¶66. Absent clearer and more definitive lines, WMATA's review necessarily devolves into a subjective inquiry by the review panel of how "hot" an issue is, based on the panel member's own varying "background knowledge and media consumption" and understanding of the myriad controversies that have "some sort of importance" to the American public. *See Mansky*, 585 U.S. at 20-21; *Suburban Mobility*, 978 F.3d at 495 ("lack of clarity" from officials responsible for reviewing advertising supported invalidity of political ad ban). What makes a discussion of an issue "polarizing," "volatile" or "controversial?" How much research must the review panel do in deciding whether a "public issue" exists? The more diligent the panel's review is, the more likely that differing opinions will be found. Ms. Nicol suggests a relatively shallow dive into any public controversies (i.e., those that "you could easily find" (SUF ¶68)), leaving issues that garner less notorious debate—at least less notorious to Outfront's reviewers or (if it gets that far) to three WMATA employees—free to be advertised. As this Court has observed, this sort of line drawing "veers dangerously into viewpoint discrimination by accepting ads expressing the significant majority-held position, as to which the opposition may be discounted as merely fringe." PI Op. at 34 n.11.

21

2.    Interpretive Aids § IV.G.2 then opens a whole new definitional front, explaining that issues of special or public importance "generally promote a message to the public about substantive ethically, socially or politically controversial or divisive topics." SUF ¶65. This introduces a raft of additional undefined terms. *See Tabak*, 109 F.4th at 637 (faulting NIH for "fail[ing] to provide any definition" of its prohibition on "off-topic" comments on its website, either "in its Comment Guidelines, to its social media moderators, or even in this litigation").

For one, it incorporates the same "unmoored" term ("politically") that led the Supreme Court to invalidate Minnesota's "political" apparel ban. *See Mansky*, 585 U.S. at 16. Such an "ill-defined term 'political' cannot provide the 'objective workable standards' that *Mansky* requires." *Zukerman*, 961 F.3d at 449; *see also AFDI v. Washington Metropolitan Area Transit Authority*, 901 F.3d 356, 371 (D.C. Cir. 2018) (the problem in *Mansky* was that the "statute did not define the term 'political,' which in the Court's view was simply too broad"). Yet in its attempt to clarify, WMATA *introduces* this unbounded term, prompting only greater uncertainty.

The Interpretive Aids' definitional provision goes even further, introducing a number of other open-ended, undefined terms—"substantive," "ethically," "socially," "controversial or divisive." SUF ¶65. As Ms. Nicol conceded, "[t]here is not a set . . . definition [for any of these terms] when we are reviewing the advertisement." *Id.* ¶69 (review panel does not have definition for "ethically, socially, or politically," "[o]utside of whatever's in these guidelines and these aids"). Instead, the review panel discusses the meaning and applicability of these terms "on an ad-by-ad basis." *Id.* Ms. Nicol also testified that the review panel took into consideration other *unwritten* considerations, such as "placement, location, kind of ad, size of ad," and "how

big the buy is, where it's being placed." *Id.* ¶70[7]  But it was this same "case-by-case" approach

that prompted this Court to preliminarily enjoin Guideline 9 as inherently unreasonable.  PI Op.

at 29-30; *see also Tabak*, 109 F.4th at 637 (off-topic social media post ban unconstitutional

where ban's undefined terms left moderators to "use their 'experience'"); *Suburban Mobility*,

978 F.3d at 497 (transit ad ban unreasonable where "officials have had to apply the ban on the

fly on a "case-by-case basis").

　　　　3.　　　As in *Mansky*, WMATA's effort to cabin Guideline 9's prohibition "raises more

questions than it answers."  *Mansky*, 585 U.S. at 4.  Among the many other questions that arise:

- What makes an issue "substantive?"  Ms. Nicol offered her view that an issue is
  substantive if there are "a good amount of people who are aware of it."  SUF ¶71
  ("Substantive means things that are generally known; in this particular instance, things
  that are highly controversial – I'm not going to say highly –  controversial or divisive in
  nature that are known by the public.").  The review panel seems to conflate substance and
  notoriety.

- Is there a threshold for the number of people who must hold contrary opinions before an
  issue will be deemed "controversial" or "divisive"?   Must it be controversial locally,
  regionally, or nationally?  Is there a specific threshold for the "public"?  Ms. Nicol could
  not say.  *Id.* ¶72 ("I can't quantify, but I would just say, like, a normal – like, generally
  speaking."); *id.* ("public" refers to a "general amount.  There is no set number").

- The reference to "social" controversies is as boundless as the varied social tastes of
  Americans.  Given that breadth, why is a sports rivalry not a "socially" controversial
  issue?  And how about an ad congratulating Travis Kelce and Taylor Swift on their
  impending nuptials?  Would WMATA view such an ad as "non-substantive," given the
  amount of ink that has been spilled in covering the engagement?

- Whose ethics are applicable in making determination about "ethical" controversies?  The
  review panel's?  Ms. Nicol offered an example of an "ethical issue" (assisted suicide) but
  admitted there was no set definition that governs review panel deliberations.  *See id.* ¶73.
  Her own unwritten definition, provided as part of WMATA's 30(b)(6) deposition, was as
  vague as it was capacious—"what people believe are right or wrong or people's morals or
  things of that nature."  *Id.*

---

[7]  SUF ¶70 ("A advertiser may purchase an ad for a specific station, right.  And if that ad were
placed at a different station, it would have a different connotation than at that station."); *id.*
("Advertisements that are intended to influence public policy are prohibited, and so some
placements are indicative of public policy intentions.").

### 3. The Interpretive Aids' Illustrative Examples and Exemptions Only Raise More Unanswered Questions

WMATA seeks clarity from this muddle in a list of examples (found in Interpretive Aid IV.G.3) that purport to "illustrate[]" the political, ethical, and social issues prohibited under Guideline 9. *Id.* ¶74. But these examples and their many exclusions only compound the uncertainty and imprecision of Guideline 9.

1. At times, the Interpretive Aids' examples simply repeat the same undefined terminology that they are meant to illustrate. Thus, for instance, an ad may not support, oppose, or promote an "ethical, social, or humanitarian cause, mission, call to action, awareness campaign, position statement, or other similar effort," again without any further definitions of "ethical, social or humanitarian" or any of these other terms. *Id.* ¶75. When asked how she would define those terms in context, Ms. Nicol ultimately stated that "I don't know how to fully answer this one. How do we determine? I mean we would do research." *Id.* ("It means what it says. It's very clear. What's—what's not clear about it."). This definitional void invites further inconsistency in Guideline 9's application.

2. Next, the Interpretive Aids' approach to advertisements for goods and services is woefully inconsistent. Earlier in this case, WMATA interpreted Guideline 9 to allow *all* such advertisements, whether they include issues or not, because they promote the sale of goods or services. *See* ECF 23-1 at 15 (arguing that "commercial advertising does not express a broader view" on issues). This Court rejected that universal approach as unsupported by Guideline 9: "WMATA's suggestion that all ads that seek to sell a product or service cannot trigger Guideline 9 is not obvious from, or even implied by, the text of Guideline 9." PI Op. at 32.

WMATA now pivots in its Interpretive Aids, but its attempt to clarify only raises more questions. Interpretive Aids § IV.G.6 provides that an ad promoting the sale of goods or services

is *not prohibited* simply because "others may be opposed to their purchase or use, so long as the advertisement does not otherwise violate the Guidelines." Interpretive Aids § IV.G.6. But it is unclear what "otherwise violate the Guidelines" means.

Does an ad "otherwise violate the Guidelines" if it raises a political, social, or ethical issue? After all, "[e]ven an individual advertisement, though entirely 'commercial,' may be of general public interest." *Va. Bd. of Pharm v. Va. Citizens Consumer Council*, 425 U.S. 748, 764 (1976). Thus, even a McDonalds ad might "otherwise" violate the Guidelines. *See White Coat Waste Proj. v. Greater Richmond Trans.*, 35 F.4th 179, 200 (4th Cir. 2022) (asking whether "Eat at McDonald's" ad expresses viewpoint on eating meat). As this Court explained, "commercial ads intended to influence consumers to purchase a particular good or service may provoke 'varying opinions' among viewers on the issue of whether to do so, and may, either expressly or implicitly, invoke issues of public debate." ECF 38 at 26-27; *see also Spokane Trans. Auth.*, 929 F.3d at 654 ("[F]or most every good or service, there is some level of debate.").[8]

Sometimes an ad for the sale of goods or services leans into a "public" controversy for commercial purposes and states or implies the advertiser's position on a disputed issue. Take, for instance, Nike's well publicized "For Once, Don't Do It" ad campaign, meant to endorse anti-racism in the aftermath of George Floyd's death.[9] How would Guideline 9 apply in those instances? There, the Interpretive Aids offer only conflict and confusion.

---

[8] *See also, e.g.*, *Mansky,* 585 U.S. at 20 (noting Ben & Jerry's has "stated positions on matters of public concern"); *Zukerman*, 961 F.3d at 450 (citing, e.g., a "Nike campaign featuring Colin Kaepernick"); *Suburban Mobility Auth.*, 978 F.3d at 496 (asking whether Nike's ad featuring a kneeling Colin Kaepernick with the caption "Believe in something. Even if it means sacrificing everything" would be covered by a "political" ban); Pl.'s Corrected PI Br. at 18; Pl.'s PI Reply Br. at 13-16.

[9] *See* S. Cohen, "'For Once, Don't Do It': The Powerful Idea Behind Nike's New Anti-Racism Ad," Forbes.com (May 30, 2020), https://www.forbes.com/sites/sethcohen/2020/05/30/for-once-dont-do-it---the-powerful-idea-behind-nikes-new-anti-racism-ad/.

Seemingly reversing course from WMATA's prior litigation position—although the Guidelines have not changed—Interpretive Aids § IV.B suggests that those ads would be prohibited: "An advertisement that otherwise violates the Guidelines is prohibited *even if it also encourages or promotes the purchase of goods or services*." *Id.* § IV.B (emphasis added). Thus, an ad cannot "support[], oppos[e], or promot[e] a policy or policies of a business or nonprofit entity other than encouraging or promoting the purchase of goods or services of the advertiser." *Id.* § IV.G.3.j. Applying these Interpretive Aids at face value, Nike would seemingly be out of luck in seeking a WMATA bus ad.

But, in the same breath, the Interpretive Aids *explicitly permit* ads "[s]upporting, opposing, or promoting an ethical, social, or humanitarian cause, mission, call to action, awareness campaign, position statement, or other similar effort," as long as such blatant issue advocacy is "solely for a commercial purpose." *Id.* § IV.G.3.p; SUF ¶76. The Interpretive Aids also permit using logos, slogans, symbols, or other words "that are otherwise prohibited by the Guidelines," as long they are used "solely for a commercial purpose." Interpretive Aids § IV.G.3.o. In neither instance do the Interpretive Aids explain what "solely for a commercial purpose" means or offer any "textual hook" for these exceptions. *See* PI Op. at 27. Is it enough that Nike is taking controversial positions on a hot-button public issues for the commercial purpose of selling more sneakers? Nike's campaign arguably promotes a "social" cause (anti-racism) "solely for a commercial purpose." *See* SUF ¶76 (stating that "Black Lives Matter would be something that might be considered a social cause"). Nike's co-founder Phil Knight embraces controversy on issues like race because it helps sell product: "It doesn't matter how

many people hate your brand as long as enough people love it."[10]  And if Interpretive Aids §
IV.G.3.o allows such explicit "issue ads" for a commercial purpose, what does Interpretive Aids
§ IV.B mean when it says that ads for the sale of goods are prohibited if they otherwise violate
the Guidelines?

Neither the Guidelines nor the Interpretive Aids provide a clear answer—or even an
unclear answer.  WMATA cannot explain the apparent conflict between these Interpretive
Aids—which both explicitly *prohibit* ads promoting a business's policies other than encouraging
the sale of goods or services (§ IV.G.3.j) and explicitly *permit* express issue advocacy when
offered "solely for a commercial purpose."  (§§ IV.G.3.o-p).  To borrow from King Mongkut of
Siam, "it is a puzzlement."  R. Rodgers & O. Hammerstein, *The King And I*.

3.    The contradictions do not end there.  The Interpretive Aids also *exempt* offers of
"goods and/or services to the government" from their interpretation prohibiting ads
"[s]upporting, opposing, or promoting a governmental action or inaction."  SUF ¶77.  Plainly, an
offer of goods or services to the government—such as a defense contractor's ad lobbying for
Congress to approve a particular weapons system—can (and often does) raise "issues" that are
the subject of heated public debate.  When asked why these ads are exempted from the ban on
issue advocacy, Ms. Nicol explained only that "those ads are commercial in nature."  *Id.*  But,
apart from being a significant source of WMATA revenue, what gives government contractors a
free pass where other commercial advertisements addressing issues—even the very same
issues—are prohibited?  And as discussed below, WMATA seems to apply this exemption as a

---

[10] *See* B. Snyder, "Phil Knight on the Controversial Kaepernick Ad and Nike's Never-Give-Up
Attitude," Stanford Business (Feb. 14, 2019) (addressing Nike's Colin Kaepernick ad
controversy), https://www.gsb.stanford.edu/insights/phil-knight-controversial-kaepernick-ad-
nikes-never-give-attitude.

blank check to defense contractors to address prominent issues of national defense policy.  *See, infra* at 44-45 (discussing Anduril ads).

4.      Similarly, WMATA allows employment ads notwithstanding the controversial issues that an employer's "mission, policies, practices or tactics" may raise.  Interpretive Aids § IV.G.5.  As these ads illustrate, the "employment" exception effectively opens the door to otherwise prohibited issue advertising.

- WMATA has recently run employment ads that directly address controversial issues or practices.  A November 2025 recruiting ad for Institute for Justice (*see* SUF ¶146), a libertarian legal organization, invites applicants to "Defend the Constitution" and directs viewers to Institute for Justice's website, which contains on the landing page (IJ.org/apply) an "Issues" link describing the organization's position on all manner of legal issues:  "IJ's work targets the core freedoms that form the foundation of a free society: the rights to own and enjoy property, speak freely, earn a living, and have a meaningful choice in your children's education."  *Id.* ¶147.

- Similarly, WMATA is currently running a campaign for U.S. Customs and Border Protection, calling on the public to "Be An Agent of Action."  *See* SUF ¶130; *see also id.* ¶131.  Multiple Reddit threads are currently devoted to complaining about or defending this ad campaign, with one online commentor declaring: "They really want that bus vandalized."  *See id.* ¶132.

5.      The Interpretive Aids similarly take contradictory approaches to the underlying *content* to which an ad refers.  *See Suburban Mobility*, 978 F.3d at 481 (citing inconsistencies in approach to underlying content of ads as a ground for unreasonableness of political ad ban).  The Interpretive Aids *require* the review panel to consider underlying content in some circumstances and require the panel to disregard that content in other circumstances.

With respect to referenced websites, for instance, the Interpretive Aids require consideration of website content to determine whether that content "would violate the Guidelines

if it appeared on the face of the advertisement." Interpretive Aids § III.B.4.[11] Similarly, the Interpretive Aids require the panel to consider the proposed content of certain *events*, prohibiting advertisements "[s]upporting, opposing, or promoting a rally, protest, march, demonstration, or other similar event *that includes any content that would otherwise be prohibited by the Guidelines.*" *Id.* § IV.G.3.n (emphasis added). WMATA's Interpretive Aids would seemingly prohibit an advertisement for a "political" "ethical" or "social" gathering even if the ad does not explicitly reference the intended content of the event.

Yet when a theatrical performance, a book or magazine article, or similar media explicitly promotes a view on the same issue, the ad is not disqualified "solely because the medium's content addresses political issues or contains political messages." *Id.* § IV.G.6. This conflicting guidance suggests that an ad for a television simulcast of a "rally, protest, march" ("Tune in to watch the March for Life!") might be allowed while an ad simply inviting people to attend the "rally, protest, march" ("Join us at the March for Life!") would not. WMATA does not offer any explanation why some categories of content addressing the very same kind of political issues are prohibited, while others are categorically not. And the text of Guideline 9 itself provides no foundation for such a distinction.

---

[11] As discussed, *infra* at 50-51, WMATA's inconsistent approach to website review often leads to it approving ads that reference content otherwise prohibited by Guideline 9, such as ads for Communitiesinschools.org and freethefacts.org, both organizations with websites that discuss and take positions on controversial federal legislative issues. *See, e.g.*, SUF ¶114 (approved Communities in Schools ad, containing link to its website, which contains discussion of organization's policy and legislative priorities) and *id.* ¶116 (discussing https://www.communitiesinschools.org/policy-priorities/); *id.* ¶114 (Free the Facts ad containing link to its website, freethefacts.org), *id.* ¶113 (discussing https://www.freefacts.org/policy-library/social-security/questions-for-solutions), and *id.* (discussing policy solutions for numerous issues, for example, including Social Security insolvency: "Social Security's solvency isn't determined by party or ideology. It's determined by simple math - revenue in, benefits out.").

6.       WMATA's marketing director was repeatedly unable to identify, from a simple review of its Guidelines and Interpretive Aids, when particular ads would be allowed or prohibited.  When presented with numerous examples of actual or hypothetical ads—many of which had been approved by WMATA or Outfront despite overt issue advocacy—Ms. Nicol was "unable to make a determination" as to whether such ads would be "in or out" under the Guidelines.  *See* SUF ¶80.  She was unable, for instance, to apply Guideline 9 to Anduril's "Rebuild the Arsenal" ad (discussed, *infra* at 44-45), Catholic University's "God Is My Light" ad (discussed, *infra* at 51-52) or the Plan B "Not an abortion pill" ad (discussed, *infra* at 35), among many other examples of actual ads run on Metro ad space.  *See id.* ¶80 (providing a dozen additional examples where Ms. Nicol unable to make an "in or out" determination).

WMATA explained that the reason Ms. Nicol could not address the applicability of the Guideline to any particular advertisement is that *WMATA itself* does not know how its Guidelines would apply without referring a particular advertisement to its review panel.  *See* SUF ¶79.  As Ms. Nicol explained, the review panel collectively decides the meaning of the many undefined terms in the Guidelines and Interpretive Aids in reviewing each ad.  *See, e.g., id.* ¶67.  But absent clear guidance, this approach surrenders WMATA's interpretation and application of Guideline 9 to the review panel's highly subjective sense of which ads are palatable.  *See Mansky*, 585 U.S. at 22 (without objective standards, "an election judge's own politics may shape his views on what counts as 'political'").[12]

---

[12] The Guidelines also rely on a review panel's potentially limited knowledge of any particular "issue."  Ms. Nicol explained that having a three-member panel helps because "everyone's not going to be well-versed or have the knowledge about what to research," SUF ¶81; thus, "there have been instances where one or two of us may not have known about something, and so we're able to add insight and then have further deliberation to make a determination."  *Id.*  But relying on the limited knowledge of three individual panel members about the vast array of potential

This "subjective enforcement of an 'indeterminate prohibition' increases the 'opportunity for abuse' in its application." *Suburban Mobility*, 978 F.3d at 497; *see also Mansky*, 585 U.S. at 21. That problem of subjective enforcement is not cured by requiring the agreement of two review panel members, rather than a single decisionmaker. *See* SUF ¶67 (decisions made by vote of two out of three panel members). The risk of uncertain application flows from the ambiguities in the Guidelines and Interpretive Aids themselves, and whether an ad can be approved or denied by a single decisionmaker or two of three panel members, those ambiguities increase the potential for subjective enforcement. *Cf. Suburban Mobility*, 978 F.3d at 486 (invalidating issue ad ban in light of uneven application, even where designated reviewer regularly sought "input from others at SMART, including its lawyers and ultimately its general manager"). In any event, as this Court observed, the composition of the review panel is wholly irrelevant in the many instances when Outfront does not even forward a problematic ad for review. PI Op. at 33-34 n.10.

6. Finally, the Interpretive Aids' many unexplained exceptions to and exclusions from Guideline 9's issue ad ban fatally undermine WMATA's objectives in adopting the ban. These many exceptions are Trojan Horses through which blatant issue advocacy—on issues as divisive as abortion—finds its way onto Metro Buses and other ad spaces. The Interpretive Aids categorically exclude from the ban certain ads that may otherwise address controversial issues— such as ads that sell books and theater tickets for performance that promote particular issues (§ IV.G.4), promote job opportunities for organizations whose missions or tactics "are the subject of 'varying opinions'" (§ IV.G.5) or "medical services that may be the subject of public

---

"issue[s] on which there are varying opinions" leads to many controversial issues slipping through the porous filter of Guideline 9, as the record here amply demonstrates.

debate and controversy," (§ IV.G.6), or include otherwise prohibited content "solely for a commercial purpose" (§§ IV.G.3.o-p)—without any apparent justification.  *See id.*

Where, as here, the government excludes certain otherwise problematic speech from its content prohibition (thus permitting the speech), that categorical exclusion must reasonably fit the government's purpose in adopting the ban.  *See Tabak*, 109 F.4th at 636-37.  In *Tabak*, the D.C. Circuit invalidated the National Institute of Health's ban on "off-topic" social media comments under *Mansky* where NIH categorically deemed as "off-topic" users' posts about animal testing, even though it admitted they were often "on topic."  *See id.*  Because the categorical ban on animal testing posts swept in a substantial number of "on topic" comments, the ban could not be justified by NIH's interest in encouraging respectful dialogue in response to its posts.  *Id.*  "To say that comments related to animal testing are categorically off-topic when a significant portion of NIH's posts are about research conducted on animals defies common sense."  *Id.* at 637.  NIH's categorical approach failed to draw a "reasonable line."  *Id.* at 636.

This case involves categorical *exclusions* to WMATA's broader issue ad ban, but the same logic applies.  The Interpretive Aids' many exceptions open the floodgates to controversial issues finding their way onto WMATA ad space, seriously undermining WMATA's concern that issue ads lead to rider discomfort, vandalism, and property damage.  The Interpretive Aids categorically *permit* ads that plainly address controversial issues (such as Carafem's abortion advocacy, a publisher's "Read Queer" advocacy, and recruitment for the Border Patrol), explicitly blessing certain messages that "are otherwise prohibited by the Guidelines."  *See, e.g.*, Interpretive Aids §§ IV.G.3.o-p; *see also*, *infra*, § IV.D.2 (discussing examples).  As in *Tabak*, the Interpretive Aids' arbitrary, unexplained exemptions "def[y] common sense," failing to draw a "sensible" line in light of the government's interests.  109 F.4th at 636-37; *see also InterVarsity*

*Christian Fellowship/USA v. Bd. of Govs. of Wayne St. Univ.*, 534 F. Supp. 3d 785, 821 (E.D. Mich. 2021) (university's organization non-discrimination policy failed First Amendment reasonableness analysis where it was "inconsistent and arbitrary" and "riddled with exceptions" that allowed discrimination by some organizations); *id.* at 817 n.6.

In short, the Interpretive Aids compound Guideline 9's infirmities, confirming WMATA is hopelessly adrift in identifying what is in and what is out. *See Mansky*, 585 U.S. at 16.

### D.    WMATA's Haphazard Implementation of Guideline 9 Confirms that the Guideline Is Not Capable of Reasoned Application

#### 1.    WMATA's Interpretation and Application of Guideline 9 Has Been Consistently Inconsistent

"[A] challenged regulation may be unreasonable, regardless of the reasons for its adoption, if it is inconsistently enforced." *Archdiocese of Washington*, 897 F.3d at 330. According to WMATA, Guideline 9 was intended to "close[] WMATA's commercial advertising space to all issue-oriented advertising on a permanent basis." SUF ¶11. But experience shows that the ad space remains open for a wide but capricious range of issue advertising. After concluding that the text of Guideline 9 offers no limiting principle, this Court's preliminary injunction order thus turned to WMATA's *application* of the Guideline, which would "certainly [contain] information as to whether it is capable of reasoned application." PI Op. at 31 (citing *Am. Freedom Def. Initiative v. WMATA*, 901 F.3d 356, 373 (D.C. Cir. 2018) ("*AFDI*")). The Court concluded that "WMATA's application of Guideline 9 has been far from consistent, with a history of regularly publishing ads that could fairly be described as advocating for an 'issue on which there are varying opinions.'" *Id.* at 31-32.

The Court cited a "plethora of examples" of WMATA's erratic application. *Id.* at 32; *see* Pl.'s Corrected PI Br. at 22-30; Pl.'s PI Reply Br. at 8-13. But it concluded that three examples were "sufficient" to demonstrate WMATA's unmoored approach to Guideline 9. *Id.* at 32-35;

33

*see also* SUF ¶¶ 89, 95, 98.  Each of those ads, and more recent issue ads run after adoption of the Interpretive Aids, reinforce the hopelessly unmoored nature of Guideline 9.  And the repeated nature of these inconsistencies makes clear that "WMATA's 'difficulties with its restriction go beyond close calls on borderline or fanciful cases.'"  PI Op. at 35 (citation omitted).

1.    The three ads highlighted by the Court—a Plan B contraception ad (SUF ¶89), DC Public Health's Covid Vaccine ad (*Id.* ¶98), and Power to the Patients' ad "advocating for lower and more transparent hospital pricing," (*Id.* ¶95)—more than adequately support the Court's conclusion that Guideline 9 is incapable of reasoned application.

For instance, WMATA ran advertisements for "Plan B" contraception, despite the fact that "some members of society do not approve of the use of contraception . . . much less the ready availability of contraception over the counter and delivered to consumers the 'same[]day.'" PI Op. at 32.  WMATA sought to close that door in its Interpretive Aids, announcing that Guideline 9 does not prohibit advertisements for a product or service just "because others may be opposed to their purchase or use, so long as the advertisement does not otherwise violate the Guidelines."  Interpretive Aids § IV.G.6.  Why that is so, WMATA still does not explain.

But even if it could, the Interpretive Aids do not justify WMATA's decision to run Plan

B ads that explicitly take a position on a disputed

"issue."  WMATA's review panel approved one

such ad containing claims that Plan B was "not an

abortion pill."  *Compare* SUF ¶90.  That statement

is disputed by the U.S. Conference of Catholic

Bishops, which has published commentary stating

that "[t]he secret best kept from the American

public is that these drugs can cause abortions."  *Id.*



Similarly, this Court relied on an ad for Power to the Patients that pictured the rapper Fat

Joe with a statement that "We ~~Need~~ Demand Hospital Prices" and a link to the organization's

website, which "advocates for 'real prices and transparency in healthcare.'"  PI Op. at 34.  The

Court found it difficult to understand why this ad was permitted in light of Guideline 9's

prohibition, as "[t]he proper degree of hospital price transparency and the appropriate regulatory

solution are plainly issues on which members of the public have varying opinions."  *Id.*

The Power to the Patients ad is a microcosm of WMATA's erratic approach to issue

ads—arbitrarily accepting and rejecting ads even from the same advertiser on the same issue

without any explanation.  At the same time WMATA was running the "Fat Joe" ads at its metro

stations, it *rejected* another Power to the Patients' ad featuring Fat Joe and five other rappers,

stating "Demand Real Prices in Health Care . . . . WE NEED REAL PRICES.  NOT 'estimates'

Not 'percentages' Not 'averages,'" and including the same web address as the approved ad.  *See*

SUF ¶96.  Two nearly identical ads led to two different responses by WMATA.

Even after this Court pointed to the "Fat Joe" ad as an example of WMATA's erratic approach to issue ads—and after WMATA rejected the "WE NEED REAL PRICES" ad by the same organization—WMATA accepted and ran a *third* ad from Power to the Patients *on the same issue*. *Id.* ¶97. This one also criticizes the health care industry for failing to comply with federal law, stating: "Can you find hospital prices? The law says that hospitals must post their prices. But most ignore the law . . . . Join Our Healthcare Revolution. Hold Hospitals Accountable." *Id.* This ad ran in the summer of 2025, after the adoption of the Interpretive Aids, which purported to prohibit ads "supporting, opposing, or promoting a law, ordinance, regulation, or policy," Interpretive Aids § IV.G.3.d, and ads "supporting, opposing, or promoting a policy or policies of a business or nonprofit entity." *Id.* § IV.G.3.j. Despite its apparent inconsistency with Guideline 9 and its Interpretive Aids, the ad ran in WMATA rail stations.[13]



WMATA's vacillation on the Power to the Patients ads is incomprehensible. WMATA rejected the second Power to the Patients ad (SUF ¶96) because "it was definitely trying to influence members of the public on the healthcare industry and perceived . . . lack of transparency in healthcare practices." *Id.* But WMATA accepted the first "Fat Joe" ad (SUF

---

[13] WMATA has rejected ads by *other* organizations addressing health care pricing transparency and fairness, all the while giving special access to Power to the Patients on the issue. *See* SUF ¶120 (Arnold Ventures ad calling for "fair and transparent" healthcare pricing) and SUF ¶99 (Blue Cross ad discussing "fair and reasonable" healthcare pricing).

¶95), which this Court previously suggested was inconsistent with Guideline 9, because it "provided a more informational tone in their messaging to the customers to understand more about the healthcare industry versus implying something about the healthcare industry." *Id.* It found no controversial issues presented by the ad despite Fat Joe's claim about hospitals and insurance companies: "They're robbing us!" *Id.* WMATA remarkably concluded that the third Power to the Patients ad (*Id.* ¶97)—which states "Join Our Healthcare Revolution. Hold Hospitals Accountable"—does not "promote[] a certain viewpoint," but merely "provid[es] information to the customers about healthcare industry pricing." *Id.* WMATA's wildly inconsistent approach to three different ads by the same advertiser on the same issue starkly illustrates the indefensibly arbitrary nature of Guideline 9 and its Interpretive Aids.

2.      This Court also cited a local Planned Parenthood ad inviting the public to "ask about" its "Gender Affirming Care" and "Sexual Reproductive Health Care," *i.e.*, abortion services, as an example of an issue ad that WMATA permitted notwithstanding Guideline 9's ban. *See id.* ¶103. The Court suggested Planned Parenthood's ad arguably promoted commercially available health care services *while also* promoting divisive public issues like abortion and "gender affirming care." PI Op. at 27. Indeed, the Planned Parenthood ad invited viewers to visit its website, which explicitly advocated its position on the highly divisive issue of abortion and condemned the Supreme Court's overturning of *Roe. See* ECF 34 at 2-3; SUF ¶¶103-106.

Yet even WMATA's approach to Planned Parenthood ads is inconsistent. Around the same time, WMATA *rejected* a virtually identical Planned Parenthood ad, which differs only in the URL listed on the advertisement. *Compare* SUF ¶103 (approved PPMDC ad) *with id.* ¶107 (rejected PPMDC ad). Both incorporated URLs ultimately ended up in the same place and

contained the same information.  The ad that was accepted by WMATA contained links on its landing page (www.PrimaryCarePP.org) to the very same pages contained on the website (PPMetroDC.org) for the Planned Parenthood ad that WMATA rejected.  *Id.* ¶109.  Apart from different landing pages, the ads and the incorporated websites were identical and contained identical express advocacy on abortion—yet WMATA reached a different result for the two ads.

More recently, a December 2025 advertisement for Carafem, another nonprofit abortion provider, displays a photo with the text:  "This is a carefem abortion clinic," and includes a link to carafem.org's website, which is chock full of abortion advocacy.  *Id.* ¶148.  To take one of many examples:



"During a time when some policy makers are working to place increasingly restrictive laws that aim to put abortion out of reach, many are concerned about their rights as well as their access to abortion and reproductive health care.  carafem is speaking out about the importance of people being allowed to decide what's best for them when it comes to their medical care."  *See id.* ¶151.

The Supreme Court has repeatedly acknowledged the highly divisive nature of the abortion debate, observing that "[a]bortion presents a profound moral issue on which Americans hold sharply conflicting views."  *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 223 (2022); *Nat'l Institute of Family & Life Advocates v. Bacerra*, 585 U.S. 755, 769 (2018) ("abortion [is] anything but an 'uncontroversial' topic").  As the Supreme Court itself has

recognized, advertisements for abortion services can be "entirely 'commercial'" and still raise issues of "general public interest" on which opinions inevitably differ. *Va. Bd. of Pharm.*, 425 U.S. at 764. It would be difficult to imagine an ad that touches on a more hot-button social issue.

       3.       The undisputed record here is rife with other examples of WMATA's inconsistent application of Guideline 9. *See generally* SUF ¶¶82-154. WMATA permitted the AARP's "Get out the Vote" and voter education ads aimed at making sure elderly voters voted and knew the positions of the organization, yet it rejected a Hispanic interest group's similar ad exhorting its members to vote *in the same election cycle*. *Compare id.* ¶111 *with id.* ¶119. Ms. Nicol explained that the AARP ad—which states "Voters 50+ Our Voices Decide," and invites riders to "learn where the candidates stand on issues important to you" on AARP's website (*id.* ¶111)—merely "provides information on how to vote and when and where but not instructing individuals to vote." *Id.* But WMATA rejected a similar interest group's voting ad, depicting a Hispanic family's Dia De Los Muertos display and stating: "Honoring our past by voting for our future," (*Id.* ¶119) because "this one's instructing individuals to vote." *Id.* That distinction is not apparent from an objective review of the ads.

       Similarly, while some ads for controversial films, books and other media are allowed by WMATA, others are prohibited. *See ACLU v. WMATA*, 303 F. Supp. 3d 11 (D.D.C. 2018) (discussing WMATA's rejection of an ad for Milo Yiannopoulos's book). In some cases, WMATA reached contradictory results for related ads for the same film or performance. For instance, WMATA reached different results for two different ads for the same documentary film, "The Bibi Files." *See* SUF ¶124.[14] That WMATA reached different results for two ads for the

---

[14] Ms. Nicol explained that one ad was permitted because it was an ad for a film, while the second ad was rejected because "without connecting it to the fact that it's a movie and that

same film based only on the inclusion of additional promotional language in the first further illustrates the arbitrary nature of Guideline 9. *See also Id.* ¶¶112-115 (showing WMATA running Freethefacts.org ad virtually identical to one that it had previously rejected as inconsistent with Guideline 9).

### 2. WMATA'S Record Under the Interpretive Aids Is No Better than Before Their Adoption

Since WMATA's publication of the Interpretive Aids, WMATA has continued to run ads addressing issues on which the public may hold varying opinions. The Interpretive Aids did not solve those inconsistencies; it multiplied them.

1. In 2025 alone, WMATA has run ads that advocate on a wide range of issues on which the public may have varying opinions. For instance, during Pride Month (June 2025), WMATA ran an ad for Penguin Books that read "Read Queer All Year" and highlighted several LGBTQ books. *Id.* ¶134. The publisher's website (linked by QR code) reads: "June is Pride Month, but we're reading queer all year." *Id.* ¶135. WMATA briefly reversed course and pulled this ad when WallBuilders raised questions through counsel. But after further panel review, the ad was reinstated. *Id.* ¶134.



---

people should go and see it and the commercial aspects of it, it takes away that—the commercial aspects of it and instead lends itself to the message of a very polarizing and controversial topic." SUF ¶124. Both ads advertise the same film by its title—the only difference was that the first ad contained the phrase "A film by Alexis Bloom" and a film credit block, while the second did not. Ms. Nicol testified that the second ad for the same film, "is not promoting the purchase or use of goods or services," and is a prohibited issue ad. *Id.*

These sorts of inconsistent decisions are not "mistakes," but are the inevitable result of confusion created by WMATA's incomprehensible ground rules. The Interpretive Aids' instruction that an ad for a publication is not prohibited "solely because the medium's content addresses political issues or contains political messages," also provides that the ad must not "otherwise violate the Guidelines." Interpretive Aids § IV.G.4. At the same time, Interpretive Aids § IV.G.3.1 prohibits ads "[d]escribing or promoting a view of the role that any particular group (including groups characterized by their . . . sexual orientation . . .) played or should play in any government, society, or country." Ms. Nicol struggled to reconcile these interpretive rules, explaining that the ad was ultimately approved because it was "a statement—it's saying to read something. That's not a varying opinion. It's a marketing copy to say read something. It's not an opinion." SUF ¶134. But an admonition that WMATA's customers "Read Queer All Year" goes beyond seeking to sell any particular books and highlights the importance of the "queer" community in American life while also as using divisive terminology to describe a certain group of people—both issues that plainly invite varying opinions.

2.      In the late summer of 2025, WMATA ran bus ads for "Stop the Shuffle" (*see id.* ¶142), an "impact campaign" built around the documentary film "Shuffle," and "aimed at sparking a nationwide dialogue on recovery—building awareness, fostering empathy, and



driving change in the addiction treatment field." *See id.* ¶143. The website displayed on the ad (Stoptheshuffle.com) explains that "Shuffle" is a "process by which clients are cycled through a rinse-and-repeat

style of addiction 'treatment' for maximum profit.  It's insurance fraud and can generate up to one million dollars a year per person in insurance reimbursements." *Id.*  The website goes well beyond discussing the film and includes the campaign's statement of "Political Advocacy: Promote and support policy changes at the state level in collaboration with NGO's . . . . Create awareness and *dialog with political opposition*." *Id.* (emphasis added).  The organization thus concedes that the campaign's goal is to address a political issue on which people can and do disagree.  Yet Outfront, acting on authority conferred by WMATA, approved it without review by WMATA's review panel. *Id.* ¶142.

3.    In defending its approach to the Power to the Patients ads discussed above, WMATA previously sought to distinguish between ads that seek to educate viewers on their rights under existing law and those that seek to encourage them to change the law, a distinction this Court rejected as inconsistent with Guideline 9.  *See* PI Op. at 35.  The Interpretive Aids now appear to prohibit both categories of ads, stating that Guideline 9 prohibits ads "[s]upporting, opposing *or promoting* a law, ordinance, regulation or policy or proposed law, ordinance, regulation or policy."  Interpretive Aids § IV.G.3.d (emphasis added).

WMATA's review panel nonetheless continues to take inconsistent positions on whether and when ads "promote" (itself an undefined term) such laws, as evidenced by its erratic approaches to Power to the Patients' ads.  *See supra* at 35-37.  The panel has similarly approved ads that promote federal housing discrimination laws, including a National Community Reinvestment Coalition ad stating, "STOP HOUSING DISCRIMINATION."  SUF ¶94; *see also id.* ¶118 (HUD/National Fair Housing Alliance ads declaring "Home Appraisals Should Be Based on Property. Not People.").  Ms. Nicol claimed this ad did not "promote" federal law:  "If the law that this ad is informing customers about prohibits housing discrimination, that's not

supporting or promoting—that's what the law is or the policy is that's listed here.  It's not a promotion of that policy.  It's saying what the policy is."  *Id.* ¶94.  Ms. Nicol's nonsensical explanation reveals the ambiguity inherent in Interpretive Aids' use of "supporting, opposing or promoting a law."

        4.        Finally, one of the key problems with open-ended bans on "political," "social" or "ethical" issues is that they require the decisionmaker to maintain a "mental index" of all the countless "political," "social" or "ethical" issues on which the public may hold varying opinions. *See Mansky*, 585 U.S. at 19; *see also* PI Op. at 30.  Such a rule, requiring the reviewers to have an infinite command of the myriad "issues" that be contained in an ad, "is not reasonable." *Mansky*, 585 U.S. at 19.  Other examples show that disputed issues frequently slip through WMATA's porous screening process simply because the review panel (or Outfront acting on behalf of WMATA) may not be sufficiently educated on the underlying controversy.

        For example, NextEra Energy recently ran an ad in Metro stations with the slogan "American Energy Dominance."  SUF ¶129.  To the uninformed, that ad may have seemed like a relatively issue-free ad for an energy company.  But when viewed against President Trump's February 2025 executive order declaring, "[i]t shall be the policy of my Administration to make America energy dominant" and establishing a "National Energy Dominance Council," *id.*, it is readily apparent that the ad sought to reinforce the President's policy preferences and to show that the sponsor was aligned with that policy.



Similarly, the Interpretive Aids permit government contractors to offer goods and services to the government, no matter how controversial the products they offer (e.g., weapons systems) may be. Interpretive Aids § IV.G.3.g. A defense contractor recently took advantage of

 

this porous exception to cleverly promote its views on national defense policy on WMATA ad space. Throughout 2025, Anduril Industries has run a series of ads showing nothing more than the company logo and slogans addressing U.S. defense policy, like "Rebuild the Arsenal" (SUF ¶136), and "Command the Sea Command the World." (*Id.* ¶138). Anduril's "Rebuild the Arsenal" ad was part of a broader campaign to call for more robust defense spending to modernize the nation's defense industrial base and workforce—a point its officials contemporaneously made in just those terms in testimony to Congress.[15] "Command the Sea Command the World" paraphrases Sir Walter Raleigh's famous view of the need for a strong navy to control the world.[16] Lacking a cavernous mental index, the ad reviewers may have

---

[15] "America and our allies need to rebuild the arsenal of democracy, and that is achievable, but only if we adopt a fundamentally new approach to how we define, design, and produce military power." SUF ¶137.

[16] "Whosoever commands the sea commands the trade; whosoever commands the trade of the world commands the riches of the world, and consequently the world itself." Raleigh, *A Discourse of the Invention of Ships, Anchors, Compass, etc.* (1650).

missed these points entirely, although it would hardly be difficult for an informed person to realize that the ads were pushing a political point of view about national defense policy. The Anduril ads illustrate the impossibility of policing the many issues that can easily slip through WMATA's permissive filters by virtue of inventive or obscure ad copy. WMATA's issue ad ban unreasonably rewards those advertisers who can cleverly disguise their issues from WMATA's review panel and its advertising agent, Outfront, which in many cases (including the Anduril Industry ads discussed above) fails even to spot the issue for further panel review. *See id.* ¶6.

That Outfront approves many problematic ads without WMATA's review is no defense to "the concern that Guideline 9 is incapable of reasoned application." PI Op. at 33; SUF ¶5. WMATA delegates the authority to Outfront to conduct initial review of submitted ads "for compliance with the Guidelines." Interpretive Aids § II.A. Outfront is also "authorized" by WMATA "to run advertisements that it deems are in compliance with the Commercial Advertising Guidelines." SUF ¶5. As this Court reasoned, Outfront's determination that an ad is consistent with the Guidelines "does not make it so." PI Op. at 33.[17] Outfront's inability to reliably determine that an ad merits further review by WMATA's review panel confirms Guideline 9's lack of clarity.

The many examples discussed above (and those previously considered by this Court) demonstrate that Guideline 9 and its Interpretive Aids are not simply poorly drafted or

---

[17] WMATA exercises little oversight over its contractor. Apart from the Guidelines and Interpretive Aids, WMATA provides no other guidance or training to Outfront and has no regularized process for determining whether Outfront properly applies the Guidelines—it reviews Outfront's approvals only when particular ads are "flagged" for its attention. SUF ¶6. Ms. Nicol, WMATA's 30(b)(6) witness, did not know what processes Outfront employed to determine Guideline compliance. *Id.*

occasionally misapplied.  They are instead *incapable* of reasoned application within the meaning of *Manksy*.  Guideline 9 is unconstitutional on its face.

E.    **Guideline 9 Is Inconsistent with WMATA's Purpose Of Avoiding Community Discord And Protecting Public Safety**

Guideline 9 is also unreasonable because it is not "consistent with the government's legitimate interest in maintaining the property for its dedicated use." *Zukerman*, 961 F.3d at 447.  Guideline 9 is inconsistent with WMATA's stated purpose in limiting its advertising space—to avoid community discord, protect WMATA property, and promote public safety.  SUF ¶10.

At the outset, "avoiding community discord" and otherwise upsetting listeners is not a sufficient justification for limiting protected speech under the First Amendment, as it would grant a "heckler's veto" to those who disagree with the message.  *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 n.8 (2022) ("Nor under our Constitution does protected speech or religious exercise readily give way to a 'heckler's veto.'").  A policy that simply assumes certain categories of speech will provoke community discord and endanger public safety "invites a heckler's veto by signaling that the government will suppress unpopular speech if the public behaves badly." *Northeastern Pa. Freethought Society v. County of Lackawanna Trans. Sys.*, 938 F.3d 424, 438 (3d Cir. 2019).  "It is inherently viewpoint discriminatory because WMATA deems certain speech about issues of public debate or religion—such as "Peace on Earth" (*see* SUF ¶87) or "God is our Light," (*see id.* ¶117; *see* discussion, *infra* at 51-52)—anodyne and inoffensive, while less favored speech about issues is prohibited as too controversial.  Where the "whole point of the exercise is to prohibit the expression of political views," WMATA must tread lightly.  *Mansky*, 585 U.S. at 21.

But even if WMATA's stated goals are legitimate, the record here demonstrates that Guideline 9 does not reasonably serve them.  First, as this Court reasoned, the sheer volume of

ads addressing issues of public dispute that Guideline 9 allows through its porous filters severely

undermines any stated interest in preventing community discord, discrimination, and promoting

public safety—as any one of those many permitted ads might spark sharp disagreement among

members of the public.  *See Mansky*, 585 U.S at 21-22; *Zukerman*, 961 F.3d at 447 ("[T]he risks

of arbitrary or inconsistent enforcement will tend to undermine the very governmental interests

that the regulation in question was meant to advance.").  "Put differently, concluding that

Guideline 9 does not provide objective, workable standards . . . may necessarily mean that

Guideline 9 is inconsistent with the forum's purpose."  PI Op. at 23.

Second, WMATA's *own* use of the same ad spaces to display messages and

advertisements addressing controversial issues—as with WMATA's Earth Day contest (*see* Pl.'s

Corrected PI Br. at 26; SUF ¶88) or D.C. Health's COVID vaccine ad (ECF 38 at 33; SUF

¶98)—suggests that WMATA's concerns for community discord, etc., may be a stalking horse

for preventing controversial ads with which WMATA might disagree.  *See Greater Richmond

Transit Auth.*, 35 F.4th at 200 (finding inconsistent application of political ad ban where

"advertisements *of the government itself* are often permitted as 'public service

announcements'").

Examples are plentiful.  WMATA wrapped its buses and trains in LGBTQ rainbow

colors and celebrated the D.C.-hosted World Pride event in June 2025, including ads reading,

"Metro proudly welcomes the world, and "We put the ride in Pride."  SUF ¶133.



Yet it prohibits private parties from addressing the same controversial issue—and it even has

blocked the *same message* by private parties, like the World Pride organization, promoting Pride

Month and the World Pride event.  *See id.* ¶127.

    Similarly, Metro honors our veterans on Veterans Day.  But it says Guideline 9 prohibits

TikTok from running ads "Honoring Veterans."  *Compare, e.g.*, *id.* ¶121 (Metro "celebrate[s]

Veterans") *with id.* ¶122 (Tik Tok "Honoring veterans" ads).  The same message, the same

venue, two different results.  *Greater Richmond Transit Co*. relied on similar inconsistencies in

invalidating the City of Richmond's "political" ad ban.  *See* 35 F.4th at 200 (transit authority's

witness "said that an advertisement stating 'Support our troops' would not be political if run by

the United States but would be political if run by someone else").

    WMATA also purports to prohibit private parties like WallBuilders from expressing

views on historical events (Interpretive Aids § IV.G.3.m) lest riders get upset, yet it places *its

own* placards celebrating Rosa Parks Day on its trains.  SUF ¶152.  In a similar vein, an ad

sponsored by the "Black Coalition Against Covid-19" and bearing WMATA's logo (indicating

that WMATA co-sponsored the ad), entreats riders to wear a mask in public "[b]ecause I miss

seeing my Nana" (*see id.* ¶128).  That WMATA allows this private coalition to advertise on the

highly disputed effectiveness of masking to be run along with its logo suggests that as long as

48

Metro approves of an advertisement's message, and a co-sponsor spends sufficient dollars with WMATA, a divide in public opinion on its subject matter is beside the point.[18]

WMATA, their select partners, and other government agencies use the same advertising space to promote messages about a wide variety of fairly debatable issues, such as promoting mandatory vaccination (SUF ¶98), imploring the public to "Be Climate Smart" and take the Climate Smart pledge (*Id.* ¶144), and promoting "Car Free Days" (*Id.* ¶93)—all the while banning ads on the *same topics* by private advertisers. *Compare, e.g., id.*; *id.* ¶100 (WMATA rejected vegan group's ad because "they were intending to influence the public on issues regarding climate change").

WMATA's own use of its ad space severely undermines its stated purpose in restricting private speech on the same subjects—as any one of those messages is equally likely to lead to rider discomfort or provoke vandalism based on content—and some actually have. *See, e.g., id.* ¶132 (vandalized U.S. Customs & Border Protection ad); *id.* ¶110 (Montgomery County HIV ad vandalized with "no mor gays"). WMATA's own promotion of controversial issues on its ad space renders Guideline 9's ban on similar divisive private speech unreasonable.

## II.    Guideline 12 is Also Incapable of Reasoned Application

For similar reasons, this Court should conclude that Guideline 12—the religious advertising ban—is incapable of reasoned application. *See Young Israel*, 89 F.4th at 1348-49; *Northeastern Pa. Freethought Society*, 938 A.3d at 441. Rule 54(b) permits the Court to

---

[18] WMATA exempts certain speakers, who can convince Metro to partner with them—like the Black Coalition Against Covid 19—from the issue ad ban, giving preferential treatment to select speakers with select messages. *See* SUF ¶128; *see Greater Richmond Transit*, 35 F.4th at 188 (noting scope of political ad ban was "murky" in part because transit official admitted that, if private plaintiff "partnered with a local government entity, they might be able to run their anti-dog-experimentation advertisement—despite the nature of both the advertisement itself and of their organization remaining the same").

reconsider its dismissal of WallBuilders' challenge to Guideline 12 at any time before final

judgment. *See, e.g.*, *Robinson-Reeder v. Amer. Council on Educ.*, 571 F.3d 1333, 1337 (D.C.

Cir. 2009). WallBuilders respectfully requests that it do so. *See also* Pl.'s Corrected PI Br. at

31-34; Pl.'s PI Reply Br. at 16-19.

     First, the same rationale that supported this Court's preliminary injunction applies equally

to Guideline 12. The Court observed, for example, that WMATA's determination of when to

consult outside material referenced in an ad, especially websites, was not guided by any clear

rules. *See* PI Op. at 29 n.8. "[I]f WMATA had a policy of always looking at websites

referenced in ads, its process would be considerably more consistent." *Id.* Several examples of

website content confirm that this concern applies equally to Guideline 12:

- WMATA allowed ads for the Museum of the Bible despite its website inviting visitors to "engage with the transformative power of the Bible." SUF ¶154.

- A 2023 ad for the Art of Living Foundation's World Culture Festival incorporated its website, inviting viewers to "[b]e a part of an iconic yoga event at the Lincoln Memorial in D.C." *Id.* ¶92. The incorporated website suggested that the event was more "recognizably religious," *see Archdiocese of Wash.*, 897 F.3d at 330—explaining that the event "featur[ed] world-renowned yogi, spiritual teacher & meditation master Gurudev Sri Sri Ravi Shankar," who would "lead a meditation and share yogic wisdom," and also invited readers to "experience all aspects of an authentic practice." SUF ¶¶91-92. In responding to questions about the ad, Ms. Nicol admitted that she did not understand yoga to have a spiritual aspect. *Id.* ¶92.

- A December 2024 Salvation Army ad (*Id.* ¶125), approved after the adoption of the Interpretive Aids, directed viewers to the Salvation Army's website, which states: "The Salvation Army, an international movement, is an evangelical part of the universal Christian Church. Its message is based on the Bible. Its ministry is motivated by the love of God. Its mission is to preach the gospel of Jesus Christ and to meet human needs in His name without discrimination." *Id.* ¶126. By contrast, the Salvation Army ad considered in *Archdiocese of Washington* "contained only non-religious imagery." *See* 897 F.3d at 329.

     Second, WMATA's inconsistent approach to WallBuilders' ads illustrate Guideline 12's

ambiguity. WMATA has explained it determined WallBuilders' ads—including an ad depicting

George Washington kneeling in prayer, asking whether the founders were "Christian?", and

inviting viewers to learn more "about the Faith of the Founders" at WallBuilders' website—*did not* promote religion or religious belief.  *See* SUF ¶44.  This prompted incredulity from this Court:  "WMATA asserts that 'promoting [a] view of the role of Christianity in American history in support of its belief that Christian faith should have a role in government' is 'quite different from promotion of a religion, religious practice or belief,' but this 'differen[ce]' . . . is not immediately obvious, particularly without further explanation by WMATA."  PI Op. at 43.  Yet when WallBuilders later submitted different ads as part of the same campaign, WMATA's panel rejected them for promoting religion.  *See supra*, at 10-11.

Third, in opposing WallBuilders' preliminary injunction motion, WMATA contended that Catholic University ads used Catholic University's motto—which translates from Latin to "God is My Light"—only as an "incidental" part of its overall educational recruitment message. ECF 22 at 35.  But more recent Catholic University ads undermine WMATA's areligious interpretation.  Ads run at Metro Center in late 2024 *explicitly* promoted Catholic University's belief in God.  One ad panel pronounces the belief that "GOD IS OUR LIGHT."  SUF ¶117.  Another panel features Catholic's motto, "Deus Lux Mea Est," and includes a tagline inviting potential students to "Lead *with* Light."  *Id.*



A similar ad stated, "Shine Forth," "Enlighten the World," and "Lead with Light," and included the University's logo and motto.  *Id.* ¶117.

This Court previously concluded that Catholic University ads "promote[d] the educational opportunities that would accompany enrollment in these schools," PI Op. at 19, and that any religious messages were a means of recruiting for the school. *Id.* But, as these more recent examples illustrate, an ad for Catholic education can be designed both to recruit prospective students *and* to promote the Catholic faith. Catholic University's ads promote a Catholic worldview that "God is our Light" and encourage viewers to Lead *with [God's] Light.* Far from an incidental element of an ad selling educational services, the ads explicitly promote belief in God. *See* SUF ¶117. If Guideline 12 is to be applied consistently, a university's educational mission should not immunize its explicitly religious message from review.

The same goes for WMATA's 2025 *Dianetics* ad campaign. *See* SUF ¶139.



WMATA now contends that a book ad is permissible even if the book promotes religion, but the *Dianetics* ads went well beyond simply advertising the sale of a book. It also explained on its incorporated website (www.getridofyourreactivemind.org) the self-described religious organization's practices and beliefs (e.g., "auditing" of repressed memories) and invited viewers to obtain a Scientology "How-to kit." *Id.* ¶140 ("Everything you and a partner or friend need to begin your journey to Clear—right at home."). That WMATA would run such ads underscores the inherent difficulty of policing ads that "promote" a religion or religious beliefs or practices. *See Young Israel*, 89 F.4th at 1348-49.

52

Fourth, WMATA's recent Interpretive Aids fail to dispel the confusion; rather, they add to it. As with Guideline 9, the Interpretive Aids read Guideline 12 not to prohibit ads "for a newspaper, magazine, other publication, TV program, film, theatrical performance, concert, podcast, product, or other media solely because the medium's content addresses religion, religious practices, or religious beliefs or contains religious messages." Interpretive Aids § IV.H.1. WMATA apparently included this exception to justify its prior ads for performances or shows like *The Book of Mormon* (SUF ¶83), *Jesus Christ Superstar* (*Id.* ¶101), or Fox Nation's *Martin Scorsese Presents: The Saints* (*Id.* ¶123)*, performances that address religious beliefs and practices. But would the Guidelines allow an ad promoting the Bible or the Quran? How about a "John 3:16" ad, which points the reader to a specific passage in a publication? *Compare, e.g.*, *Id.* ¶139 (citing specific pages in *Dianetics*). Would the Interpretive Aids allow the Archdiocese of Washington to promote its parishes' television simulcasts or online livestreams of daily mass for the homebound? So applied, the exception would seem to swallow the rule by allowing promotion of core religious practices and beliefs.

Similarly, the Interpretive Aids, without providing any textual support, conclude that Guideline 12 does not prohibit ads "for an institution solely because of its affiliation with a religion or because it displays a religious, institutional logo, slogan, phrase, symbol, or any other word(s) or image(s)." Interpretive Aids § IV.H.2. It does not define what an "institution" is. And dictionary definitions are again boundless. *See, e.g.*, *Dictionary.com*, Institution ("An organization, establishment, foundation, society, or the like, devoted to the promotion of a particular cause or program, especially one of a public, educational, or charitable character."). Does this include *religious* institutions, such as churches and church organizations? Is the Catholic Church, one of the largest "institutions" in the world, free to use religious imagery (e.g.,

the Cross), slogans or phrases (e.g., "For the Greater Glory of God") in advertisements promoting its charitable mission?  WMATA's exception permits ads that freely and openly promote faith, such as Catholic University's "God is Our Light" ad.  *See* SUF ¶117.  But how is that consistent with WMATA's stated purpose for the religious advertising ban?

To be sure, *Archdiocese of Washington* upheld Guideline 12, but it did so on a much more limited TRO record and without the benefit of the Interpretive Aids, which reinforce the unreasonableness of the ban.  This case presents an appropriate vehicle to revisit the constitutionality of Guideline 12 on WallBuilders' much more robust record of WMATA's inconsistent interpretation and application of the ban.[19]

## III.    The Court Should Permanently Enjoin Enforcement

This Court's preliminary injunction findings also satisfy the four-part test for granting permanent injunctive relief.  *See Amoco Prod. Co v. Village of Gambell*, 480 U.S. 531, 546, n.12 (1987).  A "plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief.  A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

---

[19] The Interpretive Aids also illustrate that Guideline 12 is not a subject-matter ban, despite *Archdiocese of Washington*'s contrary determination.  WMATA openly permits its preferred discussion of religious topics, including religious "slogans" and "phrases" by certain institutions and promotion of religiously themed books and performances.  In doing so, WMATA discriminates against disfavored religious speech, such as WallBuilders' rejected advertisements, in violation of cases like *Rosenberger v. Rectors & Visitors of Univ. of Virginia*, 515 U.S. 819 (1995).  *See County of Lackawanna Trans. Sys.*, 938 F.3d at 435-37 (disagreeing with holding of *Archdiocese of Washington*).

This Court's prior analysis addresses these additional injunction factors. From the Court's determination of a First Amendment violation, "it follows" that "WallBuilders has satisfied the other three factors because the well-settled law in this Circuit is that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" PI Op. at 36 (quoting *Singh v. Berger*, 56 F.4th 88, 109 (D.C. Cir. 2022)). Citing *Archdiocese*, this Court concluded that "'the deprivation of constitutional rights constitutes irreparable injury' when the 'deprivation is shown to be likely;' the suffering of a constitutional violation by WallBuilders outweighs the costs WMATA has identified associated with losing the ability to prohibit issue-oriented advocacy and provide for the safety of its riders; and '[t]he public interest favors the protection of constitutional rights.'" *Id.* at 37 (quoting *Archdiocese*, 897 F.3d at 334-35). WallBuilders also has no adequate monetary remedy for the deprivation of its First Amendment rights, especially given WMATA's consistent practice of asserting sovereign immunity from damages claims. These additional factors fully support a permanent injunction against enforcement of Guideline 9 and Guideline 12. *See Ctr. for Investigative Reporting*, 975 F.3d at 317 (permanent injunction against enforcement of unreasonable political advertising ban).

## CONCLUSION

This Court should grant summary judgment, declare that Guidelines 9 and 12 violate the First Amendment, and permanently enjoin their enforcement.

Dated: January 16, 2026

Respectfully submitted,

/s/ *Shannen W. Coffin*

| | |
|---|---|
| David J. Hacker (admitted *pro hac vice*) | Shannen W. Coffin (D.C. Bar # 449197) |
| Jeremiah G. Dys (D.C. Bar # 90000678) | Andrew Sloniewsky (D.C. Bar # 440474) |
| Ryan Gardner (admitted *pro hac vice*) | Caitlin E. Ames (D.C. Bar # 90002918) |
| FIRST LIBERTY INSTITUTE | STEPTOE LLP |
| 2001 West Plano Parkway, Suite 1600 | 1330 Connecticut Ave., N.W. |
| Plano, TX 75075 | Washington, D.C.  20036 |
| Tel: (972) 941-4444 | Tel: (202) 429-3000 |
| dhacker@firstliberty.org | Fax: (202) 429-3902 |
| jdys@firstliberty.org | scoffin@steptoe.com |
| rgardner@firstliberty.org | asloniewsky@steptoe.com |
| | cames@steptoe.com |

Brian Hauss (D.D.C Bar # NY0581)

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION

125 Broad Street, 18th Floor

New York, NY 10004

Tel: (212) 549-2500

bhauss@aclu.org

Arthur B. Spitzer (D.C. Bar # 235960)

Scott Michelman (D.C. Bar # 1006945)

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF THE DISTRICT OF COLUMBIA

529 14th Street NW, Suite 722

Washington, D.C. 20045

Tel: (202) 457-0800

aspitzer@acludc.org

smichelman@acludc.org

David Cole (D.C. Bar # 438355)

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION

915 15th Street NW

Washington, D.C. 20005

Tel: (212) 549-2611

dcole@aclu.org

*Counsel for WallBuilder Presentations*