Page 270

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

WALLBUILDER PRESENTATIONS,      )
                                )
          Plaintiff,            )
                                )
vs.                             ) Civil Action No.:
                                ) 23-cv-03695-BAH
                                )
RANDY CLARKE, in his official   )
capacity as General Manager     )
and Chief Executive Officer     )
of the Washington Metropolitan  )
Area Transit Authority,         )
                                )
          Defendant.            )
_____

AMERICAN CIVIL LIBERTIES UNION  )
FOUNDATION                      )
                                )
FEMHEALTH USA, INC., d/b/a       )
CARAFEM,                        )
                                )
          Plaintiffs,           )
                                )
vs.                             ) Civil Action No.:
                                ) 1:17-cv-15998 (TSC)
                                )
RANDY CLARKE,                   )
                                )
          Defendant.            )
_____

DEPOSITION OF GEORGETTA NICOL, VOLUME II
November 10, 2025
_____

DIGITAL EVIDENCE GROUP
1730 M Street NW, Suite 812
Washington, DC  20036
202.232.0646

Page 271

APPEARANCES

ON BEHALF OF THE PLAINTIFF:

    STEPTOE LLP
    Caitlin E. Ames, Esquire
    Andrew J. Sloniewsky, Esquire
    Shannen W. Coffin, Esquire
    1330 Connecticut Avenue NW
    Washington, DC  20036
    202.429.3000
    cames@steptoe.com
    asloniewsky@steptoe.com
    scoffin@steptoe.com

    FIRST LIBERTY INSTITUTE
    Jeremiah G. Dys, Esquire
    2001 West Plano Parkway, Suite 1600
    Plano, Texas  75075
    972.941.4444

ON BEHALF OF THE DEFENDANT:

    AKIN GUMP STRAUSS HAUER & FELD LLP
    Caroline L. Wolverton, Esquire
    Vanessa Meraz, Esquire
    2001 K Street NW
    Washington, DC  20006
    202.887.4107
    cwolverton@akingump.com
    vmeraz@akingump.com

ALSO PRESENT:
    Ryan Gardner (via videoconference)

Page 272

PURSUANT TO NOTICE and the Federal Rules of Civil Procedure, the deposition of Georgette Nicol, Volume II, called for examination by the Plaintiff, was taken on Monday, November 10, 2025, commencing at 9:35 a.m. Eastern Standard Time at Akin Gump Strauss Hauer & Feld LLP, 2001 K Street NW, Washington, District of Columbia, 20006, before Traci M. Mertens, a Registered Diplomate Reporter and Certified Realtime Report and Notary Public for the District of Columbia.

Page 273

INDEX OF EXAMINATION

Examination by Ms. Ames          Page 279
Examination by Ms. Wolverton     Page 423

INDEX OF EXHIBITS

Exhibit 66                Page 282
  (Exhibit A - Definitions and
  Instructions, no Bates number)

Exhibit 67                Page 297
  (Third Declaration of G. Nicol,
  no Bates number)

Exhibit 68                Page 314
  (Defendant's Stipulation
  Regarding Authenticity of
  Documents, no Bates number)

Exhibit 69                Page 319
  (Stop the Shuffle ad, Bates No.
  Clarke_WB-0004820)

Exhibit 70                Page 347
  (World Culture Festival website,
  no Bates number)

Exhibit 71                Page 347
  (World Culture Festival ad, no
  Bates number)

Page 274

INDEX OF EXHIBITS

Exhibit 72                Page 349
  (Yoga for a Blissful Life ad,
  no Bates number)

Exhibit 73                Page 354
  (The Bibi Files movie ad, no
  Bates number)

Exhibit 74                Page 354
  (The Bibi Files photo, no Bates
  number)

Exhibit 75                Page 354
  (Email dated 12/6/24, Bates No.
  CLARKE_WB-0002973)

Exhibit 76                Page 382
  (Planned Parenthood ad, no Bates
  number)

Exhibit 77                Page 385
  (Planned Parenthood website
  link, no Bates number)

Exhibit 78                Page 391
  (Salvation Army ad, no Bates
  number)

Exhibit 79                Page 395
  (Black Coalition Against
  COVID-19 ad, no Bates number)

Exhibit 80                Page 398
  (Climate Smart bus tail ad,
  no Bates number)

Page 275

INDEX OF EXHIBITS

Exhibit 81                    Page 399
   (Climate Smart website link,
    no Bates number)

Exhibit 82                    Page 402
   (Stop the Shuffle video print,
    no Bates number)

Exhibit 83                    Page 406
   (Advertisement)

Exhibit 84                    Page 411
   (Defaced ad)

Exhibit 85                    Page 413
   (Email)

Page 277

INDEX OF EXHIBITS PREVIOUSLY MARKED

Exhibit 21                    Page 336
   (Dia de los Muertos ad,
    no Bates number)

Exhibit 22                    Page 336
   (Email dated 10/25/24, Bates
    No. CLARKE_WB-0003880)

Exhibit 23                    Page 340
   (Rosa Parks Day ad, no Bates
    number)

Exhibit 45                    Page 375
   (Power to the Patients ad, no
    Bates number)

Exhibit 47                    Page 375
   (Power to the Patients ad,
    no Bates number)

Exhibit 48                    Page 377
   (Power to the Patients ad,
    no Bates number)

Exhibit 49                    Page 380
   (Planned Parenthood ad,
    PrimaryCarePP.org, no Bates
    number)

Exhibit 53                    Page 381
   (Planned Parenthood ad,
    PPMetroDC.org, no Bates
    number)

Exhibit 55                    Page 388
   (National Community Reinvestment
    Coalition ad, no Bates number)

Page 276

INDEX OF PREVIOUSLY MARKED EXHIBITS

Exhibit 3                     Page 294
   (Guidelines Governing Commercial
    Advertising, Bates No.
    CLARKE_WB-0000027)

Exhibit 4                     Page 296
   (Metro Internal Policies and
    Interpretive Aids for Reviewing
    Proposed Commercial Advertising,
    Bates Nos. CLARKE_WB-0002644-48)

Exhibit 5                     Page 381
   (Email dated 12/5/23)

Exhibit 7                     Page 314
   (Put Families First ad, no
    Bates number)

Exhibit 14                    Page 326
   (Read Queer All Year ad, no
    Bates number)

Exhibit 15                    Page 330
   (Plan B ad, no Bates number)

Exhibit 16                    Page 329
   (Email dated 8/16/23, Bates Nos.
    CLARKE_WB-00001158-59)

Exhibit 17                    Page 333
   (United States Conference of
    Catholic Bishops article,
    no Bates number)

Exhibit 20                    Page 335
   (AARP ad, no Bates number)

Page 278

INDEX OF EXHIBITS PREVIOUSLY MARKED

Exhibit 57                    Page 391
   (Salvation Army ad, no Bates
    number)

www.DigitalEvidenceGroup.com      Digital Evidence Group C'rt 2025          202-232-0646

Page 279

PROCEEDINGS

GEORGETTA NICOL,
having been first duly sworn, was examined and
testified as follows:

EXAMINATION

BY MS. AMES:

Q.   Good morning, Ms. Nicol.  Can you please state your name for the record?

A.   Good morning.  My name is Georgetta Nicol.

Q.   So we're here today again because of a lawsuit filed by my client, WallBuilder Presentations, against Randy Clarke, and we'll refer today to WallBuilder Presentations as WallBuilder.

A.   Okay.

Q.   And Randy Clarke; I'll refer to him as Mr. Clarke or the defendant.

A.   Okay.

Q.   And Mr. Clarke is still the general manager and CEO of the Washington Metropolitan Area Transit Authority?

A.   Yes.

Q.   And for the record, I'll refer to the Washington Metropolitan Area Transit Authority as WMATA.  Is that okay?

Page 280

A.   Yes.

Q.   We talked last time that WMATA operates both the buses and a subway system, is that correct?

A.   Yes.

Q.   And the buses; I'll refer to them as Metro buses.  Is that okay?

A.   Yes.

Q.   And I'll refer to the subway as the Metro.  Is that okay?

A.   Yes.  You know, Metro is buses and rail, so if you could refer to it as rail, that would be great, but okay.

Q.   I'll try to keep that --

A.   Okay.

Q.   So I know we just went through this not too long ago, but I'll remind you briefly what you can expect today.  We'll be here for a while, hopefully not as long as last time, but whenever you need to take break, just let me know and we can do that.  We just can't take a break after I've asked you a question and before you've answered.

Do you understand?

A.   Yes, ma'am.

Q.   And let me know if you don't hear a question or you don't understand, and I'll repeat it

Page 281

or rephrase it, but we're going to assume that if you answer, you understood what the question meant.  Is that okay?

A.   Okay.

Q.   We'll take turns talking and try not to speak over each other for the court reporter's sake.

If at any point you remember something that you want to add or something you want to clarify, just let me know, and we'll let you do that while it's on your mind.

Do you understand?

A.   Yes.

Q.   And please verbally answer all questions.  You did a good job of that last time.

Do you understand that your testimony today is under oath as if you're in front of a judge or a jury?

A.   Yes.

Q.   At your last deposition, you told us that you are WMATA's Director of Marketing.  Is that still true?

A.   Yes.

Q.   You understand that you've been designated by WMATA to testify about specific topics today?

A.   Yes.

Page 282

MS. AMES:  Andrew, we'll start with -- this will be Exhibit 66.

(Exhibit 66 was marked for identification.)

Q.   (By Ms. Ames) Have you seen this before?

A.   Yes.

Q.   These are my client's 30(b)(6) topics.  Do you understand that you're testifying as the corporate representative of WMATA regarding these topics?

A.   Yes.

Q.   You understand this means your answers are supposed to be based on personal knowledge and what is reasonably knowable by WMATA?

A.   Yes.

Q.   Do you understand that your answers are binding on WMATA?

A.   Yes.

Q.   If there's anything, any question or topic that you don't have personal knowledge of, you only know the answer as part of preparing for this deposition, please make that clear to us.

A.   Can you explain how that works, please?

Q.   So I'm assuming that a lot of what you're going to testify about is stuff that you know in

Page 283

your own personal capacity, but some of the stuff that you might answer might be something that you learned in preparation for this deposition.

Does that make sense?

MS. WOLVERTON: I'm going to object to that instruction as contrary to the requirements under Rule 30(b)(6).

MR. SLONIEWSKY: You can go ahead and object.

Q. (By Ms. Ames) Let's look at this document.

A. I'm sorry. Before we continue, just so I can understand, the question is I'm only to speak about things that I know about and not things I learned about in preparation for this deposition?

Q. No. You should answer either.

A. Okay.

Q. Yeah.

A. Okay.

Q. Let's look at these 30(b)(6) topics, then, and we'll start going through these.

Can you please read Topics 1 and 3 to yourself? So you'll be testifying about these topics today, correct?

A. Yes.

Q. What did you do to prepare to testify

Page 284

about Topics 1 and 3?

MS. WOLVERTON: You can answer.

A. I met with legal counsel to review the exhibits mentioned in Topics 1 and 3.

Q. (By Ms. Ames) Did you do anything else?

A. To prepare?

Q. Yes.

A. No.

Q. You didn't review any other exhibits?

A. I reviewed all exhibits that we submitted to you for review.

Q. Did you speak to anyone at WMATA or just counsel?

A. I spoke to counsel, and I also spoke to the Director of Customer Service. I don't know her exact title.

Q. What's her name?

A. Darby Dickerson.

Q. When you say counsel, do you mean counsel at Akin or in-house counsel or both?

A. Both.

Q. Did you speak with anyone from Outfront?

A. No.

Q. Now let's read Topic 2. You'll be testifying about this topic as well?

Page 285

A. Yes.

Q. What did you do to prepare to testify about this topic?

A. I met with legal counsel.

Q. You didn't speak to anyone else at WMATA outside the people we've already discussed?

A. No.

Q. Did you review anything in connection with this document, any topics?

A. I reviewed the interpretive aids and the guidelines document.

Q. Can you please read Topics 4 and 5 to yourself? You'll be testifying about these as well?

A. Yes.

Q. What did you do to prepare for these topics?

A. Met with legal counsel.

Q. Did you look at any documents?

A. Yes.

Q. What documents?

A. The exhibits we submitted to you.

Q. When you say the exhibits you submitted to us, do you mean the exhibits -- like, documents that were produced in discovery, if you understand that?

A. I do not understand that.

Page 286

Q. During this case, your counsel produced documents --

A. Yes.

Q. -- to us. That's what you're referring to? Okay.

And then please read Topic 6 to yourself. You'll be testifying about this topic today too?

A. Yes.

Q. What did you do to prepare for this topic?

A. Met with legal counsel.

Q. And you mentioned earlier that you spoke with someone named Darby Dickerson. What did you talk about with her?

A. We discussed the procedure, I guess, for the customer service team in response to complaints they received, generally speaking.

Q. Did you also -- so in your last deposition, you had mentioned that during meetings with the review panel, someone usually takes notes. Did you review any of those notes in preparation for this deposition?

A. No, ma'am.

Q. No? Okay.

About how much time would you say you spent preparing for this deposition? A rough

Page 287

estimate is fine.

A. Five to six hours.

Q. Who is representing you today?

A. Sitting in this room?

Q. Yeah.

A. Akin Gump; Caroline.

Q. Without telling me the substance of your conversation, did you meet with anyone at Akin to prepare for this deposition?

A. Outside of Caroline and Vanessa?

Q. If there is someone outside of them, you can tell me that.

A. No.

Q. So you just met with Caroline and Vanessa?

A. Yes.

Q. When was that?

A. Friday, November -- sorry. I'm -- I don't have my phone in front of me.

Q. This past Friday?

A. Yeah. This past Friday.

Q. About how long?

A. Five to six hours.

Q. So you testified last time that WMATA has an outside contractor called Outfront Media that handles the day-to-day advertising for WMATA, is

Page 288

that correct?

A. Yes.

Q. And Outfront has authority to run ads without receiving any approval from WMATA if it believes they comply with the guidelines?

MS. WOLVERTON: Objection; form.

You can answer.

MS. AMES: I didn't know if she was thinking or not.

MS. WOLVERTON: You don't need to wait for me to tell you to answer. You can answer.

THE WITNESS: I'll wait for you.

MS. WOLVERTON: It will take longer. Don't answer only if I instruct you not to answer.

THE WITNESS: Okay.

Q. (By Ms. Ames) She'll probably be pretty forceful about that too.

A. Yes.

Q. Yes, that's true?

A. Uh-huh.

Q. And Outfront is supposed to submit to WMATA any ads that it thinks might violate the guidelines?

A. Yes.

Q. How does Outfront determine whether to

Page 289

submit ads to WMATA?

A. I'm not aware of --

MS. WOLVERTON: Objection; form.

A. I'm not aware of their process to make that determination. ^^

Q. (By Ms. Ames) Does WMATA provide any other guidance besides the advertising guidelines and the interpretive aids to Outfront to guide their review of ads?

A. No.

Q. Is there any training that WMATA does with Outfront?

A. Not that I'm aware of.

Q. Has WMATA ever provided any guidance on particular ads to Outfront?

A. Not that I am aware of.

Q. Is there any -- when Outfront decides on its own to approve and run an ad, is there any after-the-fact process for WMATA to review those ads and confirm that they comply with the guidelines?

A. Can you rephrase that a little bit?

Q. Yeah.

So we said earlier that Outfront has authority to approve ads --

A. Uh-huh.

Page 290

Q. -- on its own, right? And in situations where that happens, does WMATA ever review those ads after the fact, after Outfront has approved them?

A. WMATA will review an ad that Outfront may have placed without submitting to the ad review panel if it is flagged that it needs to be reviewed by the ad review panel.

Q. So only if it's brought to the --

A. Attention of the --

Q. -- attention of --

A. Correct.

Q. Does Outfront send photos or copies of ads that it decides to run on its own to WMATA?

A. I do not believe so.

Q. Are you aware of any complaints by anyone at WMATA about Outfront's screening process?

A. Say that again, please.

Q. Are you aware of any complaints from any WMATA employees about Outfront's screening process?

A. Hm. No.

Q. Okay.

A. Okay. Are your questions numbered? No?

Q. Like, sort of, but it's an outline format, so it's -- yeah.

A. Okay.

Page 291

Q. Nothing that would be helpful to you.

A. I know. I realize that.

Can you repeat the question again, please?

Q. Has any -- have any WMATA employees ever complained about Outfront's screening process?

A. Thank you.

Q. And just to be clear, you said the answer's no, right?

A. Uh-huh.

Q. And there's a panel at WMATA that reviews ads forwarded by Outfront for their analysis?

A. Sorry. One second. Okay. Can you repeat that again?

Q. There's a panel at WMATA that reviews ads submitted by Outfront for further analysis, correct?

A. Yes.

Q. And do members of the panel receive training in the legal standards applicable to the review process?

A. Now they do.

Q. What does that look like?

A. I'm not familiar with their process fully, but I believe they review previous case law as it relates to First Amendment process in addition to reviewing the guidelines and the interpretive aids

Page 292

and how it applies to the advertising process at metro.

Q. And when you say now they do, what do you mean?

A. Post -- well, not post. In my transition from coming off of the advertising review panel, there were -- there was a need to bring on new individuals, and they started a training process for new panel members and alternates.

Q. How frequently does that happen?

A. How frequently does what happen?

Q. The training.

A. Well, there's only been one training session.

Q. Okay.

A. It comprises multiple sessions.

Q. So people are only trained, like, when they first start on the panel or as an alternate?

A. Correct.

Q. Can you just remind me when you transitioned off of the panel?

A. I believe early spring, so March or April 2025.

Q. Are you aware of any instances where Outfront failed to submit ads to the panel that

Page 293

should have been subject to the panel's review?

A. Can you repeat that one more time? Am I aware --

Q. Are you aware of any instances where Outfront should have submitted an ad to the panel for review but didn't for whatever reason?

A. Yes.

Q. Can you tell me about that?

A. The most recent example I can give is I want to say a Penguin or Random House Publishing ad in the summer of this year.

Q. Do you remember what happened with that?

A. The ad was immediately pulled from display and then submitted to the ad review panel for review.

Q. Do you remember the panel's decision?

A. Do I remember the panel's decision? I believe -- I don't want to say what it was because I don't remember off the top of my head, so give me one second. It was approved.

Q. Do you know when that was?

A. June 2025.

Q. What was that ad? Again, I know you said it was a Penguin or Random House, but do you remember anything more?

Page 294

A. Hold on. I'll help you guys out. It was -- I'll go ahead and do that. Is that okay?

Q. Yes. It's okay. That's a big binder.

A. Thank you. Teamwork. It was for a contest for reading books, and the content was Read Queer All Year.

Q. Were there any other instances that you can remember where that happened?

A. I believe in that same time period, there was another ad. I don't remember the content, but I remember it was pulled at the same time as this one, but that ad was not submitted to the ad review panel for review.

Q. Why not?

A. I don't know.

Q. You don't remember? Okay.

MR. COFFIN: Can we go off the record for just a minute, Caroline? Can I speak to you outside?

MS. WOLVERTON: Sure.

(A discussion was held off the record.)

Q. (By Ms. Ames) We're going to talk about the advertising guidelines.

MS. AMES: Andrew, can we have Exhibit 3 to WMATA's deposition.

7 (Pages 291 to 294)

Page 295

Q. (By Ms. Ames) So these are the -- WMATA's guidelines governing commercial advertising, correct?

A. Yes.

Q. And WMATA's advertising practices are governed by these guidelines?

A. Yes.

Q. And the guidelines were last amended in November 2015?

A. Yes.

Q. Why did the Board of Directors adopt these guidelines?

A. Ooh. From my understanding, around that time there were ads being placed in other jurisdictions and countries that were causing violence or unrest or a lot of activity. And given the sensitivity of our region and just -- you know, the services we offer, the Board of Directors implemented these guidelines to prevent such activity within our system.

Q. How do you know that?

A. I was told that by members of our ad review panel.

Q. When you joined the panel?

A. Yeah, uh-huh.

Page 296

Q. And on page 2 of this document, we'll look at paragraph or guideline 9 which states that advertisements intended to influence members of the public regarding an issue on which there are varying opinions are prohibited.

Did I read that correctly?

A. Yes, you did.

Q. Now we'll look at Exhibit 4 from last time.

A. Thank you. These are my copies?

Q. Yeah.

A. This is my handwriting. Okay. Sorry.

Q. That's okay.

A. Okay.

Q. And these are the Metro internal procedures and interpretive aids for reviewing proposed commercial advertising, correct?

A. Yes. Let me get my glasses on.

Q. Just to confirm, this is Exhibit 4 from the prior deposition, correct?

A. Yes.

Q. And these interpretive aids were adopted on November 1, 2024?

A. Yes.

Q. Why were they created?

Page 297

A. They were created to -- they were created internally to assist the panel in making more concrete decisions with the guidelines.

Q. What do you mean when you say more concrete decisions?

A. I'm not sure if that's the word I would like to use. Just to help us interpret the guidelines better.

Q. Who created them?

A. They were created -- I'm not fully aware of -- they were created by counsel.

Q. Okay.

A. Okay.

Q. Do you know if it was in-house or outside counsel or both?

A. I'm not sure.

Q. Just counsel?

A. Uh-huh.

Q. Well, we'll look at --

MS. AMES: Andrew, this is Tab 4. I think this will be Exhibit 67.

(Exhibit 67 was marked for identification.)

Q. (By Ms. Ames) Take a minute to review it.

A. Thank you. Okay.

Page 298

Q. This is the declaration you prepared in this case, correct?

A. Uh-huh.

Q. We'll look at paragraph 3, and that states: WMATA's in-house and outside legal counsel participated in all aspects of the development of WMATA's internal procedures, interpretive aids for reviewing proposed commercial advertising, interpretive aids, and provided legal advice as to the contents of the interpreted -- interpretive aids.

Did I read that correctly?

A. Yes.

Q. And so did any nonlawyers participate in the interpretive aids development that you're aware of?

A. Not that I'm aware of.

Q. In paragraph 4, the first sentence states: WMATA counsel's legal advice during the development of the interpretive aids took into consideration the litigation challenging certain of WMATA's guidelines governing commercial advertising in this case, guideline 9; White Coat Waste Project versus Clarke; guidelines 9, 13 and 14; and ACLU versus Clarke, guidelines 4, 9, 13, and 14.

8 (Pages 295 to 298)

Page 299

Did I read that correctly?

A. Yes.

Q. What does that paragraph mean?

A. This means that while we were creating the guidelines -- I mean, the interpretive -- while the interpretive aids where being created, the legal team took into consideration current at that time cases that we were a part of.

Q. Do you know, did counsel seek to draft the interpretive aids to assist in the litigation?

MS. WOLVERTON: Objection; form.

A. Not that I'm aware of.

Q. (By Ms. Ames) Do you know of any other factors counsel took into account in drafting the interpretive aids?

MS. WOLVERTON: Objection; form.

A. Not that I'm aware of.

Q. (By Ms. Ames) Can you describe the procedures used to create them?

A. No, I cannot.

Q. Do you know under what authority they were adopted?

A. What does that mean?

Q. Well, so, for example, the guidelines themselves were adopted by the Board of Directors.

Page 300

Is there -- was there any similar authority that issued the interpretive aids?

A. The interpretive aids are an internal document prepared for us to use to facilitate our panel.

Q. So there was no, like, formal process for adopting them?

A. The guidelines?

Q. The interpretive aids. Sorry.

A. No. I'm saying the guidelines are a board-approved-document These are -- this is an internal work product; like, internal work document.

Q. By what legal authority are they binding on WMATA?

MS. WOLVERTON: Objection; form.

A. Can you explain what that means?

Q. (By Ms. Ames) I guess is there any legal authority making them binding on WMATA?

A. The interpretive aids?

MS. WOLVERTON: Objection; form.

A. No.

Q. (By Ms. Ames) Is there any real authority making them binding on Outfront?

MS. WOLVERTON: Objection; form.

A. No.

Page 301

Q. (By Ms. Ames) Did the Board of Directors review these interpretive aids at all before they were finalized?

A. Not that I'm aware of.

Q. Has WMATA applied the interpretive aids in reviewing ads submitted to WMATA?

A. Yes.

Q. I wasn't trying to ask you a trick question or anything.

Can you give me an example of an ad that WMATA has applied them to?

A. Every ad that was submitted after November 1, 2024, the interpretive aids were used to assist in making a decision.

Q. Were the interpretive aids meant to change past practices?

A. No.

Q. Are you aware of any ads that were previously approved under the guidelines but that would now be rejected in light of the interpretive aids?

MS. WOLVERTON: Objection; form.

A. I want to say two things. One, I am not a lawyer, but two, is that considered a hypothetical?

Q. (By Ms. Ames) No.

Page 302

A. No?

MS. WOLVERTON: Well, I would disagree.

I have my objection, but you can still answer.

A. Not that I'm aware of, but yeah, I think -- yeah. We're not going back and looking at past decisions.

Q. (By Ms. Ames) So anything that was approved before November 1, that was set in stone. It wasn't looked at again after the November 1 interpretive aids?

A. Correct.

Q. Let's look at the interpretive aids, and we'll start with paragraph 1C, and that states: All members of the panel shall review past advertisements that have been considered by the panel to familiarize themselves with how the guidelines have been applied in the past.

Did I read that correctly?

A. Yes.

MR. SLONIEWSKY: Sorry. This is Exhibit 4?

MS. AMES: Yeah.

MR. SLONIEWSKY: Got it.

MS. AMES: We're going to go back and

Page 303

forth on this a lot.

Q. (By Ms. Ames) What's the purpose of looking at the prior advertisements?

A. The purpose is to potentially glean some insight into how to review new copy or new advertisements, see what changes there may have been.

And I just want to add a note because I know in your previous question, you asked about reviewing past decisions. So we did not review past decisions, but when we are reviewing -- like, say if Apple was to submit an ad today, we might go back and look at ads that were previously submitted by Apple, so that's what that means.

Q. Right.

A. Okay.

Q. Had the panel been doing that practice of looking at past ads prior to the interpretive aids?

A. Yes.

Q. Do you know how long that had been?

A. Since I was on the panel.

Q. Okay.

A. Let me -- let me clarify. I believe they've been doing it since they've been -- since they implemented the panel, but in my experience on

Page 304

the panel, they've been doing it.

Q. Thank you for clarifying.

Let's look at the interpretive aids page 3, paragraph G(2) and that defines an issue on which there are varying opinions as a point, matter, or dispute, the decision of which is of special or public importance.

Did I read that correctly?

MS. WOLVERTON: Sorry. Which paragraph?

A. Yeah. Where are you reading? I'm sorry.

Q. (By Ms. Ames) G(2)?

A. G(2). That's not what I read, so --

Q. I will --

A. Are you skipping down?

Q. So it says on the very first line: An issue on which there are varying opinions, and then it says in sentence three: An issue for purposes of guideline 9 is a point, matter, or dispute, a decision of which is of public or special importance.

A. Thank you.

Q. Have I read that correctly?

A. Yes.

Q. What does that mean?

A. What does what mean?

Page 305

Q. That division; a point, matter, or dispute, the decision of which is of special or public importance.

MS. WOLVERTON: Objection; form.

A. So I want to clarify.

THE WITNESS: She skipped a whole lot in the whole paragraph.

A. So can you read the entire paragraph and then we can --

Q. (By Ms. Ames) An issue on which there are varying opinions does not mean any topic on which people might disagree. For example, an advertisement for a sports team does not involve an issue on which there are varying opinions merely because some people support other teams. Rather, an issue for purposes of guideline 9 is a point, matter, or dispute, the decision of which is of special or public importance, and then it has the dictionary.com definition of issue.

Advertisements that include such as use generally promote a message to the public of substantive ethically, socially, or politically controversial or topics as illustrated in this section.

Did I read that correctly?

Page 306

A. Yes, you did. And so your question is what does this mean?

Q. I'm asking specifically about the definition of issue which this document states is a point, matter, or dispute, the decision of which is of special or public importance.

A. Okay.

MS. WOLVERTON: Objection; form.

A. You just want me to --

Q. (By Ms. Ames) Explain what that definition means.

A. It means that if something is -- has, generally speaking, some sort of importance to the public, then that is an issue that we would consider.

Q. When would you consider an issue a matter of special or public importance?

MS. WOLVERTON: Objection; form.

A. As it relates to guideline 9?

Q. (By Ms. Ames) Uh-huh.

A. As it relates to guideline 9, if it's controversial or divisive on any of these points mentioned, then we would consider it.

Q. Controversial or divisive to whom?

A. Generally speaking, the public.

Page 307

Q. When we're saying public, how much of the public do you mean, the majority or something different?

A. A general -- a general amount. There's no set number.

Q. Does WMATA provide any further definition of issue -- of that term issue to Outfront to guide their review of ads?

A. No. Not that I'm aware of.

Q. We'll look at Nicol Exhibits 5 and 6 from last time.

A. You're going to hand them to me?

Q. Yeah.

MS. AMES: Tab 49 and 50.

MR. SLONIEWSKY: 49 and 50?

MS. AMES: Yeah. Sorry.

Q. (By Ms. Ames) And you can just take a minute to read and review these.

A. These are two different -- okay.

Q. Yeah. They're Exhibits 5 and 6 from last time.

A. Okay.

Q. So in Exhibit 6 in that top email, Mr. Holter states that these ads are -- or they violate guideline 9, correct?

Page 308

A. Correct.

Q. Why do they violate guideline 9?

A. These ads submitted in December 2023 for I believe several ads for veganuary.com were rejected based on 9 because they were intending to influence the public on issues regarding climate change and other issues as identified during the panel process.

I would like note that the panel reviews websites in addition to the advertising copy and that the website was listed on all three ads submitted in this ad request.

Q. So from what I can see, only one of them mentions climate change. You said that there were other issues. Can you elaborate?

A. As I referenced, the website is what we used to review these ads. The website is listed on all three of the advertisements, and unfortunately, in these exhibits do not include the web snippets from that day.

Q. So you're saying that the website referenced climate change?

A. Correct.

Q. And was climate change the only issue of special or public importance that the panel identified on this -- on these ads?

Page 309

A. That's what I can determine as of this time.

Q. What standard is applied in making the determination of whether something's -- whether an issue is of special or public importance?

MS. WOLVERTON: Objection; form.

A. I do not understand that question.

Q. (By Ms. Ames) I guess is there any standard used to determine whether something is an issue of special or public importance?

A. I still don't understand that question.

Q. I guess --

A. I mean, ads are -- go ahead.

Q. I guess how would the panel determine that, for example, climate change is an issue of special or public importance?

MS. WOLVERTON: Objection; form.

A. On its face, climate change is a topic that's generally known by the public as something that there are varying opinions, but again, the panel takes the time to review not just the website and the copy of the advertisement, but we also do research to ensure that there's nothing going on. Maybe there's a -- a law proposed or something at that time that might require an additional dialogue

Page 310

or discourse.

Q. (By Ms. Ames) Do you know if there was any additional research done with this set of ads?

A. I'm not aware of what we did in 2023.

Q. Going back to the interpretive aids, that same paragraph as I read earlier, it states in the very last sentence: Advertisements that include such issues generally promote a message to the public about substantive ethically, socially, or politically controversial or divisive topics.

A. Uh-huh.

Q. Did I read that correctly?

A. Uh-huh. Yes.

Q. Can you explain what substantive means in this sentence?

A. Substantive means things that are again generally known and -- generally known, doesn't require a lot of, like -- I need to clean that up. Substantive means things that are generally known; in this particular instance, things that are highly controversial -- I'm not going to say highly -- controversial or divisive in nature that are known by the public.

Q. Can you describe what ethically controversial or divisive topics are?

Page 311

A. Say that again. Can I describe is what you said?

Q. Yeah. Can you describe what ethically --

A. It could be just as simple as something -- what people believe are right or wrong or people's morals or things of that nature.

Q. Can you give any examples?

A. Can I give an example of something that's ethically --

Q. Yes.

A. Capital punishment might be something that's an ethically controversial or divisive topic.

Q. Can you describe what socially controversial or divisive topics are?

A. Can I describe? Is that what you said?

Q. Yeah.

A. An example of a socially controversial or divisive topic might be something along the lines of racial or gender topics.

Q. Can you describe what politically controversial or divisive topics are?

A. Politically controversial could be something as simple as Republican versus Democrat or -- yeah, let's just leave it.

Q. Does the panel have any definition for

Page 312

these terms?

MS. WOLVERTON: Objection; form.

Q. (By Ms. Ames) For ethically, socially, or politically.

A. Outside of -- whatever's in these guidelines and these aids are what we.

Q. I believe you said last time that the panel makes determinations of what substantive means on an ad-by-ad basis, is that correct?

MS. WOLVERTON: Objection; form.

A. I don't recall that, but if that's in the transcript, then okay.

Q. (By Ms. Ames) And just to be clear, has WMATA provided any further definition of these terms to Outfront?

A. Not that I'm aware of.

Q. And then I guess looking back at Exhibits 5 and 6 again, what were the issues that would have been substantive ethically, socially, or politically controversial or divisive topics in these ads?

A. As mentioned earlier, climate change would have been something that is politically controversial or divisive.

Q. Anything else?

A. Not that I'm aware of at this time.

Page 313

Q. And we read -- I read before in paragraph G(2) in the interpretive aids, an advertisement for a sports team does not involve an issue on which there are varying opinions.

Is that correct?

A. Correct.

Q. Does the passion with which a rider might hold a particular view inform its substantive importance?

MS. WOLVERTON: Objection; form.

A. I don't understand the question.

Q. (By Ms. Ames) I guess the question is there -- you know, people have varying levels of passion about different topics. does that come into play in deciding what is a substantive issue?

MS. WOLVERTON: Objection; form.

A. I don't know how I can answer that question. Our riders are very passionate. Customers can say: I hate the red line. Does that dictate we cancel the red line tomorrow? No, it doesn't, so I'm not sure how to answer that question.

Q. (By Ms. Ames) So in an October 7 email from your counsel, Ms. Wolverton, to the Court, she stated that WMATA, quote, did not know and cannot

Page 314

reasonably predict how the review panel would apply the guidelines to any ads it has not considered such as hypothetical ads.

A. Uh-huh.

Q. Is that your understanding as well?

MS. WOLVERTON: Objection; form.

A. Is what my understanding?

Q. (By Ms. Ames) That WMATA cannot reasonably predict how the review panel would apply the guidelines to ads that it has not actually considered.

A. Correct. Yes.

MS. AMES: We will go on to Nicol Exhibit 7 and 10.

THE WITNESS: Thank you.

MS. AMES: Actually, Andrew, we can also get out a new exhibit which is Tab 6.

MR. SLONIEWSKY: Tab 6.

MS. AMES: And this will be Exhibit 68.

(Exhibit 68 was marked for identification.)

Q. (By Ms. Ames) You can just take a minute to review both of those.

A. Okay.

Q. So this is a stipulation that WMATA's

Page 315

counsel prepared in this case regarding the authenticity of certain documents from your last deposition.

A. Uh-huh.

Q. Have you seen this before?

A. Yes.

Q. All right. Let's go down to paragraph 3 on the first page --

A. Yes.

Q. -- and look at sentences 4 and 5 which state that the ad depicted in Exhibit 7 was run but not approved by Outfront. The ad depicted in Exhibit 7 was included in the posting schedule by administrative error and promptly removed when noticed in June 2025.

Did I read that correctly?

A. Yes.

Q. When it says noticed in June 2025, is it correct that WMATA only became aware of this ad when it was brought to its attention by its counsel?

MS. WOLVERTON: Objection; form.

A. Say that last part of your question again, please.

Q. (By Ms. Ames) Is it correct that WMATA only became aware of the ad in Nicol Exhibit 7 when

Page 316

it was brought to its attention by counsel?

MS. WOLVERTON: Objection; form.

A. I'm not sure of the answer on this one.

Q. (By Ms. Ames) Do you know -- when it says when noticed in June 2025 --

A. Yes.

Q. -- do you know what --

A. I know.

Q. What happened?

A. So this is the ad I referenced earlier when I was discussing the -- the book ad that was resubmitted, and this was the ad that was not resubmitted. It was noticed. I just don't know who noticed it, so I can't speak to who noticed.

Q. Okay.

A. But it was noticed, and it was removed.

Q. So you're not aware that WMATA's counsel learned about it from plaintiff's counsel in this case?

MS. WOLVERTON: Objection; form.

A. No.

Q. (By Ms. Ames) Can you explain what it means, what the administrative error was?

A. From my understanding, it was submitted via -- and this is -- the technical terms are going

Page 317

to -- I'm going to butcher a bit, so please forgive me. I believe it was submittals via programmatic which is a type of advertisement, and it should have flagged that it needed to be reviewed, but it wasn't flagged or something like that.

Q. So is that different -- I guess a lot of the ads that we've seen in this case that were submitted to the panel, someone from Outfront emailed them to someone at WMATA. So you're saying that one came in through a different process?

A. I'm saying -- no. I'm saying it does not come through someone at WMATA. It was uploaded into the Outfront database without going through the regular channels, I believe.

So programmatic is a different way of purchasing, from what I understand, than if you were to contact the salesperson and say hey, I would like to -- like, contact them via email or phone and say hey, I would like to submit this ad, and then you give them the ad. Programmatic is you upload it yourself, and it bypasses the human component in some capacity.

Q. That makes sense. Thank you.

And so I know before you said that you're not aware of Outfront sending photos of ads to WMATA

Page 318

before they run.

A. Uh-huh.

Q. It says in here that this was added to the posting schedule. Does WMATA ever receive a copy of the posting schedule?

A. Not that I'm aware of, but -- yeah. Not that I'm aware of.

Q. Not that you're aware of? Okay.

Are you aware of whether WMATA ever has communications with Outfront about the posting schedule?

A. I don't know.

MS. AMES: We'd like to take a break, just a few minutes.

MS. WOLVERTON: Sure. How long?

MS. AMES: Five minutes.

MS. WOLVERTON: Sure.

(A break was taken.)

Q. (By Ms. Ames) We'll start looking back at the interpretive aids again, page 3. And before we get started again, just to confirm, the writing that's on this copy of the exhibit, that is your writing?

A. That is my handwriting.

Q. We'll look at paragraph G(3)(d), and that

Page 319

states that guideline 9 prohibits ads supporting, opposing, or promoting a law, ordinance, regulation, or policy or a proposed law, ordinance, regulation, or policy.

Did I read that correctly?

A. Yes.

MS. AMES: Andrew, let's look at Tab 9. This is a new exhibit.

A. And while he's looking, can I make a clarification to --

Q. (By Ms. Ames) Yeah.

A. I don't know the question in reference to defining or further explaining ethically, socially, or politically controversial or divisive topics.

I just want the reference -- the thing to reference that guideline G(3) outlines all those potential kinds of advertisements. So A through P kind of lists ethically, socially, or politically, like, what kind of content that might be.

Q. Okay.

A. Okay.

(Exhibit 69 was marked for identification.)

Q. (By Ms. Ames) Have you seen this before?

A. Not to my recollection.

Page 320

Q. What is it?

A. This is an image of a bus with a bus king or queen advertisement that says: Stop the Shuffle and has a website at the bottom underneath Stop the Shuffle repeated many times.

Q. Can you read the website link?

A. Www.stoptheshuffle.com.

Q. Is this a true and correct depiction of an ad approved by either WMATA or Outfront?

MS. WOLVERTON: Objection; form.

A. I cannot speak to what that is in this manner.

MS. AMES: Counsel, can you clarify what your objection is?

MS. WOLVERTON: Lack of foundation.

Q. (By Ms. Ames) Do you know why this ad was approved?

MS. WOLVERTON: Objection; form.

A. I can't speak to that.

Q. (By Ms. Ames) Did --

A. So you submitted an image to me.

Q. Yes.

A. And we know this -- like, where did this image come from?

Q. It's a photo.

Page 321

A. Who took it?

Q. One of my colleagues.

A. Okay.

MR. COFFIN: Actually, this is their document.

THE WITNESS: This is our document?

MR. COFFIN: Yes.

MS. AMES: Oh. This was provided by counsel, yeah.

MR. COFFIN: It's CLARKE_WB-4820.

THE WITNESS: Can I -- I don't have any information. I don't know what I'm speaking to.

MR. COFFIN: This is a document provided by WMATA --

THE WITNESS: I hear what you're saying. I'm just saying --

MR. COFFIN: -- in response to our request for any images of this ad from WMATA.

MS. WOLVERTON: Can you give us just a second to check? We're checking.

MS. AMES: If it helps, I think this was in September sometime.

THE WITNESS: September of this year?

MS. AMES: Would you say it was this September, Shannen?

Page 322

THE WITNESS: Sorry. I just needed a little bit more guidance. Sorry.

Q. (By Ms. Ames) That is a big binder, so --

A. Give me just two more minutes.

Q. Take your time.

A. Okay. Yeah. It's not in here.

MS. WOLVERTON: Recognizing 30(b)(6), can we just table that question and at a break, we can research?

MS. AMES: Yeah.

THE WITNESS: I'm sorry.

MS. AMES: No. It's fine.

MS. WOLVERTON: It's a lot of ads.

MS. AMES: Yeah. We can come back to that.

MS. WOLVERTON: Okay.

Q. (By Ms. Ames) Let's go back to the interpretive aids, paragraph G(3)G.

MS. WOLVERTON: Sorry. Can you repeat that?

MS. AMES: Paragraph 3G(3) in the interpretive aids.

MS. WOLVERTON: Thank you.

Q. (By Ms. Ames) It states that guideline 9 prohibits ads supporting, opposing, or promoting a

Page 323

governmental action or inaction other than offering goods and/or services to the government.

Did I read that correctly?

A. Yes.

Q. What does governmental action or inaction mean?

A. It could mean a lot of things. If we were to use November 10, 2025 as an example, an example of government inaction or action could reference the furlough or things of that nature.

Q. There's no set definition of that phrase?

A. Outside of this document, no.

Q. Why are ads offering goods or services to the government permitted?

A. Those ads are commercial in nature.

Q. So the sale of goods or services, you would say that doesn't implicate the concerns that led to the adoption of guideline 9?

A. The concerns for what? Say that again.

Q. For the adoption of the guidelines.

A. Say the first part.

Q. The sale of goods or services --

A. Uh-huh.

Q. -- would you say that that does not implicate the concerns that led to the adoption of

Page 324

the guidelines?

MS. WOLVERTON: Objection; form.

MS. AMES: What is the basis for your objection?

MS. WOLVERTON: I think it's outside the scope of this topic.

MS. AMES: Okay.

Q. (By Ms. Ames) You can go ahead and answer.

A. Not that I'm aware of.

Q. Is there any language in the guidelines that would support an exception for ads offering goods or services to the government?

MS. WOLVERTON: Objection; form.

MS. AMES: What is the basis of your objection?

MS. WOLVERTON: The document speaks for itself.

Q. (By Ms. Ames) Go ahead.

A. Repeat the question.

Q. Is there any language in the guideline that supports the exception for offering goods or services to the government?

MS. WOLVERTON: Same objection.

A. I'm sorry. She's going to say same objection again. Please repeat the question one

Page 325

more time.

Q. (By Ms. Ames) Okay.

A. Slower.

Q. Is there any language in guideline 9 that supports the exception for offering goods or services to the government?

MS. WOLVERTON: Objection; form.

A. So the document doesn't make exception. It just shows what's permitted and not permitted. I think that's what's throwing me off.

So it's not an exception, like, if you're selling goods or services but you violate other parts of the guidelines, then it would be permitted.

Q. (By Ms. Ames) Does this exception mean that government contractors can address issues as long as it's in the form of offering a good or service for purchase by the government?

MS. WOLVERTON: Objection; form.

A. I can't answer that.

Q. (By Ms. Ames) Let's look at interpretive aids, I think page 2, Exhibit 4, paragraph 4(B). It states that an advertisement that otherwise violates the guidelines is prohibited --

A. Correct.

Q. -- even if it also encourages or promotes

Page 326

the purchase or use of goods or services.

Did I read that correctly?

A. Yes, ma'am.

Q. What does that mean?

A. What I just said a few seconds ago. Even if it's commercial but it -- it violates a part of guidelines, it's not going to be permitted.

Q. Do you know how much annual revenue WMATA generates from advertisements placed by government contractors?

A. Oh. No, not at this time, I do not.

Q. All right.

A. We don't break down revenue based on industry or advertiser.

Q. Just wondering.

A. Uh-huh.

Q. Let's look at Nicol Exhibit 14.

A. Oh. The one we talked about before.

Q. I think you had a better head on it, but if you want to look at this one, that's fine too.

So as you just mentioned, we looked at this briefly before when we were discussing instances where Outfront approved ads on its own --

A. Uh-huh.

Q. -- correct?

Page 327

A. Uh-huh.

Q. And you said earlier that this ad was sent back to the review panel after it was noticed and that the panel then approved it after reviewing it, is that correct?

A. Yes.

Q. Why was this ad approved?

A. It was approved because it did not violate the guidelines.

Q. Why not?

A. Because it does not.

Q. Even though it discusses, like, Read Queer All Year, that was not considered an issue?

MS. WOLVERTON: Objection; form.

MS. AMES: What's the basis for your question?

MS. WOLVERTON: Asked and answered.

MS. AMES: Okay.

Q. (By Ms. Ames) Go ahead.

A. Oh, okay. Then repeat the question, sorry, because of what she said.

Q. Even though it discusses read queer, that's not an issue on which there are varying opinions?

MS. WOLVERTON: Objection; form.

Page 328

A. No.

Q. (By Ms. Ames) Why not?

A. It's a statement -- it's saying to read something. That's not a varying opinion. It's a marketing copy to say read something. It's not an opinion. It's not -- yeah.

Q. So just because it's telling people to read something or purchase something, that is not -- that makes it not an issue on which there are varying opinions?

A. I'm saying on this particular ad, the panel reviewed -- there's a QR code --

Q. Yep.

A. -- I believe, and also, when the -- when the panel reviewed the advertisement, it went to the website. It showed that it was for a marketing campaign promoting a sweepstakes to read books in a certain category by this publishing company.

Q. Let's look at Nicol Exhibits 15 and 16 as well, actually.

A. You said 16?

Q. 15 and 16.

A. 15 and 16. Okay.

Q. Take a minute to review those.

A. Uh-huh.

Page 329

Q. So looking at Exhibit 16 at the very bottom --

A. Uh-huh.

Q. -- there's an email from Ron Holzer to Aaron Bronson dated August 11, 2023, is that correct?

A. August 11th?

Q. Yeah. At the very bottom of page 1.

A. Yeah. Yeah. Yeah. Uh-huh.

Q. And then the text is on page 2.

A. Yeah. I see it.

Q. Can you please read that text of that email?

A. Good morning, Aaron. Regarding ad no. 1, no. 2, and no. 3, yes. Regarding ad no. 4, please ask Plan B to provide verification that the substance of this message is currently accepted by the AMA and/or the FDA. Thank you. Ron.

Q. Let's look back at Exhibit 68 that we looked at a little bit ago.

A. 68?

Q. Yes. It's the stipulation.

A. Thank you. I'm all over the place. Okay.

Q. And then on page 2, paragraph 4 states that Exhibit 16 is a true and correct copy of an

Page 330

August 16, 2023 email that was sent by R. Holzer within the scope of his duties at WMATA, and that refers to the advertisement depicted in Exhibit 15 that was run by WMATA.

A. Yes.

Q. Did I read that correctly?

A. Yes.

Q. So going back to Exhibit 16, then, in that email that you just read, would you say that Mr. Holzer was unsure as to whether the claim that Plan B is an abortion pill or is not an abortion pill was accurate?

MS. WOLVERTON: Objection; form.

A. Repeat your question. I just want to -- repeat your question, please.

Q. (By Ms. Ames) So would you say that from the text of that email that Mr. Holzer was unsure as to whether the claim that Plan B is not an abortion pill is accurate?

MS. WOLVERTON: Objection; form.

MS. AMES: What's the basis of your objection? Sorry.

MS. WOLVERTON: Lack of foundation, personal knowledge.

A. Yeah. See, that's where I struggle

16 (Pages 327 to 330)

Page 331

because you're inferring that this is Ron's thought or an understanding, and that's not for Ron to understand or know, right. So if he's asking this question, it is based on feedback from the panel.

Q. (By Ms. Ames) Okay.

A. Okay.

Q. What was the panel's understanding, then?

A. Correct. So the panel was inquiring into the substance of the message, not Ron, and that's why I wanted to clarify.

Q. So you would say that the panel was unsure about the substance of the message --

A. The panel -- correct.

Q. -- in the ad?

A. Correct.

Q. Then on page 1 of this email, the middle email there is from Aaron Bronson to Ron Holzer dated August 15, 2023, correct?

A. Yes.

Q. And Mr. Bronson responds to Mr. Holzer saying that the client confirmed that the ad -- or that the claim in the ad that Plan B is not an abortion pill, is that correct?

MS. WOLVERTON: Objection; form.

MS. AMES: What's the basis for the

Page 332

objection?

MS. WOLVERTON: The document speaks for itself.

A. So I'm going to -- Aaron's email to Ron states that the client's claim is supported and included a link.

Q. (By Ms. Ames) Right.

A. I don't know what the link goes to, but I -- I am going to infer along with everyone here that it's going to either an AMA or FDA reference as to what the pill is as identified in the advertisement.

Q. So then in the top email, you can see it's from Mr. Holzer to Mr. Bronson --

A. Yeah.

Q. -- dated August 16, 2023, is that correct?

A. Yes.

Q. And he says: Yes, 4 is approved as well.

A. Yes. No. 4.

Q. Why was this ad approved?

A. Because in my memory, the advertising review panel was concerned that this was presenting as medical or health-related messages and could potentially be in violation of guideline no. 4, and therefore, we requested further assurance that it was not promoting messages that was not currently

Page 333

accepted by the AMA or FDA.

Q. Was the ad in Exhibit 15 subsequently run?

A. I believe so.

Q. So last time we talked about -- well, actually, let's get Nicol Exhibit 17 out. This is the article from the US Conference of Catholic Bishops that we looked at the last time.

A. Uh-huh.

Q. Is that correct?

A. Yes.

Q. Go ahead and read through it or scan through it if you want.

A. Uh-huh. You're going to tell me where to read?

Q. Yes.

A. Okay.

Q. So the same as last time. We're going to look at page 7 under the heading Conclusion.

A. Okay.

Q. And can you read the first paragraph starting with the availability?

A. The availability of emergency contraception is not the nation's best-kept secret as promoters like to claim. The secret best kept from the American public is that these drugs can

Page 334

cause abortions. The time for covering up this unpleasant reality is long past. Many Americans believe that --

Q. You can stop there.

A. Sorry.

Q. You're fine.

It's at least some group's, like this article suggests, belief that emergency contraception such as Plan B causes abortion. Would the ad in Exhibit 15 not seem to be promoting a policy or belief held by the advertiser?

MS. WOLVERTON: Objection; form.

MS. AMES: What's the basis?

MS. WOLVERTON: Calls for speculation.

A. Yeah. I can't speculate on that one.

Q. (By Ms. Ames) Do you know if the review panel looked to see whether there were any groups that were opposed to emergency contraception or that believed that Plan B is an abortion pill?

A. I believe that they did. No, no. Keep going. I believe they did.

Q. You believe that?

A. Uh-huh.

Q. Do you know anything else about the research that they did for this ad?

Page 335

A. Not at the moment, no.

Q. We'll go back to the interpretive aids.

A. Okay.

Q. Page 3 towards the bottom. We'll look at G(3)L which states that guideline 9 prohibits ads describing or promoting a view of the role that any particular group, including groups characterized by their race, religion, ethnicity, nation origin, sexual orientation, disability status, marital status, age, or ideology has played or should play in any government, society, or country.

Did I read that correctly?

A. Yes.

Q. Why are these ads prohibited?

A. Because as mentioned, maybe like a good hour ago, these types of ads can be substantively controversial or divisive in nature.

Q. How so?

A. As described in this guideline.

Q. Do you have an example?

A. Not at this moment.

Q. Let's look at Nicol Exhibit 20.

This is the AARP ad we looked at the last time, correct?

A. Uh-huh. Yes.

Page 336

Q. Do you know why this ad was approved?

A. Because it did not violate the guidelines.

Q. Why not?

A. I don't know what that means when you say why not. It did not violate the guidelines.

Q. Do you know what the panel looked at in reviewing this ad?

A. The panel reviewed the copy of the ad. It used the QR code to go to the website, and it also went to the Facebook pages referenced in the bottom right corner. Sorry; the social media pages, not Facebook.

Q. Is it fair to say that this ad encourages voters over the age of 50 to vote?

MS. WOLVERTON: Objection; form.

MS. AMES: What's the basis?

MS. WOLVERTON: The document speaks for itself.

A. I think it's fair to say that this document provides information on how to vote and when and where but not instructing individuals to vote.

MS. AMES: Let's look at Nicol Exhibit 21. Actually, if you can get 22 out also at the same time.

Page 337

THE WITNESS: Thank you.

Q. (By Ms. Ames) So looking at Exhibit 22, this -- the ad in Exhibit 21 was rejected by the panel, correct?

A. Yes.

Q. Why does it violate guideline 9?

A. In comparison to the ad we previously saw, this one's instructing individuals to vote.

Q. I was going to ask you to compare them, so thank you for doing that.

A. You're welcome.

Q. Look at the email again. In the subject line, you can see that it's from a group called The Amplifier Foundation that submitted this. Is that correct?

A. That's what the email says, yes.

Q. Actually, you already said what I was going to ask you.

Again, you would agree this ad encourages a particular group of people to vote?

A. It's not even a particular group. It's encouraging voting in general, not necessarily particular people, yeah.

Q. Actually, I want to look at the email.

A. Uh-huh.

Page 338

Q. You see on the top that it says attachments?

A. Uh-huh.

Q. It says: Diadelosmuertos_votes_18by24.

A. Uh-huh.

Q. Do you know what dia de los muertos is?

A. I'm not going to try to translate Spanish. I'm not a Spanish speaker.

Q. Have you heard of the holiday, dia de los muertos?

A. Actually, no. Is it Cinco de Mayo?

Q. No, no. It actually just happened about a week ago.

A. No.

Q. It's a holiday called Day of the Dead that I believe they celebrate in Hispanic countries.

A. Okay.

Q. Would that change --

MS. WOLVERTON: Objection; form.

Q. (By Ms. Ames) Would that change your view on whether this ad encourages a particular group of people to vote as opposed to people in general?

A. No, it would not change. I think if you remember from the previous deposition, right, this ad doesn't have any -- outside of the copy at the

Page 339

bottom, there's no logo. There's no -- we don't know who this ad is for --

Q. Right.

A. -- or from. And so when we review ads, we're not looking at title names of documents. We're literally looking at the image on the screen. And then if there's any QR codes or links from there, then we might go to something, but there was nothing here that gave us any additional information.

Q. Let's go back to the interpretive aids.

A. Okay.

MR. SLONIEWSKY: Exhibit 4?

MS. AMES: Yep. Exhibit 4. Our favorite exhibit.

A. We're on Exhibit 4.

Q. (By Ms. Ames) We'll look at the bottom of page 3 again, paragraph G(3)M.

A. M as in Mary?

Q. Yes. It states: Guideline 9 prohibits ads describing or promoting a particular view, interpretation, or meaning of historical events, historical documents, for example, but not limited to the Declaration of Independence or Constitution, laws, statutes, regulations, or other government

Page 340

policies.

Did I read that correctly?

A. Yes.

Q. Why are these types of ads prohibited?

A. If I remember from my last deposition, we talked about how these types of things could be polarizing and create -- not just be polarizing but how they can be considered at times, depending on the topic, controversial or divisive, and therefore, prohibited.

Q. Can you think of any examples from the past where WMATA has rejected any ads based on this reasoning?

A. I can't --

MS. WOLVERTON: Objection; form.

A. I can't think of any.

MS. AMES: What is the basis for the objection?

MS. WOLVERTON: Attorney work product privilege, attorney-client privilege.

MS. AMES: All right. Let's look at Exhibit 23 from last time.

Q. (By Ms. Ames) This is a Rosa Parks Day sign that was placed in Metro buses.

A. Uh-huh.

Page 341

Q. Is that correct?

A. Yes, it is.

Q. Do the ads -- or do the guidelines apply to this type of signage?

A. No.

Q. Why not?

A. This is not advertising.

Q. What is it?

A. This was a simple promotional -- it was more like a commemorative exercise we did in honor of Rosa Parks.

Q. Is it fair to say that this particular sign describes or promotes a particular view, interpretation, or meaning of an historical event?

MS. WOLVERTON: Objection; form.

A. No, it does not.

MS. AMES: What's the basis for the objection?

MS. WOLVERTON: The document speaks for itself.

Q. (By Ms. Ames) Why not?

A. Why not what?

Q. Why does it not describe or promote a particular view, interpretation, or meaning of an historical event?

Page 342

MS. WOLVERTON: Same objection.

A. It's literally just saying Rosa Parks Day.

Q. (By Ms. Ames) Right. And that doesn't promote a particular historical event?

MS. WOLVERTON: Objection; form.

A. I don't understand the question. It's like Happy New Year. It's just -- I don't understand what the question is exactly.

Q. (By Ms. Ames) I mean, I guess it is a little bit different than Happy New Year because New Year just marks the beginning of the new year, but Rosa Parks Day --

A. Or President's Day.

Q. -- indicates something specific, correct?

A. Or President's Day. President's Day celebrates President's Day. Rosa Parks Day celebrates Rosa Parks Day.

Q. What is Rosa Parks Day?

A. I want -- so that's the thing. There's two Rosa Parks Days. I don't want to speak incorrectly. One is her birthday. I'm not sure what the other one is. So, again, it's commemorative in nature.

Q. Okay.

A. One's in December; one's in February.

Page 343

Q. This one appears to be the one in February.

A. I don't remember which one is which.

Q. And just to clarify, this was not -- this particular sign and other signs like this would not be subject to the guidelines?

A. No.

MS. WOLVERTON: Objection; form.

THE WITNESS: Sorry.

A. No, it would not.

Q. (By Ms. Ames) Let's again look at the very bottom of Exhibit 4, interpretive aids, paragraph G(3)N.

A. Uh-huh.

Q. It states that guideline 9 prohibits ads supporting, opposing, or promoting a rally, protest, march, demonstration, or other similar events that includes any content that would otherwise be prohibited by the guidelines.

Did I read that correctly?

A. Yes.

Q. And then just below that on page 4, paragraph G(4) states that guideline 9 does not prohibit advertisements for a newspaper, magazine, other publication, TV program, film, theatrical

Page 344

performance, concert, podcast, or other media solely because the medium's content addresses political issues or contains political messages so long as the advertisement does not otherwise violate the guidelines.

Did I read that that correctly?

A. Yes.

Q. Why do the interpretive aids require rejection of an ad for a rally but not for a play or performance that might have the same message?

MS. WOLVERTON: Objection to form.

MS. AMES: What is the basis?

MS. WOLVERTON: Lack of foundation.

A. So your question is why would the guidelines prohibit something like a rally but not a play?

Q. (By Ms. Ames) Right.

MS. WOLVERTON: Same objection.

A. Because it's here in the guidelines, in the interpretive aid. I mean, I don't know what you want beyond that.

Q. (By Ms. Ames) I guess I'm just looking for any reasoning for the distinction in treatment between a rally and a play.

MS. WOLVERTON: Objection; form.

Page 345

A. I can't speak to that, but we can talk about -- I can't speak to that.

Q. (By Ms. Ames) So is it possible that you could have a demonstration and a play on the same political topic at the same location, and an ad for the demonstration would be rejected, but the performance would be allowed?

MS. WOLVERTON: Objection; form.

A. I can't speak to that.

MS. AMES: Let's look at Exhibit 26 which is the video ad that we looked at last time. Caroline, we have another copy, but I don't know if you need one.

MS. WOLVERTON: Which --

MS. AMES: It's Exhibit 26. It's the -- I mean, we'll look at it in a second. It's the World Culture Festival.

MS. WOLVERTON: Yeah. We have it already loaded. We can pull it up.

MS. AMES: Oh. You can just pull it up?

MS. WOLVERTON: Uh-huh.

MS. AMES: That's easier. The passwords for these are kind of a pain.

MS. MERAZ: Is it from August 23?

MS. AMES: Yeah.

Page 346

A. Uh-huh.

Q. (By Ms. Ames) So just to be clear, this is a video ad for the World Culture Festival that -- it appears to be a mock Metro system in the shape of a heart?

A. The last time I didn't see the heart until you pointed it out. Yes.

Q. We spent a lot of time looking at these things.

MR. COFFIN: You've got a memory.

Q. (By Ms. Ames) So why does this ad not violate guideline 9?

A. Okay. Thank you. Why does it not violate guideline 9?

MS. WOLVERTON: Objection; form.

MS. AMES: What's the basis?

MS. WOLVERTON: Lack of foundation.

A. Let's go through it together, shall we? Okay. I don't know why it would violate guideline 9.

Q. (By Ms. Ames) Let's look at the website, then, which is wcf.artofliving.org.

MS. AMES: This is a new exhibit, Andrew.

A. One second. What exhibit number was this one?

Page 347

Q. (By Ms. Ames) 26.

A. 26. All right. Thank you. This is from the previous, or is this a new one?

Q. No. This is a new one, and this will be Exhibit 70.

(Exhibit 70 was marked for identification.)

Q. (By Ms. Ames) And while you're reviewing that, I'll represent that we accessed this website on the Wayback Machine and that this is a page available as of August 2023.

A. Okay.

Q. Did the panel review this website in connection with the advertisement?

A. I can't speak to what happened in 2023 on the panel.

Q. Do you see on the top left-hand corner of the first page the about tab?

A. Uh-huh.

Q. We'll look at that.

MS. AMES: This is -- this will be Exhibit 71.

(Exhibit 71 was marked for identification.)

A. And this is from 2023?

Page 348

Q. (By Ms. Ames) Yes. This is April 2023.

A. Why does it look different than this one?

Q. It's a different page.

A. I know, but even the -- okay.

Q. And then on the second page, can you please read under the heading Spirit of the Festival that first paragraph that starts with: The purpose?

A. The purpose of the World Culture Festival is to send a message that the whole world is one family, and we can all coexist with our differences. It is an opportunity for leaders from all segments of society, business, politics, religion, and academia to come together and renew their vision to work for the common welfare.

Keep reading?

Q. Yes, please.

A. The festival provides a platform for the preservation of local and indigenous traditions through music and dance as well as the opportunity for everyone else to relish and enjoy. This is a movement for the revival of universal human values such as love, compassion, and friendliness.

Q. And we'll look at one more page from this website.

MS. AMES: Andrew, Tab 25. This will be

Page 349

Exhibit 72.

(Exhibit 72 was marked for identification.)

Q. (By Ms. Ames) We've accessed this one that was available as of September 2023.

A. And where did this -- so when you go to the home page, how do you get to this page?

Q. This page, I believe -- I believe this came from the activities tab, if you see that on the top left --

A. Yes.

Q. -- of that first --

A. So you're saying in the Wayback Machine --

THE WITNESS: Am I allowed to ask questions?

MS. WOLVERTON: If you're confirming. I'm sorry; is there a question pending?

THE WITNESS: She hasn't gotten there yet. I'm just trying to understand.

A. So just for clarification, in the Wayback Machine, you pulled up this website.

Q. (By Ms. Ames) Yes.

A. From there, you clicked about us and got Exhibit 71.

Q. Yes.

Page 350

A. And then from there, you're proposing you selected activities on Exhibit 70 --

Q. Yes.

A. -- and got Exhibit 72.

Q. Yes.

A. Okay.

Q. Can you look at page 2?

A. Okay.

Q. You see at the top it says: The Yoga Experience. Can you read starting at: Join us?

A. Join us for an epic 60-minute yoga event. Afterwards, Gurudev, chairman of the Indian Yoga Association, will lead a meditation and share yogic wisdom.

Q. Can you read the second paragraph as well: You will experience?

A. You will experience all aspects of an authentic practice in celebration of yoga. Whether you're a yoga expert or just getting started, we invite you to roll out your mat and join the flow with thousands of others.

And then there's -- I assume maybe a button to say: Save your spot, and then it says: Yoga teacher and studio interested in partnering for the event, and then there's another I assume button

Page 351

that says:  Count me in.

Q.  Thank you.

Is this sort of yoga practice led by some kind of spiritual leader something that people might have varying opinions on?

MS. WOLVERTON:  Objection; form.

MS. AMES:  What's the basis?

MS. WOLVERTON:  Calls for speculation, lack of foundation.

A.  Is yoga spiritual, or is it a form of fitness activity?

Q.  (By Ms. Ames) That's what I'm asking you.  Is it --

A.  I thought yoga --

MS. WOLVERTON:  Objection; form.

A.  I thought yoga was a fitness activity.  You said spiritual leader, and it says chairman of the Indian Yoga Association.  So am I to infer that this is something beyond physical activity?

Q.  (By Ms. Ames) I guess I'll represent to you that there are people who view yoga as a spiritual activity.

A.  Oh, okay.  That's news to me.

Q.  Did the panel consider the purpose of the festival in determining whether to approve this ad?

Page 352

MS. WOLVERTON:  Objection; form.

A.  Did the panel review this as a yoga event?

Q.  (By Ms. Ames) Just generally, the purpose of the festival.

MS. WOLVERTON:  Same objection.

A.  I can't speak fully to what the panel reviewed in 2023, so I can't speak to that.

Q.  (By Ms. Ames) I guess I just want to clarify.  There are -- there have been some ads that you have been able to clarify what the panel reviewed, but then there are some that you are not, and I'm just wondering what the basis of your knowledge is.

A.  Some of the panel -- some of the ads I did actually sit on the panel for, so I can speak a little bit more confidently to those.  In 2023 -- I'm not sure what year this was.

Q.  This was 2023.

A.  I know.  I mean, I'm not sure if I was even on the panel or even in this capacity.  I've never seen these before, so I know I wasn't.

Q.  I guess last time in your last deposition you were not able to speak -- you didn't have any memory of what the panel had reviewed for many of the same ads.  Is that something you reviewed in

Page 353

preparing for this deposition as compared to last time.?

A.  I didn't.

MS. WOLVERTON:  Objection; form.

MS. AMES:  What's the basis?

MS. WOLVERTON:  Lack of clarity.  I'm not sure what you're referring to.

A.  Yeah.  I did not review these -- I have not seen these before.

Q.  (By Ms. Ames) I just meant generally.

A.  Okay.

Q.  Because you have been telling us for some of the other ads --

A.  Yeah.

Q.  -- that we've already looked at today --

A.  That I -- yeah.  Some of the other ads we've looked at today, I -- what have I said that I have seen before today?

Q.  I think several of the ones that you just -- well, for that one, for example, the AARP ad, you told me that the panel looked at the QR code and the social media --

A.  Uh-huh.

Q.  -- and that stuff, so you remembered the process.

Page 354

A.  I -- that's been consistent even with my last deposition.  I always said the panel looked at websites and QR codes and anything that was on the face of the ad.  I always said that.  That hasn't changed.

MS. AMES:  We'll look at some new ones now, tabs 26 and 27, and they'll be -- actually, if you can get 28 too.  It will be 73, 74, and 75.

(Exhibits 73, 74, and 75 were marked for identification.)

A.  Okay.

Q.  (By Ms. Ames) Have you seen Exhibit 73 and 74 previously?

A.  Yes.

Q.  What are they?

A.  Advertisements for a film titled, I believe, The Bibi Files.

Q.  I was going to ask you to read what they say, but they both say The Bibi Files.

A.  Uh-huh.

Q.  So let's look at Exhibit 75 which is the email.  Is that a true and accurate copy of an email sent by Ron Holzer on December 6th, 2024 within the scope of his duties at WMATA?

A.  Yes.

Page 355

MS. WOLVERTON: Objection; form.

A. Yeah.

MS. AMES: What's the basis?

MS. WOLVERTON: Lack of foundation.

Q. (By Ms. Ames) Can you just repeat your answer? Sorry.

A. Yes.

Q. So you can see in the text of his email, the first sentence of the email says: The attached proposed advertisement with the file name thebibifiles_1$_lrg.jpeg is a yes.

Did I read that correctly?

A. Yes.

Q. Does that name of that document refer to the ad in Exhibit 73?

MS. WOLVERTON: Objection; form.

A. That's -- I was going to ask you; which one is which.

Q. (By Ms. Ames) I'll represent to you that it does --

A. Okay.

Q. -- refer to Exhibit 73.

Do you know why that ad was approved?

A. Because it was clear that it was a poster for a movie.

Page 356

Q. Did the panel consider the content of the movie at all in reviewing that ad?

A. Yes. They considered the content of the movie.

Q. So then the second sentence says: The attached proposed advertisement with the file name option3(1).jpeg is prohibited by advertising guidelines 1, 8, and 9.

Did I read that correctly?

A. Yes.

Q. And so I'll represent that the option 3 document is the ad in Exhibit 74.

Do you know why that ad was rejected?

A. As you mentioned, it violated the guidelines based on 1, 8, and 9. It's not clear who this -- or what this image is. It doesn't appear to be a movie poster. It doesn't appear to be who it's coming from or who -- and it could be inferred if someone wasn't looking for it that it was a Metro -- like, a Metro message versus a message from a third party.

Q. Why does it violate guideline 9 specifically?

A. It violates guideline 9 specifically because it's about -- like, without connecting it to

Page 357

the fact that it's a movie and that people should go and see it and the commercial aspects of it, it takes away that -- the commercial aspects of it and instead lends itself to the message of a very polarizing and controversial topic.

Q. So I think you've talked about this a little bit generally, but why were these two ads treated differently?

A. This one has copy to show that it's movie. This one does not.

Q. So you just said about Exhibit 74 that it features -- it lacks the commercial aspect of it, correct?

A. Uh-huh.

Q. And that it appears to be something about a polarizing topic or person, correct?

A. Uh-huh.

Q. So wouldn't that be true about Exhibit 73 as well?

MS. WOLVERTON: Objection; form.

MS. AMES: What's the basis?

MS. WOLVERTON: Asked and answered.

A. Yeah. It already is commercial.

Q. (By Ms. Ames) Okay, but -- actually, let's look at the guidelines.

Page 358

MR. SLONIEWSKY: Exhibit 4.

MS. AMES: Exhibit 4.

Q. (By Ms. Ames) The interpretive aids; I'm sorry.

A. You're fine.

Q. So we looked already at paragraph 4(B) and that again states that an advertisement that otherwise violates the guidelines is prohibited even if it also encourages or promotes the purchase or use of goods or services.

Did I read that correctly?

MS. WOLVERTON: Sorry. Where are you?

MS. AMES: Page 2, paragraph 4(B).

THE WITNESS: Page 2. Up towards the top.

MS. AMES: Do you need me to read it again?

MS. WOLVERTON: No, thank you.

Q. (By Ms. Ames) So how does that not apply to Exhibit 73?

MS. WOLVERTON: Objection; form.

MS. AMES: What's the basis?

MS. WOLVERTON: Asked and answered.

A. The difference is again, this is showing -- Exhibit 73 is showing an advertisement for a movie, a film. 74 does not show an advertisement

23 (Pages 355 to 358)

Page 359

for a movie or film, and that's the difference.

Q. (By Ms. Ames) I think I'm just confused, then, about what paragraph 4(B) means. Do you mind explaining that to me again?

MS. WOLVERTON: Objection; form.

A. If an ad promotes -- sorry. If an ad violates the guidelines, even though it promotes a purchase or a use of service of goods, then it will be prohibited. But again, 74 is not promoting the purchase or use of goods or services. It's not -- it's not commercial in that aspect, so it's not applicable to 4(B).

Q. (By Ms. Ames) I was asking if it's applicable to 73.

A. Oh. To 73. No, because the general message of the ad is not about something that -- it's not about the polarizing topic or person. It's about watching a movie.

Q. All right. We'll move on, then.

Sticking with Exhibit 4, page 4, paragraph G(3)O at the top, it states that guideline 9 prohibits ads using logos, slogans, phrases, symbols, or any other words or images that are otherwise prohibited by the guidelines unless solely for a commercial purpose.

Page 360

A. Uh-huh.

Q. Did I read that correctly?

A. Yes.

Q. What does that interpretive aid mean?

MS. WOLVERTON: Objection; form.

A. Lordy. It means that certain logos, slogans, phrases, or symbols -- hold on. I'm getting tired. Can you clarify your question? You just want me to explain what the words say in O?

Q. (By Ms. Ames) Yeah. I'm just asking what -- I guess -- maybe you could give an example of what this would apply to.

MS. WOLVERTON: Objection; form.

A. I can't give an example at this moment.

Q. (By Ms. Ames) Why not?

A. My brain is just not able to give an example. Did I give an example in the previous deposition because it's underlined, so I feel like we talked about it extensively.

Q. We did talk about it, yes.

A. What example did I give in the previous deposition?

Q. You talked about a -- like, the no symbol, like the circle with the line through it.

A. Okay. Okay. That's what I talked about?

Page 361

I don't even remember.

Q. And if you need to take break, we can take one.

A. Wait. I can't take a break during the question, right?

Q. No. I was going to say in a minute.

A. My brain is really not able to --

MR. COFFIN: I think you've answered the question.

THE WITNESS: Yes.

MR. COFFIN: You're not able to answer it.

THE WITNESS: Yeah. I can come back, but I'm not able to answer this one.

MS. AMES: If we want to take a break --

MS. WOLVERTON: Sure. That's fine.

THE WITNESS: I'm sorry.

MS. AMES: It's fine. We've been pushing along.

(A break was taken.)

Q. (By Ms. Ames) Let's go back very, very quickly to Exhibit 71 which was the about page for the World Culture Festival.

A. Uh-huh.

Q. I just wanted to ask you. I already had you read that -- those two paragraphs on the second

Page 362

page.

A. Uh-huh.

Q. If you want to read it again to yourself, that's -- you can.

A. Oh. Again? Go ahead.

Q. What we read in there, is that not something the panel would consider in determining if this -- the ad that we looked at presents an issue?

MS. WOLVERTON: Objection; form.

A. The panel considers everything when reviewing.

Q. (By Ms. Ames) I think that's all I have on that one, then.

A. Okay.

Q. When we left off, we were looking at Exhibit 4 at paragraph G(3)O, and I'll just read that again. That states that the guideline prohibits ads using logos, slogans, phrases, symbols, or any other word or images that are otherwise prohibited by the guidelines unless solely for commercial purpose.

Did I read that correctly? Did you find it?

A. Sorry.

Q. It's page 4.

Page 363

A. Thank you. Yeah. You read it correctly, uh-huh.

Q. **What does that mean?**

A. You came back, Caitlin.

MS. WOLVERTON: Objection; form.

THE WITNESS: Caitlin said: I'm coming back.

A. Okay. That means that if something was prohibited by the guidelines, if it was used in a commercial purpose, it would be okay. It -- no. Let me make myself clear. It could potentially be okay.

Q. **(By Ms. Ames) When you say potentially it could be okay, can you just explain what that means?**

A. Because that would just be one part of the ad, right, so you have -- thank you for refreshing my memory earlier with the no symbol.

It was -- let's say the no symbol was prohibited and it was used, and the rest of the copy, everything, the link to the website we reviewed, everything does not prohibit the guidelines. If it was a commercial-in-nature ad, it would be permissible. I'm saying that, yes, like, we would consider it for a commercial ad, but if there's something else in the ad that violates, then

Page 364

it wouldn't be permitted.

Q. **Is there any example that you can think of where a slogan that would otherwise violate the guidelines was used solely for commercial purpose?**

A. I can't think of any at this moment.

Q. **How would you reconcile the solely for a commercial purpose phrase at the end of that paragraph with paragraph 4(B) which we looked at already?**

MS. WOLVERTON: Objection; form.

A. 4(B) which is the -- how would I -- say it again. How would I do what?

Q. **(By Ms. Ames) How would you reconcile it?**

A. Reconcile it.

MS. WOLVERTON: Same objection.

MS. AMES: What's the basis for the objection?

MS. WOLVERTON: Vague and unclear.

A. I mean, I think I reconcile it the way I stated previously, right, like, so the slogan wouldn't be something we would prohibit if it's used in a commercial setting. If there's other parts of the ad that violate the guidance, then we would not permit the ad in totality.

Q. **(By Ms. Ames) Let's go to the next**

Page 365

**paragraph in Exhibit 4, paragraph G(3)P., still on page 4.**

A. Okay. Sorry.

Q. **You're fine.**

**That states guideline 9 prohibits ads supporting, opposing, or promoting an ethical, social, or humanitarian cause, mission, cause of action, awareness campaign, position statement, or other similar effort unless solely for a commercial purpose.**

**Did I read that correctly?**

A. Yes.

Q. **How does WMATA define ethical, social, or humanitarian cause?**

MS. WOLVERTON: Objection; form.

MS. AMES: What's the basis?

MS. WOLVERTON: To the extent it's asked and answered.

A. Yeah.

Q. **(By Ms. Ames) Go ahead.**

A. We've discussed previously, you know, ethically and socially in terms of defining it, so that was -- you know, I said that earlier in terms of what people's morals or viewpoints might be, whether it's right or wrong. We also defined social

Page 366

earlier as well.

Q. **I guess those were in a different context, though, because this is specifically talking about an ethical, social, or humanitarian cause.**

A. Uh-huh.

Q. **I'm just asking you what that means.**

MS. WOLVERTON: Same objection.

A. It means what it says. It's very clear. What's -- what's not clear about it?

Q. **(By Ms. Ames) None of these words are defined in these interpretive aids, so that's --**

A. The word support isn't defined, the word opposing isn't defined, but we know those meanings.

Q. **Arguably, we don't.**

A. We don't? Are we defining every single word in this document? I'm just curious. I don't know what that means. Like, all words have meanings.

Q. **Yeah.**

A. So --

Q. **I'm just asking what is an ethical, social, or humanitarian cause? Do you have an example of something that will qualify?**

A. That's different. Earlier you said define. You're asking for an example of those?

Page 367

Q.  Because you wouldn't -- you don't have the definition, and so now I'm asking you for an example.

MS. WOLVERTON:  Objection; form.

MS. AMES:  What's the basis?

MS. WOLVERTON:  Argumentative.

THE WITNESS:  I'm trying to think of the social example I gave earlier.  Can I -- can I ask her --

MS. WOLVERTON:  The court reporter.

THE WITNESS:  -- the court reporter what I said earlier or no?

MS. WOLVERTON:  You can ask counsel if she's okay with that.

(A discussion was held off the record.)

A.  So an example for your question -- to answer your question, an example of something supporting or opposing something ethical, social, or humanitarian, I'll give you the example I think I gave or maybe you gave in the last deposition.  Like, Black Lives Matter would be something that might be considered a social cause, so something along those lines.

Q.  (By Ms. Ames) What about a humanitarian cause?

Page 368

A.  A humanitarian cause could be --

MS. WOLVERTON:  Objection; form.

MS. AMES:  What's the basis?

MS. WOLVERTON:  Vague.

A.  An example of a humanitarian cause could be something along the lines of support Hurricane Melissa victims or something along those lines.

Q.  (By Ms. Ames) When would an ad for any of the topics mentioned in G(3)P be considered solely for a commercial purpose?

MS. WOLVERTON:  Objection; form.

MS. AMES:  What's the basis?

MS. WOLVERTON:  Calls for speculation.

A.  Yeah.  In speculating, I would say, for example, with the Hurricane Melissa example, if it was explicitly like hey, click here to donate to the victims or whatever it may be of Hurricane Melissa.

Q.  (By Ms. Ames) So you would consider donating a commercial purpose --

MS. WOLVERTON:  Objection.

Q.  (By Ms. Ames) -- to be a commercial purpose?

MS. WOLVERTON:  Objection; form.

MS. AMES:  What's the basis?

MS. WOLVERTON:  Incomplete hypothetical.

Page 369

A.  It could be a part of a commercial advertisement, yes.

Q.  (By Ms. Ames) Are you aware of any ads for an ethical, social, or humanitarian cause that were considered to be solely for a commercial purpose?

A.  I'm not aware at this time.

Q.  And similar to what I asked you before about the last paragraph, how do you reconcile this solely for a commercial purpose phrase with paragraph 4(B)?

MS. WOLVERTON:  Objection; form.

MS. AMES:  What's the basis?

MS. WOLVERTON:  The document speaks for itself.

A.  Yeah.  So, again, all parts of the ads and guidelines have to be considered.  So even if it, you know, is permissible under a certain -- one particular part of the guideline, if it violates another part, it would not be permissible.

Q.  (By Ms. Ames) Now let's go to paragraph G(4) in Exhibit 4, the interpretive aids.

A.  G(4)?

Q.  Yes.

A.  Okay.

Q.  It's right below P.

Page 370

A.  Uh-huh.

Q.  We looked at this before, but I'll read it again.  Does not prohibit advertisements for newspaper, magazine, or -- sorry -- for a newspaper, magazine, other publication, TV program, film, theatrical performance, concert, podcast, or other media solely because the medium's content addresses political issues or contains political messages so long as the advertisement does not otherwise violate the guidelines.

Did I read that correctly?

A.  Yes, ma'am.

Q.  What does media mean in this paragraph?

A.  Media.  See, it's like repeat questions, but I just don't remember my answers.  I want to say media could be something digital.  Hold on.  Yeah.  It could be digital, so maybe social media or -- it's just like a catch-all thing, you know.

Q.  So there's no set definition of the term media as used in this paragraph?

A.  No.  I mean, media is media, so in this category, it could be like a web series.  It could be -- like, there's just different types of media, but it's not undefined.

Q.  Does media include books?

26 (Pages 367 to 370)

Page 371

MS. WOLVERTON: Objection; form.

MS. AMES: What's the basis?

MS. WOLVERTON: The document speaks for itself.

A. Yes.

Q. (By Ms. Ames) What about movies?

MS. WOLVERTON: Objection; form.

A. Film.

Q. (By Ms. Ames) What about plays?

MS. WOLVERTON: Objection; form.

A. Theatrical performance.

Q. (By Ms. Ames) Music videos?

MS. WOLVERTON: Objection; form.

A. Other media.

Q. (By Ms. Ames) So you consider music videos to be other media?

A. Uh-huh.

Q. Websites?

MS. WOLVERTON: Objection; form.

A. Other media.

Q. (By Ms. Ames) What about, like, an object, a T-shirt or a bag with a printed message on it?

MS. WOLVERTON: Objection; form.

A. I don't know if that would be considered media. That's a -- like, something physical?

Page 372

Q. (By Ms. Ames) Uh-huh.

A. No.

Q. Okay.

A. You said, like, a T-shirt? I just want to be clear.

Q. Yeah. A T-shirt, a tote bag --

A. Okay.

Q. -- something like that.

A. Uh-huh.

Q. And your answer was no?

A. No.

Q. You would not consider that media, is that correct?

A. That is correct. I said no.

Q. All right. Let's look down a couple paragraphs at G(7) and that states that guideline 9 does not prohibit advertisements that promote medical services that may be the subject of public debate and controversy; for example, but not limited to abortion, pregnancy care, gender-affirming medical treatment, in vitro fertilization, vaccines, et cetera, if the advertisement is limited to describing the services available so long as the advertisement does not otherwise violate the guidelines.

Page 373

Did I read that correctly?

A. Yes.

Q. Why are these types of ads allowed?

A. Because they are -- and I just would like to also, Traci [as spoken], add this point of clarification or just a note in reference to Exhibit 15, that this directly applies to Exhibit 15 as well.

Q. Okay.

A. Exhibit 15, sorry, and 17.

Q. But is there a reason that these types of ads listed here are allowed?

A. Other than explained in the guidelines and aids?

Q. I mean, I don't see anywhere in the guidelines why it's -- as to why these would be allowed or anything in here that explains why they're allowed. It just states that they are allowed.

MS. WOLVERTON: Objection; form.

MS. AMES: What's the basis?

MS. WOLVERTON: I object to counsel's testimony.

A. Guideline -- I'm sorry. G -- in the interpretive aids, in Exhibit 4, G(7) there is --

Page 374

it's connected also to Exhibit 3, No. 4, right, that if it's a medical or health-related message and it's from a government health organization that it can be accepted, and so that's why.

Q. (By Ms. Ames) I'm asking about guideline 9, though.

A. You're asking about guideline 9, but I'm showing connectivity to guideline 4 in this interpretive aid --

Q. Okay.

A. -- number or letter or whatever.

Q. So the interpretive aid, G(7) specifically refers to ads for abortion services and gender-affirming medical treatment.

A. Uh-huh.

Q. Correct?

A. Uh-huh.

Q. Do those ads not raise the same kind of concerns for rider discomfort or complaints or vandalism that the guidelines are intended to address?

MS. WOLVERTON: Objection; form.

A. If the advertisement is speaking solely to the services being offered -- goods or services being offered in that advertisement and they're not

27 (Pages 371 to 374)

Page 375

violating the guidelines overall, then no. Again, we -- we've talked about what can cause discomfort to our customers.

I mentioned earlier today people hate the red line. People hate the long bus waits on certain lines. People hate the colors that I'm putting on the AK train. It could vary, so -- and I'm not -- the colors that Metro is putting on the AK train. So that can vary in terms of what a customer's comfort level is.

Q. Let's look at Exhibit 45 from last time.

A. Thank you.

Q. So the last time we looked at this ad, this was from 2023, and WMATA -- the panel rejected this ad, correct?

A. Yes.

Q. Why was it rejected?

A. I believe it violated guidelines 9 and 14.

Q. Why did it violate guideline 9?

A. It was -- let's go back to our aid, but it was definitely trying to influence members of the public on the healthcare industry and perceived lack of -- lack of or -- lack of transparency in healthcare practices.

Q. Let's look at Exhibit 47. This one was

Page 376

from January of this year, and this was approved, correct?

A. This is 47?

Q. Yes.

A. Sorry. One second. Yes.

Q. Do you know why this ad was approved?

A. Because it did not violate the guidelines.

Q. Why not?

A. What do you mean by why not?

Q. I guess how is this one different than Exhibit 45?

A. This one is different in that the copy in 40 -- Exhibit 45 inferred malfeasance on the healthcare industry whereas the copy in Exhibit 47 provided a more informational tone in their messaging to the customers to understand more about the healthcare industry versus implying something about the healthcare industry.

Q. Did the panel look at the link in either of these ads in its review?

A. Yes, it did.

Q. So are you saying that the content of the website didn't have anything to do with the decision; it was the content of the ad?

A. No. I am not saying that.

Page 377

Q. Okay.

A. I'm just -- I'm saying on its face right now, those are two distinguishable things between these ads, but the ad -- the ad review panel did review the QR codes and the websites at the times that they received the panels -- I mean, received the ads. I'd note that there is also a huge span of time in which these two ads were submitted for review.

Q. Let's look at Exhibit 48.

A. Gracias. The little Spanish I know. That's it.

Q. And the ad in Exhibit 48, this was also approved?

A. Yes.

Q. Why was this one approved?

A. Again, it did not violate the guidelines.

Q. How as this one different from Exhibit 45?

A. Again, Exhibit 48 was similar to Exhibit 47 in that it was providing information to the customers about healthcare industry pricing. This one may have used a little bit more provocative marketing copy, but it was not implying any malfeasance of the healthcare industry as Exhibit 45 was.

Page 378

Q. Would you say that this ad promotes a particular view about the healthcare pricing transparency laws?

MS. WOLVERTON: Objection; form.

MS. AMES: What's the basis?

MS. WOLVERTON: The document speaks for itself.

A. No. Where would you view that kind of language?

Q. (By Ms. Ames) It says: If the law says hospital prices -- or hospitals must post their prices, and then it seems to suggest that there is some violation of the law. It is a little hard to read.

A. I'll read it for you guys. Is it okay if I read it for everyone?

Q. Yeah.

A. Can you find hospital prices? The law says hospitals must post their prices but most ignore the law, so patients looking to shop and compare will not be able to see the prices of anything.

So you're saying that the statement: But most ignore the law is --

Q. I mean, I'm asking you --

Page 379

A.  Oh, okay.

Q.  -- if that would promote a particular viewpoint.

MS. WOLVERTON:  Objection; form.

MS. AMES:  What's the basis?

MS. WOLVERTON:  The same as before; the document speaks for itself.

Q.  (By Ms. Ames) Go ahead.

A.  No, I would not infer that it promotes a certain viewpoint.

Q.  Why not?

A.  Because I would not.

Q.  Does the fact that this ad was run at the Foggy Bottom station directly below a hospital affect anything about the application of the guidelines?

MS. WOLVERTON:  Objection; form.

MS. AMES:  What's the basis?

MS. WOLVERTON:  Lack of foundation.

A.  Can I get clarity on your question?  Are you saying this was only run at Foggy Bottom?

Q.  (By Ms. Ames) I'm not saying it was only run there, but this particular image in Exhibit 48 was taken at Foggy Bottom.

MS. WOLVERTON:  Same objection.

Page 380

A.  And so your question is because an ad was taken at a location, it implies --

Q.  (By Ms. Ames) I was just asking if the location being that that stop is directly below a hospital affects the application of the guidelines.

A.  I can't speak to that in this case. There's no supporting information in terms of the span -- like, the scope of this placement, and so I can't speak to that.

Q.  Can you just explain to me what that means?

A.  What I mean is you're saying it was taken at Foggy Bottom, but this ad could have been running at College Park station.  It could have been running at Metro Center.  It could have been running at Gallery Place, right.

So just because it's running on all the screens or a certain screen, I can't speak to that because I don't know the full breadth of the ad campaign, right.

Q.  Let's look at Exhibit 49.

A.  Thank you.  I was writing notes.

Q.  And this ad was approved in February 2024, correct?

A.  Yes.

Page 381

Q.  Can you just read the link on this ad?

A.  Primarycarepp.org.

Q.  Do you know why this ad was approved?

A.  I cannot recall.  I know there was two ads that were similar in nature.  I'm going to say it passed the guidelines.  I'm sorry.  I'm doing too much.  Yeah.

Q.  Do you know what the panel reviewed in connection with this ad?

A.  The panel reviewed the website as well as the copy in this ad.

Q.  Let's look at the other one which is Nicol Exhibit 53.

A.  Thank you again.

Q.  And can you read the link in this one as well?

A.  The link in Exhibit 53 is ppmetrodc.org.

Q.  And this ad is -- this was rejected by the panel in February of 2024, correct?

A.  Yes.

Q.  Why was this one rejected?

A.  So that's what I was trying to recall.  It ultimately boiled down to the difference between 59 -- I mean, 49 and 53 is that they went to two different websites, and the website on -- for

Page 382

Exhibit 53 had content on the website that was in violation of the guidelines.

Q.  So we're going to -- we'll look at them in a second.

A.  Okay.

Q.  Do you know off the top of your head what the content was that was problematic?

A.  I cannot recall at this time, but I would love your new exhibits.

MS. AMES:  This will be a new exhibit, Andrew, Tab 37.

(Exhibit 76 was marked for identification.)

A.  Thank you.  This is 76?

Q.  (By Ms. Ames) Yes.

A.  Okay.

Q.  You can take a moment to review it.

A.  And can I ask a clarifying question?

Q.  I might get to it.

A.  Oh.  Go for it.

Q.  I think I might know what you're going to ask.

A.  All right.  Go for it.

Q.  This is the webpage for -- we accessed this on the Wayback Machine, and it's the page

Page 383

**available as of March 31st, 2024.**
A. So you can't go back as far as February -- what's the exact date for this ad?
**Q. It is February.**
A. You said March just now.
**Q. Unfortunately, they don't have the dates available online, so we did --**
A. You don't have --
**Q. -- the best we could.**
A. We did the best we could. But I want to record to reflect, Traci [as spoken], that this is not the webpage from the date the panel reviewed the ad.
MR. COFFIN: How do you know that?
THE WITNESS: Because she just said that.
MR. COFFIN: How do you know that?
MS. AMES: I will clarify it was available on March 31st, 2024. I don't know when this webpage exactly came out. It could have been in place for years.
MR. COFFIN: How do you know that?
THE WITNESS: How do you know that it was?
MS. WOLVERTON: I'm just going to interject and ask that only one counsel --
MR. COFFIN: That's fair, Caroline. I'm

Page 384

sorry.
A. I'm not saying that I know that it was not. I'm saying that you cannot say that this was in place the date that the panel reviewed the website.
**Q. (By Ms. Ames) I'm not saying it is.**
A. Okay.
**Q. I'm saying it's as close in time as we could get.**
A. I want the record to reflect -- right?
**Q. Okay.**
A. Is Exhibit 76 for Exhibit 53?
**Q. Yes.**
A. Okay. So Exhibit 53 was reviewed by the panel on February 23rd, 2024. This webpage for Exhibit 76 has a date of March 31st, 2024, a month after the panel reviewed.
So I do not feel comfortable saying that this is the website the panel reviewed because we don't have evidence to show that this is the website the panel reviewed. That's all I'm saying.
**Q. That's fine.**
A. Okay.
**Q. We're going to look at it anyway --**
A. Okay.

Page 385

**Q. -- because we don't have any evidence that it was not the website.**
A. Okay. That's fair.
**Q. Let's go to page 2, and if you could look at the -- I guess it's the gray colored box that says: PPMW responds. Can you just read the content of that box?**
A. PPMW responds to the Supreme Court decision that overturned Roe v. Wade. Abortion is still legal in DC, Maryland, and Virginia.
**Q. Thank you.**
**And going back to the -- actually, that's all we're doing on that one.**
MS. AMES: All right, Andrew; new exhibit. This will be 77.
MR. SLONIEWSKY: Tab 38?
MS. WOLVERTON: Yep.
THE WITNESS: Thank you, Traci.
(Exhibit 77 was marked for identification.)
A. This is the website for --
**Q. (By Ms. Ames) This is the website for primarycarepp.org --**
A. Okay.
**Q. -- which was for --**

Page 386

A. Which was approved.
**Q. I believe it was 49.**
A. Yes. It was 49.
**Q. Again, this one is from July 2024. Again, we could not -- this was the closest in time that we could get.**
**I understand that you can't confirm or deny whether this --**
A. Okay.
**Q. -- was the actual page that the panel reviewed.**
A. Okay.
**Q. So do you see at the top left of that website on the first page, it says -- there's a logo, and it says Planned Parenthood of Metropolitan Washington, DC, Inc.?**
A. Yes.
**Q. So I'll represent that if you click on that, it takes you back to the page we just looked at.**
A. It takes you back to --
**Q. Exhibit 76.**
A. Okay.
**Q. And we just discussed that Exhibit 76 represents -- I'm sorry -- it includes a reference**

Page 387

to Planned Parenthood's response to Roe v. Wade, is that correct?

A. I'm going to follow along, so I'm going to repeat what I think I heard. Is that okay?

Q. Yes.

A. You're saying on Exhibit 77 --

Q. Yes.

A. -- when you click on the link in the top right corner or the logo for Planned Parenthood of metropolitan Washington, DC, it takes you to the page that you submitted as Exhibit 76.

Q. Yes.

A. Okay.

Q. And just to ask you again, we -- you just read on Exhibit 76 that there's a reference to Planned Parenthood's response to Roe v. Wade being overturned, correct?

A. Correct. I did read that, yes.

Q. And so going back to Exhibits 49 and 53, can you explain a little further why those were treated differently by the panel?

A. So I'm going to state that Exhibits 49 and 53 were treated differently because they went to two different web pages, right. Unfortunately, today we do not have the websites at that time that the panel

Page 388

reviewed. But when the panel reviewed the websites for -- in February 2024 for the first -- for Exhibit 49, there wasn't any content that was in violation of the guidelines.

When the panel reviewed Exhibit 53 and they reviewed the website, there was content on the website that violated the guidelines.

Q. Can I just ask you? So I explained how you can click on that logo, and it would take you back to the other page --

A. In October?

Q. -- on -- I'm just asking generally.

A. Okay.

Q. Is that kind of logo something that the panel would click on when they're reviewing a website?

A. Yes.

Q. Great.

MS. AMES: Let's look at Exhibit 55.

THE WITNESS: Thank you.

Q. (By Ms. Ames) And we looked at this last time. This ad was approved, correct?

A. Yes.

Q. And why was it approved?

A. Because it did not violate the guidelines.

Page 389

Q. Do you know why?

A. Can you be more specific?

Q. Just -- do you know why it does not violate the guidelines? Is there any reason?

A. Because it was informational in nature for the viewers of the ad.

Q. Do you know what the panel reviewed in connection with this ad?

A. I believe the panel went to the website listed at the bottom as well as looked at the other logos on the -- like, in the bottom left-hand corner.

Q. So we looked earlier at the interpretive aids. I think Exhibit 4, paragraph -- which one is it? G(3)(d).

A. Wait. 4G(3)(d)? 4G(3) --

Q. Exhibit 4, G(3)(d), on page 3.

A. Oh. 4 -- it's confusing me.

Q. There's a lot of letters and numbers.

A. Okay. Sorry.

Q. So as we read earlier, that prohibits ads promoting policies. So why does this ad in Exhibit 55 not violate that interpretive aid?

MS. WOLVERTON: Objection; form.

MS. AMES: What's the basis?

Page 390

MS. WOLVERTON: Lack of foundation.

A. I'm not seeing how the ad promotes a law. I see an ad that is promoting informational -- like, educational resources.

Q. (By Ms. Ames) I was asking specifically about a policy because I think it does say stop housing discrimination, so --

A. Well, that's --

MS. WOLVERTON: Objection.

Hold on.

Did you finish your question?

MS. AMES: Yes.

MS. WOLVERTON: I'm going to object to the form.

MS. AMES: What's the basis?

MS. WOLVERTON: I object to counsel testifying.

Q. (By Ms. Ames) Go ahead.

A. If the law that this ad is informing customers about prohibits housing discrimination, that's not supporting or promoting -- that's what the law is or the policy is that's listed here. It's not a promotion of that policy. It's saying what the policy is.

Q. Great. That's fine.

www.DigitalEvidenceGroup.com      Digital Evidence Group C'rt 2025                    202-232-0646

Page 391

A. Okay.

Q. Thank you.

MS. AMES: Exhibit 57.

Q. (By Ms. Ames) So we looked at this last time. This ad was approved, correct?

A. Good question. Yes. It was.

Q. Why was this ad approved?

A. Because it did not violate the guidelines.

Q. What did the panel review in connection with this ad?

A. The panel reviewed the website listed in the ad and the copy of the ad.

MS. AMES: We'll look at that website, salvationarmynca.org, and this will be Exhibit 78.

A. Is this a new exhibit?

Q. Yes.

(Exhibit 78 was marked for identification.)

Q. (By Ms. Ames) And this is the landing page for that website link as of December 5, 2024. We accessed this on the Wayback Machine as well.

A. Okay.

Q. So we'll go down to, in the middle of the page, the Salvation Army Mission Statement. Can you just read that paragraph?

Page 392

A. The Salvation Army, an international movement, is an evangelical part of a universal Christian church. Its message is based on the Bible. Its ministry is involved by the love of God. Its mission is to preach the gospel of Jesus Christ and to meet human needs in His name without discrimination.

Q. Did the panel review that mission statement in approving this ad?

A. I want to say it would have. However, this is one I remembered last time and I still remember to this day that there was something wrong with the website. So I'm not sure if this was the correct -- when we went to the website as a panel, at the time, it was pointing to a different region than this one, so I'm just not clear on that part, but --

Q. I actually don't have the email in front of me, but I think --

A. It was, I believe, Exhibit -- it might have been 58 from last time.

Q. Yeah.

A. Okay.

Q. Yeah. I believe the panel did receive the correct link. Is that correct?

Page 393

A. That's the thing. I'm not sure if that -- like, do we have additional correspondence? That part I don't have, but I just -- I don't -- I can't speak fully to this.

Q. All right.

A. I don't know if I'm making sense to you guys right now, but --

Q. No. It's fine.

A. Okay.

Q. I understand that there was that confusion with it.

A. Okay.

Q. But would it have made a difference --

A. There you go.

Q. -- if the panel reviewed that mission statement?

MS. WOLVERTON: Objection; form.

MS. AMES: What's the basis?

MS. WOLVERTON: Speculation.

A. No, because I think as I mentioned in not this deposition but the last one, the call to action I believe was -- you know, it had a call to action, right, donate, and this was the intent. That's why I don't believe this was the page that this went to.

Like, I remember seeing the page. It

Page 394

didn't look like this. That's why I don't feel comfortable saying this is what the panel reviewed, but they would have reviewed this content if this is the page they went to, yeah, because that was, like, less than a year ago. Yeah.

Q. It does seem like a long time ago.

A. It does.

Q. I guess my question -- and you may not remember this, but if the panel -- you said that the original link on the ad was incorrect.

A. Uh-huh.

Q. Is that right?

A. Yes.

Q. If the panel did receive the correct link later --

A. Uh-huh.

Q. -- the panel -- would the panel have reviewed that correct link then?

MS. WOLVERTON: Objection; form.

MS. AMES: What's the basis?

MS. WOLVERTON: Speculation.

A. If we were to receive an updated ad with the correct link, we would have reviewed it.

Q. (By Ms. Ames) All right.

A. I'm sorry on this one.

Page 395

Q.  No.  That's helpful.

A.  Uh-huh.

MS. AMES:  Let's look at another new one; Tab 42 which will be Exhibit 79.

(Exhibit 79 was marked for identification.)

Q.  (By Ms. Ames) Have you seen this before?

A.  No.

Q.  What is it?

MS. WOLVERTON:  Objection; form.

MS. AMES:  What's the basis?

MS. WOLVERTON:  Lack of foundation.

A.  You asked what is this?

Q.  (By Ms. Ames) Yeah.

A.  This appears to be an ad in either rail or bus.  It looks like one of the interior cars for the Black Coalition Against COVID-19.

Q.  Can you read what it says?

A.  Wear a mask and get your life back because I miss seeing my Nana.  Jadyn, 17.

Q.  Can we look back at Exhibit 66 briefly.

A.  66?

Q.  Yep.  It was the first one we looked at today.

A.  I'm so sorry.

Page 396

Q.  It's okay.  You have a lot of documents there.

A.  Yeah.  I thought I had put it in an order that made sense to me.  Is it one of my -- is it the declaration one?  Oh.  This one.  Okay.  Sorry.  Got it.

Q.  If you look on the back page, paragraph -- or Topic 6 --

A.  Uh-huh.

Q.  -- I'm not going to read the entire thing, but in the parenthetical there it does say, for example:  Black Coalition Against COVID-19.

A.  Yes.

Q.  I just want to ask.  You did not review this ad in preparing to testify about Topic 6?

A.  No.  In reviewing to prepare about the topics listed in Exhibit 66, we were unable to find any documentation or ads as it relates to the Black Coalition Against COVID-19 --

Q.  Okay.

A.  -- so there's no partnership or joint marketing agreement as it relates to this advertisement.

Q.  Thank you.

Do you know who sponsored this ad?

Page 397

A.  I -- we -- I have no information about this ad, unfortunately.

Q.  Would this be something that was subject to the guidelines?

MS. WOLVERTON:  Objection; form.

A.  No, it would not.  If it -- if this -- if this were a marketing advertisement that was from a marketing partnership or joint marketing or advertising campaign, it would not be per the interpretive aid.

Q.  (By Ms. Ames) Okay.

A.  I want to get the exact number, so hold on.

Q.  That's helpful.

A.  1(a).  WMATA shall utilize a three-person panel to review advertisements that are identified by WMATA's third-party advertising vendor.

That would not have been submitted via the advertising vendor.

Q.  Thank you.

A.  You're welcome.

Q.  We'll look at another new one.

A.  Oh.  Wait.  Can I add a point of clarity as well?

Q.  Yes.

Page 398

A.  That applies as well to the Rosa Parks exhibit.  That would not have been submitted to the panel as well.

Q.  Thank you.

MS. AMES:  This will be Exhibit 80.

(Exhibit 80 was marked for identification.)

THE WITNESS:  Thank you.

Q.  (By Ms. Ames) Have you seen this before?

A.  No, I have not.

Q.  What is it?

A.  It appears --

MS. WOLVERTON:  Objection; form.

THE WITNESS:  Sorry.

A.  It appears to be an advertisement for the back of the bus, a bus tail.

Q.  (By Ms. Ames) Can you read what it says, please.

A.  It's kind of worded weird.

Q.  Yeah.  Do your best.

A.  I think it's saying:  Be climate smart.  Montgomery County, Maryland.  Will you pledge to do more, and then there's a link that -- or a website link, montgomerycountymaryland.gov/climatesmart, and I believe there's a logo maybe for Montgomery County

33 (Pages 395 to 398)

Page 399

beside it.

Q.  Is this a true and correct depiction of an ad that was run by either Outfront or WMATA?

MS. WOLVERTON:  Objection; form.

A.  It is a true and clear picture of what appears to be an ad on the back of a bus tail.

Q.  (By Ms. Ames) Would this have been subject to the guidelines?

MS. WOLVERTON:  Objection; form.

MS. AMES:  What's the basis?

MS. WOLVERTON:  Speculation.

A.  I don't have enough information to make that assertion.

Q.  (By Ms. Ames) Actually, let's look at the climate pledge that's referenced in the ad from montgomerycountymd.gov/climatesmart.

MS. AMES:  This will be Exhibit 81.

(Exhibit 81 was marked for identification.)

THE WITNESS:  Thank you.

Q.  (By Ms. Ames) I know you just said you can't speak to whether that would be subject to the guidelines --

A.  Uh-huh.

Q.  -- that ad in Exhibit 80, but if it were,

Page 400

would this pledge in Exhibit 81 be something that the panel would review in determining whether to approve it?

MS. WOLVERTON:  Objection; form.

MS. AMES:  What's the basis?

MS. WOLVERTON:  Speculation.

A.  So the first question.  Exhibit 80 is taken when?  What's the date and time for this, month and year or whatever?

Q.  It was I believe September of 2025 -- actually, it was October of 2025.

A.  October of 2025, okay.

Q.  And I will represent that this was --

A.  Perfect.  October 2025.

Q.  -- pulled within days of receiving that photo.

A.  And do you know if this was submitted; like, Outfront posted this?

Q.  I was asking you that.

A.  Okay.  I don't have any information to tell -- to give you that information.  Like, I can't answer anything.

Q.  Okay.

A.  Yeah.

Q.  But if it had been submitted to the

Page 401

panel --

A.  The panel review reviewed the website if it was submitted to the panel.

Q.  That's my question.  Thank you.

A.  Uh-huh.

Q.  Would you say -- is it fair to say there are people who would disagree over a pledge like this one?

MS. WOLVERTON:  Objection; form.

MS. AMES:  What's the basis?

MS. WOLVERTON:  Lack of foundation, lack of personal knowledge, speculative.

A.  Yeah.  I -- I still can't speak to how we would have fully deliberated on this because I feel like I would have -- we would need more information to determine.

Q.  That's fine.

Let's go back to Exhibit 69.  That was the Stop the Shuffle ad.

A.  Okay.

Q.  Let me find my question on it.

Was this a true and accurate depiction of an ad that was approved by either WMATA or Outfront?

A.  Okay.  So -- wait.  Say it one more time.

Q.  Is this a true and correct depiction of an

Page 402

ad that was approved by either WMATA or Outfront?

MS. WOLVERTON:  Objection; form.

MS. AMES:  What's basis?

MS. WOLVERTON:  Foundation.

A.  Approved is a very interesting word.  So we're going to say this ad was placed by Outfront in the system.

Q.  (By Ms. Ames) Did the panel review it?

A.  The panel did not review this ad.

Q.  Did the panel or anyone at WMATA ever receive a copy or a photo of the ad before it was placed on Metro buses?

A.  Not that I'm aware of.

Q.  Let's look at the website in that ad which is www.stoptheshuffle.com.

MS. AMES:  This will be Exhibit 82, and this is Tab 10.

(Exhibit 82 was marked for identification.)

A.  Not what I was expecting.

Q.  (By Ms. Ames) So how had this gotten to the panel to review?  Is this something that the panel would have looked at?

MS. WOLVERTON:  Objection; form.

A.  Yes.  The panel would have looked at the

Page 403

website.

Q. (By Ms. Ames) Let's go to page 2 under the heading in the middle: What is the Shuffle? Can you read that paragraph?

A. The shuffle is a process by which clients are cycled through a rinse-and-repeat style of addiction treatment for maximum fraud. It's insurance fraud and can generate up to $1 million a year per person in insurance reimbursement. From the outside, it may look no different than legitimate treatment.

Q. Could this be considered a political or ethical issue?

MS. WOLVERTON: Objection; form.

MS. AMES: What's the basis?

MS. WOLVERTON: Speculation.

A. What were the two words you said?

Q. (By Ms. Ames) Political or ethical issue.

A. It may be considered that.

Q. What would you need to know to -- you or the panel -- to make a decision about that?

MS. WOLVERTON: Objection; form.

MS. AMES: What's the basis?

MS. WOLVERTON: Lack of foundation.

A. As mentioned in my previous deposition,

Page 404

what I love about the panel, which all of us love about the panel, is that it's three people who bring forth their knowledge, expertise, and interpretation of everything.

And so we would have definitely had a discussion around the copy on this page and whether or not it was a point of -- or an issue of ethical or political discourse.

Q. (By Ms. Ames) Having read this paragraph, do you think this is -- this ad in Exhibit 69 was one that should have been submitted to the panel for review?

MS. WOLVERTON: Objection; form.

MS. AMES: What's the basis?

MS. WOLVERTON: Lack of foundation, calls for speculation.

A. I would like to point you to Exhibit -- I'm sorry -- Exhibit 4 on page 4, guideline 9 where it says: Guideline 9 does not prohibit advertisements for a newspaper or magazine, other publication, TV program, film, theatrical performance, concert, podcast, or other media solely because the media content addresses political issues or contains political messages as long as the advertisement does not otherwise violate the

Page 405

guidelines.

Q. (By Ms. Ames) Let's look at --

MS. WOLVERTON: Can we take a lunch break now?

THE WITNESS: Yeah.

MS. AMES: Can I finish asking a couple more questions about this ad?

MS. WOLVERTON: I think we need a break.

MS. AMES: I'd like to ask two more questions.

THE WITNESS: Are these your final questions, or are there more after this?

MS. AMES: They're about this ad.

MS. WOLVERTON: Can you do it?

THE WITNESS: Yes.

MS. WOLVERTON: Okay.

Q. (By Ms. Ames) So on the website, you see at the top on the first page there's an impact tab --

A. Yes.

Q. -- and we'll look at that briefly. I just have two questions about that.

MS. AMES: That is Tab 11, Andrew.

A. And while he's looking, can I just make a note?

Page 406

THE WITNESS: Go ahead and get ready.

(Exhibit 83 was marked for identification.)

A. And the note I would like to make is that this is all hypothetical discourse that we're doing right now because we did not -- the panel did not review this ad.

MR. SLONIEWSKY: This ad is which ad?

THE WITNESS: Stop the Shuffle.

Q. (By Ms. Ames) Exhibit 69.

A. Oh. Sorry. Exhibit 69.

THE WITNESS: Thank you.

Q. (By Ms. Ames) So on the first page here you see campaign pillars. Can you go down to the third paragraph that says: Political advocacy and just read that sentence?

A. Promote and support -- it is lunchtime.

Promote and support policy changes at the state level in collaboration with NGOs, create awareness and dialogue with political opposition.

Q. Would that be something the panel would have wanted to review?

MS. WOLVERTON: Objection; form.

A. Yes.

Q. (By Ms. Ames) Would it affect your answer

Page 407

about whether this violates the guidelines -- guideline 9?

MS. WOLVERTON: Objection; form.

A. I don't know that I said that it -- whether or not -- I didn't say that before, so let's just --

Q. (By Ms. Ames) To clarify --

A. Yeah.

Q. -- would it affect whether this ad discusses a political or ethical issue?

MS. WOLVERTON: Objection; form.

A. Yes, that would.

MS. AMES: That's all I have on this ad, so we can take a break.

MS. WOLVERTON: Thank you.

THE WITNESS: Thank you, Caitlin.

MS. AMES: I don't have too many more questions after this; maybe 10 or 15 minutes.

MS. WOLVERTON: We can go off the record.

(A lunch break was taken.)

Q. (By Ms. Ames) So now that we just came back from a break, I want to ask you whether you discussed any of your testimony that's already been given or upcoming testimony with counsel.

MS. WOLVERTON: I'll object and instruct

Page 408

the witness not to reveal any attorney work product or attorney-client protected information.

A. Sorry. Give me a moment --

Q. (By Ms. Ames) Okay.

A. -- just to make sure. Not that I'm aware of. During lunch, it was other stuff --

Q. Okay.

A. -- like my job, like -- yeah.

Q. That's fine. Thanks.

A. Okay. Uh-huh.

MS. AMES: Let's look at Exhibits 12 and 13.

Q. (By Ms. Ames) Can you just confirm on Exhibit 12 that that is your handwriting there?

A. On Exhibit 12 and 13 are both my handwriting --

Q. Thank you.

A. -- from the last deposition.

Q. Thanks.

A. Uh-huh.

Q. And we can look at it if you need to, but in the stipulation that your counsel submitted in this case, it said that Outfront approved these ads on its own, that they did not go to the panel.

Is that your understanding?

Page 409

A. Yes, that is.

Q. Did WMATA do anything about these ads after it -- they were brought to its attention?

A. Not that I'm aware of.

Q. That's all I'm going to ask on those --

A. Okay.

Q. -- if you want to -- okay.

Now we're going to talk about graffiti and vandalism, switch gears a little bit.

A. Okay.

MS. AMES: We'll look at Exhibit 62 from last time.

Q. (By Ms. Ames) And this is a US Customs and Border Protection ad that has been graffiti'd, is that correct?

A. Yes.

Q. Do you know if there were any other ads for US Customs and Border Protection that were vandalized?

A. Let me just refresh my memory. Hold on.

Q. That's fine.

A. I'm so sorry.

MS. WOLVERTON: Here.

THE WITNESS: Thank you.

A. I'm going to go with no. Sorry.

Page 410

Q. (By Ms. Ames) Are you still looking?

A. No. I'm going to go with no. No is my answer.

Q. Do you know how WMATA responded to the vandalism on this ad?

A. I believe we removed it. I just need to find it. One second. I believe we removed it and replaced it.

Q. Sorry. Did you finish?

A. I'm sorry. We removed it and replaced it, more than likely.

Q. Do you know that for sure?

A. I don't know that for sure, but I know that we removed it for sure.

Q. Okay.

A. Yeah.

Q. You're not sure if it was replaced?

A. Yeah. Let me just add a clarifying point. Depending on the contractual obligation, it would have been replaced if it was still within the time timeframe it should have been installed in the system.

Q. Do you know, by any chance, what the timeframe for this ad was?

A. I don't know when this picture was

Page 411

taken --

Q. It was this fall.

A. -- so -- yeah. I would need, like, June 1 through September 1.

Q. You don't know off the top of your head?

A. I don't have contractual details on this particular ad.

Q. Thank you.

A. Uh-huh.

MS. AMES: We'll look at a new one. This will be Exhibit 84.

(Exhibit 84 was marked for identification.)

MS. WOLVERTON: I'll just point out that this looks like this was marked August 13, 2025, so it would have been sooner that the fall.

MS. AMES: I thought I said summer.

MS. WOLVERTON: Okay.

A. Okay.

Q. (By Ms. Ames) So have you seen this before?

A. I haven't seen this displayed the way it is in this picture, but I've seen a black and white that I could not -- I didn't see any graffiti in it.

Q. So I'll represent to you that when we

Page 412

received the black and white image, we also could not tell what it said --

A. Okay.

Q. -- so we asked counsel to produce color versions.

A. Okay.

Q. They did, and then it was also hard to read when printed, so we enhanced that so you could read it better.

A. Thank you.

Q. It's just blown up, basically.

A. Okay.

Q. Can you read the graffiti that is written across their foreheads?

A. Not fully. I see no M-R gay. I think that's what it says. I don't know. NOMA. I don't know what the letters are in between the two foreheads.

Q. Okay.

A. Sorry. Were you asking for the actual copy of the ad or the graffiti?

Q. No. I was asking you --

A. Okay.

Q. -- to read the graffiti on their heads.

A. Thank you.

Page 413

Q. And while you're looking, we'll get the -- we're going to look at the email --

A. Okay.

Q. -- that has the original photo.

MS. AMES: This will be 85.

(Exhibit 85 was marked for identification.)

THE WITNESS: Thank you.

A. Oh, okay.

Q. (By Ms. Ames) So the subject line of this email chain is called: Offensive Graffiti, Silver Spring. Correct?

A. Yes.

Q. And the photo that we just looked at and also on the second page of this email, it shows two men embracing.

A. Uh-huh. Yes.

Q. So the graffiti we just read which said no -- I think it said: No more gays, but it said no something gays.

A. Uh-huh.

Q. That appears to be opposing the content of the ad, correct?

MS. WOLVERTON: Objection; form.

MS. AMES: What's the basis?

Page 414

MS. WOLVERTON: Speculation, and I object to counsel testifying.

A. So how do I say this? I don't know that I would say that the content or the graffiti is objecting to the content of the ad. It is objecting to the image in the ad, I think. I'm not sure what apprende mas celebre -- I don't know what the content of the ad is to say that it's objecting to the content of the ad.

Q. (By Ms. Ames) I guess, then, my question is, is the image in the ad different than the content, in your opinion?

MS. WOLVERTON: Objection; form.

MS. AMES: What's the basis?

MS. WOLVERTON: Lack of foundation.

A. I'm not saying it's different. It's a part of the ad. It's not the content of the ad, right. Like, it's not the full content --

Q. (By Ms. Ames) Okay.

A. -- of the ad.

Q. Thank you. I just wanted to clarify.

A. Okay.

Q. So aside from that ad as well as the Customs and Border Protection ad that we just looked at, are you aware of any instances of graffiti

Page 415

directly responding to the content of an ad?

A. I'm aware of graffiti on ads that may or may not address the content or parts of the content in the ads.

Q. Can you give an example or two?

A. Sorry. I have to find it --

Q. Okay.

A. -- so give me a moment.

Q. Take your time.

A. Thank you.

For example, I believe we ran some advertisements for recruitment for our police department, MPD, and there was some defacing of an advertisement there.

Q. Do you remember how the defacement responded to the content of the ad?

A. The content of the ad, I believe, mentioned -- well, the graffiti mentioned the salary of the position, so that's, I believe, the connecting point between the graffiti and the content of the ad or part of the content of the ad.

Q. Are you referring to a specific -- is that something that you produced to us or that your counsel produced to us?

MS. WOLVERTON: Yeah. It's

Page 416

Clarke_WB-0000657 to 658.

MS. AMES: That's all I wanted to know.

Q. (By Ms. Ames) That's exactly what I wanted.

A. Okay.

Q. Thank you.

A. Uh-huh. I thought this would all be just one number, like -- do you know what I mean? Okay.

Q. Are you aware of any other instances of any other form of vandalism about the content of an ad?

A. Not particularly, no. I'm just looking --

Q. Just flipping it?

A. No.

Q. Are you aware of any instances of graffiti related to the content of an ad?

A. Yes.

Q. How frequently would you say ads are defaced with graffiti unrelated to the content of the ad?

A. I'm not aware of, like, percentages or things of that nature. Unfortunately, it's public areas, and graffiti and vandalism can happen on all kinds of instances, so it's hard to say.

Q. What would you say is the proportion of

Page 417

graffiti unrelated to an ad as compared to related to the content?

A. I'm unable to speak to that fully at this time.

Q. Are you aware of instances of vandalism unrelated to the content of an ad?

A. Yeah. I mean, yes.

Q. How frequently would you say?

A. I'm not aware to -- I'm not in knowledge of the frequency of vandalism. Those types of incidents go through another department like Facilities, and they would know that information.

Q. You said it's the Facilities Department?

A. Yes.

Q. This is the last set we'll look at; Exhibits 63 to 65.

A. Wait. Say that again; 63 to 65?

Q. Yeah. From the last deposition.

A. That's fine. Sorry. My brain just needed to catch up with you.

Q. These are the ones that were --

A. This is from last time?

Q. Yes.

A. Okay.

Q. They're hard to read, but I'm not going to

Page 418

ask you to, like, really read them --

A. No.

Q. -- so I'm just asking you generally about them.

A. Okay.

Q. Are these true and correct copies of documents kept by WMATA that record complaints received at various times between 2020 and 2024 regarding advertisements that WMATA has run?

MS. WOLVERTON: Objection.

MS. AMES: What's the basis?

MS. WOLVERTON: The document is not legible.

MS. AMES: Can we pull them up on the computer, then?

THE WITNESS: Which one, 27?

MS. AMES: I think part of the problem is these are, like, a scanned exhibit form. If you can just read the first thing, I can try to find it.

MS. WOLVERTON: Should we go off the record while we try to find it?

MS. AMES: That's fine.

(A discussion was held off the record.)

A. Oh, okay. I understand. It's broken. So this is this half. This is this are half. That's

Page 419

why it's hard to find.

Okay. Your question?

Q. (By Ms. Ames) My question was are these true and correct copies of documents kept by WMATA that record complaints received at various times between 2020 and 2024 regarding advertisements that WMATA has run?

MS. WOLVERTON: Objection; form.

A. Can I -- these are not documents that are kept by WMATA. These are documents that were produced for this deposition.

Q. (By Ms. Ames) So they were prepared in the course of this litigation --

A. Correct.

Q. -- is that what you're saying?

Was it some kind of printout from a database or --

A. Yes. I believe that the inquiry was to pull reports from the customer service CRM about complaints as it related to advertising in the system.

Q. Okay.

A. So do you understand why I made the difference?

Q. Yeah.

Page 420

A. Okay.

Q. So it's kept in a database, and this was printed out for purposes of this litigation?

A. Yeah. So, like, we're not keeping reports on customer service complaints.

Q. Okay.

A. Okay.

Q. Is that database kept in the ordinary course of business?

A. I believe so.

Q. Can you describe at a high level the content of these spreadsheets?

A. These are complaints received -- comments or complaints received by the Customer Service Department via either phone, website, or email or even potentially social media from customers with comments as it relates to various things. These are particularly about advertising in the system.

Q. So just to be clear again, a number of these are about advertising in the system?

A. These particular documents, yes.

Q. Are you aware of any instances where complaints that WMATA received such as this ultimately led to some form of violence or vandalism?

Page 421

A. I am not aware of anything leading to violence or vandalism from these complaints.

MS. AMES: That's all my questions.

THE WITNESS: Total?

MS. AMES: Yeah.

THE WITNESS: Okay.

MR. COFFIN: One second.

MS. AMES: Maybe not.

Q. (By Ms. Ames) I have just, like, one more question.

A. That's fine.

Q. I just have to figure out which number it is. Exhibit 34, please.

A. Thank you. My notes are on it. Thank you.

Q. I am just asking you to confirm that those are your notes on Exhibit 34.

A. Yes. These are my notes on Exhibit 34.

Q. And this is another ad that, according to the stipulation submitted in this case, was not submitted to the review panel, is that correct?

A. Hold on.

Q. Go ahead and look.

A. Thank you. I'm sorry. Can you tell me where this was stipulated in the stipulation? Oh.

Page 422

Never mind. No. 3.

Q. Got it? Okay. It was probably a list of --

A. Yeah. It was a list. That's why. Okay. Now I can answer the question. Sorry.

Q. So this ad was not submitted to the review panel?

A. No, it was not.

Q. Did WMATA or the panel do anything about this ad after becoming aware of it?

A. Not that I'm aware of, but I also am lacking just a little bit of detail on this, so I can't speak fully to it. When was WMATA made aware of it?

Q. At a minimum, during the course of this litigation.

A. Okay. And this litigation began --

Q. It began in December of 2023, but this would have been in a filing sometime last summer --

A. Okay.

Q. -- I believe.

A. Not that I'm aware of.

MS. AMES: Okay. That's all.

THE WITNESS: That's it?

MS. WOLVERTON: We'll take a break,

39 (Pages 419 to 422)

Page 423

though, and see if we have any questions.

MR. COFFIN:  We can come up with more if you want.

THE WITNESS:  No, no, no.  You can put that on the record.

(A break was taken.)

MR. SLONIEWSKY:  Will you note the time is 2:57.

EXAMINATION

BY MS. WOLVERTON:

**Q.  Ms. Nicol, do you recall being asked in relation to Exhibit 4, the interpretive aids, to compare section 4G(3)M and section 4G(4) with 4G(3)N reading:  Guideline 9 prohibits supporting, opposing, or promoting a rally, protests, march, demonstration, or other similar events that includes any content that would otherwise be prohibited by the guidelines and section 4G(4) stating:  Guideline 9 does not prohibit advertisements for a newspaper, magazine, other publication, TV program, film, theatrical performance, concert, podcast, or other media solely because the medium's content addresses political issues or contains political messages so long as the advertisement does not otherwise violate the guidelines.**

Page 424

**Do you remember being asked to compare those two sections?**

A.  Yes, I do.

**Q.  And can you elaborate on how ads prohibited under section 4G(3)N differ from ads that are not prohibited under section 4G(4)?**

A.  Yes.  Ads that are not prohibited under 4G(4) of the interpretive aids in Exhibit 4 are -- the call to action is commercial in nature, meaning purchasing tickets or watching a film or purchasing tickets for a play or a movie, whereas the call to action for a rally or a protest are calling on advocacy or things of that nature that are not commercial in aspect.

MS. WOLVERTON:  No further questions.  Thank you.

MS. AMES:  I don't have anything else.

MS. WOLVERTON:  We will read and sign.

(Deposition concluded at 3 p.m. EST.)

Page 425

REPORTER CERTIFICATE

I, TRACI M. MERTENS, RDR, CRR, do hereby certify that there came before me

GEORGETTA NICOL

who was by me first duly sworn to testify to the truth and nothing but the truth of all knowledge touching and concerning the matters in controversy in this cause; that the witness was thereupon carefully examined under oath and said examination was reduced to writing by me; and that this deposition is a true and correct record of the testimony given by the witness and that signature by the witness is reserved.

I further certify that I am neither attorney nor counsel for nor related nor employed by any of the parties to the action in which this deposition is taken; further, that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in this action.

Dated November 11, 2025

_____
TRACI M. MERTENS, RDR, CRR

Page 426

Georgetta Nicol, Vol II, c/o
Akin Gump Strauss Hauer & Feld LLP
Robert S. Strauss Tower, 2001 K Street, N.W.
Washington, DC  20006

Case: WallBuilder Presentations v. Randy Clarke
Date of deposition: November 10, 2025
Deponent: Georgetta Nicol, Vol II

Please be advised that the transcript in the above referenced matter is now complete and ready for signature. The deponent may come to this office to sign the transcript, a copy may be purchased for the witness to review and sign, or the deponent and/or counsel may waive the option of signing. Please advise us of the option selected.
Please forward the errata sheet and the original signed signature page to counsel noticing the deposition, noting the applicable time period allowed for such by the governing Rules of Procedure. If you have any questions, please do not hesitate to call our office at (202)-232-0646.

Sincerely,
Digital Evidence Group
Copyright 2025 Digital Evidence Group
Copying is forbidden, including electronically, absent express written consent.

Page 427

Digital Evidence Group, L.L.C.

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

.

SIGNATURE PAGE

Case: WallBuilder Presentations v. Randy Clarke

Witness Name: Georgetta Nicol, Vol II

Deposition Date: November 10, 2025

I do hereby acknowledge that I have read and examined the foregoing pages of the transcript of my deposition and that: (Check appropriate box):

( ) The same is a true, correct and complete transcription of the answers given by me to the questions therein recorded.

( ) Except for the changes noted in the attached Errata Sheet, the same is a true, correct and complete transcription of the answers given by me to the questions therein recorded.

_____     _____

DATE              WITNESS SIGNATURE

_____     _____

DATE              NOTARY

Page 428

Digital Evidence Group, LLC

1730 M Street, NW, Suite 812

Washington, D.C.  20036

(202)232-0646

ERRATA SHEET

Case: WallBuilder Presentations v. Randy Clarke

Witness Name: Georgetta Nicol, Vol II

Deposition Date: November 10, 2025

Page No.   Line No.    Change

_____     _____

Signature                Date

## Georgetta Nicol 30(b)(6) Deposition
### Exhibit Index

| Exhibit | Description |
|---|---|
| 3 | Guidelines Governing Commercial Advertising |
| 4 | Metro Internal Procedures and Interpretive Aids |
| 5 | Email Re Veganuary Proposed Ads |
| 6 | Email Re Rejecting Veganuary Proposed Ads |
| 7 | Put Families First Ad |
| 12 | Command the Sea Command the World Ad |
| 13 | Rebuild the Arsenal Ad |
| 14 | Read Queer All Year Ad |
| 15 | PlanB One-Step: Not an Abortion Pill Ad |
| 16 | Email Re Approving PlanB Proposed Ad |
| 17 | United States Conference of Catholic Bishops Article |
| 20 | AARP: 2024 AARP DC Voter Guide Ad |
| 21 | Honoring Our Past By Voting For Our Future Ad |
| 22 | Email Re Rejecting Honoring Our Past By Voting For Our Future Ad |
| 23 | Rosa Parks Day Placard |
| 34 | CUA God is Our Light Ad |
| 45 | Power to the Patients "Demand Real Prices in Healthcare" Ad |
| 47 | Power to the Patients "WE ~~NEED~~ DEMAND HOSPITAL PRICES" Ad |
| 48 | Power to the Patients "Can You Find Hospital Prices?" Ad |
| 49 | Approved Planned Parenthood Ad |
| 53 | Rejected Planned Parenthood Ad |
| 55 | NCRC Stop Housing Discrimination Ad |
| 57 | Salvation Army Ad |
| 62 | Customs and Border Protection Graffiti |
| 63 | Excel of Customer Comments Sent to WMATA 1 |
| 64 | Excel of Customer Comments Sent to WMATA 2 |
| 65 | Excel of Customer Comments Sent to WMATA 3 |
| 66 | Exhibit A: Testimony Regarding Advertising Guidelines, Interpretive Aids, and Customer Complaints and Vandalism |
| 67 | Exhibit A: Third Declaration of Georgetta Nicol |
| 68 | Def.'s Stipulation Regarding Authenticity of Documents |
| 69 | Stop the Shuffle Ad |
| 70 | World Culture Festival Website |

1

| Exhibit | Description |
|---|---|
| 71 | World Culture Festival Website: About Us |
| 72 | The Art of Living Website: Yoga |
| 73 | Accepted Bibi Ad |
| 74 | Rejected Bibi Ad |
| 75 | Email Re Rejecting and Accepting Proposed Bibi Advertisements |
| 76 | PPMetroDC.org Website |
| 77 | PrimaryCarePP.org Website |
| 78 | Salvation Army Website |
| 79 | Black Coalition Mask Advertisement |
| 80 | Climate Smart Advertisement |
| 81 | Climate Smart Website |
| 82 | Stop the Shuffle Website |
| 83 | Stop the Shuffle Website: Impact |
| 84 | Anti-Gay Graffiti |
| 85 | Email Re Offensive Graffiti |

# NICOL DEPOSITION EXHIBIT 3

**Guidelines Governing
Commercial Advertising**

Adopted August 3, 1972
by
Board of Directors
Amended November 20, 2003 and November 19, 2015

Amended by
General Manager/Chief Executive Officer
Pursuant to Board Resolution Nos. 2015-55 and 2015-57

1.      All advertising shall comply with the spirit of all applicable laws and regulations of the various jurisdictions in which it is displayed unless the inconsistencies among the various jurisdictions prevents such compliance.  Advertising will not be accepted that is false, misleading or deceptive.

2.      Advertisers promoting contests shall insure the contest is being conducted with fairness to all entrants and complies with all applicable laws and regulations.

3.      Testimonials should be authentic and shall honestly reflect the response of the person making them.  (The sales contract shall provide for the indemnification of WMATA against action by any person quoted or referred to in any advertisement placed in the Metro system).

4.      Medical and health-related messages will be accepted only from government health organizations, or if the substance of the message is currently accepted by the American Medical Association and/or the Food and Drug Administration.

5.      Advertisers shall avoid illustrations or references which disregard normal safety precautions.

6.      Advertising offering premiums or gifts shall avoid representations which would enlarge the value of the item in the minds of the viewers.



EXHIBIT
MM   3   8/13/25

CLARKE_WB-0000027

7.    Use of Metro graphics or representations in advertising is subject to approval by WMATA.

8.    No implied or declared endorsement of any product or service or message by WMATA is permitted.

9.    Advertisements intended to influence members of the public regarding an issue on which there are varying opinions are prohibited.

10.    Advertisements of tobacco products are prohibited in accordance with Board Resolution 94-36.

11.    Advertisements that support or oppose any political party or candidate are prohibited.

12.    Advertisements that promote or oppose any religion, religious practice or belief are prohibited.

13.    Advertisements that support or oppose an industry position or industry goal without any direct commercial benefit to the advertiser are prohibited.

14.    Advertisements that are intended to influence public policy are prohibited.

CLARKE_WB-0000028

# NICOL DEPOSITION EXHIBIT 4

**METRO INTERNAL PROCEDURES AND INTERPRETIVE AIDS**
**FOR REVIEWING PROPOSED COMMERCIAL ADVERTISING**

The following are the internal procedures and interpretive aids for the Guidelines Governing Commercial Advertising adopted by the Washington Metropolitan Area Transit Authority ("WMATA") on August 3, 1972, as most recently amended November 19, 2015 (the "Guidelines").[1] These internal procedures and interpretive aids help WMATA's advertisement review panel ("Panel") apply the Guidelines to all advertisements submitted for review by its third-party advertising vendor ("Vendor"). WMATA reserves the right to revise or amend the internal procedures and interpretive aids without notice.

I.   Composition of WMATA's advertisement review Panel

   A.   WMATA shall utilize a three-person Panel to review advertisements that are identified by WMATA's third party advertising Vendor as potentially violating the Guidelines. The Panel shall consist of one person from the Marketing Department and two attorneys from the Legal Department.

   B.   Each Panel member shall be generally familiar with the law governing advertising in non-public forums.

   C.   All members of the Panel shall review past advertisements that have been considered by the Panel to familiarize themselves with how the Guidelines have been applied in the past.

   D.   If the Panel is unable to reach a consensus on whether an advertisement violates the Guidelines, the advertisement shall be submitted to outside counsel with demonstrated extensive experience in First Amendment law for advice in order for the Panel to make a final determination.

II.  Submission of advertisements through third-party advertising vendor

   A.   All advertisements submitted for advertising through WMATA's third-party advertising vendor ("Vendor") shall be reviewed initially for compliance with the Guidelines by the Vendor. If the Vendor believes an advertisement is prohibited by a Guideline or is unsure whether an advertisement may violate a Guideline, it shall submit the advertisement to the Panel for review and a decision.

   B.   Periodically, members of the Panel shall meet with any employees of Vendor responsible for initially reviewing advertisements to discuss the Guidelines and these internal procedures and interpretive aids.

   C.   Advertisements submitted in any language other than English shall be accompanied by a certified English translation.

III. Panel review of advertisements

   A.   When an advertisement is submitted to the Panel to determine if it complies with or violates the Guidelines, each member shall review the advertisement.

   B.   If any advertisement submitted to the Panel contains a link to a website, a QR code, or a reference to a website (for example, but not limited to, "check out our website for more information"), the Panel shall access the website and endeavour to review:

      1.   Any page linked directly from the advertisement;

      2.   Any homepage for the website;

      3.   Any page directly accessible from the above pages that purports to provide background information on the content, meaning, and/or purpose of the advertisement, which may include pages that describe the advertiser and their self-stated mission and/or purpose; and

      4.   Any page linked from one of the foregoing pages that suggests it contains content that would violate the Guidelines if it appeared on the face of the advertisement.

   C.   To the extent technically practical, download or otherwise save page(s) that the Panel reviewed in making its determination. If a website contains content that does not download (for example, but not limited to, images or link titles), the page shall be printed or saved in another manner that preserves as much information as possible

---

[1] Effective as of November 1, 2024.

1



EXHIBIT

4

MW     8/13/25

CLARKE_WB-0002644

from the reviewed pages.

D.  If an advertisement does not include a link, QR code, or other reference to a website, the Panel generally will not consider the website during its review. However, if any advertisement presents information that is not readily known to or understood by the Panel, the Panel may perform enough research regarding the information presented by the advertisement to educate itself in order to make an informed decision as to whether the advertisement violates the Guidelines.

E.  The Panel will not provide advisory opinions or feedback on potential advertisements.

F.  Panel decisions are final. The Panel will not consider requests for reconsideration or additional explanation.

IV.  Guidance for determining if advertisements violate the Guidelines

A.  The Panel shall apply the Guidelines consistently. It shall not reject advertisements because of the particular viewpoint stated or the identity of the advertiser.

B.  An advertisement that otherwise violates the Guidelines is prohibited even if it also encourages or promotes the purchase or use of goods or services.

C.  An advertisement for an educational institution is not prohibited solely because it refers to its mission or describes itself using general terms that do not refer to a specific issue (for example, but not limited to, describing itself or its educational offerings as "diverse," "traditional," or guided by religious tenets) so long as the advertisement does not otherwise violate the Guidelines.

D.  Interpretive aids for Guideline 1: "All advertising shall comply with the spirit of all applicable laws and regulations of the various jurisdictions in which it is displayed unless inconsistencies among the various jurisdictions prevents such compliance. Advertisements will not be accepted that are false, misleading or deceptive."

  1.  Advertisements that are obscene, indecent, or defamatory, that depict graphically violent or graphically sexual material, or that are otherwise legally actionable are prohibited.

  2.  Advertisements that contain profanity or fighting words are prohibited. "Profanity" is grossly offensive language that is considered a public nuisance or as otherwise defined by the Federal Communications Commission. "Fighting words" are words that naturally tend to provoke violent resentment, inflict injury, or incite an immediate breach of the peace.

  3.  Upon request, advertisers must provide evidence demonstrating compliance with this Guideline.

  4.  All advertisements must clearly identify the entity submitting the advertisement. Advertisements that appear as if a third party is the advertiser are prohibited.

E.  Interpretive aids for Guideline 4: "Medical and health-related messages will be accepted only from government health organizations, or if the substance of the message is currently accepted by the American Medical Association and/or the Food and Drug Administration."

  1.  "Medical and health-related messages" are statements that refer to particular drugs, supplements, medical products, treatments, or other health-related services to combat illnesses, diseases, or health conditions and make representations or statements about the efficacy, benefits, or side effects of the drugs, supplements, medical products, treatments, or other health-related services being advertised.

  2.  "Medical and health-related messages" must be both (a) factual in nature or presented as opinions of experts, medical professionals, or government officials; and (b) capable of verification by the American Medical Association and/or the Food and Drug Administration.

  3.  Guideline 4 does not prohibit advertisements that identify a particular drug, supplement, medical product, treatment, or other service without making the type of representations or statements described in this section.

  4.  Guideline 4 does not prohibit advertisements for fitness products or services, such as gyms, yoga studios, or other fitness training, unless the advertisement makes the type of representations or statements described in this section.

  5.  Guideline 4 does not prohibit advertisements for a weight-loss program unless the advertisement contains the

2

CLARKE_WB-0002645

types of representations or statements described in this section.

    6. Upon request, advertisers must provide evidence demonstrating compliance with this Guideline.

F. Interpretive aids for Guideline 8: "No implied or declared endorsement of any product or service or message by WMATA is permitted."

    1. All advertisements must clearly identify the entity submitting the advertisement to avoid any confusion regarding whether it is a WMATA or WMATA-endorsed advertisement.

G. Interpretive aids for Guideline 9: "Advertisements intended to influence members of the public regarding an issue on which there are varying opinions are prohibited."

    1. The Panel determines an advertisement's intent from review of the face of the advertisement and review of any relevant websites in accordance with section III.

    2. An "issue on which there are varying opinions" does not mean any topic on which people might disagree. For example, an advertisement for a sports team does not involve an "issue on which there are varying opinions" merely because some people support other teams. Rather, an "issue" for purposes of Guideline 9 is "a point, matter, or dispute, the decision of which is of special or public importance[.]" (Dictionary.com definition of "issue.") Advertisements that include such issues generally promote a message to the public about substantive ethically, socially, or politically controversial or divisive topics, as illustrated in this section.

    3. Guideline 9 prohibits the following types of advertisements:

        a. Supporting, opposing, or promoting a political party;

        b. Supporting, opposing, or promoting any person holding any government position or any candidate for such a position;

        c. Supporting, opposing, or promoting a ballot measure or proposed measure;

        d. Supporting, opposing, or promoting a law, ordinance, regulation, or policy or proposed law, ordinance, regulation, or policy;

        e. Supporting, opposing, or promoting a constitutional amendment or amendments or a proposed constitutional amendment or amendments;

        f. Supporting, opposing, or promoting a governmental investigation or proposed government investigation;

        g. Supporting, opposing, or promoting a governmental action or inaction, other than offering goods and/or services to the government;

        h. Supporting, opposing, or promoting any civil, criminal, or administrative proceeding, or any ruling in such a proceeding;

        i. Supporting, opposing, or promoting a strike, walkout, boycott, divestment, embargo, or similar activity;

        j. Supporting, opposing, or promoting a policy or policies of a business or nonprofit entity other than encouraging or promoting the purchase or use of goods or services of the advertiser;

        k. Supporting, opposing, or promoting any foreign nation, group of foreign nations, foreign interest, or related entity, or any policy of or action/inaction of any foreign nation, group of foreign nations, foreign interest, or related entity, unless for a commercial purpose, such as tourism or sports-related advertisements;

        l. Describing or promoting a view of the role that any particular group (including groups characterized by their race, religion, ethnicity, nation origin, sexual orientation, disability status, marital status, age, or ideology) has played or should play in any government, society, or country.

        m. Describing or promoting a particular view, interpretation, or meaning of historical events, historical documents (for example, but not limited to, the Declaration of Independence or Constitution), laws, statutes, regulations, or other government policies.

        n. Supporting, opposing, or promoting a rally, protest, march, demonstration, or other similar event that

3

*Conferences*

CLARKE_WB-0002646

includes any content that would otherwise be prohibited by the Guidelines.

   o.  Using logo(s), slogan(s), phrase(s), symbol(s), or any other word(s) or image(s) that are otherwise prohibited by the Guidelines, unless solely for a commercial purpose.

   p.  Supporting, opposing, or promoting an ethical, social, or humanitarian cause, mission, call to action, awareness campaign, position statement, or other similar effort unless solely for a commercial purpose.

4. Guideline 9 does not prohibit advertisements for a newspaper, magazine, other publication, TV program, film, theatrical performance, concert, podcast, or other media solely because the medium's content addresses political issues or contains political messages, so long as the advertisement does not otherwise violate the Guidelines.

5. Guideline 9 does not prohibit advertisements for employment, including encouraging enlistment in a branch of the military or application for a job with federal, state, or local governments, solely because the employer's missions, policies, practices, or tactics are the subject of "varying opinions," so long as the advertisement does not otherwise violate the Guidelines.

6. Guideline 9 does not prohibit advertisements that encourage or promote the purchase or use of goods or services because others may be opposed to their purchase or use, so long as the advertisement does not otherwise violate the Guidelines. For example, an advertisement for a fast food restaurant with an image of a hamburger does not violate Guideline 9 because some people may oppose the consumption of meat. Likewise, an advertisement from a charitable or religious organization that provides free meals or services to the poor is not prohibited because some people may be opposed to that organization, so long as the advertisement does not otherwise violate the Guidelines.

7. Guideline 9 does not prohibit advertisements that promote medical services that may be the subject of public debate and controversy (for example, but not limited to, abortion, pregnancy care, gender-affirming medical treatment, in-vitro fertilization, vaccines, etc.) if the advertisement is limited to describing the services available, so long as the advertisement does not otherwise violate the Guidelines.

8. Guideline 9 does not prohibit advertisements soliciting donations so long as the advertisement does not otherwise violate the Guidelines.

H. Interpretive aids for Guideline 12: "Advertisements that promote or oppose any religion, religious practice or belief are prohibited."

   1. Guideline 12 does not prohibit advertisements for a newspaper, magazine, other publication, TV program, film, theatrical performance, concert, podcast, product, or other media solely because the medium's content addresses religion, religious practices, or religious beliefs or contains religious messages, so long as the advertisement does not otherwise violate the Guidelines.

   2. Guideline 12 does not prohibit advertisements for an institution solely because of its affiliation with a religion or because it displays a religious, institutional logo, slogan, phrase, symbol, or any other word(s) or image(s), so long as the advertisement does not otherwise violate the Guidelines.

I. Interpretive aids for Guideline 13: "Advertisements that support or oppose an industry position or industry goal without any direct commercial benefit to the advertiser are prohibited."

   1. Guideline 13 prohibits advertisements that support or oppose industry, trade, or professional group members (for example, but not limited to, aerospace, doctors, manufacturing, organics, green energy, teachers, pilots, etc.) by seeking to influence the public or government policy regarding them without direct commercial benefit to the advertiser.

J. Interpretive aids for Guideline 14: "Advertisements that are intended to influence public policy are prohibited."

   1. Guideline 14 prohibits advertisements that seek to influence lawmakers, regulatory agencies, judges, and any other government officials in the conduct of their duties, other than those offering goods and/or services to the government, so long as the advertisement does not otherwise violate the Guidelines.

   2. Guideline 14 prohibits advertisements that call on the public to contact, lobby, or otherwise influence lawmakers, regulatory agencies, judges, and any other government officials to support or oppose a matter

4

CLARKE_WB-0002647

under consideration or likely to be considered by them, other than those offering goods and/or services to the government, so long as the advertisement does not otherwise violate the Guidelines.

3.  Content that involves "public policy" for purposes of Guideline 14 includes content that is described under Guideline 9.

5

CLARKE_WB-0002648

# NICOL DEPOSITION EXHIBIT 5

| | |
|---|---|
| From: | Aaron Bronson[aaron.bronson@outfront.com] |
| Sent: | Tue 12/5/2023 6:25:56 PM (UTC) |
| To: | Holzer, Ron[rholzer@wmata.com] |
| Cc: | Murray, Donna[dmurray@wmata.com] |
| Subject: | <External>Veganuary Creative for WMATA Approval |

**CAUTION:**This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and have verified the authenticity of the message.

Hey Ron, this copy would be for Liveboards...







**AARON BRONSON**
General Manager

C   202.669.0041
1325 Massachusetts Ave NW, Ste 200
Washington, DC 20005



# NICOL DEPOSITION EXHIBIT 6

| | |
|---|---|
| **From:** | Holzer, Ron[RHolzer@wmata.com] |
| **Sent:** | Thur 12/7/2023 9:53:05 PM (UTC) |
| **To:** | Aaron Bronson[aaron.bronson@outfront.com] |
| **Cc:** | Murray, Donna[DMurray@wmata.com] |
| **Subject:** | RE: <External>Veganuary Creative for WMATA Approval |
| **Attachment:** | Advertising_Guidelines.pdf |

Aaron

The panel has reviewed the included advertisements and determined they are prohibited by guideline 9 of WMATA's Commercial Advertising Guidelines.

Thanks,
Ron

**From:** Aaron Bronson <aaron.bronson@outfront.com>
**Sent:** Tuesday, December 5, 2023 1:26 PM
**To:** Holzer, Ron <RHolzer@wmata.com>
**Cc:** Murray, Donna <DMurray@wmata.com>
**Subject:** <External>Veganuary Creative for WMATA Approval

**CAUTION:**This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and have verified the authenticity of the message.

Hey Ron, this copy would be for Liveboards...



EXHIBIT
6





**AARON BRONSON**
General Manager

**C**   202.669.0041
1325 Massachusetts Ave NW, Ste 200
Washington, DC 20005



# NICOL DEPOSITION EXHIBIT 7



# NICOL DEPOSITION EXHIBIT 12





# NICOL DEPOSITION EXHIBIT 13







# NICOL DEPOSITION EXHIBIT 14



# NICOL DEPOSITION EXHIBIT 15





# NICOL DEPOSITION EXHIBIT 16

Message
_____

**From:** Holzer, Ron [RHolzer@wmata.com]
**Sent:** 8/16/2023 2:35:43 PM
**To:** Aaron Bronson [aaron.bronson@outfront.com]
**CC:** Murray, Donna [DMurray@wmata.com]
**Subject:** Re: <External>copy approval- Plan B


Aaron

Yes, #4 is approved as well.

Thank you.
Ron

Ronald A. Holzer
Manager, Advertising Revenue Operations
Washington Metropolitan Area Transit Authority
600 5th Street NW
Washington DC 20001
Cell: 202-309-4624

_____

**From:** Aaron Bronson <aaron.bronson@outfront.com>
**Sent:** Tuesday, August 15, 2023 2:47:38 PM
**To:** Holzer, Ron <RHolzer@wmata.com>
**Subject:** RE: <External>copy approval- Plan B

Hey Ron,

We received backup/ substantiation from the client regarding the 4th creative.

*The client has confirmed the claim is supported, as you can read here.*


**AARON BRONSON**
General Manager

C   202.669.0041
1325 Massachusetts Ave NW, Ste 200
Washington, DC 20005



**From:** Holzer, Ron <RHolzer@wmata.com>
**Sent:** Friday, August 11, 2023 7:01 AM
**To:** Aaron Bronson <aaron.bronson@outfront.com>
**Subject:** RE: <External>copy approval- Plan B

EXTERNAL EMAIL

Good morning Aaron



CLARKE_WB-0001158

Regarding Ad #1, #2, and #3 – yes.

Regarding Ad #4 – please ask Plan B to provide verification that the substance of this message is currently accepted by the AMA and/or the FDA.

Thank you

Ron


**From:** Aaron Bronson <aaron.bronson@outfront.com>
**Sent:** Tuesday, August 8, 2023 9:10 AM
**To:** Holzer, Ron <RHolzer@wmata.com>
**Subject:** <External>copy approval- Plan B

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and have verified the authenticity of the message.

Hello Ron, finally got the Plan B creative with active QRs.  Please see attached for approval.

**AARON BRONSON**
General Manager

**C**   202.669.0041
1325 Massachusetts Ave NW, Ste 200
Washington, DC 20005



CLARKE_WB-0001159

# NICOL DEPOSITION EXHIBIT 17



About          Prayer &        ∨  ∨      Issues &       ∨  ∨      Resources      Vatican
USCCB          Worship                   Action                   ∨  ∨           ∨  ∨
               Bible                            News
∨  ∨          ∨  ∨                    ∨  ∨

PRO-LIFE ACTIVITIES

Emergency Contraception: Boon or Bane?

 Sign Up for Our Email Newsletters

✕ @usccbprolife on Twitter

f USCCB Respect Life on Facebook

**Emergency Contraception: Boon or Bane?**

Home  ›  Pro-Life Activities  ›  Emergency Contraception: Boon or Bane?



EXHIBIT

MM 17 7/15/25

**by Susan E. Wills**

Following the public debate on "emergency contraceptives" (ECs) is bound to be confusing.

Are ECs really contraceptives–that is, do they prevent conception, as supporters insist? Are they ineffective if a woman is already pregnant, as they also claim? Or do they always or usually cause abortions, as some pro-life groups say? And if so, why would legislators who usually oppose abortion support ECs, and even vote to make them available without a prescription?

Are emergency contraceptives as easy, safe, and effective as the advertising suggests?

Before addressing such questions, it might be helpful to illustrate the opposing perspectives on emergency contraceptives. One view is held by reproductive "professionals" who promote

them as a silver bullet solution to unintended pregnancy; some women who have been on the receiving end of this bullet have a different perspective.

The American College of Obstetricians and Gynecologists (ACOG) has long advocated legal abortion, even partial-birth abortion. So it was no surprise that in late April, newly-elected ACOG president Thomas F. Purdon, MD, issued a "call to action" to ob-gyns, asking them to offer "an advance prescription"of ECs to women during routine office visits. No need to wait until the FDA permits over-the-counter sale, he explained: "We need to pursue all avenues to increase women's awareness of emergency contraception and their ability to get it within 72 hours" (ACOG News Release, 4/30/01). He calls ECs "a last chance method of oral contraception, which helps prevent abortion," and he hopes that one day they will be "as common in most women's homes as a first aid kit."

Planned Parenthood boasts of being the largest supplier of ECs and says they could "prevent 1.7 million unintended pregnancies and 800,000 abortions each year." It also says that women who have used ECs "report high levels of satisfaction." But that's clearly not true of all women. Postings on a "morning after pill" on-line support message board (www.afterabortion.com) contradict the rosy picture of EC use as easy or uncomplicated.

"L" describes "feeling agonizing remorse." She wrote to her doctor several times, asking him to explain why he never told her it could cause an abortion and to tell him what she had been going through since learning, five years later, that she might have aborted her child. He never replied. She also felt angry with her mother, who had taken her to the doctor for morning-after pills but later refused to "pressure" the doctor to explain why he hadn't warned her that the pills might cause an abortion. On October 25, 2000, "L" posted this message: What I can say with absolute certainty is that FOR ME the morning-after pill was a totally negative experience which left me with lots of self-blame, unanswered questions, mistrust in doctors and even loss of much of the trust I had in my own mother.

"D" wrote on February 8, 2001: I just want to say ... [BLEERRRRRGGGGGGHHHHHHH!!!] I'm sick. I'm sore. I'm a complete emotional wreck. I'm scared. I'm now terrified about the prospect of having to have sex again. I've got a pounding headache. I have spots in front of my eyes. I have 2 children under 5 that need looking after today.

Several women commiserate with "D," mentioning their own experiences—being sick for three days or thinking they'd never stop throwing up.

"Anonymous" wrote on March 8, 2001: i feel so many things, all so conflicting, and i have so much fear and self-loathing, i need help. my counselor today said he thinks i may be suffering from pas [post-abortion syndrome], and i don't want to deal with this with him

because i want it to go away. he says i don't have to have had a surgical abortion to feel like i caused that baby to die by my taking those pills. i am so scared and confused. ...

This is supposed to be good for women? And it's going to prevent abortions?

## What are "Emergency Contraceptives"?

The idea of "emergency contraceptives" arose decades ago as a high dose of ordinary oral contraceptive pills. The idea was that women could use these hours or days after "unprotected intercourse" or after their usual contraceptive had failed to avert a pregnancy. The ACOG Practice Bulletin (No. 25, March 2001) lists the following methods of emergency contraception: "combination or progestin-only oral contraceptives, danazol, synthetic estrogens and conjugated estrogens, antiprogestins and the insertion of an intrauterine device [IUD]."

Combination oral contraceptives (COCs) typically contain a low daily dose of a synthetic estrogen (ethinyl estradiol) and a low dose of progestin (norgestrel or levonorgestrel). When used as a back-up for missed or failed contraception, two doses of COCs, consisting of 2, 4 or 5 pills each, are taken 12 hours apart, beginning within 72 hours of intercourse. This method, known as the "Yuzpe Regimen," was introduced in 1974 and is the most commonly used. In 1998 the FDA approved the first product specifically marketed for emergency contraception, the "Preven" Emergency Contraceptive Kit. It contains 4 pills for the Yuzpe regimen, a pregnancy test, and instructions.

Progestin-only oral contraceptives (e.g., Ovrette) contain a low dose of norgestrel. For use as emergency contraception, one must take 20 Ovrette pills, followed by another 20 pills twelve hours later. In 1999, the FDA approved "Plan B," an emergency contraception kit with two high-dose pills of levonorgestrel each, equal to about one-third of the amount one would take in a month.

The copper-releasing intrauterine device (IUD) can be used as "emergency contraception" if inserted within five to seven days after intercourse. With such use, "the IUD interferes primarily with the process of implantation" thus ending the life of the week-old embryo. (Rosenfield, A., "Emergency Contraception: A Modality Whose Time Has Come," Journal of the American Medical Women's Association, vol.53, no.5, Sept. 1998, p. 212)

## How Emergency Contraceptives Work

This discussion will focus only on the two most widely used methods of emergency contraception—COCs (Preven or "ordinary" COCs used according to the Yuzpe regimen)

and Plan B. First, it might be helpful to review the normal fluctuations of a woman's reproductive hormones each month.

At the beginning of a woman's menstrual flow, the pituitary gland produces a higher level of follicle stimulating hormone (FSH). The ovary responds by ripening a follicle from which a maturing egg will be released. The covering of the egg then produces estrogen which prompts the lining of the uterus to proliferate. The rising estrogen level sets off a sudden release of luteinizing hormone (LH) from the pituitary gland. The LH "surge" causes the now mature egg to be released from the ovarian follicle. This is ovulation. After ovulation, the lining of the follicle begins to produce the hormone progesterone. Normally the follicle's cells live for eleven to sixteen days, producing progesterone and small amounts of estrogen. The progesterone causes the uterine lining to thicken and produce a nutritious liquid so that if the egg were fertilized, the week-old embryo can implant in it.

If conception does not occur, then eleven to sixteen days after ovulation, levels of progesterone and estrogen drop and the next menstrual period begins.

The human egg lives only for about 24 hours after its release. Sperm can live for three days, and possibly even five days during the fertile phase. A woman's "fertile phase" may therefore last at most from about six calendar days prior to ovulation to the calendar day following ovulation.

The main mechanisms of ECs are suppressing ovulation (by delaying or suppressing FSH and LH), altering cervical mucus which slows sperm transport, slowing transport of egg or embryo through the fallopian tube, and changes to the uterine lining which make it thin and atrophied, inhibiting implantation of the embryo. Researchers describe three possible post-fertilization effects of hormonal contraceptives: the slower transport of the embryo through the fallopian tube could prevent the embryo from reaching the uterus to implant (resulting in embryo loss or tubal pregnancy); changes in the uterine lining which prevent implantation; changes in the uterine lining which are "not sufficient to prevent implantation but unfavorable for maintenance of the pregnancy" (Larimore, W. and Stanford, J., "Postfertilization Effects of Oral Contraceptives and Their Relationship to Informed Consent," Archives of Family Medicine, vol. 9, Feb 2000, 126-133).

Whether ECs prevent conception or act as an abortifacient depends on when in the woman's fertility cycle intercourse occurs and ECs are used.

If taken before the beginning of the fertile phase, their only effect would be to cause withdrawal bleeding completely out of phase with the woman's ordinary cycle. (Klaus, "The Morning After Pill: Boon or Boondoggle?," March 11, 2001).

If taken at the beginning of the fertile phase, "they may delay or suppress the [LH] surge. ... If ovulation is delayed by more than 72 hours, it is possible that the sperm may not survive. If ovulation is suppressed entirely, then there would be an out-of-phase bleed" (Ibid.). Therefore, taken during this period of several days, COCs and progestin would be somewhat more likely to prevent conception than to interfere with implantation.

ECs taken after the LH surge cannot inhibit ovulation. If an egg has been released in the preceding 24 hours, a sperm may penetrate the egg within 15 to 30 minutes after intercourse, beginning the process of fertilization. The new human embryo grows and develops over the next three to five days while traveling down the fallopian tube to the uterus to implant. The abnormally high level of synthetic progesterone present in the ECs, however, alters the uterine lining, inhibiting or preventing implantation. "This mode of action could explain the majority of cases where pregnancies are prevented by the morning after pill" (Grou, F. and Rodriguez, I. "The morning after pill, how long after?" American Journal of Obstetrics and Gynecology (1994), vol. 171: 1529-34).

Finally, if ECs are taken in the late infertile phase, they would simply cause premature menstrual bleeding.

For almost three weeks of the average cycle, then, ECs will neither prevent conception nor cause an abortion because a woman is infertile. During the remaining week or so, ECs are capable of both contraceptive and abortifacient actions, the former action predominating in the earlier days of the fertile phase and the latter action predominating after the LH surge. Unless a woman charts her fertility (quite an easy thing to do with methods developed for natural family planning) she cannot be certain which action has "prevented pregnancy" when the pills "succeed."

**Issues of Informed Consent**

Those who promote "emergency contraception" omit facts and publish inaccuracies and half-truths, depriving women of their right to informed consent. The foremost claim is that ECs do not cause abortion and have "no effect on a pregnancy." To make this claim they have had to redefine "pregnancy" as beginning after an embryo has implanted in the uterine lining, and redefine "abortion" as terminating a "pregnancy." Terminating a human being's life prior to successful implantation is not counted. These word games are designed to obscure what ECs do, and to prevent state abortion regulations from applying to the destruction of embryos' lives by synthetic hormones. They also prevent conscientiously objecting health care personnel–doctors, nurses and pharmacists–from being able to cite state and federal "conscience clauses" on abortion in their own defense.

For the same reason promoters of ECs refer to the implantation of a "fertilized egg." At the age of 6-7 days when an embryo begins implantation, it is not a "fertilized egg." It is an embryo in the blastocyst stage. "The term embryo covers the several stages of early development [single-celled zygote, multi-celled blastocyst, highly differentiated embryo] from conception to the ninth or tenth week of life" when all organs are present and the fetal stage begins. (Considine, D. (ed.), Van Nostrand's Scientific Encyclopedia, 5th ed. (1976), p. 943).

Women are also misled about the unpleasant side effects and health risks of ECs. Promoters of ECs trivialize the physical, emotional and psychological impact from using these drugs, assuming perhaps that any amount of such harm to women is preferable to continuing a pregnancy. In fact, ACOG seems willing to subject women to potential harm even when the likelihood of pregnancy is nil. The ACOG Practice Bulletin describes a candidate for emergency contraception as any woman of reproductive age who has had "unprotected" intercourse in the previous 72 hours, "independent of the time in the menstrual cycle" (emphasis added).

There are a number of common, relatively manageable, adverse reactions to Preven and Plan B. Over 50% of women taking Preven experience nausea, as do 23% of those taking Plan B. About 19% vomit after taking Preven, compared to 5.6% of those taking Plan B. (WHO Department of Reproductive Health and Research, "Improving Methods of Emergency Contraception," Progress in Human Reproduction Research, Bulletin No. 51, 1999). One out of every five or six women may also experience headaches, abdominal pain, menstrual irregularities, dizziness or fatigue.

But far more troubling is the long list of very serious contraindications and warnings given to doctors. (See, e.g., "Prescribing Information" at www.preven.com.)

The risk of developing blood clots in the deep veins of the leg is three to six times greater among users of COCs than for non-users. "Blood clots that form in the leg can cause blockage of blood flow in the leg veins [and] can travel to the lung, causing serious disability or death. Rarely, clots occur in the blood vessels of the eye and may cause blindness, double vision, or impaired vision." These risks are substantially increased for women who smoke.

There is an increased risk of heart attack and stroke, both of which can cause serious disability or death. Women who have had a heart attack, and those with ischemic or valvular heart disease or very high blood pressure are at even greater risk and should not use combination ECs. Women are warned not to take combination ECs if they have diabetes with blood vessel involvement, severe headaches including migraine, current or past breast

cancer, liver tumors or disease, or a known allergy to any component in ECs. Schering Health Care, a manufacturer of COCs marketed as ECs in England, provides the following warning to pharmacists:

There is a general opinion based on statistical evidence, that users of combined oral contraceptives ... experience, more often than non-users, venous thromboembolism, arterial thrombosis, including cerebral and myocardial infarction, and subarachnoid hemorrhage. Full recovery from such disorders does not always occur, and it should be realized that in a few cases, they are fatal.

Because it can be difficult to schedule a medical appointment during the 72 hour window in which the initial dose must be taken, promoters of ECs are lobbying the Food and Drug Administration and state legislatures to authorize over-the-counter availability. Currently only Washington state allows distribution by pharmacists. But a very public and busy pharmacy counter is no place for a distraught and embarrassed teen or woman to discuss her relevant medical and sexual history with a pharmacist–absolutely essential given the serious contraindications of the drugs. Nor will the average pharmacist have the time to explain all that a woman needs to know to make an informed decision.

Failure to properly advise a patient of risks and options can be actionable malpractice. And, although the National Federation of State Medical Boards "explicitly" states that prescriptions without a doctor's visit are "outside the bounds of professional conduct" except in the case of refills, prescriptions for ECs can now be obtained through several web sites operated in the U.S.

## Conclusion

The availability of "emergency contraception" is not "the nation's best kept secret" as promoters like to claim. The secret best kept from the American public is that these drugs can cause abortions. The time for covering up this unpleasant reality is long past.

Many Americans believe that if a woman is abortion-minded, it's better to take the life of a week-old embryo than one at ten or 20 weeks. But it's wrong to consider hormonally-induced abortion as a lesser evil than later-term abortions, simply because the embryo has less resemblance to what we think humans look like. In fact, we all once looked exactly like a week-old embryo. The essence, the effect of both abortions is the same: an individual is deprived of her entire earthly life span. She will never be kissed or cuddled, never walk on a beach or ride a bike, never sing in a choir or graduate from college, never fall in love, raise kids, have a fulfilling career or leave the world a better place for having lived here.

For Catholics the choice is clear. Natural family planning–fertility awareness coupled with abstinence during the fertile phase–is the healthy, risk-free and morally sound way for couples to plan the spacing and number of their children. But all who believe in the sanctity of human life–and all who oppose giving potentially dangerous drugs to women with inadequate or extremely misleading information–can and should oppose the growing use of emergency contraceptives.

**Susan Wills is assistant director for program development, USCCB Secretariat for Pro-Life Activities.**

# NICOL DEPOSITION EXHIBIT 20

Case 1:23-cv-03695-BAH    Document 61-4    Filed 01/16/26    Page 83 of 180



**AARP®**
**District of Columbia**

# 2024 AARP DC Voter Guide

Get trusted, up-to-date information on when, where and how to vote in the District's 2024 Primary election June 4th. Also learn where the candidates stand on issues important to you.

**VOTERS 50+**
*Our Voices Decide*



**Scan the QR code, or visit aarp.org/DCVotes**
En español: aarp.org/DCVota

facebook.com/AARPDC
@AARPDC

Paid for by AARP



EXHIBIT

MM  20  8/13/25

# NICOL DEPOSITION EXHIBIT 21

EXHIBIT

21



# NICOL DEPOSITION EXHIBIT 22

Message

**From:**      Holzer, Ron [RHolzer@wmata.com]
**Sent:**      10/25/2024 11:04:36 AM
**To:**        Aaron Bronson [aaron.bronson@outfront.com]
**Subject:**   RE: <External>Amplifier Foundation - Copy Approval
**Attachments:** DíaDeLosMuertos_Votes_18x24.jpg; Advertising_Guidelines.pdf

Aaron

The ad review panel has determined that the attached proposed advertisement is prohibited by Commercial Advertising Guidelines 8 & 9.

Thanks,
Ron

**From:** Aaron Bronson <aaron.bronson@outfront.com>
**Sent:** Tuesday, October 22, 2024 11:46 AM
**To:** Holzer, Ron <RHolzer@wmata.com>
**Subject:** <External>Amplifier Foundation - Copy Approval

**CAUTION:**This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and have verified the authenticity of the message.

This is for Live Boards.

**AARON BRONSON**
General Manager

C   202.669.0041
1325 Massachusetts Ave NW, Ste 200
Washington, DC 20005

**OUTFRONT/**



EXHIBIT
22

CLARKE_WB-0003880

# NICOL DEPOSITION EXHIBIT 23



# NICOL DEPOSITION EXHIBIT 34

Case 1:23-cv-03695-BAH    Document 61-4    Filed 01/16/26    Page 91 of 180

June 2024

Metro station
printed ad
series of ads
entrance (main)

aware →



EXHIBIT

34

MM          7/15/25

# NICOL DEPOSITION EXHIBIT 45






# NICOL DEPOSITION EXHIBIT 47



Jan 2025

EXHIBIT

47

MQ        5/13/25

# NICOL DEPOSITION EXHIBIT 48



# NICOL DEPOSITION EXHIBIT 49

February 2024



Better Health Care!

A Better Tomorrow!


Planned Parenthood®
Care. No matter what.
Planned Parenthood of
Metropolitan Washington, DC

## ASK ABOUT OUR SERVICES!

We provide...

☑ PRIMARY CARE

☑ GENDER-AFFIRMING CARE

☑ SEXUAL REPRODUCTIVE HEALTH CARE

**Healthy From Head to Toe**

Visit PrimaryCarePP.org | Call 202.347.8512

EXHIBIT

49   8/13/25

# NICOL DEPOSITION EXHIBIT 53





# NICOL DEPOSITION EXHIBIT 55



**EXHIBIT 55**

# STOP HOUSING DISCRIMINATION BECAUSE OF

**DISABILITY** **SEX** **GENDER IDENTITY** **COLOR** **FAMILIAL STATUS** **NATIONAL ORIGION** **RELIGION** **RACE** **SEXUAL ORIENTATION**





THE FAIR HOUSING ACT PROHIBITS HOUSING DISCRIMINATION BECAUSE OF RACE, COLOR, RELIGION, SEX (SEXUAL ORIENTATION AND GENDER IDENTITY), NATIONAL ORIGIN, DISABILITY AND F AMILIAL STATUS.

*If you believe that you have experienced housing discrimination, submit a complaint.*
*Learn more at: ncrc.org/fh*

The work that provided the basis for this publication was supported by funding under a grant with the U.S.Department of Housing and Urban Development.The substance and findings of the work are dedicated to the public.The author and publisher are solely responsible for the accuracy of the statements and interpretations contained in this publication. Such interpretations do not necessarily reflect the views of the federal Government

# NICOL DEPOSITION EXHIBIT 57



December 2024



# NICOL DEPOSITION EXHIBIT 62



# NICOL DEPOSITION EXHIBIT 63

Case 1:23-cv-03695-BAH   Document 61-4   Filed 01/16/26   Page 109 of 180

EXHIBIT

63   8/13/23

# NICOL DEPOSITION
# EXHIBIT 64

# NICOL DEPOSITION EXHIBIT 65

| Reference # | Date Created | Date Closed | Status | Incident Date/Time | WMATA Source | Product ID | Category ID | Topic | Queue | Field Research | RouteID | Line | Station | Text | Subject |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 240723-000368 | 07/23/2024 02:15 PM | 07/23/2024 02:15 PM | Closed | 07/23/2024 02:06 PM | Phone | Metrobus | Advertising | Bus Vehicle | Bus Ops Western | No Research Required | L2 | No Value | No Value | Caller states that there is a problem with one of the ads displayed saying "80% of Americans Support Israel." | Ad Complaint |
| 240730-000440 | 07/30/2024 05:09 PM | 08/07/2024 11:07 AM | Closed | 07/30/2024 04:50 PM | Comment Card | Metrobus | Advertising | Bus Vehicle | Bus Ops Montgomery | Research Required, Follow-up Needed | 70 | No Value | No Value | This bus has an ad on it for WallBuilders.com which is a Christian Nationalist group led by David Barton who is labeled as a religious extremist by the Southern Poverty Law Center (https://www.splcenter.org/fighting-hate/extremist-files/individual/david-barton). Christian Nationalism, including the website for WallBuilders, relies on spreading hatred, especially regarding protected classes (like religion and sexuality). I love WMATA and especially the Pride metros and buses but it is unacceptable for public transportation to be a mobile for hate. Please remove this ad and do not allow for these types of ads in the future. | This bus has an ad on it for WallBuilders.com which is a Christian Nationalist |
| 210630-000107 | 06/30/2021 02:13 PM | 07/02/2021 04:16 PM | Closed | 06/30/2021 02:10 PM | Comment Card | Metrobus | Advertising | Bus Stop | Bus Ops Four Mile Run | No Research Required | 1A | No Value | No Value | Any thought put into allowing advertisements on the bus stop that bring up sex for rent? I have had to navigate questions from my 5 and 7 years olds as we drive by the stop with the billboard about sex for rent. I could only imagine how a mother would feel if her daughter asked her while waiting for the bus if she has sex with their landlord. Or if you were the landlord for the apartment building behind where this billboard is. It's an important concern just doesn't seem like a well thought out awareness campaign that examined potential unintended consequences and confusion among youth viewers of this very public ad. | Bus - Advertising |
| 210730-000138 | 07/30/2021 04:48 PM | 07/30/2021 04:51 PM | Closed | 07/30/2021 04:21 PM | Comment Card | Metrobus | Advertising | Other | Customer Relations | No Research Required | No Value | No Value | No Value | We monitor what our children see on TV and internet. Therefore, Public Transit should not allow two men or women in bed together painted on their bus where children can see them. All people should care about protecting and guarding their | We monitor what our children see on TV and internet. Therefore, Public Transit |
| 230426-000021 | 04/26/2023 07:40 AM | 05/02/2023 02:06 PM | Closed | 04/26/2023 07:35 AM | Comment Card | Metrorail | Advertising | General Information | Rail Alexandria Yard | No Research Required | No Value | Blue | Ronald Reagan Washington National Airport | Army advertising is placed along the metro. Based on prospective, it looks like the army is telling you to jump... at a rail station... same month someone was killed on the rail. Picture taken while stopped at RRN | Army advertising is placed along the metro. Based on prospective, it looks |
| 230613-000127 | 06/13/2023 11:57 AM | 06/21/2023 02:09 PM | Closed | 06/13/2023 11:26 AM | Comment Card | Metrorail | Advertising | Railcar | Rail Car Maintenance | No Research Required | No Value | Silver | Ashburn | ADVERTISING POSTERS FOR MAY 20 EVENT OUTDATED. STILL POSTED IN METRO CAR ON JUN 13. HAS HAPPENED MULTIPLE TIMES. RESULT: REDUCED RELIANCE ON METRO INFORMATION AND TRUST IN THE SYSTEM | ADVERTISING POSTERS FOR MAY 20 EVENT OUTDATED. STILL POSTED IN METRO CAR ON JUN |
| 240714-000009 | 07/14/2024 01:31 PM | 07/27/2024 09:47 AM | Closed | 07/14/2024 01:26 PM | Comment Card | Metrorail | Advertising | Station | Rail Alexandria Yard | No Research Required | No Value | Yellow | Pentagon City | Why is Metro allowing Wall Builders to advertise in the system? They are an extremist organization according the Southern Poverty Law Center (the premier American organization that tracks hate groups) and they push a grossly inaccurate widely discredited, Christian nationalistic version of American history that is hateful, exclusionary, and dangerous. Surely Metro can hold itself to a higher advertising standard. A hate group's money isn't worth it. Please do better and pull their | Why is Metro allowing Wall Builders to advertise in the system? They are an |

EXHIBIT
65
MM 8/13/25

# NICOL DEPOSITION EXHIBIT 66

## EXHIBIT A

### Definitions and Instructions

1.    "WMATA" refers to Washington Metro Area Transit Authority.

2.    "OUTFRONT" refers to OUTFRONT Media, Inc.

3.    "Interpretive Aids" refers to WMATA's "Metro Internal Procedures and Interpretive Aids for Reviewing Proposed Commercial Advertising" as as promulgated and/or made public on November 1, 2024.  A copy of the Interpretive Aids appears on the docket of this litigation at Dkt. 49-1.

\* \* \* \* \* \* \*

Exhibit numbers mentioned in this document refer to the exhibits marked at the Nicol deposition.

### Testimony Regarding Advertising Guidelines, Interpretive Aids, and Customer Complaints and Vandalism

1.    The interpretation and application of Guideline 9, including but not limited to:

    A.    The interpretation and application of Guideline 9 in connection with Exs. 5, 7, 9-10, 12-15, 20-21, 26, 31-32, 34, 38, 41-44, 45, 47-48, 49, 53, 55, and 57 and more recent advertisements run on WMATA advertising space;

    B.    WMATA's definition, understanding and application of key terms in Guideline 9.

2.    The adoption of the Nov. 1, 2024 Interpretive Aids, including

    A.    The identity of the individuals and entities that authorized issuance and adoption of the Interpretive Aids;

    B.    The authority under which the Interpretive Aids were adopted, and the procedures under which they were adopted;

    C.    Whether the Interpretive Aids have legal effect or are binding on WMATA;

    D.    The methods by which WMATA generally adopts binding rules.

3.    The interpretation and application of the Interpretative Aids, including but not limited to:

    A.    The interpretation and application of the Interpretive aids in connection with Exs. 7, 9-10, 12-14, 31-32, 38, 47-48, and 57 and more recent advertisements run on WMATA advertising space;



1

        B.      WMATA's definition, understanding and application of key terms in the Interpretive Aids relevant to Guideline 9.

4.      Complaints from the public related to the content of advertisements run in or on WMATA's stations, subways, and/or buses, and WMATA's responses thereto. This topic is limited to complaints received from 2020 to the present.

5.      Vandalism, graffiti, and/or damage to advertisements run in or on WMATA's stations, subways, and/or buses, including (i) vandalism, graffiti, and/or damage related to the content of an advertisement, (ii) vandalism, graffiti, and/or damage not related to such content, and (iii) the relative proportions of (i) and (ii). This topic is limited to vandalism, graffiti, and/or damage suffered from 2020 to the present.

6.      WMATA's experience with marketing partnerships or other joint marketing or advertising campaigns with governmental and non-governmental organizations (e.g., Black Coalition against Covid-19), and how any marketing messages or advertisements jointly sponsored thereunder are regulated by WMATA. This topic is limited to marketing partnerships and campaigns that were in effect at any time from 2020 to the present.

# NICOL DEPOSITION EXHIBIT 67

# Exhibit A



## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WALLBUILDER PRESENTATIONS,<br><br>Plaintiff,<br><br>v.<br><br>RANDY CLARKE,<br><br><br>Defendant. | <br><br><br><br>Civil Action No. 1:23-cv-03695-BAH |

### THIRD DECLARATION OF GEORGETTA NICOL

I, Georgetta Nicol, make this Declaration based upon personal knowledge and information available to me, and I am competent to testify to matters contained herein.

1.    I am the Director of Marketing at the Washington Metropolitan Area Transit Authority ("WMATA").  Among my duties, I oversee the activities of WMATA's Office of Marketing, and WMATA's advertising program related to the Metrorail and Metrobus systems.

2.    I make this declaration in support of Defendant's Partial Opposition to Plaintiff's Rule 56(d) Motion.

3.    WMATA's in-house and outside legal counsel participated in all aspects of the development of WMATA's Internal Procedures and Interpretive Aids for Reviewing Proposed Commercial Advertising ("Interpretive Aids") and provided legal advice as to the contents of the Interpretive Aids.

4.    WMATA counsel's legal advice during the development of the Interpretive Aids took into consideration the litigation challenging certain of WMATA's Guidelines Governing Commercial Advertising in this case (Guideline 9), *White Coat Waste Project v. Clarke*, No. 23-

cv-1866-JEB (D.D.C.) (Guidelines 9, 13 and 14), and *ACLU v. Clarke*, No. 17-cv-1598-TSC (D.D.C.) (Guidelines 4, 9, 13 and 14).   WMATA counsel's legal advice also took into consideration the prospect of future legal challenges to the Guidelines and the Interpretive Aids.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 5_____ day of _December_____ 2024, in Washington, D.C.

Georgetta Nicol  
Digitally signed by Georgetta Nicol  
Date: 2024.12.05 10:27:10 -05'00'

Georgetta Nicol

# NICOL DEPOSITION EXHIBIT 68

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

WALLBUILDER PRESENTATIONS,

        Plaintiff,

    v.

RANDY CLARKE,

        Defendant.

Civil Action No. 1:23-cv-03695-BAH

Judge Beryl A. Howell

**DEFENDANT'S STIPULATION REGARDING AUTHENTICITY OF DOCUMENTS**

Defendant Randy Clarke stipulates, for purposes of this civil action only, as follows regarding the authenticity of certain of the documents referenced in Topics 1-20 of Plaintiff Wallbuilder Presentations' Notice of Deposition of Washington Area Transit Authority ("WMATA"). Exhibit numbers mentioned in this stipulation refer to the exhibits marked at the deposition of Georgetta Nicol on August 13, 2025.

1. Exhibit ("Ex.") 1 is a true and correct copy of an 8/18/2023 email sent by R. Holzer within the scope of his duties at WMATA.

2. Ex. 6 is a true and correct copy of a 12/7/2023 email sent by R. Holzer within the scope of his duties at WMATA.

3. Exs. 7, 9-10, 12-14, 25, 31-32, 34, and 47-48 are true and correct depictions of advertisements run by OUTFRONT. WMATA's Advertisement Review Panel did not review the advertisements depicted in Exhibits 7, 9-10, 12-14, 25, 31-32, or 34. WMATA's Advertisement Review Panel approved the advertisements depicted in Exhibits 47-48. The ad depicted in Exhibit 7 was run, but not approved, by OUTFRONT. The ad depicted in Exhibit 7 was included in the posting schedule by

EXHIBIT
68
TMM 11/10/25

administrative error and promptly removed when noticed in June 2025. The ad depicted in Ex. 14 was also promptly removed when noticed in June 2025.

4. Ex. 16 is a true and correct copy of an 8/16/2023 email that was sent by R. Holzer within the scope of his duties at WMATA, and that refers to the advertisement depicted in Ex. 15 that was run by WMATA.

5. CLARKE WB-0001967 is a true and correct copy of a 4/26/24 email that was sent by R. Holzer within the scope of his duties at WMATA, and that refers to the advertisement depicted in Ex. 20 that was run by WMATA.

6. Ex. 22 is a true and correct copy of a 10/25/2024 email that was sent by R. Holzer within the scope of his duties at WMATA, and that refers to the advertisement depicted in Ex. 21 that was rejected by WMATA.

7. Ex. 23 is a true and correct depiction of a temporary, non-commercial WMATA installation honoring historical figure Rosa Parks, installed outside of WMATA's commercial advertising inventory. The installation was not part of WMATA's advertising or promotional program and did not involve the sale, purchase, utilization, or display of paid commercial content. Its purpose was commemorative and educational, to honor Rosa Parks' nationally recognized holiday. The display also served to foster community pride and strengthen WMATA's connection to the communities it serves and, thereby, encourage increased ridership.

8. Ex. 27 is a true and correct copy of a 9/1/23 email that was sent by R. Holzer within the scope of his duties at WMATA, and that refers to the video advertisement depicted in Ex. 26 that was run by WMATA.

9. Ex. 35-37 are true and correct depictions of liveboard signs installed in 2025 as part of a WMATA ridership and community engagement initiative designed to increase public transit use and promote service awareness during a period of significant regional tourism and special events. The initiative was operational in nature and focused on encouraging ridership, managing travel demand, and supporting safe, reliable access to major Pride Month events across the region. Its purpose was to promote public transit as the preferred mode of transportation during a high-volume travel period, consistent with WMATA's mission. The initiative did not advocate for any organization or viewpoint; rather, it advanced WMATA's public service objectives and, thereby, encourage increased ridership.

10. CLARKE WB-0002926-27 is a true and correct copy of a 12/27/24 email that was sent by R. Holzer within the scope of his duties at WMATA, and that refers, among other ads, to the advertisement depicted in Ex. 38 that was rejected by WMATA.

11. Exs. 39-40 are true and correct depictions of temporary, non-commercial displays installed in October 2024 honoring the service and sacrifice of U.S. military veterans. The wraps were created as a civic recognition of veterans' contributions. They did not promote, endorse, or fundraise for any external foundation, organization, or advocacy group. The initiative's purpose was commemorative and community-focused, expressing institutional gratitude, fostering civic pride, and strengthening WMATA's connection to the communities it serves and, thereby, encourage increased ridership.

12. CLARKE WB-0003867 is a true and correct copy of a 10/31/24 email that was sent by R. Holzer within the scope of his duties at WMATA.

3

13. CLARKE_WB-0002893 is a true and correct copy of a 11/8/2024 email that was sent by R. Holzer within the scope of his duties at WMATA, and that refers to the advertisements depicted in Exs. 41-44 that were rejected by WMATA.

14. Ex. 46 is a true and correct copy of a 10/20/23 email that was sent by R. Holzer within the scope of his duties at WMATA, and that refers to the advertisement depicted in Ex. 45 that was rejected by WMATA.

15. Ex. 52 is a true and correct copy of a 2/15/24 email that was sent by R. Holzer within the scope of his duties at WMATA, and that refers to the advertisement depicted in Ex. 49 that was run by WMATA.

16. Ex. 54 is a true and correct copy of a 2/23/24 email that was sent by R. Holzer within the scope of his duties at WMATA, and that refers to the advertisement depicted in Ex. 53 that was rejected by WMATA.

17. Ex. 56 is a true and correct copy of a 9/8/23 email that was sent by R. Holzer within the scope of his duties at WMATA, and that refers to two versions of an advertisement that was run by WMATA, one of which is the English version of the ad depicted in Ex. 55.

18. Ex. 59 is a true and correct copy of a 12/12/24 email that was sent by R. Holzer within the scope of his duties at WMATA, and that refers to two advertisements, one being the advertisement depicted in Ex. 57 that was run by WMATA.

19. Ex. 61 contains a true and correct depiction of an advertisement that was run with the approval of WMATA.

20. Ex. 62 is a true and correct depiction of an advertisement run by OUTFRONT. The WMATA advertisement review panel did not review the image depicted in Ex. 62. WMATA has no information regarding the vandalization of the ad depicted in Ex. 62.

21. Exs. 63-65 are true and correct copies of documents kept by WMATA that record complaints received at various times between 2020 and 2024 regarding advertisements that WMATA has run.

All parties retain the right to argue that any document produced in this action is not admissible.

SO STIPULATED.

Date:   October 9, 2025                              Respectfully submitted,

                                                    /s/ Caroline L. Wolverton
                                                    Anthony T. Pierce, D.C. Bar No. 415263
                                                    Caroline L. Wolverton, D.C. Bar No. 496433
                                                    AKIN GUMP STRAUSS HAUER & FELD LLP
                                                    Robert S. Strauss Tower
                                                    2001 K Street, N.W.
                                                    Washington, D.C. 20006
                                                    Telephone: (202) 887-4000
                                                    Email: apierce@akingump.com
                                                    cwolverton@akingump.com

                                                    Rex S. Heinke, D.C. Bar No. CA00080
                                                    COMPLEX APPELLATE LITIGATION GROUP LLP
                                                    355 South Grand Avenue, Suite 2450
                                                    Los Angeles, CA 90071
                                                    Telephone: (213) 878-0404
                                                    Email: rex.heinke@calg.com

                                                    *Attorneys for Defendant*

5

# CERTIFICATE OF SERVICE

I hereby certify that on October 9, 2025, I served the foregoing document upon

counsel of record by emailing it as follows:

Shannen Coffin, scoffin@steptoe.com
Andrew Sloniewsky, asloniewsky@steptoe.com
Caitlin Daday, cdaday@steptoe.com
David Hacker, dhacker@firstliberty.org
Jeremiah Dys, jdys@firstliberty.org
Ryan Gardner, rgardner@firstliberty.org
Arthur Spitzer, aspitzer@acludc.org
Scott Michelman, smichelman@acludc.org
Brian Hauss, bhauss@aclu.org
David Cole, cole@law.georgetown.edu

/s/ Caroline L. Wolverton
Caroline L. Wolverton

# NICOL DEPOSITION EXHIBIT 69



CLARKE_WB-0004820

# NICOL DEPOSITION EXHIBIT 70



EXHIBIT

70

tabbies
MM 11/10/25


Home
About ▾
Activities ▾
Travel ▾
Contact
Donate
Store

# WORLD CULTURE FESTIVAL —

## DITION

Sept 29 – Oct 1 '23
The National Mall in DC

...ure Festival is coming to the National Mall in Washington DC.  Renew, groove, dance, sing, and connect with millions of people who long for ...y and less division.

DONOR PASS

GET YOUR

Donate

Store

GET YOUR FREE PASS





## GLOBAL ARTISTS FROM ALL CULTURAL TRADITIONS





**1,000+**
Guitar Ensemble



**1,000+**
Gospel Choir



**200+**
Latin American Dancers



**200+**
Hip Hop Performers

## OFFSTAGE ACTIVITIES

Nourish your heart, mind, and body with inspiration, meditation, & food from all traditions



**MORNING YOGA**

for Global Unity



**FOOD TRUCK**

Bonanza



**YOUTH EVENT**

Peace Summit

# EXPERIENCE PEACE, JOY AND ACCEPTANCE OF SELF AND OTHERS

World Culture Festival is an unforgettable cultural extravaganza, featuring incredible voices, talent, and creativity from around the world. YOU are invited to participate, share your uniqueness, and connect with others at this one of a kind event.







GET YOUR FREE PASS

# PRIOR WORLD CULTURE FESTIVALS IN NUMBERS...

In its last three editions, WCF reached over six million people in-person and drove hundreds of millions of views online, making it the most successful recurring global artistic event in human history.



3.75 MILLION ATTENDEES



70,000 ATTENDEES



## THE NATIONAL MALL:
## A HISTORIC SETTING FOR UNITY



The Mayor of DC, Honorable Muriel Bowser invites the world to the National Mall to experience the World Culture Festival, made in the USA. The power of this site, as a symbol of the people exercising their freedom to live together and accept each other as unique individuals, cannot be overstated.

## WORLD LEADERS SUPPORTING WCF 2023



H.E. Ban Ki-Moon
Honorary Committee Chair
Former Secretary General of the
United Nations, South Korea



**H.E. Pravind Jugnauth**
Prime Minister, Mauritius



**H.E. Ratu Wiliame Katonivere**
President, Fiji



**H.E. Chan Santokhi**
President, Suriname

See All

## BUSINESS LEADERS SUPPORTING WCF 2023




**Rob Trombold**
Living
Culture



**Ann Luskey**
Founder and Trustee,
Charlotte's Web



**The Honorable Binod Chaudhary**
Member of Parliament, Nepal
Chairman and President, The
Chaudhary Group (CG)



**Chirag Patel**
President and CEO, Amneal
Pharmaceuticals

See All

#WCF2023, #UnitedWeCelebrate, #EnoughDivision, #TheArtofLiving

3



## UNITED WE CELEBRATE

...o play a role in uniting this country and this world. One way is to participate. Another way is to donate. All donations are tax-deductible.

...ity of seating is available for general admission pass holders, it is not guaranteed and will be provided onsite on a first come basis.

HOME   ART OF LIVING   RECEPTION COMMITTEE   ORGANIZING COMMITTEE   FAQ   CONTACT

**THE ART OF LIVING**

Copyright © 2023 Art of Living Foundation   English

English

4

# NICOL DEPOSITION EXHIBIT 71

THE ART OF LIVING | **World Culture Festival** 2023

About    Committees ▾    FAQs    Contact    Get Your Free Pass    🇺🇸 English ▾

# An Unforgettable Cultural Extravaganza

*An event to bring the world together as one global family*

World Culture Festival was born out of inspiration: it was a vision to create a celebration that reflected both the world's unity and incredible diversity–its music and dance, soaring artistry and urgent dreams. And so a stage was born. Since then, the festival has entertained, thrilled, and inspired more than five million people over 20 years. Past festivals were held in Berlin, New Delhi, and Bangalore.

Now, for the first time, the festival comes to America where it will be hosted on the National Mall in Washington DC. It will feature unforgettable performances and, perhaps more importantly, bring us all together again. Sept. 29-Oct 1, we invite you to come be part of the wonder at World Culture Festival.

Get Your Free Pass

## Welcome to the Festival



## Be Part of this historic moment

**Spirit of the Festival**

"The purpose of the World Culture Festival is to send a message that the whole world is one family and we can all coexist with our differences. It is an opportunity for leaders from all segments of society – business, politics, religion, academia – to come together and renew their vision to work for the common welfare.

The Festival provides a platform for the preservation of local and indigenous traditions through music and dance as well as the opportunity for everyone else to relish and enjoy. This is a movement for the revival of universal human values such as love, compassion, and friendliness."

– Gurudev Sri Sri Ravi Shankar
*Founder, Art of Living Foundation & International Association for Human Values*

## About Us

The Art of Living is one of the world's largest volunteer-based non-profits. Together with our partner organization, the International Association for Human Values, we aim to help create a stress-free, violence-free society. We offer programs to help individuals and communities lower stress, improve mental health, and build resilience. We are also actively engaged in service projects that work towards conflict resolution, transformation for prison inmates, environmental restoration, and rural development. Our programs and initiatives have reached more than 500 million people in 180 countries.

For media inquires, please email WCF2023@lindarothpr.com

Copyright © 2023 Art of Living Foundation



🇺🇸 English   🇪🇸 Español (Spanish)   🇧🇷 Português (Portuguese (Brazil))

2

# NICOL DEPOSITION EXHIBIT 72



BE PART OF AN ICONIC YOGA EVENT
AT THE LINCOLN MEMORIAL IN DC





# THE YOGA EXPERIENCE
EXPERIENCE AN ICONIC YOGA EVENT

Join us for an epic 60 minute yoga event! Afterwards, Gurudev, chairman of the Indian Yoga Association, will lead a meditation and share yogic wisdom.

You'll experience all aspects of an authentic practice —in celebration of yoga. Whether you're a yoga expert or just getting started, we invite you to roll out your mat and join the flow with thousands of others:

**SAVE YOUR SPOT**

Yoga teachers and studios - Interested in partnering for the Yoga event?

**COUNT ME IN**



**Breathwork**
Breathe into calm

**Yoga practice**
Find ease and stability

**Guided meditation**
**with Gurudev**
Relax deeply

**Inspiration**
Tune into you



## OPEN TO ALL
SUITABLE FOR BEGINNERS TO ADVANCED PRACTIONERS. BRING YOUR YOGA MAT AND WATER BOTTLE.

2

## THE FESTIVAL EXPERIENCE

World Culture Festival is the 4th in a global series of epic artistic events. It's an unforgettable 3-day cultural festival featuring incredible voices, talent, and creativity from around the world in celebration of diversity and our unity. Over 6 million people have attended World Culture Festivals globally—but this will be a world-first in the US!

## YOUR REGISTRATION GIVES YOU ACCESS TO BOTH THE YOGA EVENT AND THE WORLD CULTURE FESTIVAL, FEATURING:

SAVE YOUR SPOT

Yoga teachers and studios - Interested in partnering for the Yoga event?

COUNT ME IN

17,000 performers from all traditions

Inspirational speakers

Well-being sessions

International food truck festival

…and more!

### —OUR PARTNERS—

Email: wcf.yoga@us.artofliving.org
Phone: (828)278-8700

3

# NICOL DEPOSITION EXHIBIT 73



# THE BIBI FILES

A film by Alexis Bloom

# NICOL DEPOSITION EXHIBIT 74



# NICOL DEPOSITION EXHIBIT 75

---

Message

---

**From:** Holzer, Ron [RHolzer@wmata.com]
**Sent:** 12/6/2024 12:14:52 PM
**To:** Aaron Bronson [aaron.bronson@outfront.com]
**Subject:** RE: <External>Copy Approval for WMATA - Joltspace Film
**Attachments:** Option3 (1).jpg; TheBibiFiles_1$_Lrg.jpeg

Aaron

The attached proposed advertisement with the file name "TheBiBiFiles_1$_Lrg.jpeg" is a yes.

The attached proposed advertisement with the file name "Option3 (1).jpg" is prohibited by Advertising Guidelines 1, 8 and 9.

Thank you
Ron

**From:** Aaron Bronson <aaron.bronson@outfront.com>
**Sent:** Monday, December 2, 2024 11:25 AM
**To:** Holzer, Ron <RHolzer@wmata.com>
**Subject:** <External>Copy Approval for WMATA - Joltspace Film

> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and have verified the authenticity of the message.

This is for a movie about Bibi... Liveboards and Car Card copy attached for approval.

**AARON BRONSON**
General Manager

C   202.669.0041
1325 Massachusetts Ave NW, Ste 200
Washington, DC 20005





# NICOL DEPOSITION EXHIBIT 76



← Back to PlannedParenthood.org                                                    Español

Planned Parenthood of Metropolitan Washington, DC, Inc.

WHO WE ARE ⌄    GET CARE ⌄    GET INVOLVED ⌄    NEWS ⌄    SHOP    MYCHART    DONATE    🔍 SEARCH

## The Abortion Access Fund

At Planned Parenthood, we care. No matter what. Please contribute to our Abortion Access Fund to cover the cost of abortions for those in need.

DONATE

## Join Our Team!

At PPMW, you're part of a team of compassionate, dedicated professionals.

CURRENT OPENINGS



PPMW Patient Story - Anna



EXHIBIT
76
TMM 11/10/25

## At PPMW, you have access to your medical records. Any time you need them.

It can be helpful to get a copy of your medical records so that providers know what care you've received. Access your medical records on demand using the MyChart patient portal.

**ACCESS YOUR RECORDS**



### Pay Your Bill

Make online payments and view your payment history in the MyChart patient portal.

**PAY ONLINE**



### Education & Training

Our programs equip teens and adults with the tools they need to make healthy reproductive decisions.

**LEARN MORE**



### Donate

Make a gift today to support our health centers and education services.

**WAYS TO GIVE**

## Did You Know? You Have the Right to a Cost Estimate.

Learn more about your right to obtain a good faith estimate of the cost of services you want from PPMW.

**LEARN MORE**

## PPMW Responds to Supreme Court Decision that Overturned *Roe v. Wade*

Abortion is still legal in DC, Maryland, and Virginia.

**LEARN MORE**

**Carol Whitehill Moses (DC) Health Center**

1225 4th St. NE
Washington, DC 20002

**BOOK HERE**

**Suitland (Prince George's County) Health Center**

5001 Silver Hill Road Suite #103
Suitland, MD 20746

**BOOK HERE**

**Gaithersburg (Montgomery County) Health Center**

19650 Clubhouse Road #101
Gaithersburg, MD 20886

**BOOK HERE**

2



3

# NICOL DEPOSITION EXHIBIT 77

← Back to PlannedParenthood.org                                                          Español

**Planned Parenthood of Metropolitan Washington, DC, Inc.**    WHO WE ARE ⌄   GET CARE ⌄   GET INVOLVED ⌄   NEWS ⌄   SHOP   MYCHART   **DONATE**   🔍 SEARCH

# Healthy From Head to Toe

We care for all of you. Primary Care is offered at our DC and Gaithersburg health centers. Make an in-person or telehealth appointment today!

Migraines • Anxi
abetes • High Blood Pre
es • Anxiety & Depression •
Blood Pressure • And More
ety & Depression • Asthma • Flu
od Pressure • And More • Headach
pression • Asthma • Flu & Colds • Diab

**Primary Care available in DC and Gaithersburg!**

CALL 202.347.8500

PPMW Primary Care

**Planned Parenthood®**
Care. No matter what.

Planned Parenthood of Metropolitan Washington, DC

▶



## Appointments

You can privately and easily book your appointment online for select services 24/7. For the full set of services, you can call 202-347-8500 to book your appointment. Health center staff can also answer any questions you may have.

BOOK ONLINE



**Convenient Hours That Fit Your Schedule!**

PPMW offers in-person and telehealth appointments for primary care, including some early morning and late night options. In-person appointments are available at both our Washington, DC and Gaithersburg locations.

| | | |
|---|---|---|
| Anemia ⊕ | Asthma ⊕ | Mental Health ⊕ |
| Concussions ⊕ | Diabetes ⊕ | Headaches and Migraines ⊕ |
| High Blood Pressure ⊕ | Muscle Pain and Joint Injuries ⊕ | Physical Exams, Screenings ⊕ |
| Quitting Smoking ⊕ | Rashes ⊕ | Respiratory Infections ⊕ |
| Cancer Screenings ⊕ | Sleep Apnea ⊕ | Thyroid Disorders ⊕ |
| Vaccines and Titers ⊕ | Weight Management ⊕ | And More Primary Care! ⊕ |

2

## Insurance Coverage for Primary Care

PPMW accepts a wide range of insurance providers for primary care services. If you don't see your provider on our list of accepted insurances, please call us to discuss your options.

**VIEW INSURANCE LIST**



### Transportation to DC health center

By Metro
Red Line: Take the Red Line to the Noma-Gallaudet U Metro station. Walk approximately three blocks up Florida Avenue. Turn right on 4th street. 1225 4th Street is located on the left.

By Bus:
Routes: 90, 92, and X3. Bus Stop: #1003647

Parking:
Rooftop parking is available on a first come basis.

### Dr. Divya Shenoy

Dr. Shenoy completed medical school at University of California, Irvine and earned a Master of Public Health in Community Health Science at UCLA. Given her strong belief that everyone should have the information and resources to achieve optimal health, she decided to pursue a career in family medicine, which focuses on care for the whole person. Dr. Shenoy worked for four years as a primary care physician at Planned Parenthood of Orange and San Bernardino Counties.

## Book an Appointment



ZIP, CITY, OR STATE

SERVICE

All Services

FILTER BY
● All      ○ Telehealth      ○ In-person

**SEARCH**

Or call 1-800-230-7526

3



# NICOL DEPOSITION EXHIBIT 78

https://salvationarmynca.org

230 captures
2 Oct 2012 - 8 Aug 2025

OCT  DEC  JAN
05
2023  2024  2025

HOME    ABOUT    HOW WE HELP    WAYS TO GIVE    VOLUNTEER    ANGEL TREE    WOMEN'S AUXILIARY    CORPORATE PARTNERS    GET HELP    CONTACT US

# TODAY, YOU CAN GIVE HELP AND HOPE TO HURRICANES HELENE & MILTON SURVIVORS.

Thank you to the BMW Car Club of America National Capital Chapter for their partnership.

Donate Now

## See What's Happening at Your Local Salvation Army

Enter Zip Here        See what's happening

### The Salvation Army Mission Statement

The Salvation Army, an international movement, is an evangelical part of the universal Christian Church.
Its message is based on the Bible. Its ministry is motivated by the love of God. Its mission is to preach
the gospel of Jesus Christ and to meet human needs in His name without discrimination.

Women's Auxiliary
Sherman Avenue Corps
Solomon G. Brown Corps
Montgomery County Corps
Prince George's Corps
Alexandria Citadel Corps
Arlington Corps
Fairfax Corps
Landmark Corps 랜드 마크 군단
Prince William Service Center
Waldorf Outpost
Corporate Partners
Get Help
Careers

Site Search        Search

BBB ACCREDITED CHARITY
give.org

ECFA ACCREDITED

Commitment to Diversity

EXHIBIT
78

# NICOL DEPOSITION EXHIBIT 79



# NICOL DEPOSITION EXHIBIT 80

Case 1:23-cv-03695-BAH    Document 61-4    Filed 01/16/25    Page 163 of 180



# NICOL DEPOSITION EXHIBIT 81

**Montgomery County, MD**

# CLIMATE SMART

**BIG CHANGE starts small. Take the Climate Smart pledge!**

Get money-saving, energy-saving, and planet-saving resources!

**All fields marked with * are required and must be filled.**

First Name *                          Last Name

Email *

Would you like to receive emails of tips and resources for money-saving, energy-saving, and planet-saving resources; and sign up for the 'Climate News' newsletter? *

- [ ] Yes
- [ ] No

Join our Climate Smart efforts! The actions listed below help the environment and provide personal benefits and savings. By committing to a few small changes, we can make a BIG impact together. For each action, check the box if it applies to you. *

|  | Already Do or Willing to Try |
|---|---|
| **FOOD:** Plan meals to reduce food waste. |  |
| **FOOD:** Buy local and seasonal produce. |  |
| **FOOD:** Compost food scraps. |  |
| **EMERGENCY PREPAREDNESS:** Sign up to receive alerts from Alert Montgomery. |  |
| **EMERGENCY PREPAREDNESS:** Make an emergency plan. |  |
| **EMERGENCY PREPAREDNESS:** Check your flood risk and purchase flood insurance. |  |
| **TRANSPORATION:** Choose public transportation. |  |
| **TRANSPORATION:** Walk or bike more often. |  |
| **TRANSPORATION:** Make your next car an electric vehicle. |  |
| **ENERGY:** Set a programmable thermostat to 68°F in winter and 78°F in summer. |  |
| **ENERGY:** Switch to LED bulbs. |  |
| **ENERGY:** Turn off lights when leaving a room. |  |
| **ENERGY:** Schedule a free Quick Home Energy Checkup. |  |
| **PLANTS:** Care for the trees at your home. |  |
| **PLANTS:** Volunteer with Montgomery Parks' Weed Warriors. |  |
| **PLANTS:** Plant a tree. |  |

[ Pledge ]

*October 2025*



# NICOL DEPOSITION EXHIBIT 82



An intimate look inside the billion-dollar addiction treatment industry where young people are bought and sold for their insurance policies and ushered into a system designed to keep them sick.

EXHIBIT
82
TMM 11/10/25

# Director's Statement

The participants in Shuffle trusted us in their most vulnerable moments with their most intimate truths. The film belongs to them. It is their story. I was the listener, the facilitator, the amplifier. My background as a person in recovery deeply informed my approach. I recognized the coded language of survival and the defensive humor in our subjects' voices. My goal was to craft a narrative that refused to flatten them into victims or heroes, and instead allowed their contradictions to remain intact. Directing SHUFFLE was an act of witness, accountability, and ultimately love.

## #stoptheshuffle

*SHUFFLE has partnered with Twin Seas Media to launch an impact campaign aimed at sparking a nationwide dialogue on recovery—building awareness, fostering empathy, and driving change in the addiction treatment field.*

LEARN MORE

# What is the Shuffle?



The Shuffle is a process by which clients are cycled through a rinse-and-repeat style of addiction 'treatment' for maximum profit. It's insurance fraud and can generate up to one million dollars a year per person in insurance reimbursements. From the outside, it may look no different than legitimate treatment.

# Upcoming Screenings

TICKETS

October 28th - Duke University

TICKETS

October 29th - Film for Thought Series at Nantucket Dreamland

TICKETS

November 8th - Ojai Film Festival                                    +

TICKETS

November 13th - Practical Recovery - Private Event



# NICOL DEPOSITION EXHIBIT 83





## #stoptheshuffle

*SHUFFLE has partnered with Twin Seas Media to launch an impact campaign aimed at sparking a nationwide dialogue on recovery—building awareness, fostering empathy, and driving change in the addiction treatment field.*

*Twin Seas Media is a filmmaker-centered boutique agency that champions bold storytelling through creative strategies designed to connect films with audiences and inspire meaningful change.*

**BOOK A SCREENING**

## CAMPAIGN PILLARS

### Public Awareness & Engagement
We'll tour the film nationally, targeting affected areas, with screenings and discussions in collaboration with local non-profits.  In addition, we'll release a book titled the "the ABC's of Addiction Treatment" an illustrated and informative guide to empower and inform.

### Institutional Accountability
Schedule one off screenings to coincide with institutional gatherings.

### Political Advocacy
Promote and support policy changes at the state level in collaboration with NGO's. Create awareness and dialogue with political opposition.

### Education
Programs and screenings in educational settings like Counseling, Behavioral Health, Nursing and Public Policy. Our first impact screening is presented by the UCLA Documentary Film Legal Clinic at the UCLA School of Law.

### Media and Social Media
We'll use traditional and social media to create awareness and engagement, foster community and share information about the issue.



EXHIBIT
83
TMM 11/10/25



## UCLA DOC FILM LEGAL CLINIC | MAY 12TH 2025 LA

We kicked off our #stoptheshuffle campaign May 2025 with a screening in LA at the Landmark Westwood presented by the UCLA Doc Film Legal Clinic.

A capacity crowd of 200 invited guests participated in the screening and Q+A that followed featuring Mark Peterson.



## Enrich | June 30th 2025 Richmond KY

rehabilitation to people in recovery. They hosted a screening of Shuffle at Easter Kentucky University and a lively discussion that followed the film with two Kentucky legislators, a judge, sober home owner/operators and a variety of other advocates. There is a shared responsibility for change.



**LaSalle University | September 10th 2025**
**Philadelphia, PA**

discussion in early September 2025.



New Mexico Leaders in Recovery & New Mexico Peer Coalition | September 18th 2025
**Albuquerque, NM**
New Mexico Leaders in Recovery & New Mexico Peer Coalition
presented a screening of Shuffle at the Lobo Theater September 18th
followed by a discussion with community advocates and stakeholders.





# NICOL DEPOSITION EXHIBIT 84



# NICOL DEPOSITION EXHIBIT 85

Message

| | |
|---|---|
| **From:** | Leigh Walsh [leigh.walsh@outfront.com] |
| **Sent:** | 3/11/2024 4:51:48 PM |
| **To:** | Murray, Donna [dmurray@wmata.com] |
| **CC:** | Holzer, Ron [rholzer@wmata.com] |
| **Subject:** | RE: <External>RE: Offensive Graffiti - Silver Spring |

Hi Donna,

This has been successful cleaned off as of about 20 minutes ago, just FYI! Also, one of their other other Platform Runners there also had some graffiti on it so they cleaned both off.

Thank you!

**LEIGH WALSH THIELE**
Operations Manager

☎ 202.618.3572 | **M** 978.877.1894
1325 Massachusetts Ave NW, Suite 200, Washington, DC 20005

# OUTFRONT/

**From:** Murray, Donna <DMurray@wmata.com>
**Sent:** Monday, March 11, 2024 9:43 AM
**To:** Leigh Walsh <leigh.walsh@outfront.com>
**Cc:** Holzer, Ron <rholzer@wmata.com>
**Subject:** RE: <External>RE: Offensive Graffiti - Silver Spring

EXTERNAL EMAIL

Thank you!

**Donna M Murray**
Sr. Manager, Advertising Revenue & Partnerships
Office of Marketing
**Washington Metropolitan Area Transit Authority**
300 7th Street SW
Washington, DC 20024
Cell: 202/997.1584 | dmurray@wmata.com

**From:** Leigh Walsh <leigh.walsh@outfront.com>
**Sent:** Monday, March 11, 2024 9:42 AM
**To:** Murray, Donna <DMurray@wmata.com>
**Cc:** Holzer, Ron <RHolzer@wmata.com>
**Subject:** <External>RE: Offensive Graffiti - Silver Spring

EXHIBIT
85
mm 11/10/25

**CAUTION:**This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and have verified the authenticity of the message.

Hi Donna,
    On it!

CLARKE_WB-0001482

**LEIGH WALSH THIELE**
Operations Manager

T  202.618.3572 | M  978.877.1894
1325 Massachusetts Ave NW, Suite 200, Washington, DC 20005

# OUTFRONT/

**From:** Murray, Donna <DMurray@wmata.com>
**Sent:** Monday, March 11, 2024 8:22 AM
**To:** Leigh Walsh <leigh.walsh@outfront.com>
**Cc:** Holzer, Ron <rholzer@wmata.com>
**Subject:** Offensive Graffiti - Silver Spring

EXTERNAL EMAIL



Please have Perez address ASAP.  And report back when done.
Thank you!

CLARKE_WB-0001483

Donna

**Donna M Murray**
Sr. Manager, Advertising Revenue & Partnerships
Office of Marketing
**Washington Metropolitan Area Transit Authority**
300 7th Street SW
Washington, DC 20024
Cell: 202/997.1584 | dmurray@wmata.com

CLARKE_WB-0001484