UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

WALLBUILDER PRESENTATIONS,

Plaintiff,

v.

RANDY CLARKE,

Defendant.

Civil Action No. 1:23-cv-03695-BAH

Judge Beryl A. Howell

**FOURTH DECLARATION OF GEORGETTA NICOL**

I, Georgetta Nicol, declare I make this Declaration based upon personal knowledge and information available to me in my official capacity, and I am competent to testify to matters contained herein.

1.      I have been the Director of Marketing at the Washington Metropolitan Area Transit Authority ("WMATA") since June 2024. Among my duties, I oversee the activities of WMATA's Office of Marketing, and WMATA's advertising program related to the Metrorail and Metrobus systems.

2.      I served as a permanent member of WMATA's advertisement review panel ("Panel") from June 2023 to April 2025.

3.      The Panel consists of one person from the Marketing Department and two attorneys from the Legal Department. If one attorney member is absent from the Panel, a WMATA attorney will temporarily take the absent attorney's place.

4.      WMATA implemented the Metro Internal Procedures and Interpretive Aids for Reviewing Proposed Commercial Advertising ("Aids") on November 1, 2024. A true and correct copy of the Aids is attached as Exhibit A.

1

5.    Since the adoption of the Aids, at least 100,000 ads have run on WMATA advertising spaces.

6.    WMATA leases approximately 54,000 advertising spaces on Metrobuses, in Metrorail cars, and in Metro stations.

7.    Members of WMATA's Panel met with Outfront—the vendor directed by the Aids to perform initial review of ads for compliance with the Guidelines—and discussed the Guidelines and Aids on October 23, 2025.

8.    WMATA does not intend to cease the use of the Aids in the application and interpretation of the Guidelines Governing Commercial Advertising ("the Guidelines"), though it may make adjustments to the Aids as needed.

9.    On November 8, 2024, WMATA's ad review panel rejected the Tik Tok ads with messaging honoring veterans depicted in Nicol Exs. 41-44 after concluding they violated Guidelines 9 and 14.  Each ad bore the logo of an advocacy organization in addition to the Tik Tok logo.  A true and correct copy of the email exchange reflecting WMATA's rejection of the ads is attached as Exhibit B.

10.    WMATA's Board of Directors is responsible for establishing some WMATA policies.  However, not all WMATA policies require Board approval.

11.    WMATA ran the interior bus card pictured in Plaintiff's Statement of Facts No. 93 as part of a partnership with Metropolitan Washington Council of Governments to encourage customers to commute via the Metro system.

12.    WMATA ran the interior bus card pictured in Plaintiff's Statement of Fact No. 128 as part of a campaign with the Black Coalition Against Covid-19 in alignment with guidance from the Center for Disease and Control ("CDC").

13.   On August 21, 2025, Plaintiff's counsel requested, *inter alia*, any documentation in WMATA's possession regarding a "Stop the Shuffle" ad.  On September 11, 2025, Defendant's counsel responded with a copy of the ad in WMATA's records (Nicol Ex. 69), stating that WMATA had no other documents regarding it.  Defendant's counsel noted that the ad buy for the advertisement had expired at that time and thus WMATA had stopped running it in the WMATA system before Plaintiff's counsel's inquiry.  A true and correct copy of the email exchange reflecting this discussion is attached as Exhibit C.

14.   Outfront posted the "Be Climate Smart" ad pictured at Plaintiff's Statement of Fact No. 144 for Montgomery County, MD sharing resources and information from a government agency to the residents it serves.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this ___2___ day of ___March___ 2026, in Washington, D.C.

Georgetta Nicol

## INDEX OF EXHIBITS

| Exhibit | Description |
|---------|-------------|
| A | Metro Internal Procedures and Interpretive Aids for Reviewing Proposed Commercial Advertising |
| B | 2024.11.08 Email chain between Ron Holzer (WMATA) to Aaron Bronson (Outfront), regarding TikTok Veterans Day Ad Decision |
| C | 2025.09.11 Email chain between Defendant's counsel and Plaintiff's counsel regarding Stop the Shuffle Ad |

# EXHIBIT A

**METRO INTERNAL PROCEDURES AND INTERPRETIVE AIDS**

**FOR REVIEWING PROPOSED COMMERCIAL ADVERTISING**

The following are the internal procedures and interpretive aids for the Guidelines Governing Commercial Advertising adopted by the Washington Metropolitan Area Transit Authority ("WMATA") on August 3, 1972, as most recently amended November 19, 2015 (the "Guidelines").[1]  These internal procedures and interpretive aids help WMATA's advertisement review panel ("Panel") apply the Guidelines to all advertisements submitted for review by its third-party advertising vendor ("Vendor").  WMATA reserves the right to revise or amend the internal procedures and interpretive aids without notice.

I.   Composition of WMATA's advertisement review Panel

   A.   WMATA shall utilize a three-person Panel to review advertisements that are identified by WMATA's third party advertising Vendor as potentially violating the Guidelines.  The Panel shall consist of one person from the Marketing Department and two attorneys from the Legal Department.

   B.   Each Panel member shall be generally familiar with the law governing advertising in non-public forums.

   C.   All members of the Panel shall review past advertisements that have been considered by the Panel to familiarize themselves with how the Guidelines have been applied in the past.

   D.   If the Panel is unable to reach a consensus on whether an advertisement violates the Guidelines, the advertisement shall be submitted to outside counsel with demonstrated extensive experience in First Amendment law for advice in order for the Panel to make a final determination.

II.  Submission of advertisements through third-party advertising vendor

   A.   All advertisements submitted for advertising through WMATA's third-party advertising vendor ("Vendor") shall be reviewed initially for compliance with the Guidelines by the Vendor.  If the Vendor believes an advertisement is prohibited by a Guideline or is unsure whether an advertisement may violate a Guideline, it shall submit the advertisement to the Panel for review and a decision.

   B.   Periodically, members of the Panel shall meet with any employees of Vendor responsible for initially reviewing advertisements to discuss the Guidelines and these internal procedures and interpretive aids.

   C.   Advertisements submitted in any language other than English shall be accompanied by a certified English translation.

III. Panel review of advertisements

   A.   When an advertisement is submitted to the Panel to determine if it complies with or violates the Guidelines, each member shall review the advertisement.

   B.   If any advertisement submitted to the Panel contains a link to a website, a QR code, or a reference to a website (for example, but not limited to, "check out our website for more information"), the Panel shall access the website and endeavour to review:

      1.   Any page linked directly from the advertisement;

      2.   Any homepage for the website;

      3.   Any page directly accessible from the above pages that purports to provide background information on the content, meaning, and/or purpose of the advertisement, which may include pages that describe the advertiser and their self-stated mission and/or purpose; and

      4.   Any page linked from one of the foregoing pages that suggests it contains content that would violate the Guidelines if it appeared on the face of the advertisement.

   C.   To the extent technically practical, download or otherwise save page(s) that the Panel reviewed in making its determination.  If a website contains content that does not download (for example, but not limited to, images or link titles), the page shall be printed or saved in another manner that preserves as much information as possible

---

[1] Effective as of November 1, 2024.

from the reviewed pages.

D.  If an advertisement does not include a link, QR code, or other reference to a website, the Panel generally will not consider the website during its review.  However, if any advertisement presents information that is not readily known to or understood by the Panel, the Panel may perform enough research regarding the information presented by the advertisement to educate itself in order to make an informed decision as to whether the advertisement violates the Guidelines.

E.  The Panel will not provide advisory opinions or feedback on potential advertisements.

F.  Panel decisions are final.  The Panel will not consider requests for reconsideration or additional explanation.

IV.  Guidance for determining if advertisements violate the Guidelines

A.  The Panel shall apply the Guidelines consistently.  It shall not reject advertisements because of the particular viewpoint stated or the identity of the advertiser.

B.  An advertisement that otherwise violates the Guidelines is prohibited even if it also encourages or promotes the purchase or use of goods or services.

C.  An advertisement for an educational institution is not prohibited solely because it refers to its mission or describes itself using general terms that do not refer to a specific issue (for example, but not limited to, describing itself or its educational offerings as "diverse," "traditional," or guided by religious tenets) so long as the advertisement does not otherwise violate the Guidelines.

D.  Interpretive aids for Guideline 1: "All advertising shall comply with the spirit of all applicable laws and regulations of the various jurisdictions in which it is displayed unless inconsistencies among the various jurisdictions prevents such compliance.  Advertisements will not be accepted that are false, misleading or deceptive."

1.  Advertisements that are obscene, indecent, or defamatory, that depict graphically violent or graphically sexual material, or that are otherwise legally actionable are prohibited.

2.  Advertisements that contain profanity or fighting words are prohibited.  "Profanity" is grossly offensive language that is considered a public nuisance or as otherwise defined by the Federal Communications Commission.  "Fighting words" are words that naturally tend to provoke violent resentment, inflict injury, or incite an immediate breach of the peace.

3.  Upon request, advertisers must provide evidence demonstrating compliance with this Guideline.

4.  All advertisements must clearly identify the entity submitting the advertisement. Advertisements that appear as if a third party is the advertiser are prohibited.

E.  Interpretive aids for Guideline 4: "Medical and health-related messages will be accepted only from government health organizations, or if the substance of the message is currently accepted by the American Medical Association and/or the Food and Drug Administration."

1.  "Medical and health-related messages" are statements that refer to particular drugs, supplements, medical products, treatments, or other health-related services to combat illnesses, diseases, or health conditions and make representations or statements about the efficacy, benefits, or side effects of the drugs, supplements, medical products, treatments, or other health-related services being advertised.

2.  "Medical and health-related messages" must be both (a) factual in nature or presented as opinions of experts, medical professionals, or government officials; and (b) capable of verification by the American Medical Association and/or the Food and Drug Administration.

3.  Guideline 4 does not prohibit advertisements that identify a particular drug, supplement, medical product, treatment, or other service without making the type of representations or statements described in this section.

4.  Guideline 4 does not prohibit advertisements for fitness products or services, such as gyms, yoga studios, or other fitness training, unless the advertisement makes the type of representations or statements described in this section.

5.  Guideline 4 does not prohibit advertisements for a weight-loss program unless the advertisement contains the

2

types of representations or statements described in this section.

    6. Upon request, advertisers must provide evidence demonstrating compliance with this Guideline.

F. Interpretive aids for Guideline 8: "No implied or declared endorsement of any product or service or message by WMATA is permitted."

    1. All advertisements must clearly identify the entity submitting the advertisement to avoid any confusion regarding whether it is a WMATA or WMATA-endorsed advertisement.

G. Interpretive aids for Guideline 9: "Advertisements intended to influence members of the public regarding an issue on which there are varying opinions are prohibited."

    1. The Panel determines an advertisement's intent from review of the face of the advertisement and review of any relevant websites in accordance with section III.

    2. An "issue on which there are varying opinions" does not mean any topic on which people might disagree. For example, an advertisement for a sports team does not involve an "issue on which there are varying opinions" merely because some people support other teams. Rather, an "issue" for purposes of Guideline 9 is "a point, matter, or dispute, the decision of which is of special or public importance[.]" (Dictionary.com definition of "issue.") Advertisements that include such issues generally promote a message to the public about substantive ethically, socially, or politically controversial or divisive topics, as illustrated in this section.

    3. Guideline 9 prohibits the following types of advertisements:

        a. Supporting, opposing, or promoting a political party;

        b. Supporting, opposing, or promoting any person holding any government position or any candidate for such a position;

        c. Supporting, opposing, or promoting a ballot measure or proposed measure;

        d. Supporting, opposing, or promoting a law, ordinance, regulation, or policy or proposed law, ordinance, regulation, or policy;

        e. Supporting, opposing, or promoting a constitutional amendment or amendments or a proposed constitutional amendment or amendments;

        f. Supporting, opposing, or promoting a governmental investigation or proposed government investigation;

        g. Supporting, opposing, or promoting a governmental action or inaction, other than offering goods and/or services to the government;

        h. Supporting, opposing, or promoting any civil, criminal, or administrative proceeding, or any ruling in such a proceeding;

        i. Supporting, opposing, or promoting a strike, walkout, boycott, divestment, embargo, or similar activity;

        j. Supporting, opposing, or promoting a policy or policies of a business or nonprofit entity other than encouraging or promoting the purchase or use of goods or services of the advertiser;

        k. Supporting, opposing, or promoting any foreign nation, group of foreign nations, foreign interest, or related entity, or any policy of or action/inaction of any foreign nation, group of foreign nations, foreign interest, or related entity, unless for a commercial purpose, such as tourism or sports-related advertisements;

        l. Describing or promoting a view of the role that any particular group (including groups characterized by their race, religion, ethnicity, nation origin, sexual orientation, disability status, marital status, age, or ideology) has played or should play in any government, society, or country.

        m. Describing or promoting a particular view, interpretation, or meaning of historical events, historical documents (for example, but not limited to, the Declaration of Independence or Constitution), laws, statutes, regulations, or other government policies.

        n. Supporting, opposing, or promoting a rally, protest, march, demonstration, or other similar event that

includes any content that would otherwise be prohibited by the Guidelines.

    o. Using logo(s), slogan(s), phrase(s), symbol(s), or any other word(s) or image(s) that are otherwise prohibited by the Guidelines, unless solely for a commercial purpose.

    p. Supporting, opposing, or promoting an ethical, social, or humanitarian cause, mission, call to action, awareness campaign, position statement, or other similar effort unless solely for a commercial purpose.

4. Guideline 9 does not prohibit advertisements for a newspaper, magazine, other publication, TV program, film, theatrical performance, concert, podcast, or other media solely because the medium's content addresses political issues or contains political messages, so long as the advertisement does not otherwise violate the Guidelines.

5. Guideline 9 does not prohibit advertisements for employment, including encouraging enlistment in a branch of the military or application for a job with federal, state, or local governments, solely because the employer's missions, policies, practices, or tactics are the subject of "varying opinions," so long as the advertisement does not otherwise violate the Guidelines.

6. Guideline 9 does not prohibit advertisements that encourage or promote the purchase or use of goods or services because others may be opposed to their purchase or use, so long as the advertisement does not otherwise violate the Guidelines. For example, an advertisement for a fast food restaurant with an image of a hamburger does not violate Guideline 9 because some people may oppose the consumption of meat. Likewise, an advertisement from a charitable or religious organization that provides free meals or services to the poor is not prohibited because some people may be opposed to that organization, so long as the advertisement does not otherwise violate the Guidelines.

7. Guideline 9 does not prohibit advertisements that promote medical services that may be the subject of public debate and controversy (for example, but not limited to, abortion, pregnancy care, gender-affirming medical treatment, in-vitro fertilization, vaccines, etc.) if the advertisement is limited to describing the services available, so long as the advertisement does not otherwise violate the Guidelines.

8. Guideline 9 does not prohibit advertisements soliciting donations so long as the advertisement does not otherwise violate the Guidelines.

H. Interpretive aids for Guideline 12: "Advertisements that promote or oppose any religion, religious practice or belief are prohibited."

1. Guideline 12 does not prohibit advertisements for a newspaper, magazine, other publication, TV program, film, theatrical performance, concert, podcast, product, or other media solely because the medium's content addresses religion, religious practices, or religious beliefs or contains religious messages, so long as the advertisement does not otherwise violate the Guidelines.

2. Guideline 12 does not prohibit advertisements for an institution solely because of its affiliation with a religion or because it displays a religious, institutional logo, slogan, phrase, symbol, or any other word(s) or image(s), so long as the advertisement does not otherwise violate the Guidelines.

I. Interpretive aids for Guideline 13: "Advertisements that support or oppose an industry position or industry goal without any direct commercial benefit to the advertiser are prohibited."

1. Guideline 13 prohibits advertisements that support or oppose industry, trade, or professional group members (for example, but not limited to, aerospace, doctors, manufacturing, organics, green energy, teachers, pilots, etc.) by seeking to influence the public or government policy regarding them without direct commercial benefit to the advertiser.

J. Interpretive aids for Guideline 14: "Advertisements that are intended to influence public policy are prohibited."

1. Guideline 14 prohibits advertisements that seek to influence lawmakers, regulatory agencies, judges, and any other government officials in the conduct of their duties, other than those offering goods and/or services to the government, so long as the advertisement does not otherwise violate the Guidelines.

2. Guideline 14 prohibits advertisements that call on the public to contact, lobby, or otherwise influence lawmakers, regulatory agencies, judges, and any other government officials to support or oppose a matter

4

under consideration or likely to be considered by them, other than those offering goods and/or services to the government, so long as the advertisement does not otherwise violate the Guidelines.

3. Content that involves "public policy" for purposes of Guideline 14 includes content that is described under Guideline 9.

5

# EXHIBIT B

Message

---

**From:** Holzer, Ron [RHolzer@wmata.com]
**Sent:** 11/8/2024 12:26:46 PM
**To:** Aaron Bronson [aaron.bronson@outfront.com]
**Subject:** RE: <External>Fw: NEW RFP: TikTok | Veterans Day 2024 - DUE EOD 10/8 - TRANSIT ONLY
**Attachments:** TIKT6127_TTVD_EDF_Outfront_1080x1920.jpg;
TIKT6127_TT_Veterans_Day_DOOH_IAVA_Outfront_1080x1920_V2.jpg;
TIKT6127_TTVD_NCHV_Outfront_1080x1920.jpg;
TIKT6127_TT_Veterans_Day_DOOH_TAPS_Outfront_1080x1920_V2.jpg

Aaron

The ad review panel reviewed the attached proposed advertisements and determined they are prohibited by Advertising Guidelines 9 and 14.

Thanks,

Ron

---

**From:** Aaron Bronson <aaron.bronson@outfront.com>
**Sent:** Thursday, November 7, 2024 8:30 AM
**To:** Holzer, Ron <RHolzer@wmata.com>
**Subject:** <External>Fw: NEW RFP: TikTok | Veterans Day 2024 - DUE EOD 10/8 - TRANSIT ONLY

> **CAUTION:**This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and have verified the authenticity of the message.

Hey Ron, attached are tic toc Liveboards for review.  QR codes are removed.  Anyway we can get this in line for vetting this week?

Thanks!

Get Outlook for iOS

CLARKE_WB-0002893

# EXHIBIT C

| | |
|---|---|
| **From:** | Coffin, Shannen |
| **To:** | Wolverton, Caroline; Sloniewsky, Andrew |
| **Cc:** | Art Spitzer; Jeremy Dys; Ames, Caitlin; Pierce, Anthony; Meraz, Vanessa |
| **Subject:** | RE: Wallbuilders - Next Steps |
| **Date:** | Thursday, September 11, 2025 10:27:12 AM |
| **Attachments:** | image001.png |
| | image002.png |

First, thanks.  Just to be clear.  I understand the Stop the Shuffle "buy" may have lapsed, but the ads are still on WMATA buses to this date (or at least as of last week).  We have noticed that many ads well run past their buy date.  The ad was running on the day before my email (as I witnessed it myself), though I readily accept that it was past its expiration date, if that is what you are saying.

Next, to be clear, you're saying that the WMATA "Pride" ads have nothing to do with an agreement with an outside group (such as Capital Pride)?  Just want to make sure I understand that paragraph fully.

Finally, you are providing perhaps slightly different information that Ms. Nicol re: the notes.  Her testimony was that the "note-taking" would reflect, for "internal record" purposes, which, if any Interpretive Aids were implicated/violated by a particular ad.   I have in mind this exchange (at 40):

Q. So you mean that when you're 4 communicating the decision about whether an ad is 5 approved or rejected, you include a reference to the 6 interpretive aid? 7 A. No. For -- 8 Q. What do you mean then? 9 A. I mean for our tracking purposes, for 10 just our note-taking. 11 Q. Your internal records? 12 A. Correct. 13 Q. Okay. Who created the interpretive 14 aids?

To the extent that the review panel came to rest on a particular interpretive aid, that decision is not deliberative, it is part and parcel of a final decision that a relevant Guideline is violated.   Your "chill" argument is groundless – we aren't seeking discussion about the interpretive aids; only notes that identify a particular interpretive aid as violated or not violated.  That sort of information is not deliberative and would have no more of a "chilling" effect on the deliberations of the panel than would identification of the particular Guideline that is violated.  Your interpretive aids adopt "per se" categories that purportedly violate the Guidelines, so a determination that a particular interpretive aid is violated is, under your own position, per se a violation of the Guidelines.  It seems to me you're seeking to have it both ways – claiming that the Interpretive Aids somehow save your case, yet unwilling to discuss how the Interpretive Aids were applied in any particular situation.  That seems pretty unlikely to stand up in court.

---

**From:** Wolverton, Caroline <cwolverton@akingump.com>
**Sent:** Thursday, September 11, 2025 9:54 AM
**To:** Coffin, Shannen <Scoffin@steptoe.com>; Sloniewsky, Andrew <ASloniewsky@steptoe.com>
**Cc:** Art Spitzer <aspitzer@acludc.org>; Jeremy Dys <jdys@firstliberty.org>; Ames, Caitlin

<cames@steptoe.com>; Pierce, Anthony <apierce@AKINGUMP.com>; Meraz, Vanessa <vmeraz@akingump.com>
**Subject:** [EXTERNAL] RE: Wallbuilders - Next Steps

Good morning Shannen and Andrew,

Please find below our response to your three follow-up requests after Ms. Nicol's deposition.

First, you requested "copies of any agreements with Capital Pride or World Pride regarding any partnership or cooperative arrangement regarding marketing or advertising campaigns or other cooperation in relation to pride month (June 2025)." Ms. Nicol referenced during her deposition an agreement for sponsorship that does not relate to WMATA marketing or advertising. The agreement between WMATA and Capital Pride/World Pride memorializes WMATA's 2024-2026 sponsorship of Capital Pride/World Pride by providing funding in exchange for annual sponsorship level-specific benefits, i.e., participation in the parade, booth at the Pride Festival, etc. Capital Pride/World Pride did not receive any marketing benefits or authorization to promote Pride through this sponsorship. Rather, Capital Pride/World Pride received financial sponsorship from WMATA, and WMATA received sponsor benefits in exchange. Therefore, we have no documentation responsive to your request.

Second, you requested "notes of each review panel's deliberations that would show the panel's final determination of what Guideline was violated and what, if any, Interpretive Aid was violated by a particular ad." We have already produced WMATA's final decisions on panel-reviewed advertisements, which identify the Guideline the review panel concluded applied. *See* March 14, 2025 Production. The review panel uses the Interpretive Aids as a tool in applying the Guidelines and occasionally references in its notes a section or sections of the Aids that the panel considered. The panel bases its decisions on a particular Guideline, rather than a particular section of the Aids. Consequently, the review panel does not routinely record the part(s) of the Interpretive Aids that may have informed its application of the Guidelines. To the extent the review panel makes note of a section or sections of the Interpretive Aids considered during its deliberations, that reference is solely to internally track the review panel's deliberative processes. Disclosure of those notes would chill the review panel's deliberative process, including by dissuading panel members from identifying particular Interpretive Aids during their deliberations. Accordingly, we have withheld review panel member meeting notes pursuant to the deliberative process privilege. We've also withheld them pursuant to the attorney client privilege and work product protection because, as explained in the privilege log and our June 11, 2025 email to you, the panel notes reflect attorney-client advice and work product.

Third and lastly, you requested documentation regarding a "Stop the Shuffle" advertisement. The copy in our records of the advertisement you described is attached as CLARKE_WB-0004820. We have no other documents regarding it. We also note that the ad buy for this advertisement expired and, thus, stopped running in the WMATA system before your inquiry.

Best,

Caroline

**Caroline L. Wolverton**
**Akin**
Direct: <u>+1 202.887.4107</u>
Pronouns: she/her/hers (<u>What's this?</u>)

---

**From:** Coffin, Shannen <<u>Scoffin@steptoe.com</u>>
**Sent:** Thursday, August 21, 2025 11:06 AM
**To:** Sloniewsky, Andrew <<u>ASloniewsky@steptoe.com</u>>; Wolverton, Caroline
<<u>cwolverton@akingump.com</u>>
**Cc:** Art Spitzer <<u>aspitzer@acludc.org</u>>; Jeremy Dys <<u>jdys@firstliberty.org</u>>; Ames, Caitlin
<<u>cames@steptoe.com</u>>
**Subject:** RE: Wallbuilders - Next Steps

**\*\*EXTERNAL Email\*\***

Caroline,  We have two other follow up items in light of our review of last week's Nicol deposition.

First, Ms. Nicol explained (beginning at the bottom of p. 30 of the transcript) that there are notes of each review panel's deliberations that would show the panel's final determination of what Guideline was violated and what, if any, Interpretive Aid was violated by a particular ad.  You have withheld all notes based on deliberative process, but, assuming that privilege is applicable, it does not protect the panel's *final* decision, only the pre-decisional deliberations that led to it.  We are entitled to discover the non-deliberative parts of those notes reflecting the final decision of the panel as to each ad that it reviews.  For present purposes, at least, we do not challenge your invocation of the deliberative process privilege as to any discussions that led to a particular decision, but the final outcome of the panel's deliberations is not protected by the privilege.  This is particularly important for any ads considered after Nov. 1., 2024, because Ms. Nicol testified that the panel would note which, if any, interpretive aids are implicated in the notes, but for "our tracking purposes" only (Tr.40:9-10); therefore, that aspect of the final decision is not conveyed to the client/advertiser even though it reflected the culmination of the panel's decision-making process.  Therefore, there is no other available source of this information.

We would ask that you produce all such review panel notes relevant to the panel's decisions as to any ads were considered for compliance with Guideline 9, on or after November 1, 2024, the date of adoption of the Interpretive Aids.   We are entitled to all such notes during the relevant time period, but given the late hour, we are willing to live with the post-IA notes, which, based on Ms. Nicol's testimony, may contain notes regarding the final determination re: application of particular IAs.

Second, there is currently running on Metro buses downtown (yesterday on K Street) and ad that simply says, "Stop the Shuffle," and contains a website for a political advocacy campaign,

stoptheshuffle.com, which explains that it is a "social impact campaign" regarding fraud and abuse in drug treatment facilities inspired by a recent documentary film called "Shuffle."  We have observed that ad, but do not have a photo.  We request that if you have any documentation of the advertisement, including deliberations of the panel or photographs of the ad, that you supplement your production regarding this ad.   And if any subsequent decisions are made by WMATA regarding this ad in light of our raising this with you, we also ask that you both provide documentation of the original ad copy, any documents considered by the panel in connection with the ad, and any photographs of the ad in WMATA's possession.

Thank you.  I am free to discuss any concerns you may have at your convenience.

Shannen


**Shannen W. Coffin**
Partner

**Steptoe**

Steptoe LLP | 1330 Connecticut Avenue NW | Washington, DC 20036
+1 202 429 6255 direct | +1 703 625 8899 mobile | scoffin@steptoe.com |
www.steptoe.com | Steptoe Bio

---

**From:** Sloniewsky, Andrew <ASloniewsky@steptoe.com>
**Sent:** Thursday, August 21, 2025 8:52 AM
**To:** Wolverton, Caroline <cwolverton@akingump.com>
**Cc:** Coffin, Shannen <Scoffin@steptoe.com>; Art Spitzer <aspitzer@acludc.org>; Jeremy Dys <jdys@firstliberty.org>; Ames, Caitlin <cames@steptoe.com>
**Subject:** RE: Wallbuilders - Next Steps

Hello Caroline:

Have you given any thought to our request for documents regarding WMATA agreements with Capital Pride and World Pride?  Please let us know.

Also, we have decided to fold our questions regarding authentication of certain documents into a 30(b)(6) notice.  We expect to send you such notice by the end of next week.

Regards,

Andrew

---

**From:** Sloniewsky, Andrew
**Sent:** Friday, August 15, 2025 4:00 PM
**To:** 'Wolverton, Caroline' <cwolverton@akingump.com>
**Cc:** Coffin, Shannen <scoffin@steptoe.com>; Art Spitzer <aspitzer@acludc.org>; Jeremy Dys <jdys@firstliberty.org>; Ames, Caitlin <cames@steptoe.com>
**Subject:** Wallbuilders - Next Steps

Caroline:

Thank you for hosting the deposition of Ms. Nicol on April 13. As Shannen mentioned at the end of the deposition, we would like more documentation regarding certain WMATA partnerships and cooperative agreements with outside organizations. Specifically, we would like copies of any agreements with Capital Pride or World Pride regarding any partnership or cooperative arrangement regarding marketing or advertising campaigns or other cooperation in relation to pride month (June 2025), particularly with respect to the World Pride event in Washington DC in June 2025, as referenced in Ms. Nicol's deposition. Please let us know if WMATA is unwilling to produce such documents.

We also discussed at the end of the deposition that we will be providing a list of exhibits which we would like WMATA to authenticate and provide us with more information about. We will send you that list next week.

Regards,

Andrew

**Andrew J. Sloniewsky**
Of Counsel
Steptoe
Steptoe LLP | 1330 Connecticut Avenue NW | Washington, DC 20036
+1 202 429 6759 direct | +1 703 772 4991 mobile | ASloniewsky@steptoe.com |
www.steptoe.com | Steptoe Bio

This message and any attached documents contain information from the law firm Steptoe LLP that may be confidential and/or privileged. If you are not the intended recipient, please do not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail and then delete this message.