**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| WALLBUILDER PRESENTATIONS,<br><br>Plaintiff,<br><br>v.<br><br>RANDY CLARKE, in his official capacity as General Manager and Chief Executive Officer of the Washington Metropolitan Area Transit Authority,<br><br>Defendant. | Civil Action No. 23-3695 (BAH)<br><br>Judge Beryl A. Howell |

**MEMORANDUM OPINION**

Having shown a likelihood of success during consideration of its earlier successful motion for preliminary injunctive relief in 2024, plaintiff WallBuilder Presentations ("WallBuilders"), a Texas-based non-profit organization with a "primary mission" of "educating the nation concerning the Godly foundation of our country," *WallBuilder Presentations v. Clarke* ("*WallBuilder*"), No. 23-cv-3695 (BAH), 2024 WL 2299581, at *1 (D.D.C. May 21, 2024) (quoting Compl. ¶ 29, ECF No. 1), now seeks summary judgment, after nearly a year of discovery and significant changed circumstances, on claims that two of the "Guidelines Governing Commercial Advertising" (the "Guidelines") used by the Washington Metropolitan Area Transit Authority ("WMATA") to determine whether to accept or reject proposed commercial advertisements, violate the First Amendment. Pl.'s Renewed Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 61. WMATA, which "operates the Metrorail and Metrobus services in the District of Columbia, Maryland, and Virginia, and permits advertising throughout its Metro system," including "on the exterior of Metrobuses and 'dioramas' inside Metrorail stations," *WallBuilder*, 2024 WL 2299581, at *1 (quoting *Am. Freedom Def. Initiative v. WMATA* ("*AFDI*"), 901 F.3d 356, 359 (D.C. Cir. 2018)), has filed a

cross-motion for summary judgment, Def.'s Mot. for Summ. J. ("Def.'s Mot."), Def.'s Mem. of P. & A. in Supp. of Mot. for Summ. J. & in Opp'n to Pl.'s Renewed Mot. for Summ. J. ("Def.'s Opp'n"), ECF No. 62-1.[1]

"WMATA's advertising space is a non-public forum." *Archdiocese of Wash. v. WMATA*, 897 F.3d 314, 322-23 (D.C. Cir. 2018). For such a nonpublic forum, "[i]n addition to time, place, and manner regulations, the State may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 46 (1983). The reasonability requirement "is not a demanding one, but rather is a 'forgiving test.'" *Archdiocese*, 897 F.3d at 329-30 (quoting *Minn. Voters All. v. Mansky*, 585 U.S. 1, 17 (2018)). After all, as the Supreme Court has observed "on several occasions, '[t]he State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.'" *Perry Educ.*, 460 U.S. at 46 (quoting *U.S. Postal Serv. v. Greenburgh Civic Ass'n*, 453 U.S. 114, 129-30 (1981), and collecting cases). The D.C. Circuit has emphasized that "[f]ar from undermining First Amendment values, the [Supreme] Court has understood the latitude afforded the government in regulating a non-public forum to promote these values" because "[t]he non-public forum preserves some speech where there is no constitutional obligation to do so." *Archdiocese*, 897 F.3d at 324; *see Mahoney v. U.S. Capitol Police Bd.*, No. 24-5207, 2026 WL 2836881, at *7 (D.C. Cir. Sept. 22, 2026) ("Because the Eastern Steps are a nonpublic forum, the Board could prohibit demonstrations altogether, as it has done inside the Capitol.").

---

[1] WMATA's General Manager and Chief Executive Officer, Randy Clarke, is named as defendant in his official capacity. *See* Compl. ¶ 16.

Six months following the grant of preliminary injunctive relief enjoining application of WMATA's Guideline 9 to four of WallBuilders' proposed advertisements previously rejected under this policy guidance, WMATA, in November 2024, adopted Internal Procedures and Interpretive Aids (the "Interpretive Aids") intended to clarify the Guidelines. Pl.'s Mot., Att. 2, Pl.'s Rule 56 Statement of Undisputed Facts in Supp. of Its Mot. for Summ. J. ("Pl.'s SUMF") ¶ 60, ECF No. 61-2. These Aids are sufficient to satisfy the "forgiving test" applied to assess the constitutionality of regulations imposed on speech in nonpublic fora, *Archdiocese*, 897 F.3d at 329-30 (quoting *Mansky*, 585 U.S. at 17), and so render the challenged Guideline 9 a reasonable restriction on speech.

Accordingly, for the reasons explained more fully below, WallBuilders' motion for summary judgment is denied, *see* ECF No. 61, and WMATA's motion for summary judgment is granted, *see* ECF No. 62.

## I. BACKGROUND

The factual background and procedural history of this matter, including events occurring before and after issuance of a preliminary injunction in May 2024, *see WallBuilder,* 2024 WL 2299581, at*2-5, are described below, beginning with a short history of considerations leading to WMATA's adoption of the challenged portions of the commercial advertising Guidelines and continuing with a description of WallBuilders' efforts in 2023 to advertise on WMATA's Metrobuses and inside Metrorail stations, which efforts were addressed in the *WallBuilder* preliminary injunction decision, *see id.*, and then the subsequent events leading to the pending cross-motions for summary judgment.

### A. WMATA's Commercial Advertising Guidelines

"WMATA 'operates the Metrorail and Metrobus services that provide Washington-area residents with the majority of their public transit options,' and derives a significant portion of its

annual operating revenue from advertising displayed on the exterior of Metrobuses and inside Metrorail stations." *Id.* at *2 (quoting *AFDI*, 901 F.3d at 359). Its "advertising practices are governed by its 'Guidelines Governing Commercial Advertising,' which were adopted on August 3, 1972, and amended twice, on November 20, 2003, and November 19, 2015." *Id.* (citations omitted). Before 2015, "the Guidelines permitted 'issue-orienting advertising,' which, due to D.C.'s 'unique' situs as 'the seat of the federal government,' comprised a significant portion of its revenue—approximately $2 to 5 million of its $20 million in revenue in 2015." *Id.* (citations omitted). "'Beginning in 2010,' however, 'WMATA began to reconsider its approach as a result of near-monthly complaints from its employees, riders, elected officials, and community and business leaders about its advertisements.'" *Id.* (quoting *Archdiocese*, 897 F.3d at 319). WMATA's Senior Vice President for Rail Transformation explained that "the Metro Transit Police Department and the U.S. Department of Homeland Security feared that certain ads would, due to external world events, incite individuals to violence on the system and harm WMATA employees and customers." Def.'s Opp'n to Pl.'s Mot. for Prelim. Inj. ("Def.'s Opp'n to Prelim. Inj."), Att. 2, Decl. of WMATA's Senior Vice President for Rail Transformation, Lynn M. Bowersox ("Bowersox Decl.") ¶ 11, ECF No. 22-2.[2]

Then, in May 2015, WMATA received a proposed advertisement captioned at top with "[t]he phrase 'SUPPORT FREE SPEECH'" and "depict[ing] a turbaned, bearded, sword-wielding man who is apparently meant to be the Prophet Muhammad," with "[a] speech bubble emerging from the man's mouth contain[ing] the sentence 'YOU CAN'T DRAW ME!'" *AFDI*, 901 F.3d at

[2] The identical Bowersox Declaration is also found in the record as an exhibit to WallBuilders' first motion for summary judgment, *see* Pl.'s Mot. for Summ. J., Att. 11, Decl. of WMATA's Senior Vice President for Rail Transformation, Lynn M. Bowersox, ECF No. 41-11, and the instant summary judgment motion, *see* Pl.'s Mot., Att. 13, Decl. of WMATA's Senior Vice President for Rail Transformation, Lynn M. Bowersox, ECF No. 61-13. For convenience, the first filed version of the declaration is cited.

360. "[A] disembodied hand, paler in color, holding either a pen or a pencil pressed to paper" appears below the man, and "[f]rom the hand comes a speech bubble reading 'THAT'S WHY I DRAW YOU.'" *Id.* This "proposed ad featuring a cartoon depiction of the Prophet Mohammad raised concerns because some Muslims consider drawing the Prophet Mohammad so offensive that they have reacted violently to such depictions in the past," and "WMATA was aware that two gunmen were killed after they attempted to attack the building in Texas where the contest that eventually produced this proposed ad was being held." Bowersox Decl. ¶ 11. This advertisement was seen as "the straw that broke the camel's back," and so WMATA imposed "a temporary moratorium on issue-oriented advertisements, which by its terms 'close[d] WMATA's advertising space to any and all issue-oriented advertising, including but not limited to, political, religious and advocacy advertising until the end of the calendar year.'" *AFDI*, 901 F.3d at 361 (alteration in original).

The moratorium on all issue-oriented advertisements was subsequently lifted, in November 2015, when WMATA's Board of Directors adopted the two Guidelines challenged in this lawsuit: Guideline 9, which prohibits "[a]dvertisements intended to influence members of the public regarding an issue on which there are varying opinions," and Guideline 12, which prohibits "[a]dvertisements that promote or oppose any religion, religious practice or belief." Compl., Ex. A, WMATA's Guidelines Governing Commercial Advertising ("WMATA's Guidelines") at 2, ECF No. 1-1. The Board reasoned "that any economic benefit of issue-oriented ads was outweighed by community and employee opposition, the associated security and violence risks, the possibility of vandalism, and the administrative burdens associated with reviewing ads and responding to complaints about ads." *WallBuilder*, 2024 WL 2299581, *2 (citing Bowersox Decl. ¶¶ 9-13).

"The leasing of WMATA's advertising space is administered by Outfront Media, Inc. ("Outfront"), a third-party contractor that 'handles day-to-day advertising and is paid for each ad that runs in WMATA advertising space.'" *Id.* at *3 (quoting Bowersox Decl. ¶ 17). Thus, when advertisers submit proposed ads, those ads go "to Outfront, which has the authority unilaterally to accept ads that comply with the Guidelines." *Id.* (citing Bowersox Decl. ¶¶ 17-18). "Outfront accepts 'thousands of ads' without forwarding them to WMATA" but is "supposed to submit potential ads that may violate the Guidelines to WMATA for review." *Id.* (quoting Bowersox Decl. ¶¶ 18, 28). When a proposed advertisement is forwarded for review, "[a] three-member panel (the "Panel"), comprised of WMATA's Marketing Director and two attorneys appointed by WMATA's General Counsel, reviews any submissions . . . to determine whether they comply with the Guidelines." *Id.* (citing Bowersox Decl. ¶¶ 19, 21). "To make this determination, the Panel reviews the ad in the context of relevant case law regarding advertising restrictions and prior ads that the Panel has rejected or accepted." *Id.* (citing Bowersox Decl. ¶¶ 20, 23). "In addition to reviewing the ad itself, the Panel 'may' also review any website or QR code referred to in the ad 'to determine if the advertisement would lead a viewer to material that violates WMATA's Guidelines.'" *Id.* (citing Bowersox Decl. ¶ 22). "Between November 2015 and December 2023, the Panel reviewed 2,064 ads and rejected 814." *Id.* (citing Bowersox Decl. ¶ 25).

### B. WallBuilders' 2023 Advertising Campaign

"One of the primary tools WallBuilders uses 'to educate the public' about its 'primary mission' of 'educating the nation concerning the Godly foundation of our country' is its website, which provides an online library of resources, including videos, podcasts, articles, and quotations from American historical figures." *Id.* (citations omitted).

"At the end of 2022, WallBuilders began to rebrand its website, with hopes of relaunching in June 2023," and "[t]o publicize this relaunch, it developed an ad campaign, with particular focus

on 'target[ing] Washington, D.C., and the National Capital Area' due to 'the region's unique audience—including large numbers of residents who work in politics, policy, and law, as well as residents and visitors interested in learning about American history and civic traditions'—and sought to advertise, in particular, with WMATA due to 'the high visibility for WMATA advertising.'" *Id.* (quoting, *inter alia*, Pl.'s Mot. for Prelim. Inj., Att. 7, Decl. of WallBuilders' Mktg. & Project Coordinator, Kristina Smith ("Smith Decl.") ¶¶ 7-8, ECF No. 9-7.).[3]

WallBuilders proceeded to design and submit to Outfront, in May 2023, two proposed ads, "[t]he first featured Henry Brueckner's late-1800s painting of George Washington kneeling to pray at Valley Forge, and the second showed Howard Chandler Christy's 1940 painting of the signing of the United States Constitution at Independence Hall." *Id.* (citing Smith Decl. ¶¶ 9, 10, 12). These two ads, reproduced below, "stated in prominent lettering, 'Christian?' and, in smaller lettering, next to a QR code, 'to find out about the faith of our founders, go to wallbuilders.com.'" *Id.* (quoting Smith Decl. ¶ 11).




[3] The identical Smith Declaration also appears in the record as an exhibit to WallBuilders' first motion for summary judgment, *see* Pl.'s Mot. for Summ. J., Att. 8, Decl. of WallBuilders' Mktg. & Project Coordinator, Kristina Smith, ECF No. 41-8, and the pending summary judgment motion, *see* Pl.'s Mot., Att. 10, Decl. of WallBuilders' Mktg. & Project Coordinator, Kristina Smith, ECF No. 61-10. For convenience, the first filed version of the declaration is cited.




Outfront forwarded both ads to WMATA's Panel, which met on June 8, 2023, and, "[u]pon review of WallBuilders' website, the Panel concluded the website 'contain[ed] clear advocacy,' based on, *inter alia*, the following statements on the homepage: (1) 'Helping Americans Remember and Preserve the True History of Our Great Nation[.] Find all the education, training, and resources you need if you're an educator, church leader, legislator, or anyone who just wants to discover more.'; (2) 'Restore America's Biblical Foundation[.] Learn the truth about our nation's Godly heritage today!'; (3) 'Many Americans don't understand the Christian foundation of our nation. Through original source documents, we strive to reveal the historical truths about our Founding Fathers' faith and the religious principles they established. We are driven to equip people to discover this truth with documents and artifacts from the first 400+ years of US history.'; (4) 'Many 'academics' deliberately ignore, change, and revise the facts of history in order to suit their own agendas. Truth is constantly becoming harder to find. We're here to help.'; (5) 'Do you support Christian ideals of freedom in America?'; and (6) in a video statement by the WallBuilders' President available on the homepage, 'Today, so few people recognize what has made this nation, really, the most successful, prosperous nation in the history of the world [is] a biblical foundation.'" *Id.* at *4 (alterations in original) (quoting Def.'s Opp'n to Prelim. Inj. at 9-11).

Additionally, the Panel "reviewed the specific page of WallBuilders' website to which the QR code linked, different from the homepage, and concluded that the page contained advocacy by criticizing as 'blatantly false' the following position: 'One of the common criticisms is that the Founding Fathers were a collective group of atheists, agnostics, and or deists who wanted a strict separation of church and state, resulting in a secular government and public square. Some go as far as foolishly writing that these allegations are so evident that no actual evidence or proof is needed to substantiate their claims.'" *Id.* (quoting Def.'s Opp'n to Prelim. Inj. at 11-12). WMATA rejected the ads pursuant to Guideline 9, summarily explaining that "[t]he ad review panel has determined that the two attached proposed advertisements are both prohibited by Commercial Advertising Guideline 9." *Id.* (alteration in original) (quoting Smith Decl., Ex. A at 14).

WMATA did not respond to WallBuilders' inquiries about why the ads were rejected, so suspecting that the ads' reference to Christianity was the "issue" of controversy that ran afoul of Guideline 9, WallBuilders redesigned the ads by eliminating nearly all of the text and in September 2023 submitted to WMATA the revised ads, as reproduced below. *See id.* at *5.






"The Panel reviewed the revised ads on September 7, 2023, and concluded, again, that the ads violated Guideline 9 'because they sought to influence the public on the issue of the separation of church and state.'" *Id.* (citation omitted). "Outfront 'suggested that WMATA might approve WallBuilders' advertisements if [it] removed WallBuilders' website address and QR code from the ads,' which WallBuilders declined to do 'because stripping the ads of all references to WallBuilders but the organizational name and logo would have negated the possible promotional and educational benefits that WallBuilders sought to achieve by running these ads.'" *Id.* (alteration in original) (quoting Smith Decl. ¶¶ 26–27). Notably, Guideline 12 was not cited by WMATA as the reason for rejection of the different iterations of these four proposed ads.

**C. WallBuilders Initiates Instant Suit and Is Granted Preliminary Injunction**

"On December 12, 2023, WallBuilders filed the instant action against Randy Clarke," in his official capacity as WMATA's General Manager and Chief Executive Officer, "alleging, in six counts pursuant to 42 U.S.C. § 1983, that Guidelines 9 and 12 violate the First Amendment." *Id.* at *5. The Complaint alleged "that Guideline 9 is unreasonable both facially (Count I) and as applied to WallBuilders (Count II), and viewpoint discriminatory both facially (Count III) and as applied to WallBuilders (Count IV); and that Guideline 12 is facially viewpoint discriminatory

(Count V) and unreasonable (Count VI)." *Id.* at *21. Simultaneously, WallBuilders moved "for a preliminary injunction to enjoin Clarke, 'his officers, agents, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the Order, from implementing or enforcing WMATA's Commercial Advertising Guidelines 9 and 12 to continue to reject WallBuilders' proposed advertisements.'" *Id.* (quoting Pl.'s Mot. for Prelim. Inj. at 1). In response, WMATA "moved to dismiss the complaint for lack of standing, pursuant to Federal Rule of Civil Procedure 12(b)(1), and for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6)." *Id.* (citing Def.'s Mot. to Dismiss, Att. 1, Def.'s Mem. of P. & A. in Supp. of Mot. to Dismiss at 2, ECF No. 23-1). The parties' competing motions became ripe in February and March 2024, but resolution was stalled until briefing was completed, in mid-May 2024, on WallBuilders' two motions for leave to file supplemental exhibits in support of its motion. *See id.* at *5.

Ultimately, on May 21, 2024, WallBuilders' motions for leave to file supplemental exhibits were granted and WallBuilders' motion for preliminary injunctive relief was granted in part and denied in part, while WMATA's motion to dismiss was granted in part and denied in part. *See id.* at *2. Specifically, WallBuilders' claims in Counts I and II, both of which challenged Guideline 9 as unconstitutionally unreasonable, survived WMATA's motion to dismiss because "the utterly undefined use of the phrase '[a]dvertisements intended to influence . . . regarding an issue on which there are varying opinions,' coupled with the lack of any definitions or official guidance and WMATA's inconsistent application of Guideline 9, makes clear that Guideline 9 is not a reasonable restriction on speech." *Id.* at *16. This decision also critically scrutinized WMATA's advertisement review process more generally, noting that "WMATA provide[d] no definitions for the terms used in these two challenged Guidelines and ha[d] neither 'set out any formal regulations

to direct the implementation or interpretation of these Guidelines,' nor 'published advertiser guidance about what speech is forbidden under the Guidelines.'" *Id.* at *1 (quoting Compl. ¶ 27); *see id.* at *13 ("In fact, WMATA offers no definitions and no guidance on how to define an '[a]dvertisement intended to influence members of the public regarding an issue on which there are varying opinions,' and no instruction on how to apply the Guideline, including whether related content, such as information on websites referenced in the ad, should be considered." (citation omitted)). As a result, "WallBuilders' motion for a preliminary injunction [wa]s granted insofar as it seeks preliminarily to enjoin the enforcement of Guideline 9 on WallBuilders." *Id.* at *17.

At the same time, however, WMATA's motion to dismiss established that the Complaint failed to state a claim as to the remaining counts. With respect to the viewpoint-discrimination challenges to Guideline 9, WallBuilders' facial challenge in Count III was foreclosed by *AFDI,* where "the D.C. Circuit held, in reviewing Guideline 9, that 'WMATA's restrictions are [facially] viewpoint-neutral,'" *WallBuilder*, 2024 WL 2299581, at *9 (alteration in original) (quoting *AFDI*, 901 F.3d at 363), and its as-applied challenge in Count IV was rejected because "the Complaint fails adequately to allege factual support to show WMATA 'singled out' or 'disfavor[ed]' WallBuilders on account of its religious viewpoints," *id.* at *10 (alteration in original) (quoting *Matal v. Tam*, 582 U.S. 218, 248 (2017) (Kennedy, J., concurring in part and concurring in the judgment)).

As to Guideline 12, the Court determined that the claims in "Counts V and VI are foreclosed by *Archdiocese of Washington v. Washington Metropolitan Area Transit Authority*, in which the D.C. Circuit squarely held that Guideline 12, by 'prohibit[ing] religious and anti-religious ads in clear, broad categories,' is viewpoint neutral and is reasonable in light of WMATA's previous 'security concerns arising from [ ] controversial ad[s]' and its 'compelling

interest in ensuring the safety and reliability of its transportation services and operating in a manner that maintains the attractiveness of its service to a multi-cultural, multi-ethnic, and religiously diverse ridership.'" *Id.* at *20 (alterations in original) (quoting *Archdiocese*, 897 F.3d at 325, 330-31). Although WMATA "did not reject WallBuilders' ads pursuant to Guideline 12," WallBuilders had standing to bring a pre-enforcement challenge against Guideline 12 because its "ads, which can fairly be read to promote the 'religious principles' allegedly adopted by the Founders and thus foundational to the nation, are 'arguably' prohibited by Guideline 12" and because "WMATA has not disavowed future rejection of WallBuilders' ads pursuant to Guideline 12, especially if Guideline 9 is unavailable due to being found unconstitutional." *Id.* at *18-20.

In sum, WMATA's motion to dismiss was granted as to WallBuilders' viewpoint discrimination claims as well as both claims challenging Guideline 12, and a preliminary injunction was issued enjoining enforcement of Guideline 9 against WallBuilders. *See id.* at *21.

### D. WallBuilders' Summer 2024 Advertising Campaign, and WMATA's Adoption of Interpretive Aids

Following issuance, in May 2024, of preliminary injunctive relief against WMATA enjoining WMATA from enforcing Guideline 9 against WallBuilders, *see id.* at *17, "WallBuilders informed WMATA that it wanted to run the original two 'Christian?' ads on WMATA buses in June and July 2024," and those "ads ran in the summer of 2024" and "continued to appear on some WMATA buses for months after the contract period ended in July 2024," Pl.'s SUMF ¶ 57.

In the summer of 2024, WallBuilders submitted four new ads showing quotations from historical American leaders designed "to educate the public on the views of the founders on the importance of faith and on the role of faith in our country's founding and history." *Id.* ¶ 58. The first ad states "[t]he Bible contains more knowledge necessary to man in his present state than any

other book in the world," and attributes the quote to "Signer of the Declaration of Independence Dr. Benjamin Rush." *Id.* ¶ 27 (capitalization standardized). The second ad states that "[t]hose people who are not governed by God will be ruled by tyrants," and attributes the quote to the "Founder of Pennsylvania William Penn." *Id.* ¶ 31 (capitalization standardized). The third ad states that "[t]o the distinguished character of patriot, it should be our highest glory to add the more distinguished character of Christian," and attributes the quote to "President George Washington." *Id.* ¶ 32 (capitalization standardized). The fourth and last ad states "[w]ithout God, there could be no American form of government, nor an American way of life. Recognition of the Supreme Being is the first—the most basic—expression of Americanism," and attributes this quote to "President Dwight Eisenhower." *Id.* ¶ 34 (capitalization standardized). These four proposed ads are reproduced below.












All four ads submitted by WallBuilders were rejected by WMATA on July 12, 2024, within two weeks of submission. *See id.* ¶ 59; Pl.'s Opp'n to Def.'s Rule 56(D) Mot. for Disc., Att. 1,

Suppl. Decl. of WallBuilder's President, Timothy Barton ("Barton Suppl. Decl.") ¶ 12, ECF No. 44-1.[4] The reason given for rejection was for noncompliance with Guidelines 12 and 14, although "WMATA did not provide an explanation as to why these ads violated Guideline 12 when the original ads did not." Pl.'s SUMF ¶ 59; *see also* Barton Suppl. Decl. ¶ 12 ("On July 12, 2024, WMATA rejected the four ads, citing Guidelines 12 (prohibiting religious advertisements) and 14 . . . ."); WMATA's Guidelines at 2 (Guideline 14: "Advertisements that are intended to influence public policy are prohibited.").

Thereafter, in November 2024, WMATA published Internal Procedures and Interpretive Aids, which are designed to "help WMATA's advertisement review panel ("Panel") apply the Guidelines to all advertisements submitted for review by its third-party advertising vendor." Def.'s Opp'n, Ex. 1, Fourth Decl. of WMATA's Dir. of Mktg., Georgetta Nicol ("4th Nicol Decl."), Ex. A, WMATA Internal Procedures and Interpretive Aids for Reviewing Proposed Commercial Advertising ("Interpretive Aids") at Preamble, ECF No. 62-4.[5] The four-page Interpretive Aids document consists of four sections, describing: in section I, the composition and expertise of WMATA's advertisement review Panel, which is required to solicit outside legal advice if consensus by the Panel cannot be reached as to "whether an advertisement violates the Guidelines," *id.* § I. A.-D.; in section II, the procedure for submitting advertisements to the third-party advertising vendor and the circumstances when that vendor is required to submit an ad to the Panel for review, *id.* § II. A.-C.; and, in section III, guidance for "Panel review of advertisements," *id.* § III (caption), with specific steps to be undertaken by the Panel when an ad "contains a link to

[4] The identical declaration is also attached to WallBuilders' pending summary judgment motion, *see* Pl.'s Mot., Att. 19, Suppl. Decl. of WallBuilder's President, Timothy Barton, ECF No. 61-19, but only the first filed declaration is cited.

[5] This declaration and accompanying exhibits were twice docketed as a standalone entries, *see* ECF Nos. 64, 65, but the latter entry was modified to clarify that such entry was "entered in error." For convenience, the first filed declaration is cited.

a website, a QR code, or a reference to a website," *id.* § III. B.-C., and, absent such link or reference, authorizing the Panel to conduct "research" regarding information presented in the ad "that is not readily known to or understood by the Panel," so that the Panel may "educate itself in order to make an informed decision as to whether the advertisement violates the Guidelines," *id.* § III. D.

The bulk of the Interpretive Aids is devoted, in the last section IV, to "Guidance for determining if advertisements violate the Guidelines," *id.* § IV. (caption), beginning with three subsections of general policy statements, *id*. § IV., A. – C., followed by seven subsections of specific "Interpretive aids" for Guidelines 1, 4, 8, 9, 12, 13 and 14, *id.* § IV. D, E, F, G, H, I, and J, respectively. Pertinent to this case, the "Interpretive aids for Guideline 9," in subsection IV. G., starts with an instruction for the review Panel to determine "an advertisement's intent"—consistent with Guideline 9's first clause limiting the prohibition to "[a]dvertisements intended to influence members of the public . . ."—by looking at "the face of the advertisement and review of any relevant websites . . . ." *Id.* at § IV.G.1. Next, this subsection defines "an 'issue' for purposes of Guideline 9 [a]s 'a point, matter, or dispute, the decision of which is of special or public importance,'" and notes that "[a]dvertisements that include such issues generally promote a message to the public about substantive ethically, socially, or politically controversial or divisive topics, as illustrated in this section." *Id.* at § IV.G.2. Sixteen specific examples of prohibited "types of advertisements" are listed, including those "[s]upporting, opposing, or promoting," *inter alia*, "a political party," "any person holding any government position or any candidate for such a position," "a ballot measure or proposed measure," or "a policy or policies of a business or nonprofit entity other than encouraging or promoting the purchase or use of goods or services of the advertiser"; "[d]escribing or promoting a particular view, interpretation, or meaning of

historical events, historical documents (for example, but not limited to, the Declaration of Independence or Constitution), laws, statutes, regulations, or other government policies"; and "[s]upporting, opposing, or promoting an ethical, social, or humanitarian cause, mission, call to action, awareness campaign, position statement, or other similar effort unless solely for a commercial purpose." *Id.* at § IV.G.3.a, b, c, j, m, p.

To provide additional guidance in applying Guideline 9, subsection IV. G. of the Interpretive Aids goes on to list five types of advertisements that do not violate this Guideline, stating that "Guideline 9 does not prohibit": (1) "advertisements for a newspaper, magazine, other publication, TV program, film, theatrical performance, concert, podcast, or other media solely because the medium's content addresses political issues or contains political messages, so long as the advertisement does not otherwise violate the Guidelines"; (2) "advertisements for employment, including encouraging enlistment in a branch of the military" or other government job, "solely because the employer's missions, policies, practices, or tactics are the subject of 'varying opinions,' so long as the advertisement does not otherwise violate the Guidelines"; (3) "advertisements that encourage or promote the purchase or use of goods or services because others may be opposed to their purchase or use, so long as the advertisement does not otherwise violate the Guidelines"; (4) "advertisements that promote medical services that may be the subject of public debate and controversy (for example, but not limited to, abortion, pregnancy care, gender-affirming medical treatment, in-vitro fertilization, vaccines, etc.) if the advertisement is limited to describing the services available, so long as the advertisement does not otherwise violate the Guidelines"; and (5) "advertisements soliciting donations so long as the advertisement does not otherwise violate the Guidelines." *Id.* § IV.G. 4 - 8, respectively.

The Interpretive Aids make clear that "WMATA reserves the right to revise or amend the internal procedures and interpretive aids without notice." *Id.* (Preamble).

**E. Pending Cross-Motions for Summary Judgment**

Before WMATA issued the Interpretive Aids**,** the parties had filed cross-motions for summary judgment concerning Guideline 9, but, over Wallbuilders' objection, WMATA moved to defer completion of summary judgment briefing until discovery could be conducted, which discovery motion was denied. *See* Pl.'s Mot. for Summ. J., ECF No. 41; Def.'s Rule 56(d) Mot. for Disc. & Deferral of Consideration Pl.'s Mot. for Summ. J. at 1, ECF No. 43; Minute Order (Sept. 13, 2024) ("Defendant's arguments that the requested discovery is necessary for effective opposition to plaintiff's pending Motion for Summary Judgment are unpersuasive."); Def.'s Mot. for Summ. J., ECF No. 48. Following WMATA's adoption of the Interpretive Aids in November 2024, however, WallBuilders sought discovery "to probe [the Interpretive Aids'] development and meaning and to reinforce that the interpretive aids do not render the Guidelines constitutional." Pl.'s Rule 56(d) Mot. for Disc., Att. 1, Pl.'s Mem. of P. & A. in Supp. of Its Rule 56(d) Mot. for Disc. at 1, ECF No. 52-1. WMATA had no objection to limited discovery about "non-privileged, non-speculative information about WMATA's decisions on advertisements based on Guideline 9 . . . as interpreted using the Interpretive Aids," Def.'s Partial Opp'n to Pl.'s Rule 56(d) Mot. at 1, ECF No. 53, and WallBuilders' discovery request was granted, Minute Order (Dec. 17, 2024). The then-pending cross-motions for summary judgment were denied as moot with leave to refile "given that discovery will result in a different record upon which either party may seek summary judgment." *Id.* At the parties' requests, the close of discovery was twice extended until December 5, 2025, and in the interim, a discovery dispute was resolved at a telephonic hearing, at which WMATA's objection to proposed hypothetical questions WallBuilders planned to ask at a deposition of WMATA's witness, proffered under Fed. R. Civ. P. 30(b)(6), was sustained. *See*

Minute Orders (Apr. 29, 2025; Sept. 29, 2025; Oct. 10, 2025); Minute entry for telephonic hearing (Oct. 10, 2025).

At the close of discovery, in response to the Court's direction to advise "whether plaintiff's claims are moot in light of the Internal Procedures and Interpretive Aids for Reviewing Proposed Commercial Advertising," Minute Order (Dec. 17, 2024), the parties submitted divergent positions, *see* Joint Status Rep. Regarding Further Procs. ("Joint Status Rep."), ECF No. 60. WMATA contended that WallBuilders' "claims for declaratory and injunctive relief as to Guideline 9 . . . are moot because the Aids substantially change WMATA's advertisement review system, including vis-à-vis Guideline 9" and because "[t]he Complaint seeks a declaration that Guideline 9 as it existed prior to the Interpretive Aids 'violates the First Amendment on its face' and an injunction permanently preventing WMATA from enforcing Guideline 9 vis-à-vis WallBuilders." *Id.* at 3-4 (citation omitted). WallBuilders, for its part, emphasized that "the Interpretive Aids are an 'internal document' created entirely by WMATA's counsel in response to litigation" and that "the Interpretive Aids are changeable by WMATA at any time 'without notice.'" *Id.* at 5-6 (citations omitted). Furthermore, WallBuilders argued that its "summary judgment briefing will explain, in detail, how the Interpretive Aids do nothing to clarify the unmoored scope of Guideline 9, but rather, make it worse," so "[t]his case remains a live and justiciable controversy." *Id.* at 6.

WallBuilders thereafter filed a renewed motion for summary judgment, *see* Pl.'s Mot., and WMATA cross-moved for summary judgment, *see* Def.'s Opp'n. These two motions are now ripe for resolution. *See* Def.'s Reply in Supp. of Mot. for Summ. J., ECF No. 68.

## II. LEGAL STANDARD

A movant is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "'[T]he mere existence of *some* alleged factual dispute between the parties' is not enough to defeat summary judgment; 'the requirement is that there be no *genuine* issue of *material* fact.'" *United States ex rel. McBride v. Halliburton Co.*, 848 F.3d 1027, 1030 (D.C. Cir. 2017) (alteration and emphasis in original) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). "Material" facts are those that "might affect the outcome of the suit under the governing law," and "genuine" issues are those in which "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Thus, "[i]n considering a motion for summary judgment, judges must ask themselves not whether they think 'the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented,'" because that evidence is such that "the jury could reasonably find for the plaintiff." *Stoe v. Barr*, 960 F.3d 627, 638-39 (D.C. Cir. 2020) (quoting *Anderson*, 477 U.S. at 252). Any "inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (ellipsis in original) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam)).

## III. DISCUSSION

The Complaint, which has not been amended over the course of this litigation, originally asserted six counts, *see WallBuilder*, 2024 WL 2299581, at *21, and of these, only two, Counts I and II, survived WMATA's motion to dismiss, *id.* *8. WallBuilders now advances arguments seeking summary judgment as to both surviving Counts I and II (challenging Guideline 9 as

unreasonable), and also seeks reconsideration of dismissal of Count VI (challenging Guideline 12 as unreasonable), and summary judgment as to that third count as well. Pl.'s Mot., Att. 1, Pl.'s Mem. of P. & A. in Supp. of Pl.'s Renewed Mot. for Summ. J. ("Pl.'s Mem.") at 3-4, 55, ECF No. 61-1.[6] These three claims—that Guideline 12, the religious advertising ban, "is incapable of reasoned application," Pl.'s Mem. at 49; that Guideline 9, the controversial issue ban, is unreasonable as applied to WallBuilders, *see* Pl.'s Combined Opp'n to Def.'s Mot. for Summ. J. & Reply in Supp. of Pl.'s Renewed Mot. for Summ. J. ("Pl.'s Reply") at 27, ECF No. 66; and that Guideline 9 facially "violates the First Amendment" as constitutionally unreasonable, Pl.'s Mem. at 15—are addressed and rejected *seriatim,* following review of binding precedent governing speech regulation in a nonpublic forum.

### A. Regulation of Speech in a Nonpublic Forum

"Analysis of the constitutionality of a restriction on speech on government property begins with the nature of the forum," and as previously determined in this case, without contest from the parties, the government space at issue is neither a traditional public forum nor a designated public forum but rather is a nonpublic forum. *WallBuilder*, 2024 WL 2299581, at *7; *see* Pl.'s Reply at 23 (discussing "content-based restrictions on speech in nonpublic forums"); Def.'s Opp'n at 1 ("WMATA adopted the Guidelines Governing Commercial Advertising . . . to promote safety and security within the Metro system, a nonpublic forum for First Amendment purposes."). "A

[6] WallBuilders does not seek reconsideration or make any arguments otherwise in support of the dismissed counts that Guideline 9 discriminates based on viewpoint facially (Count III) and as applied (Count IV) or that Guideline 12 is facially viewpoint discriminatory (Count V). *See Wallbuilder*, 2024 WL 2299581, at *21. Both facial challenges failed because the D.C. Circuit has already determined that the Guidelines are facially neutral. *See id.* at *9 (citing *AFDI*, 901 F.3d at 363 (rejecting challenge to Guideline 9 because "WMATA's restrictions are [facially] viewpoint-neutral.")); *id.* at *20 (citing *Archdiocese*, 897 F.3d at 325 (rejecting challenge to Guideline 12 because by "prohibit[ing] religious and anti-religious ads in clear, broad categories" Guideline 12 is viewpoint neutral). As to WallBuilders' as-applied challenge to Guideline 9 as viewpoint discriminatory, this Court previously determined that "the Complaint fails adequately to allege factual support to show WMATA 'singled out' or 'disfavor[ed]' WallBuilders on account of its religious viewpoints." *Id.* at *10 (alteration in original) (quoting *Matal*, 582 U.S. at 248 (Kennedy, J., concurring in part and concurring in the judgment)).

hallmark of the nonpublic forum is that it serves a purpose incompatible with unfettered expression" and in such spaces, "the government has 'much more flexibility to craft rules limiting speech,'" such that "[r]estrictions on speech 'need only be reasonable and viewpoint neutral.'" *Mahoney*, 2026 WL 2836881, at *3 (D.C. Cir. Sept. 22, 2026) (quoting *Mansky*, 585 U.S. at 11-12, and *Price v. Garland*, 45 F.4th 1059, 1068 (D.C. Cir. 2022)).

Even in a nonpublic forum, which is subject to the most flexible forms of government regulation, a viewpoint-neutral government restriction on speech must be "reasonable." *AFDI*, 901 F.3d at 370 (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 808 (1985)). This "reasonability inquiry is not a demanding one, but rather is a 'forgiving test.'" *Archdiocese*, 897 F.3d at 329-30 (quoting *Mansky*, 585 U.S. at 17). "The challenged restriction need not be the most reasonable or the only reasonable limitation," *id.* at 330 (internal quotation marks omitted) (quoting *Hodge v. Talkin*, 799 F.3d 1145, 1165 (D.C. Cir. 2015)), and need only be "consistent with the government's legitimate interest in maintaining the property for its dedicated use," *AFDI*, 901 F.3d at 370 (quoting *Initiative & Referendum Inst. v. U.S. Postal Serv.* ("*IRI*"), 685 F.3d 1066, 1073 (D.C. Cir. 2012)), and "provide[] 'objective, workable standards' to guide a government official's exercise of discretion," *Zukerman v. U.S. Postal Serv.*, 961 F.3d 431, 447 (D.C. Cir. 2020) (quoting *Mansky*, 585 U.S. at 21). The requirement of such standards ensures that officials are not permitted "to exercise 'unbridled discretion over a forum's use.'" *Mahoney*, 2026 WL 2836881, at *6 (quoting *AFDI*, 901 F.3d at 372). Thus, "[e]ven when the government may regulate speech, it must avoid 'unfair or inconsistent enforcement.'" *Id.* (quoting *Mansky*, 585 U.S. at 22).

The Supreme Court in *Minnesota Voters Alliance v. Mansky* addressed the limits on government regulation of First Amendment speech in a nonpublic forum. There, the Court

considered a First Amendment challenge to a Minnesota law prohibiting voters from "wear[ing] a political badge, political button, or anything bearing political insignia inside a polling place on Election Day." 585 U.S. at 5. After determining that "[a] polling place in Minnesota qualifies as a nonpublic forum," the Court turned to the question of "whether Minnesota's ban on political apparel is 'reasonable in light of the purpose served by the forum': voting." *Id.* at 12-13 (quoting *Cornelius*, 473 U.S. at 806). Explaining that "[a]lthough there is no requirement of narrow tailoring in a nonpublic forum, the State must be able to articulate some sensible basis for distinguishing what may come in from what may stay out," and the Court found that Minnesota had failed to "draw a reasonable line" passing constitutional muster for three reasons. *Id.* at 16.

First, the statute "d[id] not define the term 'political,'" which "word can be expansive." *Id.* at 17. Second, this term's indeterminacy was further exacerbated by Minnesota's representations to the Court and its official guidance interpreting the statute, which had they "clarif[ied] the indeterminate scope of the political apparel provision" might have "saved" the law. *Id.* at 18 (citation omitted). For example, Minnesota represented over the course of litigation that the statute prohibited "only words and symbols that an objectively reasonable observer would perceive as conveying a message about the electoral choices at issue in the polling place," but this explanation, in the Court's view, was "far from clarifying" and, in fact, "introduces confusing line-drawing problems." *Id.* at 17-18 (citation omitted and alteration adopted). Third, the State's "authoritative guidance regarding implementation of the statute" stated that any "[i]ssue oriented material designed to influence or impact voting" is banned under the challenged statute, but the Court found this guidance "raise[d] more questions than it answer[ed]." *Id.* at 18 (citation omitted). Consequently, the statute was struck as violative of the First Amendment because "the unmoored use of the term 'political' in the Minnesota law, combined with haphazard interpretations the State

has provided in official guidance and representations to this Court, cause[d] Minnesota's restriction to fail even this forgiving [reasonability] test." *Id.* at 16-17.

WMATA acknowledges *Mansky* and also draws attention to an earlier Supreme Court decision, *Lehman v. City of Shaker Heights*, 418 U.S. 298 (1974) (plurality opinion), upholding a restriction on "paid political advertising on behalf of a candidate for public office" on a city-operated "public rapid transit system," *id.* at 299; *see* Def.'s Opp'n at 13-14 (discussing *Lehman*). *Lehman*, in turn, relied on an earlier case, *Packer Corp. v. Utah*, 285 U.S. 105 (1932), in which "Mr. Justice Brandeis, in speaking for a unanimous Court, recognized that 'there is a difference which justifies the classification between display advertising and that in periodicals or newspapers'" and "reasoned that viewers of billboards and streetcar signs had no 'choice or volition' to observe such advertising and had the message 'thrust upon them by all the arts and devices that skill can produce. . . . The radio can be turned off, but not so the billboard or street car placard.'" *Lehman*, 418 U.S. at 302 (ellipses in original) (quoting *Packer Corp.*, 285 U.S. at 110). The *Lehman* Court emphasized that "[t]he streetcar audience is a captive audience" and "is there as a matter of necessity, not of choice." *Id.* (quoting *Pub. Utils. Comm'n of D.C. v. Pollak*, 343 U.S. 451, 468 (1952) (Douglas, J., dissenting)); *see also id.* at 308 (Douglas, J., concurring in the judgment) ("Since I do not believe that petitioner has any constitutional right to spread his message before this captive audience, I concur in the Court's judgment."). "In such situations, '[t]he legislature may recognize degrees of evil and adapt its legislation accordingly.'" *Id.* at 302 (plurality opinion) (alteration in original) (quoting *Packer Corp.*, 285 U.S. at 110).

Observing that "*Mansky* did not overrule *Lehman*, a case it cited with approval," Def.'s Opp'n at 14 (citing *Mansky*, 585 U.S. at 12), WMATA points out that *Lehman* "emphasized that customers on public transportation are a captive audience" and contends that "[t]he circumstances

of public transportation—where the audience is captive and safety and security concerns are significant—raise questions as to whether *Mansky*'s analysis should apply to public transportation at all," *id.* at 13-14. This invitation from WMATA to create a special safe harbor for any speech regulation on public transportation is rejected. The D.C. Circuit has already considered the import of *Lehman* after *Mansky*, including the "distinct captive audience problems," in a case where WMATA was the appellee, and concluded that "the government has wide latitude to restrict subject matters—including those of great First Amendment salience—in a nonpublic forum as long as it maintains viewpoint neutrality and acts reasonably." *Archdiocese*, 897 F.3d at 323-24 (citing *Mansky*, 585 U.S. at 11, *Cornelius*, 473 U.S. 788, and *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 831 (1995)). In doing so, the D.C. Circuit found no need to create a special public transportation rule for government regulation of speech, and relied on general jurisprudence governing a nonpublic forum, which is what WMATA's advertising space was determined to be. *Id.* at 322-23. As the D.C. Circuit explained, "transit systems, unlike spaces like parks and sidewalks that have historically been used for congregation and discussion, have a utilitarian purpose that governments are entitled to maintain, at least where they have provided a non-speech-suppressive rationale for regulation." *Id.* at 324. Indeed, "[c]ity buses, by contrast, enjoy no historical tradition like parks and sidewalks because transit was a private enterprise in most American cities until the second half of the twentieth century." *Id.* The D.C. Circuit determined that "given the history and experience that prompted WMATA to adopt Guideline 12 and WMATA's enforcement of it, the [appellant] has not shown that Guideline 12 has failed to give adequate guidance on what is prohibited, or created so many marginal cases that it cannot be fairly administered." *Id.* at 330.

Set against the backdrop of these binding precedents, WallBuilders' arguments are reviewed next.

**B. WallBuilders' Challenge to Guideline 12 is Foreclosed by Binding Precedent**

WallBuilders again challenges Guideline 12 as "incapable of reasoned application," Pl.'s Mem. at 49, notwithstanding the previous determination that the D.C. Circuit, in *Archdiocese*, resolved this legal question and upheld Guideline 12 as "reasonable in light of WMATA's previous 'security concerns arising from [] controversial ad[s]' and its 'compelling interest in ensuring the safety and reliability of its transportation services and operating in a manner that maintains the attractiveness of its service to a multi-cultural, multi-ethnic, and religiously diverse ridership,'" *WallBuilder*, 2024 WL 2299581, at *20 (alterations in original) (quoting *Archdiocese*, 897 F.3d at 330-31). In effect, WallBuilders urges this Court to find that the D.C. Circuit's factual and legal determinations in *Archdiocese* are sufficiently undermined by the handful of examples put forward in this case as inconsistent applications of this guideline, which inconsistencies WallBuilders believes are only compounded by the Interpretive Aids, to warrant reconsideration of this binding precedent as to Guideline 12. Pl.'s Mem. at 54 ("To be sure, *Archdiocese of Washington* upheld Guideline 12, but it did so on a much more limited TRO record and without the benefit of the Interpretive Aids, which reinforce the unreasonableness of the ban."). This invitation to reconsider the D.C. Circuit's determination that Guideline 12 is clear and is a reasonable restriction on speech is rejected. WallBuilders has not established why any additional guidance provided in Interpretive Aids as to this Guideline calls for reconsideration of a binding legal conclusion, when that additional guidance was not necessary in the first place. After all the Supreme Court has reminded that where "[t]he text is clear, [courts] need not consider this extra-textual evidence." *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 305 (2017).

Regardless, the Interpretive Aids as to Guideline 12 are not unreasonable. As to Guideline 12, the Aids provide two clarifying statements, in subsection IV. H. 1 and 2, and neither of those statements lacks clarity or creates ambiguity in Guideline 12 itself. The first statement provides, in full, that "Guideline 12 does not prohibit advertisements for a newspaper, magazine, other publication, TV program, film, theatrical performance, concert, podcast, product, or other media solely because the medium's content addresses religion, religious practices, or religious beliefs or contains religious messages, so long as the advertisement does not otherwise violate the Guidelines." Interpretive Aids § IV. H.1. WallBuilders identifies nothing ambiguous about this provision and instead speculates about how hypothetical advertisements might fare under application of this provision. *See* Pl.'s Mem. at 53 ("But would the Guidelines allow an ad promoting the Bible or the Quran?"). WMATA correctly responds that the fact that "WallBuilders can imagine hypothetical ads that could present difficult line-drawing exercises under Guideline 12 . . . does not undercut the guideline's reasonableness." Def.'s Opp'n at 34. Indeed, "[p]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activities," so a challenger to a restriction must present arguments that "go beyond close calls on borderline or fanciful cases." *Mansky*, 585 U.S. at 21 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)).

The second statement provides, in full, that "Guideline 12 does not prohibit advertisements for an institution solely because of its affiliation with a religion or because it displays a religious, institutional logo, slogan, phrase, symbol, or any other word(s) or image(s), so long as the advertisement does not otherwise violate the Guidelines." Interpretive Aids § IV. H.2. WallBuilders claims that ambiguity exists here because the provision "does not define what an 'institution' is" and that "dictionary definitions are again boundless." Pl.'s Mem. at 53. Certainly,

the word "institution" is broad, but given the range of "institutions" with religious affiliations, including schools, universities, nonprofit and charitable organizations, and even for-profit enterprises, that seems appropriate. The operative part of this statement is that merely showing in an ad that the sponsoring institution has religious affiliation does not warrant rejection of the ad, and is fully consistent with the general guidance that ads will not be rejected either "because of the particular . . . identity of the advertiser," *id.* § IV. A., or because the advertiser is "an educational institution" that "describes itself using general terms that do not refer to a specific issue (for example . . . describing itself or its educational offerings as . . . guided by religious tenets)," *id.* § IV. C. To whatever degree the noun "institution" may be considered ambiguous, such ambiguity is insufficient to upset the D.C. Circuit's carefully reasoned conclusion in *Archdiocese* that Guideline 12 is reasonable.

As support for its challenge to Guideline 12, WallBuilders selects a handful of examples of advertisements appearing on WMATA advertising space that it argues run afoul of this Guideline by promoting religion either in the ad itself or on the advertiser's website. *See* Pl.'s Mem. at 50-54 (citing, *e.g.*, ads sponsored by the Art of Living Foundation in September 2023, The Catholic University of America in June 2024, the Salvation Army in December 2024, and the Church of Scientology in the summer of 2025); Pl.'s SUMF ¶¶ 91, 117, 125, 139.[7] Putting aside the fact that many of these examples occurred before promulgation of the Interpretive Aids in

[7] WallBuilders provides examples of other advertisements that were run on WMATA's Metro system before implementation of the Interpretive Aids and clearly have a commercial purpose of promoting attendance at theater performances or a museum, or viewing a television series, *see* Pl.'s SUMF ¶ 83 (*The Book of Mormon* musical ad in 2017), ¶ 101 (*Jesus Christ Superstar* musical ad in the winter of 2023-24), ¶ 123 (*Martin Scorsese Presents: The Saints* approved before November 2024), ¶ 154 (Museum of the Bible ad from before November 2024); Def.'s Mot., Att. 2, Def.'s Statement of Undisputed Material Facts in Supp. of Mot. for Summ. J. & Statement of Genuine Issues in Resp. to Pl.'s SUMF ("Def.'s SUMF"), at 115, ECF No. 62-2 (stating that the Museum of the Bible advertisements were "approved prior to the adoption of the Interpretive Aids"), as well as an ad approved in November 2022, that was paid for by "a global nonviolent movement to end war and establish a just and sustainable peace" and encourages "Peace on Earth," *id.* ¶ 87, which at a commonsense level expresses a general positive, noncontroversial message shared broadly, whether or not religiously based.

November 2024 and thus are not particularly relevant now, in most of these examples, promotion of a religious message is incidental to the primary and commercial purpose of the advertisement. For instance, the Salvation Army advertisement, containing the slogan "Love Beyond a Warm Meal" followed by "$25 a month provides more than food" and a link to the website, Pl.'s SUMF ¶ 125, is not promoting a religion, as WallBuilders contends, *see* Pl.'s Mem. at 50, but soliciting donations. WallBuilders persists, pointing to language on the Salvation's Army website stating that "[i]ts mission is to preach the gospel of Jesus Christ and to meet human needs in His name without Discrimination," *id.* (quoting Pl.'s SUMF ¶ 126), but WMATA's designee recalled that at the time the advertisement was being considered "there was something wrong with the website" so that when the review panel went to the website "it was pointing to a different region than this one" and the panel did not see that language. Pl.'s Mot., Att. 4, Dep. of WMATA's Fed. R. Civ. P. 30(b)(6) Designee, Georgetta Nicol ("Def.'s 30(b)(6) Dep.") at 392:10-17, ECF No. 61-4.

WallBuilders also highlights advertisements run in the summer of 2025 for the book *Dianetics: The Modern Science of Mental Health*, telling viewers to "Buy and Read" and providing a link and a QR code to a website where the book can be purchased. Pl.'s SUMF ¶ 139. The ads ask a series of questions including "Can your mind make you sick?" and "Can buried memories trigger stress?" followed by citations to pages of the book. *Id.* The Interpretive Aids specify that "Guideline 12 does not prohibit advertisements for a . . . publication . . . solely because the medium's content addresses religion, religious practices, or religious beliefs or contains religious messages, so long as the advertisement does not otherwise violate the Guidelines." Interpretive Aids § IV. H.1. That the website "invited viewers to obtain a Scientology 'How-to-Kit,'" as Wallbuilders emphasizes, Pl.'s Mem. at 52, does not change the purpose of the advertisement, which is to sell the book *Dianetics*.

As to the advertisements sponsored by Catholic University that were run in June 2024, WallBuilders describes these as examples of ads approved in contradiction of Guideline 12. *See id.* at 51-52. A similar argument was rejected in the preliminary injunction decision when considering advertisements by organizations "promot[ing] their educational missions" since the advertisement's reference to "'religious messages,' such as Catholic University's Latin motto [translated to "God is my light"] . . . do[es] so only as a reason for enrollment in the school." *WallBuilder*, 2024 WL 2299581, at *9 (citations omitted). Such advertisements were not comparable, to WallBuilders' proposed ads, which "in contrast, promote WallBuilders' 'religious-based educational mission'—'to educate the public on the role that the Founders' Christian faith played in the creation of the nation and the drafting of the Constitution'—in and of itself, and not in service of another end." *Id.* (citations omitted). WallBuilders now contends that new examples of Catholic University ads, from June 2024, are different because they are "designed both to recruit perspective students *and* to promote the Catholic faith," Pl.'s Mem. at 52—and this point is appreciated. All three advertisements WallBuilders cites show the Catholic University's crest, the slogan "Lead *with* Light," a play on the school's Latin motto, and two of the three ads also state "The Catholic University of America," *see* Pl.'s SUMF ¶ 117 (emphasis in original), which serves to "promote the educational opportunities that would accompany enrollment in" the Catholic University of America, *WallBuilder*, 2024 WL 2299581, at *9. WMATA offers little explanation of how these three ads pass muster under Guideline 12, noting only that these advertisements were run in June 2024, months before issuance of the Interpretive Aids. *See* Pl.'s SUMF ¶ 117; Def.'s Mot., Att. 2, Def.'s Statement of Undisputed Material Facts in Supp. of Mot. for Summ. J. & Statement of Genuine Issues in Resp. to Pl.'s SUMF, at 78, ECF No. 62-2; Def.'s Reply at 16 ("Like the Catholic University ad the Court addressed in its prior opinion, the Catholic University

'God Is Our Light' ad included in WallBuilders' summary judgment motion promotes student enrollment with a slogan that conveys the nature and values of the educational institution." (citations omitted)). The timing of the Catholic University ads to attract the attention of potential students in early summer to solicit interest for Summer or Fall enrollment corroborates the commercial purpose, albeit obliquely, of these ads.

In any event, the examples marshaled by WallBuilders of advertisements run after the promulgation of the Interpretive Aids, *i.e.*, the *Dianetics* and Salvation Army ads, and even before November 2024, are insufficient to disturb the binding precedent in the D.C. Circuit's *Archdiocese* decision. Accordingly, WallBuilders' claim that Guideline 12 is facially incapable of reasoned application does not warrant reconsideration of this Court's prior dismissal of Count VI, and that request is therefore denied.

### C. WallBuilders' As-Applied Challenge to Guideline 9 is Moot

Next, WallBuilders seeks to advance an as-applied challenge to Guideline 9, a claim upon which the organization received preliminary injunction relief. *See* Pl.'s Reply at 27; *WallBuilder*, 2024 WL 2299581, at *16-17. WallBuilders' motion for summary judgment, however, does not clearly delineate its arguments in support of its facial challenge from those in support of its as-applied challenge to Guideline 9. *See* Pl.'s Mem. For this reason, WMATA contends that "WallBuilders abandoned, and therefore waived," an as-applied challenge to Guideline 9. Def.'s Opp'n at 11; *see id.* ("The Background section of WallBuilders' summary judgment brief references WMATA's rejection of its ads (at 5), but WallBuilders does not assert an as-applied argument in the brief's Argument section. The as-applied claim is therefore waived."). In response, WallBuilders insists that any as-applied challenge was preserved because "[a] successful facial challenge would mean that the Guideline is also invalid both as it applied to WallBuilders and as it applies to all other advertisers seeking to advertise on WMATA's space," and thus,

"[b]ecause WallBuilders raises what it is, by its nature, a facial 'reasonableness' challenge under *Mansky*, it has preserved its right to enjoin its application, both on its face and as applied to WallBuilders." Pl.'s Reply at 27. Assuming without deciding that WallBuilders has preserved its as-applied challenge, this claim fails for the independent jurisdictional reason of mootness.

The doctrine of mootness "focuses on whether events subsequent to the filing of the complaint have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *N. Am. Buttefly Ass'n v. Wolf*, 977 F.3d 1244, 1258 (D.C. Cir. 2020) (internal quotation marks omitted) (quoting *Hardaway v. D.C. Hous. Auth.*, 843 F.3d 973, 978 (D.C. Cir. 2016)). "Mootness is a jurisdictional question because the Court 'is not empowered to decide moot questions or abstract propositions,'" and a court's inability "to review moot cases derives from the requirement of Article III of the Constitution under which the exercise of judicial power depends upon the existence of a case or controversy." *North Carolina v. Rice*, 404 U.S. 244, 246 (1971) (per curiam) (quoting *United States v. Alaska S.S. Co.*, 253 U.S. 113, 116 (1920), and *Liner v. Jafco, Inc.*, 375 U.S. 301, 306 n.3 (1964)).

Here, the Complaint sets out specific factual allegations in support of the as-applied challenge, stating that "WMATA unreasonably and arbitrarily denied WallBuilders' original ads" and also that "WallBuilders attempted to revise its advertisements in a way that might be acceptable to WMATA" but "[t]hese revised advertisements were also rejected under Guideline 9, with no elaboration as to what failed to satisfy the Guideline." Compl. ¶¶ 93, 96. After the Complaint was filed, and due to the preliminary injunction imposed, WMATA ran the original advertisements that were the subject of the Complaint. *See* Pl.'s SUMF ¶ 57. WallBuilders indicates no intent to run those advertisements again. Indeed, WallBuilders' president attests that

"WallBuilders prepared an additional twelve ads in support of the campaign (beyond the four that it submitted to WMATA)," which are part of "a second advertising campaign," but, "[b]eyond the advertisements already submitted to the Court in this case . . . WallBuilders does not currently have any other ads designed it would consider running with WMATA," and "WallBuilders has not designed or prepared any additional advertisements to submit to WMATA or any other public transit system." Barton Suppl. Decl. ¶¶ 9, 11,13, 17. In short, on this record, WallBuilders has no intent to run the original ad campaign again, with the result that any defects in WMATA's process as applied to WallBuilders' original advertisements appear to have little to no chance of affecting WallBuilders in the future.

To be sure, WallBuilders supplies additional factual allegations related to four other advertisements submitted to, but rejected by, WMATA in July 2024 that depicted quotes about religion attributed to notable Americans (*i.e.*, Dr. Benjamin Rush, President George Washington, William Penn, and President Dwight Eisenhower). *See* Pl.'s SUMF ¶¶ 58-59. WallBuilders has never amended its Complaint to include these subsequent submissions, and "a party may not amend its complaint or broaden its claims through summary judgment briefing." *District of Columbia v. Barrie*, 741 F. Supp. 2d 250, 263-64 (D.D.C. 2010) (CKK). Moreover, assuming *arguendo* that consideration of these four proposed advertisements were procedurally appropriate, WallBuilders would lack standing to support an as-applied claim as to them due to a lack of redressability. "The 'irreducible constitutional minimum' of standing consists of three elements," for which "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)). WMATA rejected WallBuilders' four advertisements of quotes

about religion on application of Guidelines 12 and 14, Barton Suppl. Decl. ¶ 12, with the consequence that, even if WallBuilders received "a favorable judicial decision" on Guidelines 9 and 12, its injury would not "be redressed" because Guideline 14 would still prevent the ads from running, *Spokeo*, 578 U.S. at 338.

In sum, the imposition of the preliminary injunction mooted WallBuilders' as applied claim "in light of the constitutional standard" that a court "cannot order" a party to do something that party "ha[s] already done." *Better Gov't Ass'n v. Dep't of State*, 780 F.2d 86, 91 (D.C. Cir. 1986) ("A consideration of the circumstances of this case in light of the constitutional standard reveals that the appellants' challenge to the standards *as applied to their specific fee waiver requests* is, in fact, moot. Even assuming appellants' claims that they were improperly denied fee waivers were well-founded, we cannot order the appellee departments to do something they have already done, *i.e.* waive the FOIA fees in the instant cases." (emphasis supplied)). "There is, however, no question that [WallBuilders'] other arguments concerning the facial validity of [Guideline 9] . . . are *not* moot." *Id.* The as-applied challenge of the rejected advertisements was one claim in WallBuilders' complaint, but "the additional count[] w[as] directed at the legality of the standards utilized by" WMATA. *Id.*

Accordingly, WMATA is entitled to summary judgment on Wallbuilders' as-applied claim in Count II.

### D. WallBuilders' Facial Challenge to Guideline 9 Fails on Its Merits

WallBuilders' remaining claim is a facial challenge to Guideline 9, which challenge was the principal focus of the briefing. *See, e.g.*, Pl.'s Mem. at 15-49; Def.'s Opp'n at 11-32. In response, WMATA makes no effort to relitigate arguments already rejected in the preliminary injunction decision that Guideline 9, standing alone, is reasonable on its face. *See* Pl.'s Reply at 5 ("WMATA makes no effort to defend Guideline 9 as written, leaving undisturbed this Court's

determination that Guideline 9, standing alone, is not capable of reasoned application."). Instead, WMATA contends that "[a]s supplemented by the Aids, Guideline 9 establishes an objective, workable standard that appropriately cabins WMATA's exercise of discretion in deciding whether to permit ads in the Metro system." Def.'s Opp'n at 18.[8] To ascertain whether the Interpretive Aids remedy the ills identified in the preliminary injunction decision as to Guideline 9, analysis proceeds to consideration of the two prerequisites for a permissible restriction on speech in a nonpublic forum: first, the government must be "pursuing a permissible objective," *Mansky*, 581 U.S. at 13, and second, the government "must draw a reasonable line" and "must be able to articulate some sensible basis for distinguishing what may come in from what must stay out," *id.* at 16.

### 1. *WMATA Is Pursing a Permissible Objective*

The D.C. Circuit has already determined as to Guideline 9 that this "regulation . . . is consistent with the government's legitimate interest in maintaining the property for its dedicated use," which, is "public transportation." *AFDI*, 901 F.3d at 370 (quoting *IRI*, 685 F.3d at 1073). The D.C. Circuit found that prior to the adoption of Guideline 9, "WMATA had been plagued by

[8] WMATA errs by arguing that "WallBuilders' challenge to Guideline 9 is moot because the Aids, issued after WallBuilders filed this suit, add significant detail about the process for reviewing ads and about the scope of the Guidelines, including Guideline 9." Def.'s Opp'n at 2. The D.C. Circuit has long held that "a defendant's voluntary cessation of a challenged practice moots a case only if the defendant shows that: (1) 'there is no reasonable expectation . . . that the alleged violation will recur,' and (2) 'interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.'" *Larsen v. U.S. Navy*, 525 F.3d 1, 4 (D.C. Cir. 2008) (quoting *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)). Both steps, however, presuppose that defendant's cessation remediates the underlying injury. Here, WallBuilders contends that even with the Interpretive Aids, Guideline 9 is still constitutionally defective. Thus, as WallBuilders states, "[n]otwithstanding the adoption of the Interpretive Aids, WallBuilders maintains a concrete interest in the invalidation of Guideline 9," Pl.'s Reply at 25, and "[a]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot," *Zukerman*, 961 F.3d at 442 (quoting *Chafin v. Chafin*, 568 U.S. 165, 172 (2013)). Further, as WallBuilders claims to be "still disadvantaged in the same fundamental way," such that the case is not moot, the D.C. Circuit has determined in analogous circumstances, that analysis as to the merits of the case can proceed even though WallBuilders "did not amend its complaint." *AFDI*, 901 F.3d at 361-62. To be clear, the conclusion that Wallbuilders' facial challenge to Guideline 9 is not moot is a separate question from, and not indicative of the strength of WallBuilders' arguments on, the merits of this claim.

problems stemming from issue-oriented advertisements" such as "complaints from riders, community leaders, and employees; and vandalism, security threats, and the increased administrative burden of evaluating arguably obscene or otherwise unacceptable advertisements." *Id.* at 371. Thus, "[i]n the face of all this, WMATA concluded the game was not worth the candle; better to lose some advertising revenue and avoid having to deal with the controversies they create." *Id.* The D.C. Circuit found adoption of Guideline 9 to be "eminently reasonable" because "it might have cut into WMATA's revenues, but it necessarily avoided the complaints, the vandalism, and the security threats that WMATA's open advertising policy had engendered." *Id.*; *see also Cmty. for Creative Non-Violence v. Turner*, 893 F.2d 1387, 1393 (D.C. Cir. 1990) ("WMATA is charged with providing safe and efficient transportation for almost 500,000 passengers daily and must be able to ensure that these passengers are able to reach its stations with as little risk as possible. WMATA must be able to regulate to some extent the expressive activities that occur in and around its stations.").

Here, a declarant for WMATA, a Senior Vice President, who oversaw the almost six-month moratorium of issue-based advertisements in 2015 that ended with issuance of Guideline 9, provided further explanation as to what animated WMATA to adopt the guideline. *See* Bowersox Decl. The Senior Vice President explained that "the issue-oriented ads sparked concerns about security" and that "the Metro Transit Police Department and the U.S. Department of Homeland Security feared that certain ads would, due to external world events, incite individuals to violence on the system and harm WMATA employees and customers." *Id.* ¶ 11. To illustrate the potential risk of violence, he cites "a proposed ad featuring a cartoon depiction of the Prophet Mohammad [that] raised concerns because some Muslims consider drawing the Prophet Mohammad so offensive that they have reacted violently to such depictions in the past" and that "WMATA was

aware that two gunmen were killed after they attempted to attack the building in Texas where the contest that eventually produced this proposed ad was being held." *Id.* Additionally, "WMATA staff conducted a survey of the public's views on issue-oriented ads" which found "that: (1) 98% of the public was familiar with the ads found on buses, in trains, and in stations; (2) 58% opposed issue-oriented ads while 41% supported such ads; and (3) 46% were extremely opposed compared to 20% that were extremely supportive of issue-oriented ads." *Id.* ¶ 14.

WallBuilders discounts the reference to violence in Texas as "a red herring," citing the D.C. Circuit's observation in *AFDI* "that 'neither the violence in Texas nor AFDI itself was ever mentioned at the [WMATA] Board meeting and therefore seems irrelevant to the Board's decision adopting the Moratorium' on issue ads." Pl.'s Reply at 22-23 (alteration in original) (quoting *AFDI*, 901 F.3d at 367). WallBuilders adds that WMATA's designee "when asked whether WMATA has ever received any complaints about issue ads that prompted violence or vandalism," responded "that she was 'not aware of anything leading to violence or vandalism from complaints [WMATA has received].'" *Id.* at 23 (alteration in original) (quoting Def.'s 30(b)(6) Dep. at 420:22-421:2).

The fact that actual violence and vandalism has not been sourced to controversial issue-oriented advertisements on the Metro system does not undercut the fact that WMATA had concerns about the risks of such consequences or the fact that such advertisements prompted complaints by users of the system. Bowersox Decl. ¶¶ 5, 10, 12; Def.'s 30(b)(6) Dep. at 295:13-20. These facts animated the enactment of Guideline 9, Bowersox Decl. ¶¶ 9, 15-16; Def.'s 30(b)(6) Dep. at 295:13-20, and provide the factual predicate for the D.C. Circuit's conclusion that Guideline 9's regulation of issue-oriented advertisements is designed to protect the government's legitimate interest in maintaining the property for its dedicated use of public transportation by

reducing the "complaints from riders, community leaders, and employees; and vandalism, security threats, and the increased administrative burden of evaluating arguably obscene or otherwise unacceptable advertisements." *AFDI*, 901 F.3d at 371. Thus, the reasonableness of Guideline 9 will be assessed against these legitimate government ends.

### 2. *The Interpretive Aids Render Guideline 9 Reasonable*

This Court's preliminary injunction decision found a likelihood that Guideline 9 was constitutionally unreasonable due, in part, to the fact that "WMATA offer[ed] no definitions and no guidance on how to define an '[a]dvertisement intended to influence members of the public regarding an issue on which there are varying opinions,' and no instruction on how to apply the Guideline, including whether related content, such as information on websites referenced in the ad, should be considered." *Wallbuilder*, 2024 WL 2299581, at *13 (citation omitted). WMATA designed the Interpretive Aids to remedy these shortcomings, and as explained by WMATA, "[t]he Aids offer detailed guidance, instructions, and definitions for how to interpret and apply Guideline 9, establish the composition of WMATA's Advertisement Review Panel, the process for ad submissions, the procedure for the panel's review of ads, including website review, and specific guidance for determining whether an ad violates the Guidelines, including a section dedicated to the interpretation and application of Guideline 9." Joint Status Rep. at 4, ECF No. 60.

WallBuilders contends that the Interpretive Aids do not "rescu[e] Guideline 9 from constitutional demise" for two reasons: first, the Aids "are not an 'authoritative construction' of the Guideline that a court should consider under *Mansky*," and, "[s]econd, even if they were, they only exacerbate the constitutional shortcomings of Guideline 9." Pl.'s Mem. at 18 (quoting *Mansky*, 585 U.S. at 17-18). Neither contention is persuasive, and analysis of the Interpretive Aids demonstrates that they operate to make Guideline 9 pass constitutional muster in the nonpublic forum at issue.

**a. *The Interpretive Aids Are Authoritative Constructions***

When considering challenged restrictions on speech in a nonpublic forum, the Supreme Court instructs that courts may consider "authoritative constructions." *Mansky*, 585 U.S. at 17-18 ("We consider a State's 'authoritative constructions' in interpreting a state law." (quoting *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 131 (1992))); *see also Forsyth*, 505 U.S. at 131 ("In evaluating respondent's facial challenge, we must consider the county's authoritative constructions of the ordinance, including its own implementation and interpretation of it."). WMATA offers its Interpretive Aids as "an authoritative construction of the Guidelines," Def.'s Opp'n at 18, but WallBuilders contests this treatment of the Aids because "[t]hey were not adopted pursuant to any formal WMATA process" and, consequently, are not "binding on WMATA or Outfront," and "are subject to change at any time," Pl.'s Mem. at 18. Contrary to WallBuilders' position, the fact that the Interpretive Aids were crafted by legal counsel and not formally adopted in an action by the WMATA Board and are subject to "change" and further refinement as needs arise, simply does not mean that the Aids cannot be treated as an authoritative construction of Guideline 9.

First, WallBuilders critiques the process leading to the creation of the Interpretive Aids, stating that "[t]hey were not adopted pursuant to any formal WMATA process," "were not reviewed by WMATA's Board of Governors," and "were wholly the creation of WMATA's legal counsel in response to this and other litigation." *Id.* at 18-19; *see* Pl.'s Reply at 6 (discounting the Interpretive Aids as "a lawyer-contrived document, created with this litigation in mind in an attempt to formalize WMATA's litigation position into something more worthy of judicial respect."). WMATA's Director of Marketing explains, however, that "WMATA's Board of Directors is responsible for establishing some WMATA polices," but "not all WMATA policies

require Board approval." 4th Nicol Decl. ¶ 10. WMATA is also correct that WallBuilders "cites zero authority for its assertion that the Aids are not authoritative because they were developed by lawyers." Def.'s Reply at 4 (citing Pl.'s Reply at 6). Indeed, in *Mansky*, the Supreme Court considered Minnesota's "Election Day Policy," which was created "[i]n response to the lawsuit" and designed to "provid[e] guidance on the enforcement of the political apparel ban," 585 at 9, without any indication that the policy should be disregarded merely because the crafting of the policy was not by the same entity responsible for the challenged statute but by the entity responsible for enforcement. In other words, WallBuilders has not shown why the fact that the Interpretive Aids were never adopted by the Board of Directors, as were the Guidelines themselves, is sufficient to negate their status as an authoritative construction of how the Guidelines will be applied or enforced.

Related to the lack of Board approval, WallBuilders contends that the Interpretive Aids "were not promulgated pursuant to any legal authority that would make them binding on WMATA or Outfront." Pl.'s Mem. at 18. The Interpretive Aids themselves, however, profess to "help WMATA's advertising review panel [] apply the Guidelines to all advertisements submitted for review by its third-party advertising vendor." Interpretive Aids (Preamble). Additionally, WMATA's designee attests that, in review of "[e]very ad that was submitted after November 1, 2024, the interpretive aids were used to assist in making a decision," Def.'s 30(b)(6) Dep. at 301:12-14, and WMATA's Director of Marketing reports that "[s]ince the adoption of the Aids, at least 100,000 ads have run on WMATA advertising spaces," 4th Nicol Decl. ¶ 5. These Interpretive Aids therefore represent WMATA's "own implementation and interpretation" of the Guidelines. *Forsyth*, 505 U.S. at 131.

Finally, WallBuilders points out that the Interpretive Aids are "subject to change at any time 'without notice.'" Pl.'s Mem. at 18 (quoting Pl.'s SUMF ¶ 61); *see* Interpretive Aids (Preamble: "WMATA reserves the right to revise or amend the internal procedures and interpretive aids without notice."). WallBuilders' Director of Marketing attests, however, that "WMATA does not intend to cease the use of the [Interpretive] Aids in the application and interpretation of the Guidelines . . . though it may make adjustments to the Aids as needed." 4th Nicol Decl. ¶ 8. That these Interpretive Aids have been in place for almost two years and used regularly, without any indication of having been altered, demonstrates that they are sufficiently durable to be considered an authoritative construction of the Guidelines.

Accordingly, the Interpretive Aids represent an authoritative construction as to the meaning of Guideline 9.

**b. *The Interpretive Aids Clarify Guideline 9***

Having established that the Interpretive Aids are an authoritative construction that may and should be considered when analyzing WallBuilders' challenge, WMATA posits that its "Aids provide the clarity needed to bring Guideline 9 into conformity with the First Amendment's requirements for speech restrictions in a nonpublic forum." Def.'s Reply at 4. WallBuilders believes otherwise, stating its view that the Interpretive Aids "only exacerbate the constitutional shortcomings of Guideline 9." Pl.'s Mem. at 18. WMATA has the better argument and has demonstrated that Guideline 9 is facially reasonable when considered alongside the Interpretive Aids.

In assessing the constitutional reasonableness of Guideline 9, recall that "the reasonableness of WMATA's policy limiting access to its nonpublic forum . . . 'must be assessed in the light of the purpose of the forum and all the surrounding circumstances.'" *AFDI*, 901 F.3d

at 370 (quoting *Cornelius*, 473 U.S. at 809); *see also Ateba v. Leavitt*, 133 F.4th 114, 123 (D.C. Cir. 2025) ("The Supreme Court gives the government substantial leeway to regulate access to a nonpublic forum and has upheld a range of restrictions that were justified in light of the forum's purpose."). This reasonableness test is not particularly stringent, and "[r]easonableness may be established by evidence in the record or even by a commonsense inference." *Ateba*, 133 F.4th at 123 (quoting *Price*, 45 F.4th at 1072). Indeed, the D.C. Circuit has stressed that "[t]he Government's decision to restrict access to a nonpublic forum need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation." *AFDI*, 901 F.3d at 370 (emphasis in original) (quoting *Cornelius*, 473 U.S. at 808). The D.C. Circuit has articulated the reasonableness test to be applied to Guideline 9, as follows: "the inquiry that *Mansky* seems to call for—whether the discretion vested in a government official to permit or prohibit speech is 'guided by objective, workable standards'"—requires a "determin[ation] whether Guideline 9 is so broad as to provide WMATA with no meaningful constraint upon its exercise of the power to squelch." *AFDI*, 901 F.3d at 372 (quoting *Mansky*, 585 U.S. at 21). "If so, then it is not 'reasonable,' as that term is used in *Mansky*, and not constitutional because it provides WMATA with unbridled discretion." *Id.* Conversely, "if Guideline 9 is capable of reasoned application, as *Mansky* demands, then it does not confer unbridled discretion upon WMATA." *Id.*

Although Guideline 9, on its face, falls short of meeting the requisite reasonableness standard, the Interpretive Aids address the concerns previously identified in the preliminary injunction decision, which found that "nothing in Guideline 9's text answers basic questions about its reach, and the 'indeterminate scope' of Guideline 9 is not 'clarif[ied]' or 'saved' by any official guidance." *Wallbuilder*, 2024 WL 2299581, at *13 (alteration in original) (quoting *Mansky*, 585 U.S. at 18); *see also id.* ("WMATA offers no definitions and no guidance on how to define an

'[a]dvertisement intended to influence members of the public regarding an issue on which there are varying opinions,' and no instruction on how to apply the Guideline, including whether related content, such as information on websites referenced in the ad, should be considered."). The Interpretive Aids now provide instructions for the process of applying Guideline 9, accompanied by explanations, a definition, and illustrations for key terms and phrases used in this guideline, and also adequately explains the disparate treatment between commercial and non-commercial barred-purposes advertising, which helps WMATA to overcome WallBuilders' arguments regarding inconsistent treatment of advertisements.

To be more precise, the "Interpretive aids for Guideline 9," in subsection IV.G. of the Interpretive Aids, consists of two guidance statements with instructions on identifying the intent of a proposed advertisement and providing a definition for "issue," *see* Interpretive Aids § IV. G.1-2, followed by a list of sixteen "types of advertisements" prohibited under this Guideline and five types of permitted advertisements, which taken together provide additional guidance on the bounds of an "issue on which there are varying opinions," *see id.* § IV.G.3-8. In sum, a total of 23 separate interpretation aid statements regarding Guideline 9 alone are provided in the Interpretive Aids, and each informs application of this guideline. *See Doe I v. Exxon Mobil Corp.*, No. 01-cv-1357 (RCL), 2021 WL 1910892, at *4 (D.D.C. May 12, 2021) ("[T]he whole-text canon directs courts to look to the entire text of a document in construing the meaning of one of its parts."). Despite the vigor in WallBuilders' challenge to the Interpretive Aids specific to application of Guideline 9, some added perspective is helpful in noting that the critiques are leveled at only one of the two guidance statements, eight of the sixteen types of prohibited advertisements, and four of the five permitted categories of advertisements. *See* Pl.'s Mem. 15-49 (addressing §§ IV.G.2, .3.d, .g, .j, .l-p, .4-7). This leaves roughly half of the "Interpretive aids for Guideline 9" unchallenged as

reasonable restrictions on speech. WallBuilders' peccadillos about some of the interpretive aid statements as creating ambiguity by and large miss the bigger picture, as confirmed by an analysis of each part of these interpretive aids and the purported inconsistencies in application identified by WallBuilders.

First, at the start, the "Interpretive aids for Guideline 9," recites the text of Guideline 9, that "[a]dvertisements intended to influence members of the public regarding an issue on which there are varying opinions are prohibited." Interpretive Aids § IV.G. The Guideline 9 prohibition is focused on an ad's "intended" promotion of a message to influence the public on a controversial topic, as opposed to promotion of commercial interests in the sale of products or services, and this focus is reflected in Guideline 9's reference to "[a]dvertisements intended to influence" the public regarding a divisive issue. Tellingly then, discerning this "intent" is the first step that the review Panel is directed to determine when reviewing an advertisement and "relevant websites." *Id.* § IV.G.1. To this end, the first aid statement in subsection IV.G., instructs the review Panel to "determine[]" intent from "the face of the advertisement and review of any relevant websites in accordance with section III." *id.* § IV.G.1. This referenced "section III" of the Interpretive Aids, in turn, instructs that "[i]f any advertisement submitted to the Panel contains a link to a website, a QR code, or a reference to a website (for example, but not limited to, 'check out our website for more information'), the Panel shall access the website and endeavour to review," specific listed pages on the website. *Id.* § III.B.

The intent, or purpose, of the advertisement is important under Guideline 9 and directly related to the legitimate interest of WMATA to reduce "complaints" from users of and others about of Metro system, and concomitant burdens. *AFDI*, 901 F.3d at 371. Thus, the Interpretive Aids distinguish controversial issue-oriented advertisements from those with "a commercial purpose."

*See, e.g.*, § IV.G.3.p. Much of WallBuilders' briefing blurs the line between advertisements with a commercial purpose and controversial issue-oriented advertisements. *See, e.g.*, Pl.'s Reply at 10 ("But advertisements that sell goods or services (which is a 'commercial' purpose) may, as Interpretive Aids § IV.B suggests, 'also' address issues on which public opinion is divided."). The D.C. Circuit, however, has readily accepted the permissibility of limiting non-commercial speech while permitting commercial advertisements that also include reference to an issue that may have religious associations or similarly provoke varying public opinion, observing that "ads promoting Christmastime sales are not expressing a view on Christmas any more than a McDonald's ad expresses a view on the desirability of eating beef that demands the acceptance of a contrary ad from an animal rights group, or than a Smithsonian Air and Space Museum ad for a special stargazing event expresses a view on the provenance of the cosmos that demands a spiritual response." *Archdiocese*, 897 F.3d at 329. In short, "[c]ommercial advertisements are designed to sell products." *Id.* Indeed, "[w]ere a court to treat such commercial advertising as expressing a broader view, it would, furthermore, eviscerate the distinction between viewpoint-based and subject-based regulation on which the forum doctrine rests, and the longstanding recognition that the government may limit a non-public forum to commercial advertising." *Id.*; *see id.* at 337 (Wilkins, J., concurring) ("[T]he distinction between subject matter and viewpoint is critical to forum doctrine's balance of the practical need to regulate private speech on nonpublic property, on one hand, with maximizing opportunities for speech and vigilance against unbridled administrative discretion, on the other."). This means that, for the Interpretive Aids to be found constitutionally permissible, they must provide guidance that establishes a reasonable restriction against controversial issue-oriented advertising, in furtherance of WMATA's legitimate purpose of avoiding complaints and related harms, even though commercial advertising as well as

references to bland, non-controversial issues continues to be permitted. *See id.* at 337 (Wilkins, J., concurring) ("[B]y requiring government to set prospective, categorical, subject-matter rules by which to evaluate private speech, forum doctrine provided public notice of what speech is permissible and constrains the discretion of government actors to pick favorites on an *ad hoc* basis.").

Next, the second statement in subsection IV.G., provides a scope-clarifying description and definition for the key phrase in Guideline 9, "an issue on which there are varying opinions," explaining this "does not mean any topic on which people might disagree," and instead "an 'issue' for purposes of Guideline 9 is 'a point, matter, or dispute, the decision of which is of special or public importance.'" Interpretive Aids § IV.G.2 (citation omitted). This second statement goes on to explain further that, "[f]or example, an advertisement for a sports team does not involve an 'issue on which there are varying opinions' merely because some people support other teams." *Id.* Instead, the Interpretive Aid elaborates that the scope of Guideline 9's prohibition applies to "[a]dvertisements that . . . generally promote a message to the public about substantive ethically, socially, or politically controversial or divisive topics, as illustrated in this section," *id.*, followed by a listing of sixteen types of prohibited advertisements and five types of permitted advertisements, *see id.* § IV.G.3-8.

WallBuilders basically ignores the "intended to influence" language in Guideline 9 to focus on the word "issue" and its use in the phrase "issue on which there are varying opinions," as support for its argument that the Interpretive Aids are insufficient to render Guideline 9 constitutionally reasonable because "this new definition does nothing to limit Guideline 9's capacious reach." Pl.'s Mem. at 20. Advancing this argument, WallBuilders objects to the interpretive aids' use of the phrase "'substantive ethically, socially or politically controversial or

divisive topics'" because this "introduces a raft of additional undefined terms." *Id.* at 22 (quoting Interpretive Aids § IV.G.2). No doubt these "additional undefined terms" are capable of broad construction, with the added complication that the topics qualifying as "substantive . . . controversial or divisive" may even change over time. Yet, recursively defining every term used as part of Guideline 9 is not required under the reasonability standard, particularly when the Aids do not stop there but go on to provide additional guidance, in the form of examples of types of advertisement falling within the prohibition or outside the operative Guideline 9 phrase "an issue on which there are varying opinions."

For the same reason, WallBuilders' argument criticizing the phrase "special or public importance" used in the definition of "issue" for not answering the question of "to whom must it be of special importance," *id.* at 20, fails. In WallBuilders' view, "[a]bsent clearer and more definitive lines, WMATA's review necessarily devolves into a subjective inquiry by the review panel of how 'hot' an issue is, based on the panel member's own varying 'background knowledge and media consumption' and understanding of the myriad controversies that have 'some sort of importance' to the American public." *Id.* 21 (quoting *Mansky*, 585 U.S. at 20-21). This critique boils down to a complaint that application of Guideline 9 may require judgment calls by the review Panel, and that is no critique at all. The fact that Outfront or the review Panel's judgment call on whether a particular ad is permitted or not under Guideline 9 may, on occasion, itself be subject to reasonable differences of opinion, does not render the entire enterprise unreasonable and unconstitutional. As WMATA points out, "[t]he hyper-precision WallBuilders suggests a guideline must have is unsupported by *Mansky*" because in a nonpublic forum "'perfect clarity and precise guidance' are not required, nor is narrow tailoring necessary." Def.'s Opp'n at 25 (quoting *Mansky*, 585 U.S. at 21). Indeed, the twenty-one listed examples WMATA compiles

illustrate "some sensible basis for distinguishing what may come in from what must stay out." *Mansky*, 585 U.S. at 16.

Third, as to the illustrative list of the "types of advertisement" prohibited by Guideline 9, as already noted, about half are not disputed by WallBuilders as providing clear guidance, such as prohibiting advertisements "[s]upporting, opposing or promoting a political party," "any person holding any government position or any candidate for such a position," "a ballot measure or proposed measure," "a constitutional amendment or amendments or a proposed constitutional amendment or amendments," or "a governmental investigation or proposed government investigation." Interpretive Aids § IV.G.3. a.-c, e-f. These limitations help to cabin the reach of the undefined phrases WallBuilders highlights.

Nonetheless, WallBuilders is dissatisfied with certain examples of "types" of issues that are prohibited and permissible, contending that "these examples and their many exclusions only compound the uncertainty and imprecision of Guideline 9." Pl.'s Mem. at 24. At the outset, WallBuilders' approach of making piecemeal arguments alleging ambiguities and uncertainties underlying words employed in the twenty-one listed examples belies the Supreme Court's instruction that the reasonableness of a government restriction on speech in a nonpublic forum is to "be assessed in the light of . . . all surrounding circumstances." *Cornelius*, 473 U.S. at 809. For instance, WallBuilders critiques the prohibition contained in Interpretive Aid § IV.G.3.p, which forbids advertisements "[s]upporting, opposing, or promoting an ethical, social, or humanitarian cause, mission, call to action, awareness campaign, position statement, or other similar effort unless solely for a commercial purpose," *see* Pl.'s Mem. at 24-27, as "invit[ing] further inconsistency in Guideline 9's application" by not supplying "any further definitions of 'ethical, social or humanitarian' or any of those other terms," *id.* at 24. Again, however, the reasonability

inquiry does not require hyper-specificity, and courts are only tasked with determining "whether Guideline 9 is so broad as to provide WMATA with no meaningful constraint upon its exercise of the power to squelch." *AFDI*, 901 F.3d at 372. Even though WallBuilders is capable of contriving hypothetical scenarios that might test the outer bounds of this interpretive aid, the plain meaning of the words and their surrounding context is sufficient to describe a limitation of Guideline 9 and inform its application.

Fourth, the Interpretive Aids remedy another critical issue identified in the preliminary injunction decision that "[w]hile Guideline 9 is apparently not intended to prohibit [] commercial ads, defendant offers no textual hook for this commercial/non-commercial distinction, and even if such distinction existed, the text simply leaves unclear and undefined when an 'issue' would cross the line to fall under the prohibition." *Wallbuilder*, 2024 WL 2299581, at *12 (citation omitted). As to this shortcoming, the Interpretive Aids clarify that "Guideline 9 does not prohibit advertisements that encourage or promote the purchase or use of goods or services because others may be opposed to their purchase or use, so long as the advertisement does not otherwise violate the Guidelines." Interpretive Aids § IV.G.6. As WMATA explains, the plain language of this provision means that "the mere opposition by some people to goods or services promoted in an ad does not bring it within Guideline 9's reach so long as the ad does not incorporate something that triggers a guideline." Def.'s Opp'n at 26. In a similar vein, the Interpretive Aids supply general substantive guidance that "[a]n advertisement that otherwise violates the Guidelines is prohibited even if it also encourages or promotes the purchase or use of goods or services." Interpretive Aids § IV.B. WallBuilders seizes on these provisions to argue that the Aids "both explicitly *prohibit* ads promoting a business's policies other than encouraging the sale of goods or services and explicitly *permit* express issue advocacy when offered 'solely for a commercial purpose.'" Pl.'s

Mem. at 27 (emphasis in original and citations omitted). This is a made-up contradiction, however, because "[t]he Aids clarify that ads with a commercial purpose fall outside of Guideline 9 by describing types of ads that have a commercial purpose and types of ads that have another purpose." Def.'s Opp'n at 25; *see also* Def.'s Reply at 6-7 ("The Aids make clear that if an ad's purpose is commercial and it has no other purpose that violates the Guidelines, it is not encompassed by Guideline 9. . . . The plain text clearly conveys that any ad with a purpose that conflicts with the Guidelines will be prohibited regardless of whether there is also a commercial purpose.").

Additionally, contrary to WallBuilders' claims that WMATA "offers no guidance for how it makes" a determination between classifying the purpose of advertisements as commercial or non-commercial, *see* Pl.'s Reply at 10, the Interpretive Aids provide a process to see if a submitted advertisement "complies with or violates the Guidelines" including "the face of the advertisement" and further review of any referenced website "that purports to provide background information on the content, meaning, and/or purpose of the advertisement, which may include pages that describe the advertiser and their self-stated mission and/or purpose," *see* Interpretive Aids § III.B.3.

WallBuilders raises a series of other challenges about alleged unreasonableness within specific portions of the Interpretive Aids for Guideline 9, taking issue, for instance, with the guidance that "allows employment ads notwithstanding the controversial issues that an employer's 'mission, policies, practices or tactics' may raise." Pl.'s Mem. at 28 (citing Interpretive Aids § IV.G.5). Likewise, WallBuilders criticizes "the Interpretive Aids' many unexplained exceptions to and exclusions from Guideline 9's issue ad ban," by "categorically exclud[ing] from the ban certain ads that may otherwise address controversial issues—such as ads that sell books and theater tickets for performance that promote particular issues"—"without any apparent justification." *Id.*

at 31-32 (citing Interpretive Aids § IV.G.4). WallBuilders' warns that "the exception[s] would seem to swallow the rule," *id.* at 53, but in fact, these challenges are essentially a critique of the commercial/non-commercial distinction drawn by WMATA. As already noted, the fact that close judgment calls may be required on occasion does not mean the Interpretive Aids and Guideline 9 are unworkable or standardless, particularly when WMATA could protect its legitimate interest in maintaining the Metro system for its dedicated use of public transportation by reverting to "clos[ing] the space to all" issue-oriented advertisements, as it did in 2015 with a moratorium, a decision the D.C. Circuit found "eminently reasonable." *AFDI*, 901 F.3d at 371; *see also Archdiocese*, 897 F. 3d at 337 (Wilkins, J., concurring) ("Without reasonable control over the content of private speech in nonpublic forums, government may elect to close a forum entirely rather than deal with the administrative burden or floodgate consequences of accepting private speech without effective subject-matter restrictions."). Indeed, WMATA could have just prohibited all advertisements or all issue-oriented advertisements. That WMATA, after months of study, decided to allow some speech by drawing a line between commercial and non-commercial controversial-issue advertisements, a line now embedded in Guideline 9 and the Interpretive Aids, is a reasonable decision even if, as WallBuilders contends, advertisers may occasionally and conceivably circumvent Guideline 9's limitations by combining in a single advertisement some clear commercial purpose with additional information about the advertiser that could be perceived as advocacy on a controversial issue.

Lastly, WallBuilders points to purported "examples of WMATA's inconsistent application of Guideline 9," Pl.'s Mem. at 39, with critiques of advertisements that were submitted both before and after adoption of the Interpretive Aids in November 2024, *see id.* 33-49. The most relevant advertisements in assessing the application of Guideline 9 are those reviewed under the guidance

of the Interpretive Aids. For instance, WallBuilders highlights WMATA's decision to run, in June 2025, a Penguin Books advertisement with the text "Read Queer All Year," Pl.'s Mem. at 40; Pl.'s SUMF ¶ 134, but this decision is consistent with the guidance statement in the Interpretive Aids that "Guideline 9 does not prohibit advertisements for a . . . publication, TV program, [or] film . . . solely because the medium's content addresses political issues or contains political messages, so long as the advertisement does not otherwise violate the Guidelines," Interpretive Aids § IV.G.4. Similarly, the advertisements run in August 2025 for the documentary film *Shuffle*, a movie concerning the addiction treatment field, *see* Pl.'s Mem. at 41; Pl.'s SUMF ¶ 142, fall under the same guidance statement. WallBuilders' argument that disparate treatment for advertisements run in December 2024 related to the documentary film about Israeli Prime Minister Benjamin Netanyahu called *The Bibi Files* also falls short as the version with a "film credit block," reflecting an intent to publicize a film in the advertisement, was approved, and the version, without any reference to a film, that appeared to just be an issue-oriented advertisement about a divisive figure was denied. *See* Pl.'s Mem. at 39 & n.14.

Other advertisements selected by WallBuilders include those run in the summer of 2025 by defense contractors bearing slogans like "Rebuild the Arsenal," *see id.* at 44; Pl.'s SUMF ¶ 136, but those are permitted as the prohibition against "[s]upporting, opposing, or promoting a governmental action or inaction" does not apply to those advertisements "offering goods and/or services to the government," Interpretive Aids § IV.G.3.g. Indeed, many of the advertisements that WallBuilders highlights are commercial with clear and explicit promotion of the sale of goods and services. *See, e.g.*, Pl.'s SUMF ¶ 89 (Plan B contraception ad), ¶ 90 (different Plan B contraception ads), ¶ 98 (D.C. Public Health Covid Vaccination Ad), ¶ 103 (Planned Parenthood ad), ¶ 110 ("Do It For You" HIV medication ad), ¶ 124 (*The Bibi Files* Documentary Film ad),

¶ 129 ("American Energy Dominance" ad), ¶ 130 (U.S. Customs and Border Protection recruitment ad), ¶ 131 (different U.S. Customs and Border Protection recruitment ad), ¶ 134 ("Read Queer All Year" book ad), ¶ 136 ("Rebuild the Arsenal" military-contractor ad), ¶ 138 ("Command the Sea, Command the World" military-contractor ad), ¶ 142 (*Shuffle* Documentary Film ad), ¶ 146 (Institute for Justice employment ad), ¶ 148 (Carafem Abortion Clinic ad).

More problematic examples are also presented. WallBuilders contends, for example, that WMATA's rejection of advertisements in November 2024 by TikTok "Honoring Veterans" shows "inconsistencies" in WMATA's process, because more generic Veterans Day ads were accepted. *See* Pl.'s Mem. at 48 (citing Pl.'s SUMF ¶ 122). WMATA's brief response states only that those ads "were rejected for violating Guidelines 9 and 14," the latter of which prohibits ads intended to influence public policy, "as each bore the logo of an advocacy organization" and the TikTok logo, Def.'s Opp'n at 31, together with a promotional statement of support for the advocacy organization from TikTok. While WallBuilders does not respond to this explanation, *see* Pl.'s Reply (making no reference to the TikTok Veterans Day advertisements), the reason for rejection appears due to the promotion of an advocacy organization, even though these ads could be viewed as soliciting donations to those organizations rather than advocating for a change in public policy. Indeed, WMATA's Director of Marketing testified that whether these advertisements violated Guideline 9 was not apparent from their face but that "research [about] the various organizations at the bottom of each of these ads" was necessary to determine whether the ads were permissible. Pl.'s Mot., Att. 3, Dep. of WMATA's Dir. of Mktg., Georgetta Nicol at 187:20-22, ECF No. 61-3. The rejections of these ads would be a close call.

Likewise, WallBuilders contends that WMATA acted inconsistently in December 2024 by rejecting proposed advertisements, one of which appears to show a person who is dressing in drag,

by "the World Pride Organization, promoting Pride Month and the World Pride event," while approving WMATA's own ad to "Put the Ride in Pride" on the Metro system. Pl.'s Mem. at 47-48 (citing Pl.'s SUMF ¶¶ 127, 133). WMATA explains that the World Pride Organization advertisements are "prohibited by Guideline 9" as an ad "[d]escribing or promoting a view of the role that any particular group . . . including groups characterized by their . . . sexual orientation . . . has played or should play in any government, society, or country." Def.'s Opp'n at 31 (quoting Interpretive Aids § IV.G.3.i). This explanation seems a stretch, but WallBuilders, again, does not respond to it. *See* Pl.'s Reply at 21. Notwithstanding the contrast between the World Pride Organization ad and the WMATA ad, which promotes its own services with the slogan "We Put the Ride in Pride," Pl.'s SUMF ¶133, on a backdrop of simple graphics, without any photographs or other advocacy for a particular group, this would seem to be another close call.

In other advertisements WMATA promotes its own services. *See id.* ¶ 133 ("We Put the Ride in Pride" ad in June 2025); *see also* ¶ 93 ("Car Free Day" ad in 2023). WallBuilders draws attention to two advertisements that were accepted focusing on vaccinations against the coronavirus, *see* Pl.'s Mem. at 48-49 (citing Pl.'s SUMF ¶ 98 (DC Health Covid vaccine ad), ¶ 128 ("Black Coalition against Covid-19" ad)), but WMATA persuasively argues that its "decision to use its ad space to promote its legitimate interest in commuters using its service and to promote its legitimate public health interest in adherence to CDC guidance is reasonable," Def.'s Opp'n at 31. Similarly, WallBuilders describes WMATA's decision to run an ad "imploring the public to 'Be Climate Smart'" as permitting the "advertising space to promote messages about a wide variety of fairly debatable issues," Pl.'s Mem. at 49 (citing Pl.'s SUMF ¶ 144), but WMATA points out that the purpose of the "Be Climate Smart" advertisement "for Montgomery County, MD" was "sharing resources and information from a government agency to the residents it serves," 4th Nicol

Decl. ¶ 14. Common sense informs that a prohibition against some issue-oriented advertisements that might be viewed as divisive around the fringes would not preclude a county government from advertising government resources available to its residents.

WallBuilders provides examples of some advertisements run before November 2024 on topics that are likely to be seen again, Pl.'s Mem. at 47-48, but these merely commemorate holidays recognized publicly by federal, State or local governments and do not implicate Guideline 9 at all as such holidays are not about controversial or divisive topics, given the government or local community imprimatur. *See* Pl.'s SUMF ¶ 88 (Earth Day ad in 2023), ¶ 121 (Veterans Day ad in October 2024), ¶ 152 (Rosa Parks Day ads, undated).[9]

To help establish "WMATA's inconsistent approach to website review," WallBuilders further cites two advertisements submitted by Free the Facts, *see* Pl.'s Mem. at 29 n.11, which organization "is 'a nonpartisan, non-profit organization that empowers young Americans to learn and to lead,'" Pl.'s SUMF ¶ 113 (citation omitted). The first advertisement containing the promise "Accelerate your career with freefacts.org," was submitted in May 2024 and rejected, *id.* ¶ 112, but after the adoption of the Interpretive Aids, in September 2025, a similar advertisement was running on WMATA's metrobuses, *see id.* ¶ 114. If anything, these differing outcomes reveal that the Interpretive Aids have created more consistent application of Guideline 9 because the provision

[9] WallBuilders also points to a handful of additional advertisements that, in its view, do not appear to conform with Guideline 9 by referring to a controversial issue, but all of these ads were run on WMATA's Metro system prior to the promulgation of the Interpretive Aids and, consequently, are of little to no help in assessing the reasonableness and consistency of the application of Guideline 9 with the Aids, which were promulgated in November 2024. *See* Pl.'s SUMF ¶ 94 (Stop Housing Discrimination ad in 2023), ¶ 95 (Hospital Price Transparency ad in 2023), ¶ 97 (Hospital Price Transparency ad in 2023), ¶ 111 (AARP DC Voter Guide in April 2024), ¶ 115 ("Bringing Communities of Support to Students" ad in May 2024), ¶ 118 (Fair Housing Act awareness ad in July 2024); *cf. id.* ¶ 96 (rejected Hospital Price Transparency ad from 2023), ¶ 99 (rejected Blue Cross Blue Shield fair hospital prices ad from 2023), ¶ 100 (rejected Veganuary "Try Vegan This January" ad from 2023), ¶ 107 (rejected Planned Parenthood ad from February 2024), ¶ 119 (rejected "Honoring Our Past By Voting for Our Future" ad in October 2024), ¶ 120 (rejected Arnold Ventures ad from October 2024), ¶ 153 (rejected advertisement for Milo Yiannopoulos's book in June 2017).

of nonpartisan information to young Americans does not amount to "[s]upporting, opposing, or promoting a law, ordinance, regulation or policy," Interpretive Aids § IV.G.3.d, and this ad is not prohibited under Guideline 9.

In short, a close review of the more than 2000-pages of voluminous materials submitted by both sides in connection with the pending motions does not reveal any advertisements that WMATA, since the adoption of the Interpretive Aids, ran in obvious contravention of Guideline 9, despite some close calls. Even if WallBuilders had been able to make such a showing, because WMATA has run more than 100,000 advertisements since the Aids were adopted, WallBuilders would have to show more than a handful of verboten ads were run or permissible ads were rejected to prove that the Interpretive Aids are incapable of reasoned application.

Accordingly, the Interpretive Aids render Guideline 9 constitutionally reasonable.

## IV. CONCLUSION

For the foregoing reasons, WallBuilders' as-applied challenge to Guideline 9 is moot, WMATA has established that Guideline 9 is facially reasonable, and any argument challenging the constitutionality of Guideline 12 remains foreclosed by D.C. Circuit precedent. Accordingly, WallBuilders' Motion for Summary Judgment, ECF No. 61, is denied, and WMATA's Cross-Motion for Summary Judgment, ECF No. 62, is granted.

An Order consistent with this Memorandum Opinion will be filed contemporaneously.

Date: September 27, 2026

**BERYL A. HOWELL**
United States District Judge